IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INSULATORS AND ASBESTOS WORKERS )
LOCAL NO. 14 PENSION FUND )
 )
              Plaintiff, )
      -against- )   Case No.: 07-cv-00416-GMS
 )
GEORGE W. BUCKLEY, LINDA G. )
ALVARADO, VANCE D. COFFMAN, )
MICHAEL L. ESKEW, W. JAMES FARRELL, )
HERBERT L. HENKEL, EDWARD M. LIDDY, )
ROBERT S. MORRISON, AULANA L. PETERS, )
ROZANNE L. RIDGEWAY, PATRICK D. )
CAMPBELL, MOE S. NOZARI, FREDERICK )
J. PALENSKY, RICHARD F. ZIEGLER, )
 )
            Defendants, )
      -and- )
 )
3M COMPANY, )
 )
        Nominal Defendant. )

---

## DECLARATION OF A. ARNOLD GERSHON IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

RIGRODSKY & LONG, P.A.
Seth D. Rigrodsky  (#3147)
Brian D. Long (#4347)
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5310

*Attorneys for Plaintiff*

*Of Counsel*:

Barrack, Rodos & Bacine
Alexander Arnold Gershon
Regina M. Calcaterra
Gloria Kui
1350 Broadway, Suite 1001
New York, New York 10018
(212) 688-0782

Barrack, Rodos & Bacine
Daniel E. Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-0600

I, A. ARNOLD GERSHON, hereby declare under penalty of perjury under the laws of the United States of America, that the following is true and correct.

1.    I am a member of the bar of the State of New York and an inactive member of the bar of the State of Georgia. I am a partner in the firm Barrack, Rodos & Bacine, and we are of counsel to the plaintiff in this action.

2.    I make this declaration in support of the plaintiff's motion for summary judgment.

3.    Attached hereto as Exhibit 1 is the Datascope Corp. Notice of the Annual Meeting of Shareholders, to be held December 12, 2000 and Proxy Statement, as it appears in the Joint Appendix in the appeal in *Shaev v. Saper*, 320 F.3d 373 (3d Cir. 2003). The Datascope Corp. proxy statement was the subject of the court's decision in *Shaev v. Saper*, *supra*. It is in the records of this court in *Seinfeld v. Barrett*, 05-298-JJF at D.I.5 as Exhibit 1 to the affidavit of A. Arnold Gershon.

4.    Attached hereto as Exhibit 2 is the Intel Corporation letter to stockholders, dated March 29, 2005, Notice of Annual Stockholders' Meeting May 18, 2005, and the Proxy Statement as it appears in the records of this court in *Seinfeld v. Barrett*, 05-298-JJF at D.I.5. It is attached as Exhibit 2 to the affidavit of Frank D. Seinfeld in that case.

5.    Attached hereto as Exhibit 3 is the 3M Company Proxy Statement, letter to stockholders dated March 26, 2007, and Notice of Annual Meeting of Stockholders to be held May 8, 2007 that I obtained from the official website of the United States Securities and Exchange Commission.

Dated: New York, New York
      August 10, 2007

A. Arnold Gershon

1

# EXHIBIT 1

# DATASCOPE CORP.

**Proxy Statement**

Notice of the Annual Meeting
of Shareholders to be held December 12, 2000



**Datascope°**

innovation is the best medicine

**DATASCOPE CORP.**
14 Phillps Parkway
Montvale, New Jersey 07645

---

## NOTICE OF ANNUAL MEETING OF SHAREHOLDERS
### DECEMBER 12, 2000

---

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders of Datascope Corp. (the "Corporation") will be held at 11:00 a.m., local time, on December 12, 2000, at The Chase Manhattan Bank – Conference Center, 270 Park Avenue, 11th Floor, New York, New York 10017-2070, for the following purposes:

1. To elect two directors of the Corporation to hold office until the 2003 Annual Meeting of Shareholders and until the election and qualification of their respective successors;

2. To consider and vote upon a proposal to adopt the Datascope Corp. Management Incentive Plan; and

3. To transact such other business as may properly come before the meeting.

Only holders of record of the Corporation's common stock, par value $0.01 per share, at the close of business on October 26, 2000 are entitled to notice of, and to vote at, the meeting and any adjournment or postponement thereof. Such shareholders may vote in person or by proxy.

SHAREHOLDERS WHO FIND IT CONVENIENT ARE CORDIALLY INVITED TO ATTEND THE ANNUAL MEETING IN PERSON. IF YOU ARE NOT ABLE TO DO SO AND WISH THAT YOUR STOCK BE VOTED, YOU ARE REQUESTED TO FILL IN, SIGN, DATE AND RETURN THE ACCOMPANYING PROXY IN THE ENCLOSED ENVELOPE. NO POSTAGE IS REQUIRED IF MAILED IN THE UNITED STATES.

By Order of the Board of Directors,

MURRAY PITKOWSKY
Secretary

Dated: October 27, 2000

A-40

**DATASCOPE CORP.**
**14 Phillips Parkway**
**Montvale, New Jersey 07645**

## PROXY STATEMENT

This Proxy Statement is furnished in connection with the solicitation by the Board of Directors of Datascope Corp. (the "Corporation") of proxies to be used at the Annual Meeting of Shareholders of the Corporation to be held at 11:00 a.m., local time, on December 12, 2000, at The Chase Manhattan Bank - Conference Center, 270 Park Avenue, 11th Floor, New York, New York 10017-2070, and at any adjournment or postponement thereof. The purposes of the Annual Meeting of Shareholders are:

1. To elect two directors of the Corporation to hold office until the 2003 Annual Meeting of Shareholders and until the election and qualification of their respective successors;

2. To consider and vote upon a proposal to approve the Datascope Corp. Management Incentive Plan (the "Management Incentive Plan"); and

3. To transact such other business as may properly come before the meeting.

If proxy cards in the accompanying form are properly executed and returned, the shares of Common Stock represented thereby will be voted as instructed on the proxy. If no instructions are given, such shares will be voted (i) for the election as directors of the nominees of the Board of Directors named below, (ii) for the proposal to approve the Management Incentive Plan, and (iii) in the discretion of the Proxies named in the proxy card on any other proposals to properly come before the meeting or any adjournment or postponement thereof. Any proxy may be revoked by a shareholder prior to its exercise upon written notice to the Secretary of the Corporation, or by the vote of a shareholder cast in person at the meeting. If a proxy is not returned, the shares represented by such proxy will not be voted. The approximate date of mailing of this Proxy Statement is November 8, 2000.

## VOTING

Holders of record of the Corporation's common stock, par value $0.01 per share ("Common Stock"), on October 26, 2000 will be entitled to vote at the Annual Meeting of Shareholders or any adjournment or postponement thereof. As of that date, there were 14,798,196 shares of Common Stock outstanding and entitled to vote. A majority of the outstanding shares of Common Stock represented at the Annual Meeting of Shareholders in person or by proxy will constitute a quorum for the transaction of business. Abstentions and broker non-votes are counted for purposes of determining the presence or absence of a quorum for the transaction of business; however, unreturned proxies are not counted for purposes of determining the presence or absence of a quorum. Each share of Common Stock entitles the holder thereof to one vote on all matters to come before the Annual Meeting of Shareholders, including the election of directors.

The favorable vote of a majority of the votes cast at the Annual Meeting of Shareholders is necessary to elect the nominees for director of the Corporation. The favorable vote of a majority of the votes cast at the Annual Meeting of Shareholders is necessary to approve the Management Incentive Plan. Abstentions, broker non-votes and shares represented by unreturned proxies are not considered votes cast and will have no effect on the outcome of the matters scheduled to be considered at the Annual Meeting of Shareholders. The Board of Directors recommends a vote FOR each of the nominees for director named below and FOR the proposal to approve the Management Incentive Plan.

### Item 1. Election of Directors

Two directors are to be elected at the Annual Meeting of Shareholders. The Board of Directors has recommended the persons named in the table below as nominees for election as directors. All such persons are presently directors of the Corporation. Unless otherwise specified in the accompanying proxy, the shares voted

pursuant to it will be voted for the persons named below as nominees for election as directors. If, for any reason, at the time of the election any of the nominees should be unable or unwilling to accept election, it is intended that such proxy will be voted for the election, in such nominee's place, of a substitute nominee recommended by the Board of Directors. However, the Board of Directors has no reason to believe that any nominee will be unable or unwilling to serve as a director.

## INFORMATION AS TO NOMINEES AND OTHER DIRECTORS

The following information is supplied with respect to the nominees for election as directors of the Corporation in Class III, and for the directors in Classes I and II whose terms expire at the Annual Meeting of Shareholders occurring in 2001 and 2002, respectively, and until the election and qualification of their respective successors. Unless otherwise indicated below, each director has had the principal occupation(s) indicated on the table for five years or more.

### NOMINEES FOR DIRECTOR

### DIRECTORS WHOSE TERM OF OFFICE WILL CONTINUE AFTER THE ANNUAL MEETING

Class III (If elected each director will hold office until the 2003 Annual Meeting of Shareholders.)

| Name of Director | Age | Principal Occupation or Employment | Has Been a Director of the Corporation During |
|---|---|---|---|
| Lawrence Saper | 72 | Chairman of the Board of Directors and Chief Executive Officer of the Corporation | 1964 to present |
| Arno Nash | 73 | Chairman of Iterman Industrial Products Ltd.(1) | 1965 to 1967 and 1996 to present |

(1) Mr. Nash has served as Chairman of Iterman Industrial Products Ltd. since 1965.

Class I (Term expires at the 2001 Annual Meeting of Shareholders.)

| Name of Director | Age | Principal Occupation or Employment | Has Been a Director of the Corporation During |
|---|---|---|---|
| George Heller | 78 | Director(2) | 1970 to 1979 1980 to present |
| Alan B. Abramson | 54 | Attorney(3) | 1996 to present |

(2) Mr. Heller also served as Senior Vice President of the Corporation from 1970 through 1979 and from 1980 through October 1992 and as Secretary of the Corporation from 1970 through 1979 and from 1980 through December 1992.

(3) Mr. Abramson was appointed a Class I director by the Board of Directors of the Corporation effective upon the expiration of his term as a Class III Director to fill the vacancy caused by the resignation of William L. Asmundson as a director, since the Corporation's By-Laws require that the classes of directors consist of an equal number of directors to the extent possible. Mr. Abramson has served as President of Abraham Brothers Incorporated since 1972.

2

A-42

Class II (Term expires at the 2002 Annual Meeting of Shareholders.)

| Name of Director | Age | Principal Occupation or Employment | Has Been a Director of the Corporation During |
|---|---|---|---|
| David Altschiller . . . . . . . . | 59 | Chairman and Chief Executive Officer of Hill, Holliday & Altschiller(4) | 1982 to present |
| Joseph Grayzel, M.D. . . . . . . | 69 | Consultant to the Corporation and Physician | 1969 to present |

(4) Hill, Holliday & Altschiller is the New York office of Hill, Holliday, Connors, Cosmopulos, Inc., a Boston advertising agency.

## MEETINGS OF THE BOARD

During the fiscal year ended June 30, 2000, the Board of Directors held five meetings and acted by unanimous written consent on one occasion. Each of the directors attended 75% or more of the aggregate number of meetings of the Board of Directors and committees on which he served.

The Board of Directors has an audit committee (the "Audit Committee") consisting of Messrs. Abramson, Heller and Asmundson (through August 2000). The primary functions of the Audit Committee are to review the Corporation's financial statements, recommend the appointment of the Corporation's independent auditors and review the overall scope of the audit. The Audit Committee held four meetings during fiscal year 2000.

The Board of Directors has a stock bonus committee (the "Stock Bonus Committee") consisting of Dr. Grayzel and Messrs. Saper and Heller. The Stock Bonus Committee is empowered to authorize the issuance of shares of Common Stock to certain employees of the Corporation or its subsidiaries who have provided outstanding services on behalf of the Corporation. The Stock Bonus Committee did not hold any meetings during fiscal year 2000.

The Board of Directors has a compensation committee (the "Compensation Committee") consisting of Messrs. Abramson, Nash and Asmundson (through October 2000). The primary responsibility of the Compensation Committee is to administer and make recommendations to the Board of Directors regarding the Corporation's bonus plans, to review the compensation arrangements relating to officers who are members of the Board of Directors and to administer the Datascope Corp. 1981 Incentive Stock Option Plan and the Datascope Corp. 1995 Stock Option Plan. The Compensation Committee held four meetings during fiscal year 2000.

The Board of Directors does not have a nominating committee.

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), requires the Corporation's directors and executive officers and persons who beneficially own more than 10% of a registered class of the Corporation's equity securities ("Reporting Persons") to file reports of ownership and changes in ownership with the Securities and Exchange Commission on a timely basis. Reporting Persons are required to furnish the Corporation with copies of all such forms that they file. Based solely on its review of such forms, except as set forth in the remainder of this section, the Corporation believes that all filing requirements applicable to Reporting Persons during and with respect to fiscal year 2000 were complied with on a timely basis.

3

The following individuals who were executive officers of the Corporation during fiscal year 2000 acquired or disposed of shares of Common Stock under the Datascope Corp. 401(k) Savings and Supplemental Retirement Plan (the "401(k) Plan") on a monthly basis and, under Section 16(a) of the Exchange Act, a Form 4 was required to be filed by each executive officer within ten days after the end of the month in which each acquisition occurred: Lawrence Saper, Nicholas Barker, John Gilbert and S. Arieh Zak. Rather than filing a Form 4 in respect of each acquisition of shares of Common Stock pursuant to the 401(k) Plan to report such acquisition or disposal, each such executive officer filed a Form 5 required by Section 16(a) of the Exchange Act on or about August 3, 2000.

## SECURITY OWNERSHIP OF CERTAIN SHAREHOLDERS

The following table provides information as to each person who is known to the Corporation to be the beneficial owner of more than 5% of the Corporation's voting securities as of October 2, 2000 (unless otherwise indicated):

| Name and Address of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership(1) | Percent of Common Stock(2) |
|---|---|---|
| Lawrence Saper. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>Datascope Corp.<br>14 Philips Parkway<br>Montvale, New Jersey 07645 | 2,860,215(3) | 18.8% |
| Private Capital Management, Inc. . . . . . . . . . . . . . . . . . . .<br>3003 Tamiami Trail N.<br>Naples, Florida 34103 | 1,267,189(4) | 8.6% |

(1) This table identifies persons having sole voting and investment power with respect to the shares set forth opposite their names as of October 2, 2000. except as otherwise disclosed in the footnotes to the table, according to information publicly filed or furnished to the Corporation by each of them.

(2) Shares beneficially owned, as recorded in this table, expressed as a percentage of the shares of Common Stock of the Corporation outstanding as of October 2, 2000. For purposes of calculating Mr. Saper's beneficial ownership, any shares issuable pursuant to options exercisable within 60 days of October 2, 2000 are deemed to be outstanding.

(3) Includes (i) 38,621 shares owned by trusts created by Mr. Saper for his children, (ii) 3,150 shares owned by Carol Saper, Mr. Saper's wife, and (iii) 41,885 share's owned by the Lawrence and Carol Saper Foundation, a charitable foundation.

(4) Private Capital Management, Inc. ("PCM") is an Investment Adviser registered under Section 203 of the Investment Advisers Act of 1940, as amended. As of October 2, 2000, PCM had shared investment power with respect to 1,267,189 shares of Common Stock and did not have sole investment power, shared voting power or sole voting power with respect to any shares of Common Stock. The information set forth herein was obtained from information furnished to the Corporation by PCM on October 6, 2000.

4

## SECURITY OWNERSHIP OF MANAGEMENT

The following table shows the number of shares of Common Stock beneficially owned by the Corporation's directors, executive officers identified in the summary compensation table below (excluding Mr. Saper, whose holdings are shown in the preceding table) and all directors and executive officers as a group as of October 2, 2000:

| Name of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership | Percent of Common Stock(2) |
|---|---|---|
| Alan B. Abramson | 5,000(3) | * |
| David Altschiller | 16,650(4) | * |
| Leonard S. Goodman | 18,000(5) | * |
| Joseph Grayzel, M.D | 247,071(6) | 1.7% |
| George Heller | 47,068 | * |
| Arno Nash | 13,500(7) | * |
| Murray Pitkowsky | 64,484(8) | * |
| Paul J. Southworth | 25,000(9) | * |
| S. Arieh Zak | 42,752(10) | * |
| All executive officers and directors as a group (consisting of 15 individuals) | 3,422,278(11) | 22.1% |

---

\* Represents less than 1% of the shares of Common Stock of the Corporation outstanding as of October 2, 2000.

(1) This table identifies persons having sole voting and investment power with respect to the shares set forth opposite their names, except as otherwise disclosed in the footnotes to the table, according to information furnished to the Corporation by each of them.

(2) Shares beneficially owned, as recorded in this table, expressed as a percentage of the shares of the Common Stock of the Corporation outstanding as of October 2, 2000. For the purpose of calculating each person's beneficial ownership, any shares issuable pursuant to options exercisable within 60 days of October 2, 2000 are deemed to be beneficially owned by, and outstanding with respect to, such person.

(3) Consists of 5,000 shares which are issuable pursuant to currently exercisable options.

(4) Includes 15,000 shares which are issuable pursuant to currently exercisable options.

(5) Includes 15,000 shares which are issuable pursuant to currently exercisable options.

(6) Includes 30,000 shares which are issuable pursuant to currently exercisable options. Does not include 25,000 shares which are issuable pursuant to options which will vest on the attainment of certain milestones.

(7) Includes 5,000 shares which are issuable pursuant to currently exercisable options.

(8) Includes 35,000 shares which are issuable pursuant to currently exercisable options.

(9) Consists of 25,000 shares which are issuable pursuant to currently exercisable options.

(10) Includes 39,375 shares which are issuable pursuant to currently exercisable options.

(11) Includes 689,400 shares which are issuable pursuant to currently exercisable options.

## EXECUTIVE OFFICERS OF THE CORPORATION

The following table sets forth the names, ages and all positions and offices held by the Corporation's present executive officers. Unless otherwise indicated below, each person has held the office indicated for more than five years:

| Name | Age | Positions and Offices Presently Held |
|------|-----|--------------------------------------|
| Lawrence Saper | 72 | Chairman of the Board of Directors and Chief Executive Officer |
| Nicholas E. Barker | 42 | Vice President, Design(1) |
| James L. Cooper | 49 | Vice President, Human Resources(2) |
| John Gilbert | 43 | Vice President; President, Collagen Products Division(3) |
| Brent Glendening | 46 | Vice President and Chief Information Officer(4) |
| Leonard S. Goodman | 56 | Vice President, Chief Financial Officer and Treasurer(5) |
| Murray Pitkowsky | 69 | Senior Vice President and Secretary(6) |
| Donald Southard | 54 | Vice President; President, Patient Monitoring Division(7) |
| Paul J. Southworth | 56 | Vice President; President, Cardiac Assist Division(8) |
| S. Arieh Zak | 39 | Vice President, Regulatory Affairs and Corporate Counsel(9) |

(1) Mr. Barker has been employed by the Corporation as Vice President of Design since December 1997. Mr. Barker was employed by the Corporation as Manager of Corporate Design from October 1993 to December 1997 and as an Industrial Designer from September 1991 to October 1993.

(2) Mr. Cooper has been employed by the Corporation as Vice President of Human Resources since January 1998. Mr. Cooper served as Vice President of Human Resources of Schindler Elevator Corporation from January 1994 to January 1998 and was Group Vice President of Human Resources at Ingersoll-Rand Corporation from August 1988 to January 1994.

(3) Mr. Gilbert has been employed as a Vice President of the Corporation and as the President of the Collagen Products Division since September 1997. Mr. Gilbert served as General Manager of the Collagen Products Division from May 1997 to September 1997. Mr. Gilbert served as Director of VasoSeal Sales for the Collagen Products Division from July 1995 to May 1997. Mr. Gilbert served as an Area Sales Director for the Patient Monitoring Division, beginning in 1994. Prior to becoming Area Sales Director, Mr. Gilbert served as a Regional Sales Manager and Zone Manager for the Patient Monitoring Division. Mr. Gilbert has been employed by the Corporation since 1983.

(4) Mr. Glendening has been employed by the Corporation as Vice President and Chief Information Officer since August 2000. From 1994 through July 2000, Mr. Glendening served as Vice President of Information Services of the Schindler Elevator Corporation.

(5) Mr. Goodman has been employed as Vice President and Chief Financial Officer of the Corporation since October 1998 and served as Treasurer since September 1999. Mr. Goodman served as President of LSG Associates, Financial and Business Strategy Consulting from October 1997 to September 1998. Mr. Goodman served as Senior Vice President and Chief Financial Officer at Benjamin Moore & Co. from April 1997 to September 1997 and was Vice President and Chief Financial Officer at Thompson Minwax Corporation from June 1996 to January 1997. Mr. Goodman served as Vice President, Finance and Chief Financial Officer at GAF Building Materials Corporation from August 1989 to May 1996.

(6) Mr. Pitkowsky has been employed by the Corporation as Senior Vice President since October 1992, and as Secretary since January 1993. From April 1986 through October 1992, Mr. Pitkowsky served as Vice President, Finance and Treasurer of the Corporation. He served as Treasurer from December 1996 to December 1997 and from February 1994 to May 1994. Mr. Pitkowsky also served as Chief Financial Officer

*(Footnotes continued on next page)*

6

A-46

*(Footnotes continued from previous page)*

from December 1996 to October 1998 and from August 1994 to May 1995. Mr. Pitkowsky also served as acting President of Cardiac Assist from September 1998 to June 1999 and is serving as acting President of InterVascular, Inc. since June 2000.

(7) Mr. Southard has been employed as a Vice President of the Corporation and as the President of the Patient Monitoring Division since February 1997. Mr. Southard served as Vice President, Sales of the Patient Monitoring Division from July 1996 to February 1997. Prior to his employment with the Corporation, Mr. Southard served as Vice President, Sales and Marketing of Elscint, Inc. from August 1994 to June 1996, and as Chief Executive Officer of Serviscope Corp. from November 1991 to May 1994.

(8) Mr. Southworth has been employed as Vice President of the Corporation and as President of the Cardiac Assist Division since June 1999. Prior to his employment with the Corporation, Mr. Southworth served as President of the Vascular Division—Research and Development/Technical Operations of Boston Scientific Corporation from July 1998 to June 1999 and President of the Meadox Medicals Division of Boston Scientific Corporation from February 1996 to July 1998. From September 1995 to February 1996, Mr. Southworth served as President of the Renal Products Group, National Medical Care Division of W. R. Grace. Mr. Southworth served as Vice President of Worldwide Operations of Davis and Geck Division of American Cyanamid from June 1990 to February 1996.

(9) Mr. Zak has been employed by the Corporation as Corporate Counsel since November 1992, and as Vice President of Regulatory Affairs since September 1995. From 1986 through 1992 Mr. Zak served as a litigation associate at Sullivan & Cromwell.

7

A-47

## EXECUTIVE COMPENSATION
### Summary Compensation Table

The following table sets forth for the fiscal years ended June 30, 2000, 1999 and 1998, the compensation for services in all capacities to the Corporation of those persons who were at June 30, 2000 the chief executive officer and the other four most highly compensated executive officers of the Corporation (collectively, the "Named Executives"):

| | | Annual Compensation | | | Long Term Compensation | | | |
| | | | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other Annual Compensation ($) | Restricted Stock Awards ($) | Options (#) | LTIP Payouts ($) | All Other Compensation ($)(1) |
|---|---|---|---|---|---|---|---|---|
| Lawrence Saper . . . . . . . . . | 2000 | 975,000 | 3,285,714(2) | 282,380(3) | — | — | — | 12,551 |
| Chairman of the Board | 1999 | 887,662 | 771,300 | 267,381(3) | — | 70,000 | — | 12,849 |
| of Directors and Chief | 1998 | 850,650 | 638,000 | 249,014(3) | — | — | — | 11,339 |
| Executive Officer | | | | | | | | |
| Paul J. Southworth . . . . . . | 2000 | 240,000 | 260,000(4) | — | — | 15,000 | — | — |
| Vice President; President, | 1999 | 7,385(5) | | — | — | 50,000 | — | 1,117 |
| Cardiac Assist Division | 1998 | — | — | — | — | — | — | — |
| Leonard S. Goodman . . . . . | 2000 | 247,500 | 175,000 | — | — | 10,000 | — | — |
| Vice President, Chief | 1999 | 180,000(6) | 97,000(7) | — | — | 35,000 | — | 4,155 |
| Financial Officer and | 1998 | — | — | — | — | — | — | 977 |
| Treasurer | | | | | | | | |
| Murray Pitkowsky . . . . . . . | 2000 | 215,000 | 150,500 | — | — | 10,000 | — | 11,143 |
| Senior Vice President | 1999 | 215,000 | 75,000 | — | — | 10,000 | — | 10,185 |
| and Secretary | 1998 | 215,000 | 75,000 | — | — | 10,000 | — | 8,176 |
| S. Arieh Zak . . . . . . . . . . | 2000 | 209,150 | 147,840 | — | — | 8,000 | — | 6,040 |
| Vice President, | 1999 | 201,000 | 55,000 | — | — | 6,500 | — | 5,921 |
| Regulatory Affairs and | 1998 | 192,500 | 51,000 | 59,168(8) | — | 7,500 | — | 5,082 |
| Corporate Counsel | | | | | | | | |

(1) Amounts in this column represent (a) the Corporation's matching contributions under the 401(k) Plan, (b) premiums for term life insurance and long term disability insurance and (c) with respect to split dollar life insurance policies maintained by the Corporation for the benefit of Messrs. Saper and Pitkowsky, the actuarial value of the benefit to such Named Executives of the current year's insurance premium paid by the Corporation in excess of that required to fund the death benefit under the policy. The amounts comprising items (a), (b) and (c) described above for each Named Executive in fiscal year 1998 are as follows: Saper: (a) $4,800, (b) $1,124 and (c) $5,415; Pitkowsky: (a) $4,750, (b) $996 and (c) $2,430; Goodman: (a) $0 and (b) $0; Southworth: (a) $0 and (b) $0; and Zak: (a) $3,978 and (b) $1,104. The amounts comprising items (a), (b) and (c) described above for each Named Executive in fiscal year 1999 are as follows: Saper: (a) $4,800, (b) $1,124, and (c) $6,925; Pitkowsky: (a) $4,800, (b) $878, and (c) $4,507; Goodman: (a) $4,800 and (b) $977; Southworth: (a) $0 and (b) $0; and Zak: (a) $4,800 and (b) $1,121. The amounts comprising items (a), (b) and (c) described above for each Named Executive in fiscal year 2000 are as follows: Saper: (a) $4,739, (b) $887 and (c) $6,925; Pitkowsky: (a) $4,800, (b) $696 and (c) $5,647; Goodman: (a) $3,038 and (b) $1,117; Southworth: (a) $0 and (b) $1,117; and Zak: (a) $4,923 and (b) $1,117. Cumulative net life insurance premiums under the split dollar life insurance program are recoverable (i) with respect to Mr. Saper, on death, if not recovered earlier, and (ii) with respect to Mr. Pitkowsky, at retirement or death.

(2) Represents total bonus for fiscal year 2000 of which $1,485,714 is subject to shareholder approval of the Management Incentive Plan (See Compensation of the Chief Executive Officer).

*(Footnotes continued on next page)*

8

*(Footnotes continued from previous page)*

(3) Includes payments for automobile and reimbursement for executive portion of split dollar life insurance, respectively, in the following amounts: $72,457 and $158,842 in fiscal year 2000; $70,490 and $145,115 in fiscal year 1999; $69,290 and $131,970 in fiscal year 1998.

(4) Includes sign-on bonus of $100,000.

(5) Mr. Southworth began his employment with the Corporation on June 21, 1999.

(6) Mr. Goodman began his employment with the Corporation on October 4, 1998.

(7) Includes sign-on bonus of $25,000.

(8) Includes $43,242 reimbursement for medical expenses and $15,926 representing personal use of automobile leased by the Corporation.

## Options Of Named Executives To Purchase Securities

On October 1, 1981, the Corporation adopted the 1981 Stock Option Plan, which was subsequently approved at the 1981 Annual Meeting of Shareholders. Options that qualify as, and options that do not qualify as, incentive stock options under the Internal Revenue Code of 1986, as amended (the "Code"), may be granted thereunder. The 1981 Stock Option Plan, as amended, reserved 3,075,000 shares of Common Stock for issuance to key employees and officers recommended and approved by the Board of Directors, or a committee thereof, at a price not less than 100% (or, in the case of an incentive stock option granted to a 10% shareholder, 110%) of the fair market value of the shares purchased thereunder on the date of grant. No option may be exercisable more than ten years from the date of grant, and an incentive stock option granted to a 10% shareholder may not be exercisable more than five years from the date of grant. The 1981 Stock Option Plan is administered by the Compensation Committee. The 1981 Stock Option Plan terminated on September 30, 1996; consequently, the Corporation can no longer issue options under the 1981 Stock Option Plan. However, options issued thereunder remain outstanding.

On September 19, 1995, the Corporation adopted the 1995 Stock Option Plan, which was subsequently approved at the 1995 Annual Meeting of Shareholders. Options that qualify as, and options that do not qualify as, incentive stock options under the Code may be granted thereunder. The 1995 Stock Option Plan, as amended, reserved 2,750,000 shares of Common Stock for issuance to key employees and officers recommended and approved by the Board of Directors, or a committee thereof, at a price not less than 100% (or, in the case of an incentive stock option granted to a 10% shareholder, 110%) of the fair market value of the shares purchased thereunder on the date of grant. No option may be exercisable more than ten years from the date of grant, and an incentive stock option granted to a 10% shareholder may not be exercisable more than five years from the date of grant. The Stock Option Plan is administered by the Compensation Committee. The 1995 Stock Option Plan terminates on September 17, 2005.

9

**Option Grants in Last Fiscal Year**

| Name | Individual Grants | | | | Potential Realized Value at Assumed Annual Rates of Stock Price Appreciation for Option Term | |
| | Number of Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal Year | Exercise Price ($/sh) | Expiration Date | 5%($) | 10%($) |
|---|---|---|---|---|---|---|
| Lawrence Saper......... | — | — | — | — | — | — |
| Paul J. Southworth ...... | — | — | — | — | — | — |
| Leonard S. Goodman..... | 15,000(1) | 3.5 | 37.032 | May 15, 2010 | 349,217 | 884,916 |
| Murray Pitkowsky....... | 10,000(1) | 2.3 | 37.032 | May 15, 2010 | 232,812 | 589,944 |
| S. Arieh Zak........... | 10,000(1) | 2.3 | 37.032 | May 15, 2010 | 232,812 | 589,944 |
| | 8,000(1) | 1.9 | 37.032 | May 15, 2010 | 186,249 | 471,955 |

(1) The option becomes exercisable in four equal annual installments beginning on May 16, 2001. However, prior to May 16, 2005, the portion of the option is exercisable only if the average of the high and low sales prices of the Corporation's Common Stock as quoted on The Nasdaq Stock Market on the trading day immediately preceding the exercise date is equal to or greater than $46.25. After May 16, 2005, the option is fully exercisable, without regard to the price of the Corporation's Common Stock.

**Aggregated Option Exercises in Last Fiscal Year and Fiscal Year-End Option Values**

| Name | Shares Acquired on Exercise(#) | Value Realized ($) | Number of Securities Underlying Unexercised Options at Fiscal Year End Exercisable/ Unexercisable | Value of Unexercised In-the-Money Options at Fiscal Year End($) Exercisable/Unexercisable |
|---|---|---|---|---|
| Lawrence Saper (1)........... | 75,000 | 1,921,875 | 540,000/0 | 10,766,485/0 |
| Paul J. Southworth ........... | 0 | 0 | 25,000/40,000 | 203,125/203,125 |
| Leonard S. Goodman.......... | 0 | 0 | 8,750/36,250 | 115,237/345,713 |
| Murray Pitkowsky............ | 12,500 | 272,500 | 31,250/26,250 | 433,995/202,736 |
| S. Arieh Zak .............. | 2,000 | 40,000 | 35,625/20,375 | 557,569/163,596 |

(1) Does not include an option to purchase 10% of the shares of common stock of Genisphere, Inc., a subsidiary of the Corporation. See Report of the Compensation Committee.

(2) Does not include an option to purchase 1% of the shares of common stock of Genisphere, Inc., a subsidiary of the Corporation.

**Pension Plan and Supplemental Benefit Plans**

*Pension Plan*

The Corporation maintains the Datascope Corp. Pension Plan. Each year the Corporation contributes an amount necessary to fund the plan on an actuarial basis. Pension benefits to be received upon retirement are determined by an employee's highest 5 consecutive years' earnings (based on base salary, commission and certain bonus compensation paid to sales and service representatives) in the 10 years preceding retirement, length of service with the Corporation and age at retirement. Mr. Saper is currently credited with 36 years of service under the plan, Mr. Pitkowsky with 14 years, Mr. Goodman with 15 years, Mr. Southworth with 1 year and Mr. Zak with 8 years. Pensions are reduced by 1.5% of an employee's estimated primary Social Security benefit for each year of credited service (to a maximum of 33⅓ years). The net pension is limited as required by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The table below illustrates annual pension benefits on a single life basis, assuming retirement at age 65 and prior to reduction for Social Security benefits or application of the ERISA limits.

10

A-50

*Pension Plan Table*

| Final Average Compensation | Years of Service | | | | |
|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 |
| $125,000 | $ 28,125 | $ 37,500 | $ 46,875 | $ 56,250 | $ 65,625 |
| 150,000 | 33,750 | 45,000 | 56,250 | 67,500 | 78,750 |
| 175,000 | 39,375 | 52,500 | 65,625 | 78,750 | 91,875 |
| 200,000 | 45,000 | 60,000 | 75,000 | 90,000 | 105,000 |
| 225,000 | 50,625 | 67,500 | 84,375 | 101,250 | 118,125 |
| 250,000 | 56,250 | 75,000 | 93,750 | 112,500 | 131,250 |
| 300,000 | 67,500 | 90,000 | 112,500 | 135,000 | 157,500 |
| 400,000 | 90,000 | 120,000 | 150,000 | 180,000 | 210,000 |
| 450,000 | 101,250 | 135,000 | 168,750 | 202,500 | 236,250 |
| 500,000 | 112,500 | 150,000 | 187,500 | 225,000 | 262,500 |

## Supplemental Benefit Plans

The Corporation also maintains certain plans which provide for supplemental pension benefits for Messrs. Saper and Pitkowsky (the "Supplemental Benefits Plans"). Under the terms of the plan maintained for Mr. Pitkowsky, he is entitled to receive upon retirement a total annual benefit of $120,000, which is payable for life, based on a joint and survivor basis. The payments to be received were determined based upon Mr. Pitkowsky's employment by the Corporation past age 65. The plan in effect for Mr. Saper during fiscal year 2000 provides that upon his retirement, Mr. Saper is entitled to receive annual lifetime payments, the amounts of which will be based on 60% of the average total compensation for the three years in which Mr. Saper's compensation was greatest of the ten years immediately preceding Mr. Saper's retirement, less the benefit payable under the Datascope Corp. Pension Plan. However, the supplemental retirement benefit will not be less than the value of the benefit that would have been payable had Mr. Saper's retirement occurred at age 65, which amount is actuarially increased to his actual retirement date. At June 30, 2000, the estimated annual benefit payable to Mr. Saper under his Supplemental Benefits Plan approximates $1,406,400. Under the terms of Mr. Saper's Supplemental Benefits Plan, the annual benefit will be increased to reflect changes in his compensation to retirement. The plan in effect for Mr. Saper provides survivor benefits in the form of a $10,000,000 life insurance policy, maintained pursuant to a split-dollar agreement among Mr. Saper, the Corporation, and a trust for the benefit of Mr. Saper's family (the "Trust"). The Corporation's net investment in the program is recoverable on Mr. Saper's death, but may be repaid sooner by the Trust. Benefits under each Supplemental Benefits Plan are paid from the general funds of the Corporation; however, the Corporation purchases key-man insurance intended to recover a substantial portion of the net after-tax cost of the benefits.

## Compensation of Directors and other Matters

The annual retainer for each director of the Corporation (except Messrs. Saper and Altschiller and Dr. Grayzel) is $24,000, which is payable in shares of Common Stock pursuant to the Datascope Corp. Non-Employee Director Compensation Plan (the "Non-Employee Director Plan"). Payment of the annual retainer will generally occur at the beginning of the next succeeding calendar year. In connection with the payment of annual retainers, the Corporation has reserved 25,000 shares of Common Stock for issuance. A director may elect to defer receipt of compensation, in which case the annual retainer will be paid entirely in shares of Common Stock. In the case of directors electing current receipt of compensation, 40% of such portion is paid in cash (to approximate current federal income tax liability) and the balance in Common Stock of the Corporation.

From time to time, the Corporation has granted options to directors to purchase shares of Common Stock. These options remain exercisable in full until the earlier of ten years after the date of grant or the termination of status as a director of the Corporation, and are not transferable except that each of the options may be exercised by an executor or administrator within one year after an optionee's death or disability but not beyond the option's normal expiration date. Each option provides that the optionee may pay for any shares acquired pursuant to the exercise of such option by cash or check or by transfer to the Corporation of a number of shares of Common Stock with an aggregate market value equal to the aggregate option exercise price. Such options do not qualify as incentive stock options under the Code. For federal income tax purposes, an optionee will realize taxable income on the date of exercise of an option, and the Corporation will then be allowed a deduction from income, equal to

11

A-51

the excess of (a) the aggregate market value, on the date of exercise, of the shares so acquired over (b) the aggregate option exercise price for such shares.

Transactions with respect to stock options granted to directors who are officers of the Corporation pursuant to the 1981 Stock Option Plan and the 1995 Stock Option Plan and with respect to the certain director options which have been approved by the shareholders of the Corporation are exempt from the short-swing trading liability provisions of Section 16(b) of the Exchange Act, pursuant to Rule 16b-3 of the Exchange Act. The 1981 Stock Option Plan and the 1995 Stock Option Plan do not cover grants to directors who are not employees or officers of the Corporation.

Mr. Altschiller has been engaged as a consultant to the Corporation since September 1998, providing advice and counsel in the area of advertising. In consideration for these services, the Corporation paid Mr. Altschiller a consulting fee of $134,500 during fiscal year 2000. In addition, Mr. Altschiller was paid a discretionary bonus of $25,000 during fiscal year 2000.

Dr. Grayzel has been engaged as a consultant to the Corporation since January 1968. Pursuant to an oral agreement, Dr. Grayzel spends approximately 30 hours per week providing advice and counsel to the Corporation in the area of new product development. In consideration for these services, the Corporation paid Dr. Grayzel a consulting fee of $161,700 during fiscal year 2000.

## Employment Contracts and Termination of Employment and Change in Control Arrangements

The Corporation has entered into a employment agreement with Mr. Saper, dated as of July 1, 1996 (as amended, the "Saper Employment Agreement"). The Saper Employment Agreement is for a term of five years with automatic one-year extensions of the term unless either party gives notice of intent not to extend one hundred and eighty days before the end of a term. The Saper Employment Agreement provides for an annual base salary and increases to the base salary as determined by the Board of Directors or the Compensation Committee. On September 22, 1999, the Compensation Committee determined to increase Mr. Saper's annual base salary to $1,000,000. Pursuant to the terms of the Saper Employment Agreement, Mr. Saper is entitled to an annual bonus based on criteria determined by the Compensation Committee. Under the Saper Employment Agreement, Mr. Saper is also entitled to receive bonus compensation in accordance with any long-term and annual incentive compensation plans that are maintained by the Corporation for the benefit of its executives, and to participate in any other bonus plans maintained by the Corporation for its executives. See "Report of the Compensation Committee on Executive Compensation." Mr. Saper is also entitled to certain retirement benefits. See "Pension Plan and Supplemental Benefit Plans." Mr. Saper may terminate the Saper Employment Agreement for good reason, including a significant breach by the Corporation of its obligations thereunder or certain changes-in-control of the Corporation, in which event Mr. Saper is entitled to receive a lump-sum payment equal to his compensation as then in effect (including base salary and prior year's bonus compensation) multiplied by the number of years (including any partial years) remaining in his term of employment.

The Corporation has entered into change of control agreements with various members of its management, including the Named Executives. Under these agreements, in the event of a change in control of the Corporation, the Named Executives would be entitled to a lump sum payment equal to 2.99 times their annual base salary then in effect plus bonus.

## REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

The Compensation Committee establishes and reviews the Corporation's arrangements and programs for compensating executive officers, including the Named Executives. The Compensation Committee is composed entirely of directors who are neither officers nor employees of the Corporation. The Compensation Committee has been advised by outside legal counsel and by compensation consultants in formulating the Compensation Committee's overall philosophy and objectives regarding executive compensation and in structuring the Chief Executive Officer's compensation package.

### Compensation Philosophy and Objectives of the Corporation

The Compensation Committee's policy is to design executive compensation packages that reward the achievement of both short-term and long-term objectives of the Corporation. Under this approach, the attainment of yearly earnings and other short-term targets is compensated through yearly bonuses under the bonus plans described below, and long-term performance of the Corporation is rewarded through the grant of stock options under the 1995 Stock Option Plan described above. The bonuses and stock options are in addition to executives' yearly base salaries, which are determined in a manner to be competitive with companies which the Compensation Committee believes are comparable to other corporations in the Corporation's industry.

In December 1999, the Compensation Committee approved the Datascope Corp. Management Incentive Plan (the "Management Incentive Plan"), which is subject to shareholder approval. The Management Incentive Plan allows for bonus payments to eligible executives based on attainment of overall corporate and division financial thresholds and targets and certain subjective criteria; in the case of Mr. Saper, the thresholds and targets are limited to objective financial criteria. The thresholds and targets are established periodically by the Corporation's Board of Directors. Bonuses are granted to participants if the thresholds are achieved, and the size of the executive's bonus increases with the level of achievement up to a certain maximum level of bonus. However, the Compensation Committee has the discretion to (i) decrease or eliminate the award payable to any executive who is covered by Section 162(m) of the Code (such as Mr. Saper) (each a "Covered Employee"), or (ii) increase, decrease or eliminate the award payable to any other executive, to reflect the individual performance and contribution of, and other factors relating to, such executive.

The Compensation Committee believes that, in addition to compensating executives for the long-term performance of the Corporation, the grant of stock options aligns the interest of the executives with those of the Corporation's shareholders. The Compensation Committee determines the recipients of stock option grants and the size of the grants consistent with these principles, and based on the employee's performance and position with the Corporation.

### Compensation of the Chief Executive Officer

Mr. Saper's compensation for fiscal year 2000 was determined by an employment agreement, dated as of July 1, 1996. The overall compensation included in the employment agreement was determined in a manner to be competitive with companies which the Compensation Committee believes are comparable to other corporations in the Corporation's industry. Under the Management Incentive Plan, Mr. Saper's total bonus compensation was $3,285,714 for fiscal year 2000. In the event that the Management Incentive Plan is not approved by the shareholders of the Corporation, the Compensation Committee may grant Mr. Saper another bonus for fiscal year 2000, a portion of which may not be deductible under Section 162(m) of the Code. In addition, Mr. Saper was granted an option to purchase 10% of the shares of common stock of Genisphere, Inc., a subsidiary of the Corporation ("Genisphere"). The grant of such options was designed to enhance the growth and success of Genisphere, thereby enhancing its value to the Corporation.

13

A-53

**Deductibility of Executive Compensation**

Section 162(m) of the Code generally disallows a tax deduction for compensation over $1,000,000 paid to the Corporation's Chief Executive Officer and certain other highly compensated executive officers. Qualifying performance-based compensation will not be subject to the deduction limit if certain requirements are met. The Management Incentive Plan is subject to shareholder approval and contains the provisions necessary so that amounts payable to Mr. Saper (and other covered employees) under the Management Incentive Plan will not be subject to the deduction limitations of Section 162(m) of the Code.

**Compensation Committee**

Alan B. Abramson
Arno Nash

The foregoing report of the Compensation Committee shall not be deemed incorporated by reference by any general statement incorporating by reference the Proxy Statement into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Corporation specifically incorporated this information by reference and shall not otherwise be deemed filed under such Acts.

**Performance Graph**

The following graph compares the cumulative total shareholder return on Common Stock with the cumulative total return of the Standard & Poor's 500 Stock Index and the Standard & Poor's Medical Products and Supplies Index for the five year period commencing July 1, 1995 and each subsequent June 30 through June 30, 2000. The graph assumes that the value of the investment in Common Stock was $100 on July 1, 1995 and that all dividends were reinvested.



14

## Item 2. Approval of the Management Incentive Plan

In December 1999, the Compensation Committee adopted the Management Incentive Plan (then named the Datascope Corp. Supplemental Incentive Plan). In May 2000, the Compensation Committee amended and restated the Management Incentive Plan. The purpose of the Management Incentive Plan is to benefit and advance the interests of the Corporation by rewarding selected employees of the Corporation and its subsidiaries and divisions (each such subsidiary or division is referred to herein as a "Business Unit") for their contributions to the Corporation's financial success and thereby motivate them to continue to make such contributions in the future by granting performance-based awards ("Awards"). The Management Incentive Plan provides for bonus payments to Participants (as defined below) based on any one or more performance criteria. Shareholder approval of the Management Incentive Plan is required in order for the Management Incentive Plan to be effective and for bonuses payable thereunder to a "covered employee" within the meaning of Section 162(m) of the Code whose "applicable employee remuneration" (within the meaning of Section 162(m) of the Code) for such Performance Period (as defined below) is expected to exceed $1,000,000 (each a "Covered Employee"), to be deductible under Section 162(m) of the Code.

The following is a summary of the material terms of the Management Incentive Plan. Such summary, however, should be read in conjunction with, and is qualified in its entirety by, the complete text of the Management Incentive Plan, as set forth in Exhibit A to this Proxy Statement and incorporated herein by reference.

Section 162(m) of the Code generally disallows a federal income tax deduction to any publicly held corporation for compensation paid in excess of $1,000,000 in any taxable year to the Chief Executive Officer or any of the four other most highly compensated executive officers. The Corporation intends to structure awards under the Management Incentive Plan so that any compensation paid under the Management Incentive Plan to any Covered Employee would be qualified "performance-based compensation" eligible for continued deductibility.

*Plan Administration.* The Management Incentive Plan shall be administered by the Compensation Committee. The Compensation Committee is authorized to administer, interpret and apply the Management Incentive Plan and from time to time may adopt such rules, regulations and guidelines consistent with the provisions of the Management Incentive Plan as it may deem advisable to carry out the Management Incentive Plan, except that the Compensation Committee may authorize any one or more of its members, or any officer of the Corporation, to execute and deliver documents on behalf of the Compensation Committee. The Compensation Committee's interpretations of the Management Incentive Plan, and all actions taken and determinations made by the Compensation Committee pursuant to the powers vested in it hereunder, shall be conclusive and binding on all parties concerned, including the Corporation, its shareholders and Participants. The Compensation Committee shall have authority to determine the terms and conditions of the Awards granted to Participants.

*Eligible Persons; Participants.* Only employees of the Company or its business units who are at the level of Manager (or a level determined by the Compensation Committee to be equivalent to Manager) or at a more senior level are eligible to participate in the Management Incentive Plan ("Eligible Persons"). An individual shall be deemed an employee for purposes of the Management Incentive Plan only if such individual receives compensation from either the Corporation or one of its Business Units for services performed as an employee of the Corporation or any one of its Business Units for any period during the Performance Period (defined below). An Eligible Person who is a Covered Employee shall be entitled to participate in the Management Incentive Plan with respect to a Performance Period which has commenced only if he or she commenced employment on or before the beginning of each Performance Period or any later date described in Treasury Regulation 1.162-27(e)(2) (or any successor thereto). An Eligible Person who has been chosen to receive an Award under the Management Incentive Plan shall be referred to as a "Participant."

*Awards.* Awards may be granted only to Participants with respect to each Performance Period, subject to the terms and conditions set forth in the Management Incentive Plan.

*Performance Period.* Performance periods are established by the Compensation Committee, which may establish multiple Performance Periods within each fiscal year of the Corporation. A Performance Period is the period of time over which the Performance Threshold (described below) with respect to an Award must be

satisfied. The length of any Performance Period is determined by the Compensation Committee, in its discretion, and need not be identical for all Awards.

*Performance Criteria.* The Management Incentive Plan will adopt, with respect to each Participant, specific performance criteria, performance thresholds and performance targets, a percentage of such Participant's base salary (or fixed dollar amounts) to be awarded (subject to modification (as described below) if such Participant exceeds each performance threshold, for the Performance Period, and a mathematical formula or matrix which should contain weighting for each target and indicate the extent to which Awards will be paid if such performance thresholds are achieved or excluded. If a Participant does not exceed each performance threshold, then no bonus will be paid to such Participant.

Section 162(m) of the Code requires performance awards for Covered Employees to be based upon objective performance criteria (on an absolute or relative basis, including comparisons of results for the Performance Period to prior periods or forecasts). For each Participant who is a Covered Employee, the performance criteria may include one or more of the following, derived from the Corporation's audited financial statements: (i) net sales, (ii) pre-tax earnings, (iii) after-tax earnings, (iv) operating earnings, and (v) earnings per share, each as determined in accordance with GAAP for the Corporation on a consolidated basis (collectively, the "Financial Criteria"). With respect to any Covered Employee who is employed by a Business Unit, the Financial Criteria shall be based on the results of such Business Unit, audited consolidated results of the Corporation, or a combination of the two.

With respect to each Participant who is not a Covered Employee, the performance criteria established by the Compensation Committee may be any, or a combination of any, quantitative criteria (including, without limitation, any Financial Criteria) or qualitative criteria. If such Participant is employed by a Business Unit, then the Financial Criteria for such Participant may relate to either the results of such Business Unit or the results of such Business Unit and consolidated results of the Corporation.

*Maximum Award.* The aggregate amount of any Award to any Participant for any Performance Period shall not exceed $5,000,000, and the aggregate amount of any Award or Awards to any Participant for any fiscal year shall not exceed $5,000,000.

*Calculation of Award; Certification.* As soon as practicable after the end of the Performance Period, and based upon the applicable Financial Criteria, the Compensation Committee will determine with respect to each Participant whether and the extent to which such Participant's performance thresholds were exceeded, including the extent to which, if any, each target was attained or exceeded, and will calculate such Participant's award, if any, by taking into account these factors and the weighting for each target (subject to modification (as described below). At such time, the Compensation Committee will certify in writing the amount of each award and whether each material term of the Management Incentive Plan relating to such award has been satisfied.

*Payment.* So long as the Participant remains employed by the Corporation or a Business Unit through the date of certification of such Participant's Award, such Award will be payable in cash as promptly as practicable thereafter. See "Employment Requirement."

*Deferral.* From time to time, prior to the end of a Performance Period, the Compensation Committee may, in its sole discretion (under uniform rules applicable to all Participants and in compliance with applicable law in effect at such time), offer Participants the opportunity to defer receipt of all or a portion of any Award that is made for such Performance Period.

*Modification of Awards.* At any time prior to the payment of an Award, the Compensation Committee may, in its sole discretion, (i) increase, decrease or eliminate the Award payable to any Participant who is not a Covered Employee and who would not become a Covered Employee as a result of any such increase or (ii) decrease or eliminate the Award payable to any Covered Employee, in each case to reflect the individual performance and contribution of, and other factors relating to, such Participant. The determination of the Compensation Committee shall be final and conclusive.

*Employment Requirement.* No Participant shall have any right to receive payment of any Award unless such Participant remains in the employ of the Corporation or a Business Unit through the date of payment of such Award; provided, however, that the Compensation Committee may, in its sole discretion, pay all or any part of an

16

A-56

Award to any Participant who, prior to such date of payment, retires, dies or becomes permanently disabled or where other special circumstances exist with respect to such Participant, so long as the Performance Thresholds applicable to the Participant's Targets were achieved or exceeded. The maximum amount of such payment, if any, will be calculated, and to the extent determined by the Compensation Committee, paid as provided in the Management Incentive Plan. The determination of the Compensation Committee shall be final and conclusive.

*Term, Amendment and Termination of the Management Incentive Plan.*    The Management Incentive Plan, if approved by shareholders, will be effective as of December 7, 1999. The Compensation Committee may at any time and from time to time alter, amend, suspend or terminate the Management Incentive Plan in whole or in part. No such amendment shall be effective which alters the Award, Target or other criteria relating to an Award applicable to a Covered Employee for the Performance Period in which such amendment is made or any prior Performance Period, except any such amendment that may be made without causing such Award to cease to qualify as performance-based compensation under Section 162(m) of the Code.

Board Recommendation

The Board of Directors believes that it is in the best interests of the Corporation and its shareholders to approve the Management Incentive Plan. The approval of the Management Incentive Plan requires the affirmative vote of a majority of the votes cast at the Annual Meeting of Shareholders. Accordingly, the Board of Directors recommends that you vote FOR the approval of the Management Incentive Plan.

## OTHER BUSINESS

The Board of Directors of the Corporation knows of no other matters to be presented at the Annual Meeting of Shareholders. However, if any other matters properly come before the Annual Meeting of Shareholders, or any adjournment or postponement thereof, it is intended that proxies in the accompanying form will be voted in accordance with the judgment of the persons named therein.

## SHAREHOLDER PROPOSALS

Proposals of shareholders intended to be presented at the next Annual Meeting of Shareholders must be received by the Corporation for inclusion in the Corporation's 2001 Proxy Statement and form of proxy on or prior to July 10, 2001.

## ANNUAL REPORTS AND FINANCIAL STATEMENTS

The Annual Report to Shareholders of the Corporation on Form 10-K for the fiscal year ended June 30, 2000 (the "Annual Report") is being furnished simultaneously herewith. The Annual Report is not to be considered a part of this Proxy Statement.

Upon the written request of any shareholder of the Corporation, management will provide, free of charge, a copy of the Annual Report, including the financial statements and schedules thereto. Requests should be mailed to: Datascope Corp., 14 Philips Parkway, Montvale, New Jersey 07645, Attention: Secretary.

## RELATIONSHIP WITH INDEPENDENT PUBLIC ACCOUNTANTS

The Corporation's financial statements for the years ended June 30, 2000 and 1999 have been examined by the firm of Deloitte & Touche LLP, independent certified public accountants. Representatives of Deloitte & Touche LLP are expected to be present at the Annual Meeting of Shareholders to make a statement if they so desire and they are expected to be available to respond to appropriate questions.

The Board of Directors intends to review the appointment of independent certified public accountants at a meeting subsequent to the Annual Meeting of Shareholders.

17

A-57

## COST OF SOLICITATION

The cost of soliciting proxies in the accompanying form has been or will be borne by the Corporation. The Corporation has engaged the firm of MacKenzie Partners, Inc. as proxy solicitors. The fee to such firm for solicitation services is estimated to be $8,500 plus reimbursement of out-of-pocket expenses. In addition, directors, officers and employees of the Corporation may solicit proxies personally or by telephone or other means of communication. Although there is no formal agreement to do so, arrangements may be made with brokerage houses and other custodians, nominees and fiduciaries to send proxies and proxy material to their principals, and the Corporation may reimburse them for any attendant expenses.

It is important that your shares be represented at the meeting. If you are unable to be present in person, you are respectfully requested to sign the enclosed proxy and return it in the enclosed stamped and addressed envelope as promptly as possible.

By Order of the Board of Directors,

**MURRAY PITKOWSKY**
*Secretary*

Dated: October 27, 2000

18

A-58

**EXHIBIT A**

# DATASCOPE CORP.
## MANAGEMENT INCENTIVE PLAN
### (Amended and Restated as of May 16, 2000)

**Section 1.** *Purpose.* The purpose of the Datascope Corp. Management Incentive Plan, formerly named the Datascope Corp. Supplemental Incentive Plan, (the "Plan") is to benefit and advance the interests of Datascope Corp., a Delaware corporation (the "Company"), by rewarding selected employees of the Company and its subsidiaries and divisions (each such subsidiary or division is referred to herein as a "Business Unit") for their contributions to the Company's financial success and thereby motivate them to continue to make such contributions in the future by granting performance-based awards ("Awards").

**Section 2.** *Certain Definitions.* For the purposes of the Plan the following terms shall be defined as set forth below:

(a) "Applicable Employee Remuneration" has the meaning given to such term in Section 162(m)(4) of the Code.

(b) "Base Salary Percentage" means a percentage of the Participant's annual base salary in effect as of the later of (i) the first day of the Performance Period or (ii) the common salary adjustment date within the Performance Period.

(c) "Board" means the Board of Directors of the Company.

(d) "Code" means the Internal Revenue Code of 1986, as amended.

(e) "Committee" means the Compensation Committee of the Board.

(f) "Company Plan" means the Fiscal Year Plan for the relevant Fiscal Year.

(g) "Covered Employee" has the same meaning given to such term in Section 162(m)(3) of the Code; provided, however, that a person will be considered a Covered Employee for purposes of this Plan only if such employee's Applicable Employee Remuneration for the relevant Fiscal Year is expected to exceed $1,000,000.

(h) "Financial Criteria" has the meaning given to that term in Section 6(a) hereof.

(i) "Fiscal Year" means the fiscal year ending on June 30 or such other period that the Company may hereafter adopt as its fiscal year.

(j) "Performance Period" means the period of time over which the Performance Threshold must be satisfied, which period may be of such length as the Committee, in its discretion, shall select. The Performance Period need not be identical for all Awards. Within one Fiscal Year, the Committee may establish multiple Performance Periods.

(k) "Performance Threshold" has the meaning given to such term in Section 6(b) hereof (in the case of a Covered Employee), or Section 7(b) hereof (in the case of a Participant who is not a Covered Employee).

(l) "Target" has the meaning given to such term in Section 6(a) hereof (in the case of a Covered Employee), or Section 7(a) hereof (in the case of a Participant who is not a Covered Employee).

**Section 3.** *Administration of the Plan.*

(a) *Generally.* The Plan shall be administered by the Committee. The Committee is authorized to administer, interpret and apply the Plan and from time to time may adopt such rules, regulations and guidelines consistent with the provisions of the Plan as it may deem advisable to carry out the Plan, except that the Committee may authorize any one or more of its members, or any officer of the Company, to execute and deliver documents on behalf of the Committee. The Committee's interpretations of the Plan, and all actions taken and determinations made by the Committee pursuant to the powers vested in it hereunder, shall be conclusive and binding on all parties concerned, including the Company, its shareholders

A-1

and Participants (as defined below). The Committee shall have authority to determine the terms and conditions of the Awards granted to Participants (as defined in Section 5 hereof).

(b) *Delegation.* The Committee may delegate its responsibilities for administering the Plan to the Chief Executive Officer, as the Committee deems necessary. However, the Committee shall not delegate its responsibilities under the Plan relating to Covered Employees.

(c) *Reliance and Indemnification.* The Committee may employ attorneys, consultants, accountants or other persons, and the Committee, the Company and its officers and directors shall be entitled to rely upon the advice, opinions or valuations of any such persons. No member of the Committee nor the Chief Executive Officer shall be personally liable for any action, determination or interpretation taken or made in good faith by the Committee or the Chief Executive Officer with respect to the Plan or Awards granted hereunder, and all members of the Committee and the Chief Executive Officer shall be fully indemnified and protected by the Company in respect of any such action, determination or interpretation.

Section 4. *Eligible Persons.* Only employees of the Company or its Business Units who are at the level of Manager (or a level determined by the Committee to be equivalent to Manager) or at a more senior level are eligible to participate in the Plan ("Eligible Persons"). An individual shall be deemed an employee for purposes of the Plan only if such individual receives compensation from either the Company or one of its Business Units for services performed as an employee of the Company or any one of its Business Units for any period during a Performance Period. An Eligible Person who is a Covered Employee shall be entitled to participate in the Plan with respect to a Performance Period which has commenced only if he or she commenced employment on or before the beginning of each Performance Period or any later date described in Treasury Regulation 1.162-27(e)(2) (or any successor thereto).

Section 5. *Awards; Participants.* Awards may be granted only to Eligible Persons with respect to each Performance Period, subject to the terms and conditions set forth in the Plan. An Eligible Person who has been chosen to receive an Award under the Plan shall be referred to as a "Participant."

Section 6. *Determination of Targets, Performance Thresholds and Base Salary Percentage for Covered Employees.* Prior to the beginning of each Performance Period or any later date described in Treasury Regulation 1.162-27(e)(2) (or any successor thereto), the Committee shall adopt each of the following with respect to each Participant who is a Covered Employee:

(a) one or more Targets, which shall be equal to a desired level or levels for any Performance Period or any or a combination of the following business criteria on an absolute or relative basis (including comparisons of results for the Performance Period to either (x) results for the prior Performance Period or (y) the Company Plan or forecast for the Performance Period), and measured before extraordinary items and/ or special items, derived from the Corporation's audited financial statements: (i) net sales, (ii) pre-tax earnings, (iii) after-tax earnings, (iv) operating earnings, and (v) earnings per share, each as determined in accordance with generally accepted accounting principles consistently applied for the Company on a consolidated basis (collectively, the "Financial Criteria"). With respect to any Covered Employee who is employed by a Business Unit, the Financial Criteria shall be based on the results of such Business Unit, audited consolidated results of the Company, or a combination of the two;

(b) a Performance Threshold with respect to each Target, applicable to one or more Financial Criteria, which represents a minimum amount that must be attained for a Participant to receive an Award;

(c) either (i) a Base Salary Percentage, or (ii) fixed monetary amounts, which, in each case, shall be payable as an Award in the event that 100% of such Participant's Targets are achieved.

(d) a mathematical formula or matrix that shall contain weighting for each Target and indicate the extent to which Awards will be paid if such Participant's Performance Thresholds with respect to his or her Targets are achieved or exceeded.

The Committee may make such adjustments, to the extent it deems appropriate, to the Targets and Performance Thresholds to compensate for, or to reflect, any material changes which may have occurred in accounting practices, tax laws, other laws or regulations, the financial structure of the Company, acquisitions or dispositions of Business Units or any unusual circumstances outside of management's control which, in the sole

A-2

A-60

judgment of the Committee, alters or affects the computation of such Targets and Performance Thresholds or the performance of the Company or any relevant Business Unit (each an "Extraordinary Event").

Section 7. *Determination of Targets, Performance Thresholds and Base Salary Percentage For Participants Who Are Not Covered Employees.* Prior to the end of the Performance Period, the Committee shall adopt each of the following with respect to each Participant who is not a Covered Employee:

(a) one or more Targets, which shall be equal to a desired level or levels for any Performance Period of any, or a combination of any, quantitative criteria (the "Quantitative Criteria," which Quantitative Criteria may include, without limitation, any Financial Criteria) or qualitative criteria (the "Individual Criteria"). With respect to such Participants who are employed by a Business Unit, the Quantitative Criteria may be based on the results of such Business Unit, consolidated results of the Company, or a combination of the two;

(b) a Performance Threshold with respect to each Target, applicable to one or more Quantitative Criteria or Individual Criteria, which represents a minimum that must be attained for a Participant to receive an Award;

(c) either (i) a Base Salary Percentage, or (ii) fixed monetary amounts, which, in each case, shall be payable as an Award in the event that 100% of such Participant's Targets are achieved.

(d) a mathematical formula or matrix that shall contain weighting for each Target and indicate the extent to which Awards will be paid if such Participant's Performance Thresholds with respect to his or her Targets are achieved or exceeded.

The Committee may make such adjustments, to the extent it deems appropriate, to the Targets and Performance Thresholds to compensate for, or to reflect, any material changes which may have occurred in accounting practices, tax laws, other laws or regulations, the financial structure of the Company, acquisitions or dispositions of Business Units or any unusual circumstances outside of management's control which, in the sole judgment of the Committee, alters or affects the computation of such Targets and Performance Thresholds or the performance of the Company or any relevant Business Unit (each an "Extraordinary Event").

Section 8. *Calculation of Awards; Certification; Payment; Deferral.* As soon as practicable after the end of the Performance Period, and based upon the applicable Financial Criteria, the Committee shall determine with respect to each Participant whether and the extent to which the Performance Thresholds applicable to such Participant's Targets were achieved or exceeded. Such Participant's Award, if any, shall be calculated in accordance with the mathematical formula or matrix determined pursuant to Section 6 or 7, as applicable, and subject to the limitations set forth in Section 9 hereof. The Committee shall certify in writing the amount of such Award and whether each material term of the Plan relating to such Award has been satisfied. Subject to Section 9 hereof, such Award shall become payable in cash as promptly as practicable thereafter. However, from time to time, prior to the end of a Performance Period, the Committee may, in its sole discretion (under uniform rules applicable to all Participants and in compliance with applicable law in effect at such time), offer Participants the opportunity to defer receipt of all or a portion of any Award that is made for such Performance Period.

Section 9. *Limitations; Modifications to Awards.* Each Award determined pursuant to Section 6 or 7 hereof shall be subject to modification or forfeiture in accordance with the following provisions:

(a) *Limitations.* The aggregate amount of any Award to any Participant for any Performance Period shall not exceed $5,000,000, and the aggregate amount of any Award or Awards to any Participant for any Fiscal Year shall not exceed $5,000,000.

(b) *Modifications.* At any time prior to the payment of an Award, the Committee may, in its sole discretion, (i) increase, decrease or eliminate the Award payable to any Participant who is not a Covered Employee and who would not become a Covered Employee as a result of any such increase or (ii) decrease or eliminate the Award payable to any Covered Employee, in each case to reflect the individual performance and contribution of, and other factors relating to, such Participant. The Committee may make such adjustments, to the extent it deems appropriate to any Award to compensate for, or to reflect, any Extraordinary Event. The determination of the Committee as to matters set forth in this Section 9(b) shall be final and conclusive.

A-3

Section 10. *Employment Requirement.* No Participant shall have any right to receive payment of any Award unless such Participant remains in the employ of the Company or a Business Unit through the date of payment of such Award; provided, however, that the Committee may, in its sole discretion, pay all or any part of an Award to any Participant who, prior to such date of payment, retires, dies or becomes permanently disabled or where other special circumstances exist with respect to such Participant, so long as the Performance Thresholds applicable to the Participant's Targets were achieved or exceeded. The maximum amount of such payment, if any, will be calculated, and to the extent determined by the Committee, paid as provided in Section 6 or 7. The determination of the Committee shall be final and conclusive.

Section 11. *Miscellaneous.*

(a) *No Contract; No Rights to Awards or Continued Employment.* The Plan is not a contract between the Company and any Participant or other employee. No Participant or other employee shall have any claim or right to receive Awards under the Plan. Neither the Plan nor any action taken hereunder shall be construed as giving any employee any right to be retained by the Company or any of its Business Units.

(b) *No Right to Future Participation.* Participation in the Plan during one Performance Period shall not guarantee participation during any other Performance Period.

(c) *Restriction on Transfer.* The rights of a Participant with respect to Awards under the Plan shall not be transferable by the Participant to whom such Award is granted (other than by will or the laws of descent and distribution), and any attempted assignment or transfer shall be null and void and shall permit the Committee, in its sole discretion, to extinguish the Company's obligation under the Plan to pay any Award with respect to such Participant.

(d) *Tax Withholding.* The Company or a subsidiary thereof, as appropriate, shall have the right to deduct from all payments made under the Plan to a Participant or to a Participant's beneficiary or beneficiaries any Federal, state or local taxes required by law to be withheld with respect to such payments.

(e) *No Restriction on Right of Company to Effect Changes.* The Plan shall not affect in any way the right or power of the Company or its shareholders to make or authorize any recapitalization, reorganization, merger, acquisition, divestiture, consolidation, spin off, combination, liquidation, dissolution, sale of assets, or other similar corporate transaction or event involving the Company or a subsidiary thereof or any other event or series of events, whether of a similar character or otherwise.

(f) *Source of Payments.* The Plan shall be unfunded. The Plan shall not create or be construed to create a trust or separate fund or segregation of assets of any kind or a fiduciary relationship between the Company and a Participant or any other individual, corporation, partnership, association, joint-stock company, trust, unincorporated organization, or government or political subdivision thereof. To the extent that any Participant is granted an Award hereunder, such Participant's right to receive payment of such Award shall be no greater than the right of any unsecured general creditor of the Company.

(g) *No Interest.* If the Company for any reason fails to make payment of an Award at the time such Award becomes payable, the Company shall not be liable for any interest or other charges thereon.

(h) *Amendment and Termination.* The Committee may at any time and from time to time alter, amend, suspend or terminate the Plan in whole or in part. No such amendment shall be effective which alters the Award, Target or other criteria relating to an Award applicable to a Covered Employee for the Performance Period in which such amendment is made or any prior Performance Period, except any such amendment that may be made without causing such Award to cease to qualify as performance-based compensation under Section 162(m)(4)(C) of the Code.

(i) *Governmental Regulations.* The Plan, and all Awards hereunder, shall be subject to all applicable rules and regulations of governmental or other authorities.

(j) *Headings.* The headings of sections and subsections herein are included solely for convenience of reference and shall not affect the meaning of any of the provisions of the Plan.

(k) *Governing Law.* The validity, construction, interpretation, administration and effect of the Plan and of its rules and regulations, and rights relating to the Plan, shall be determined solely in accordance with

A-4

the laws of the State of New Jersey, without regard to the choice-of-law principles thereof, and applicable federal law.

(l) *Severability.*  If any term or provision ("Provision") of the Plan or the application thereof (i) as to any Participant or circumstance (other than as described in clause (ii)) is, to any extent, found to be illegal or invalid, or (ii) would cause any Award to any Covered Employee not to constitute performance-based compensation under Section 162(m)(4)(C) of the Code, then the Committee shall sever such Provision from the Plan and, thereupon, such Provision shall not be a part of the Plan.

(m) *Effective Date.*  The Plan shall be effective as of December 7, 1999; provided, however, that it shall be a condition to the effectiveness of the Plan, and any Awards made on or after December 7, 1999, that the shareholders of the Company ("Shareholders") approve the Plan at the 2000 Annual Meeting of Shareholders. Such approval shall meet the requirements of Section 162(m) of the Code and the regulations thereunder. If such approval is not obtained, then the Plan shall not be effective and any Award made hereunder shall be void ab initio.

(n) *Approval and Reapproval by Shareholders.*  To the extent required under Section 162(m) of the Code and the regulations thereunder, (i) any change to the material terms of the Financial Criteria shall be disclosed to and approved by the Shareholders at the next Annual Meeting of Shareholders to be held following such change, and (ii) the material terms of the Financial Criteria shall be disclosed to and reapproved by the Shareholders no later than the Annual Meeting of Shareholders that occurs in the fifth year following the year in which Shareholders approve the Financial Criteria.

A-5

# EXHIBIT 2 – PART A

**INTEL CORPORATION**
2200 Mission College Blvd.
Santa Clara, CA 95052-8119
(408) 765-8080



March 29, 2005

Dear Stockholder:

We will hold our 2005 Annual Stockholders' Meeting at 8:30 a.m. Pacific Time on May 18, 2005 at the Santa Clara Convention Center in Santa Clara, California, and we look forward to your attendance either in person or by proxy. For your convenience, we are pleased to offer a live webcast of the annual meeting at *www.intc.com*.

If you received your annual meeting materials by mail, the notice of annual meeting, proxy statement and proxy card from our Board of Directors are enclosed. If you received your annual meeting materials via e-mail, the e-mail contains voting instructions and links to the annual report and the proxy statement on the Internet, which are both available at *www.intel.com/intel/annualreports/2004*.

We encourage you to conserve natural resources, as well as significantly reduce printing and mailing costs, by **signing up for electronic delivery of our stockholder communications.** For more information, see "Electronic Delivery of Our Stockholder Communications."

At this year's annual meeting, the agenda includes the annual election of directors, ratification of our independent registered public accounting firm, approval of amendment and extension of the 2004 Equity Incentive Plan, and approval of amendment and extension of the Executive Officer Incentive Plan. The Board of Directors recommends that you vote **FOR** election of the director nominees, **FOR** ratification of appointment of the independent registered public accounting firm, **FOR** approval of amendment and extension of the 2004 Equity Incentive Plan, and **FOR** approval of amendment and extension of the Executive Officer Incentive Plan. Please refer to the proxy statement for detailed information on each of the proposals and the annual meeting.

Your Intel stockholder vote is more important than ever in 2005. Each share of our stock that you own represents one vote. If you do not vote your shares, you will not have a say in the important issues to be voted on at the annual meeting. The 10 nominees receiving the most votes "for" election will be elected as directors; and to pass, each other proposal included in this year's proxy statement will require a majority of votes present or represented at the annual meeting. Many of our stockholders do not vote, so the stockholders who do vote influence the outcome of the election in greater proportion than their percentage ownership of the company. In addition, banks and brokers that have not received voting instructions from their clients cannot vote on their clients' behalf on "non-routine" proposals, such as approval of amendment and extension of the 2004 Equity Incentive Plan and the Executive Officer Incentive Plan, which further reduces the number of votes cast.

If you have any questions concerning the annual meeting or the proposals, please contact our Investor Relations department at (408) 765-1480. For questions regarding your stock ownership, you may contact our transfer agent, Computershare Investor Services, LLC, by e-mail through their web site at *www.computershare.com/contactUS* or by phone at (800) 298-0146 (within the U.S. and Canada) or (312) 360-5123 (outside the U.S. and Canada). You can view your Intel stock holdings electronically and perform other transactions by enrolling in Computershare's Investor Center at *www.computershare.com*. For questions related to voting, you may contact D. F. King & Co., Inc., our proxy solicitors, at (800) 290-6431 (within the U.S. and Canada) or (212) 269-5550 (outside the U.S. and Canada).

Sincerely yours,

*Andrew S. Grove*

Andrew S. Grove
*Chairman of the Board*



# INTEL CORPORATION

## Notice of Annual Stockholders' Meeting
## May 18, 2005
## 8:30 a.m. Pacific Time

Dear Stockholder:

You are cordially invited to attend our 2005 Annual Stockholders' Meeting, which will be held at 8:30 a.m. Pacific Time on May 18, 2005 at the Santa Clara Convention Center, Santa Clara, California. Driving directions and a map are on the back cover of this proxy statement. For your convenience, we are pleased to offer a live webcast of the annual meeting at *www.intc.com*. For further details, see "Attending the Annual Meeting."

We are holding the annual meeting for the following purposes:

1.  To elect a board of directors to hold office until the next annual stockholders' meeting or until their respective successors have been elected or appointed.

2.  To ratify the appointment of Ernst & Young LLP as our independent registered public accounting firm for the current year.

3.  To approve amendment and extension of the 2004 Equity Incentive Plan.

4.  To approve amendment and extension of the Executive Officer Incentive Plan.

5.  To transact other business that may properly come before the annual meeting or any adjournment or postponement of the meeting.

The proxy statement, which follows this notice, fully describes these items. We have not received notice of other matters that may be properly presented at the annual meeting.

Only stockholders of record at the close of business on March 21, 2005 will be entitled to vote at the annual meeting and any postponements or adjournments of the meeting. For 10 days prior to the annual meeting, a list of stockholders entitled to vote will be available for inspection at our principal executive offices, 2200 Mission College Blvd., Santa Clara, California 95052-8119. If you would like to view the stockholder list, please call our Investor Relations department at (408) 765-1480 to schedule an appointment.

To ensure that your vote is recorded promptly, please vote as soon as possible, even if you plan to attend the annual meeting. Most stockholders have three options for submitting their vote: (1) via the Internet, (2) by phone or (3) by mail. For further details, see "Submitting and Revoking Your Proxy" on page 2. If you have Internet access, **we encourage you to record your vote on the Internet.** It is convenient, and it saves your company significant postage and processing costs.

The Board of Directors

By: Cary I. Klafter
*Corporate Secretary*

Santa Clara, California
March 29, 2005

**DOORS WILL OPEN AT 8:00 A.M.**

# TABLE OF CONTENTS

| | Page |
|---|---|
| Electronic Delivery of Our Stockholder Communications | 1 |
| Attending the Annual Meeting | 1 |
| Proxy Statement | 2 |
|    Proposal 1: Election of Directors | 3 |
|    The Board, Board Committees and Meetings | 6 |
|    Corporate Governance Guidelines | 9 |
|       Policy on Poison Pill Plans | 10 |
|    Directors' Compensation | 11 |
|    Security Ownership of Certain Beneficial Owners and Management | 12 |
|    Stock Price Performance Graph | 14 |
|    Report of the Compensation Committee on Executive Compensation | 14 |
|       General Compensation Philosophy | 15 |
|       Performance-Based Compensation | 17 |
|       Stock Options | 20 |
|       Stockholding Guidelines | 21 |
|       Personal Benefits | 21 |
|       Company Performance and CEO Compensation | 21 |
|    Employment Contracts and Change in Control Arrangements | 22 |
|    Certain Relationships and Related Transactions | 23 |
|    Compensation Committee Interlocks and Insider Participation | 24 |
|    Executive Compensation | 25 |
|       Summary Compensation Table | 25 |
|       Option Grants in Last Fiscal Year | 26 |
|       Aggregated Option Exercises in Last Fiscal Year and Fiscal Year-End Option Values | 26 |
|       Pension Plan Table | 27 |
|    Report of the Audit Committee | 27 |
|    Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm | 29 |
|    Proposal 3: Approval of Amendment and Extension of the 2004 Equity Incentive Plan | 31 |
|    Proposal 4: Approval of Amendment and Extension of the Executive Officer Incentive Plan | 38 |
|    Additional Meeting Information | 42 |
|    Other Matters | 42 |
|    Communicating with Us | 43 |
|    Stockholders Sharing the Same Last Name and Address | 43 |
| Exhibit A: Intel Corporation 2004 Equity Incentive Plan, as Amended and Restated | A-1 |
| Exhibit B: Intel Corporation Executive Officer Incentive Plan, as Amended and Restated | B-1 |
| Exhibit C: Charter of the Audit Committee, as Amended and Restated | C-1 |
| Directions to the Santa Clara Convention Center | Back Cover |

## ELECTRONIC DELIVERY OF OUR STOCKHOLDER COMMUNICATIONS

If you received your annual meeting materials by mail, we encourage you to conserve natural resources, as well as significantly reduce your company's printing and mailing costs, by **signing up to receive your stockholder communications via e-mail.** With electronic delivery, we will notify you via e-mail as soon as the annual report and the proxy statement are available on the Internet, and you can easily submit your stockholder votes online. Electronic delivery can also help reduce the number of bulky documents in your personal files and eliminate duplicate mailings. To sign up for electronic delivery:

1. If you are a registered holder (you hold your Intel shares in your own name through our transfer agent, Computershare Investor Services, LLC, or you have stock certificates), visit *www.computershare.com/us/sc/ intel* to enroll.

2. If you are a beneficial holder (your shares are held by a brokerage firm, a bank or a trustee), visit *www.icsdelivery.com/intel* to enroll.

Your electronic delivery enrollment will be effective until you cancel it. If you have questions about electronic delivery, please call our Investor Relations department at (408) 765-1480.

## ATTENDING THE ANNUAL MEETING

We are pleased to offer two options for participating in our 2005 annual meeting: (1) viewing a live webcast at *www.intc.com* or (2) attending in person. We will hold the annual meeting at 8:30 a.m. Pacific Time on Wednesday, May 18, 2005 at the Santa Clara Convention Center, Santa Clara, California, located at the corner of Great America Parkway and Tasman Drive. Driving directions and a map to the Convention Center are on the back cover of this proxy statement. When you arrive at the Convention Center, signs will direct you to the appropriate meeting rooms. Please note that the doors to the meeting rooms will not open until 8:00 a.m., and due to security measures, all bags will be subject to search, and all persons who attend the meeting will be subject to a metal detector and/or a hand wand search. We will be unable to admit anyone who does not comply with these security procedures. We will not permit cameras and other recording devices in the meeting hall. If you choose to view the webcast, go to *www.intc.com* shortly before the meeting time, and follow the instructions for downloading the webcast. During the webcast, you will be able to submit questions by following the instructions on the web site. If you miss the annual meeting, you can view a replay of the webcast at *www.intc.com* until June 17, 2005. You need not attend the annual meeting in order to vote.



**INTEL CORPORATION**
**2200 Mission College Blvd.**
**Santa Clara, CA 95052-8119**

## PROXY STATEMENT

Our Board of Directors (the "Board") solicits your proxy for the 2005 Annual Stockholders' Meeting to be held at 8:30 a.m. Pacific Time on Wednesday, May 18, 2005 at the Santa Clara Convention Center in Santa Clara, California, and at any postponement or adjournment of the meeting, for the purposes set forth in "Notice of Annual Stockholders' Meeting."

### Record Date and Share Ownership

Only stockholders of record at the close of business on March 21, 2005 will be entitled to vote at the annual meeting. The majority of the shares of common stock outstanding on the record date must be present in person or by proxy to have a quorum. As of the close of business on February 25, 2005, we had 6,180,500,358 outstanding shares of common stock. We made copies of this proxy statement available to stockholders beginning on March 29, 2005.

### Submitting and Revoking Your Proxy

If you complete and submit your proxy, the persons named as proxies will vote the shares represented by your proxy in accordance with your instructions. If you submit a proxy card but do not fill out the voting instructions on the proxy card, the persons named as proxies will vote the shares represented by your proxy as follows:

- **FOR** the election of the director nominees set forth in "Proposal 1: Election of Directors."

- **FOR** ratification of the independent registered public accounting firm set forth in "Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm."

- **FOR** approval of amendment and extension of the 2004 Equity Incentive Plan set forth in "Proposal 3: Approval of Amendment and Extension of the 2004 Equity Incentive Plan."

- **FOR** approval of amendment and extension of the Executive Officer Incentive Plan set forth in "Proposal 4: Approval of Amendment and Extension of the Executive Officer Incentive Plan."

In addition, if other matters are properly presented for voting at the annual meeting, the persons named as proxies will vote on such matters in accordance with their best judgment. We have not received notice of other matters that may properly be presented for voting at the annual meeting.

Your stockholder vote is more important than ever in 2005. Each share of our stock that you own represents one vote. If you do not vote your shares, you will not have a say in the important issues to be voted upon at the annual meeting. To pass, each proposal included in this year's proxy statement other than the election of directors requires a majority of votes present or represented at the annual meeting. Many of our stockholders do not vote, so the stockholders who do vote influence the outcome of the election in greater proportion than their percentage ownership of the company. In addition, banks and brokers that have not received voting instructions from their clients cannot vote on their clients' behalf on "non-routine" proposals, such as approval of amendment and extension of the 2004 Equity Incentive Plan and the Executive Officer Incentive Plan, further reducing the number of votes cast.

To ensure that your vote is recorded promptly, please vote as soon as possible, even if you plan to attend the annual meeting in person. Most stockholders have three options for submitting their votes: (1) via the Internet, (2) by phone or (3) by mail. If you have Internet access, we encourage you to record your vote on the Internet. It is convenient, and it saves your company significant postage and processing costs. In addition, when you vote via the Internet or by phone prior to the meeting date, your vote is recorded immediately and there is no risk that postal delays will cause your vote to arrive late and therefore not be counted. If you attend the annual meeting and are a registered holder, you may also submit your vote in person, and any previous votes that you submitted, whether by Internet, phone or mail, will be superseded by the vote that you cast at the annual meeting. At this year's annual meeting, the polls will close at 10:00 a.m. Pacific Time, and no further votes will be accepted after that time. We intend to announce preliminary results at the annual meeting and

2

publish final results on our Investor Relations web site at *www.intc.com* shortly after the meeting and also in our quarterly report on Form 10-Q for the second quarter of fiscal 2005. If you have any questions about submitting your vote, call our Investor Relations department at (408) 765-1480.

You may revoke your proxy at any time prior to the close of the polls at 10:00 a.m. Pacific Time on May 18, 2005 by: (1) submitting a later-dated vote, in person at the annual meeting, via the Internet, by telephone or by mail, or (2) delivering instructions to our Corporate Secretary prior to the annual meeting via e-mail at *corporate.secretary@intel.com*, by fax to (408) 653-8050 or by mail to Cary Klafter, Corporate Secretary, Intel Corporation, at M/S SC4-203, 2200 Mission College Blvd., Santa Clara, California 95052-8119. If you hold shares through a bank or brokerage firm, you must contact that firm to revoke any prior voting instructions.

If you participate in the Intel Stock Fund through our 401(k) Savings Plan for current and former employees, your proxy will serve as a voting instruction for Fidelity Investments, the plan's record keeper. If Fidelity does not receive voting instructions for shares in your plan account, Fidelity will vote those shares in the same proportion as other plan participants' shares for which it has received voting instructions. You must submit your voting instructions for your Intel Stock Fund shares to Fidelity by May 13, 2005 to allow Fidelity time to receive your voting instructions and vote on behalf of the plan.

*Votes Required to Adopt Proposals*

Each share of our common stock outstanding on the record date will be entitled to one vote on each matter. The 10 nominees for election as directors who receive the most votes "for" election will be elected. Ratification of the appointment of our independent registered public accounting firm, approval of amendment and extension of our 2004 Equity Incentive Plan, and approval of amendment and extension of our Executive Officer Incentive Plan will each require an affirmative vote of the majority of the shares of common stock present or represented at the annual meeting.

For the election of directors, withheld votes do not affect whether a nominee has received sufficient votes to be elected. For the purpose of determining whether the stockholders have approved matters other than the election of directors, abstentions are treated as shares present or represented and voting, so abstaining has the same effect as a negative vote. Shares held by brokers that do not have discretionary authority to vote on a particular matter and that have not received voting instructions from their customers are not counted or deemed to be present or represented for the purpose of determining whether stockholders have approved that matter, but they are counted as present for the purpose of determining the existence of a quorum at the annual meeting. Please note that banks and brokers that have not received voting instructions from their clients cannot vote on their clients' behalf on "non-routine" proposals, such as approval of amendment and extension of the 2004 Equity Incentive Plan and the Executive Officer Incentive Plan, but may vote their clients' shares on the election of directors and the ratification of Ernst & Young LLP as our independent registered public accounting firm.

## PROPOSAL 1: ELECTION OF DIRECTORS

Our nominees for the upcoming election of directors include eight independent directors, as defined in the applicable rules for companies traded on The NASDAQ Stock Market* ("NASDAQ"), and two members of our senior management. Each director serves a one-year term, as described below, with all directors subject to annual election.

At the recommendation of the Corporate Governance and Nominating Committee, the Board has nominated the persons listed below to serve as directors for the term beginning at the annual meeting on May 18, 2005. Unless proxy cards are otherwise marked, the persons named as proxies will vote all proxies received **FOR** the election of each nominee named in this section.

If any director nominee is unable or unwilling to serve as a nominee at the time of the annual meeting, the persons named as proxies may vote either (1) for a substitute nominee designated by the present Board to fill the vacancy or (2) for the balance of the nominees, leaving a vacancy. Alternatively, the Board may reduce the size of the Board. The Board has no reason to believe that any of the following nominees will be unwilling or unable to serve if elected as a director. Such persons have been nominated to serve until the next annual meeting following the 2005 annual meeting or until their successors, if any, are elected or appointed. This section contains the names and biographical information for each of the nominees.

*Director Changes in 2005.* In November 2004, we announced that Andrew S. Grove, our Chairman of the Board, will not stand for reelection at the annual meeting and that Craig R. Barrett will succeed Dr. Grove as Chairman and Paul S. Otellini will succeed Dr. Barrett as Chief Executive Officer effective following the annual meeting. The Board's Corporate Governance and Nominating Committee is presently considering possible candidates to take the Board seat to be vacated by Dr. Grove. The Committee and the Board have not yet chosen a candidate, and so have acted to temporarily reduce the size of the Board from 11 to 10 directors, effective with this upcoming election of directors. Accordingly, at the annual meeting, proxies may not be voted for more than 10 director nominees. The Board expects to identify and appoint a new director at some time in 2005 following the annual meeting, and the Board presently expects that the new director will be independent. With the addition of an independent director, the Board would consist of nine independent directors and two management directors. We will make a public announcement if and when a new director is appointed.

## Recommendation of the Board

**The Board recommends that you vote "FOR" the election of each of the following nominees.**

| | |
|---|---|
| **Craig R. Barrett**<br>65 Years Old<br>Director Since 1992<br>Chief Executive Officer of Intel | *Craig R. Barrett* has been Chief Executive Officer since 1998 and a director of Intel since 1992. Dr. Barrett joined Intel in 1974. In 1984, he became Vice President, and then in 1985 General Manager of the Components Technology and Manufacturing Group. Dr. Barrett became a Senior Vice President in 1987 and General Manager of the Microcomputer Components Group in 1989. He was an Executive Vice President from 1990 to 1997, Chief Operating Officer from 1993 to 1997 and President from 1997 to 2002. |
| **Charlene Barshefsky**<br>54 Years Old<br>Director Since January 2004<br>Senior International Partner at<br>Wilmer Cutler Pickering Hale and Dorr LLP | *Ambassador Charlene Barshefsky* has been a director of Intel since January 2004 and is Senior International Partner at the law firm of Wilmer Cutler Pickering Hale and Dorr LLP. Formerly the United States Trade Representative, Ambassador Barshefsky was the chief trade negotiator and principal trade policy maker for the United States from 1997 to 2001 and a member of the President's cabinet. Ambassador Barshefsky is a director of the American Express Company, The Estée Lauder Companies Inc., Idenix Pharmaceuticals, Inc. and Starwood Hotels & Resorts Worldwide, Inc. |
| **E. John P. Browne**<br>57 Years Old<br>Director Since 1997<br>Group Chief Executive of BP plc | *E. John P. Browne,* formally known as The Lord Browne of Madingley, has been a director of Intel since 1997. He has been a Managing Director of BP plc, a provider of energy and petrochemicals, since 1991 and Group Chief Executive since 1995. Lord Browne is also a non-executive director of the Goldman Sachs Group, Inc. |
| **D. James Guzy**<br>69 Years Old<br>Director Since 1969<br>Chairman of Arbor Company | *D. James Guzy* has been a director of Intel since 1969 and is Co-Chairman of the Corporate Governance and Nominating Committee of the Board. Since 1969, he has been Chairman of Arbor Company, a limited partnership engaged in the electronics and computer industry. Mr. Guzy is also Chairman of the Board of PLX Technology, Inc. and a director of Cirrus Logic Inc., LogicVision, Inc., Tessera, Inc., and Alliance Capital Management Technology Fund. He also holds three directorships within the Davis Funds complex. Mr. Guzy is retiring from the boards of LogicVision and Tessera in May 2005. |
| **Reed E. Hundt**<br>57 Years Old<br>Director Since 2001<br>Principal of Charles Ross Partners | *Reed E. Hundt* has been a director of Intel since 2001 and is Chairman of the Compensation Committee of the Board. Since 1998, Mr. Hundt has been a principal of Charles Ross Partners, a private investor and business advisory service. Since 1998, he has served as an independent adviser on information industries to McKinsey & Company, Inc., a management consulting firm, and, since 2000, to The Blackstone Group, a private equity firm. From 1993 to 1997, Mr. Hundt was Chairman of the Federal Communications Commission. |

4

**Paul S. Otellini**
54 Years Old
Director Since 2002
President and
Chief Operating Officer of Intel

*Paul S. Otellini* has been a director of Intel and Intel's President and Chief Operating Officer since 2002. Mr. Otellini joined Intel in 1974 and has held a number of positions, including General Manager of Intel's Peripheral Components Operation and the Folsom Microcomputer Division. In 1990, Mr. Otellini became the General Manager of the Microprocessor Products Group, leading the introduction of the Intel® Pentium® processor. He was elected a corporate officer in 1991, a Senior Vice President in 1993 and Executive Vice President in 1996. From 1994 to 1998, Mr. Otellini served as General Manager of the Sales and Marketing Group, and from 1998 to 2002, he served as General Manager of the Intel Architecture Group. Mr. Otellini is a director of Google, Inc.

**David S. Pottruck**
56 Years Old
Director Since 1998
Managing Director of
The Pottruck Group

*David S. Pottruck* has been a director of Intel since 1998 and is Chairman of Intel's Retirement Plans Investment Policy Committee. Since July 2004, Mr. Pottruck has been Managing Director of The Pottruck Group, a San Francisco private equity firm. Mr. Pottruck also serves as a Senior Fellow in the Wharton School of Business Center for Leadership and Change Management. In July 2004, Mr. Pottruck resigned from the Charles Schwab Corporation, a financial services provider, after a 20-year career, having served as President, Chief Executive Officer and a member of the board of directors.

**Jane E. Shaw**
66 Years Old
Director Since 1993
Chairman and
Chief Executive Officer
of Aerogen, Inc.

*Jane E. Shaw* has been a director of Intel since 1993 and is Chairman of the Audit Committee of the Board. Dr. Shaw is Chairman and Chief Executive Officer of Aerogen, Inc., a company developing drug-device combination aerosol products for patients with respiratory disorders. She was President and Chief Operating Officer of ALZA Corporation, a pharmaceutical company, from 1987 to 1994. Dr. Shaw is a director of McKesson Corporation and OfficeMax Incorporated.

**John L. Thornton**
51 Years Old
Director Since 2003
Professor and Director of
Global Leadership,
Tsinghua University, Beijing

*John L. Thornton* has been a director of Intel since 2003 and is Chairman of the Finance Committee of the Board. He is Professor and Director of Global Leadership at Tsinghua University in Beijing. Mr. Thornton retired in 2003 as President and Co-Chief Operating Officer, and as a member of the board of directors, of the Goldman Sachs Group, Inc. Mr. Thornton is a director of China Netcom Communications Group Corporation, the Ford Motor Company, News Corporation and The Pacific Century Group, Inc.

**David B. Yoffie**
50 Years Old
Director Since 1989
Professor of International
Business Administration,
Harvard Business School

*David B. Yoffie* has been a director of Intel since 1989. He is Lead Independent Director, Co-Chairman of the Corporate Governance and Nominating Committee of the Board and Chairman of the Executive Committee of the Board. Dr. Yoffie has been the Max and Doris Starr Professor of International Business Administration at the Harvard Business School since 1993 and has been on the Harvard University faculty since 1981. He is also a director of The Charles Schwab Corporation.

Intel stock ownership information for these individuals is shown under the heading "Security Ownership of Certain Beneficial Owners and Management" and is based on information furnished by the respective individuals.

**Retiring Director**

**Andrew S. Grove**
68 Years Old
Director Since 1974
Chairman of the Board of Intel

*Andrew S. Grove* has been a director of Intel since 1974 and Chairman of the Board since 1997. Dr. Grove participated in founding Intel in 1968 and served as Vice President and Director of Operations through 1974. He became an Executive Vice President in 1975 and was Chief Operating Officer from 1976 to 1987. Dr. Grove was President from 1979 to 1997 and Chief Executive Officer from 1987 to 1998.

**Director Emeritus**

The Board has elected Gordon Moore as Chairman Emeritus and Director Emeritus. We do not have any other directors emeriti. Dr. Moore is invited to attend Board and Board committee meetings, but he does not have voting rights. Director emeritus is an unpaid position. We will reimburse Dr. Moore for his attendance-related expenses, although he has not to date requested any reimbursement.

| | |
|---|---|
| **Gordon E. Moore**<br>76 Years Old<br>Director Emeritus Since 2001<br>Chairman Emeritus of the Board<br>of Intel Since 1997 | *Gordon E. Moore* was a director of Intel from 1968 to 2001 and has been Chairman Emeritus of the Board since 1997. Dr. Moore co-founded Intel in 1968 and served as Executive Vice President until 1975. From 1975 to 1987, he served as Chief Executive Officer; and from 1979 to 1997, he served as Chairman. Dr. Moore is a director of Gilead Sciences, Inc. |

## THE BOARD, BOARD COMMITTEES AND MEETINGS

Corporate governance is typically defined as the system that allocates duties and authority among a company's stockholders, board of directors and management. The stockholders elect the board and vote on extraordinary matters; the board is the company's governing body, responsible for hiring, overseeing and evaluating management, particularly the Chief Executive Officer; and management runs the company's day-to-day operations. Our Board of Directors currently consists of eleven directors. The Board believes that there should be a substantial majority of independent directors on the Board. The Board also believes that it is useful and appropriate to have members of management, including the Chief Executive Officer, as directors. The current Board members include eight independent directors and three members of our senior management. The Board also has one director emeritus who may participate in Board meetings but does not vote.

*"Independent" Directors.* Each of our directors other than Messrs. Grove, Barrett and Otellini qualifies as "independent" in accordance with the published listing requirements of NASDAQ. The NASDAQ independence definition includes a series of objective tests, such as that the director is not an employee of the company and has not engaged in various types of business dealings with the company. In addition, as further required by the NASDAQ rules, the Board has made a subjective determination as to each independent director that no relationships exist which, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. In making these determinations, the directors reviewed and discussed information provided by the directors and the company with regard to each director's business and personal activities as they may relate to Intel and Intel's management.

In addition, as required by NASDAQ rules, the members of the Audit Committee each qualify as "independent" under special standards established by the U.S. Securities and Exchange Commission (the "SEC") for members of audit committees. The Audit Committee also includes at least one independent member who is determined by the Board to meet the qualifications of an "audit committee financial expert" in accordance with SEC rules, including that the person meets the relevant definition of an "independent director." E. John P. Browne is the independent director who has been determined to be an audit committee financial expert. Stockholders should understand that this designation is a disclosure requirement of the SEC related to Lord Browne's experience and understanding with respect to certain accounting and auditing matters. The designation does not impose upon Lord Browne any duties, obligations or liability that are greater than are generally imposed on him as a member of the Audit Committee and the Board, and his designation as an audit committee financial expert pursuant to this SEC requirement does not affect the duties, obligations or liability of any other member of the Audit Committee or the Board. The Board has also determined that each Audit Committee member has sufficient knowledge in reading and understanding the company's financial statements to serve on the Audit Committee.

*Board Responsibilities and Structure.* The primary responsibilities of the Board are oversight, counseling and direction to our management in the long-term interests of the company and our stockholders. The Board's detailed responsibilities include: (a) selecting and regularly evaluating the performance of the Chief Executive Officer and other senior executives; (b) planning for succession with respect to the position of Chief Executive Officer and monitoring management's succession planning for other senior executives; (c) reviewing and, where appropriate, approving our major financial objectives and strategic and operating plans, business risks and actions; (d) overseeing the conduct of our business to evaluate whether the business is being properly managed; and (e) overseeing the processes for maintaining our integrity with regard to our financial statements and other public disclosures and compliance with law and ethics. The Board has instructed our Chief Executive Officer, working with our other executive officers, to manage our business in a manner consistent with our standards and practices, and in accordance with any specific plans, instructions or directions of the Board. The Chief Executive Officer and management are responsible for seeking the advice and, in appropriate situations, the approval of the Board with respect to extraordinary actions that we may undertake.

The Board's general policy, based on experience, is that the positions of Chairman of the Board and Chief Executive Officer should be held by separate persons as an aid in the Board's oversight of management. In addition, the Board has an independent director designated as the Lead Independent Director, who is responsible for coordinating the activities of the other independent directors and performing various other duties. The general authority and responsibilities of the Lead Independent Director are established in a written charter adopted by the Board.

The Board and its committees meet throughout the year on a set schedule, and also hold special meetings and act by written consent from time to time as appropriate. Board agendas include regularly scheduled sessions for the independent directors to meet without management present, and the Board's Lead Independent Director leads those sessions. The Board has delegated various responsibilities and authority to different Board committees as described in this section of the proxy statement. Committees regularly report on their activities and actions to the full Board. Board members have access to all of our employees outside of Board meetings, and the Board has a program that encourages each director to visit different Intel sites and events worldwide on a regular basis and meet with local management at those sites and events.

*Board Committees and Charters.* The Board currently has, and appoints the members of, standing Audit, Compensation, Corporate Governance and Nominating, Executive and Finance Committees. In addition, the Finance Committee has the authority to appoint the members of the Retirement Plans Investment Policy Committee, and there are Board members serving on that committee. Each member of the Audit, Compensation, Corporate Governance and Nominating, and Finance Committees is an independent director in accordance with NASDAQ standards. Each of the Board committees has a written charter approved by the Board. Copies of each charter, including the charter describing the position of Lead Independent Director, are posted on our Investor Relations web site at *www.intc.com* under the "Corporate Governance & Social Responsibility" section. The members of the committees are identified in the following table.

| Director | Audit | Compensation | Corporate Governance and Nominating | Executive | Finance | Retirement Plans Investment Policy† |
|---|---|---|---|---|---|---|
| Craig R. Barrett | | | | ✓ | | |
| Charlene Barshefsky | | | | | ✓ | ✓ |
| E. John P. Browne | ✓ | ✓ | | | | |
| Andrew S. Grove | | | | | | |
| D. James Guzy | ✓ | | Co-Chair | | | |
| Reed E. Hundt | | Chair | ✓ | | | |
| Paul S. Otellini | | | | ✓ | | ✓ |
| David S. Pottruck | | ✓ | | | | Chair |
| Jane E. Shaw | Chair | | ✓ | | | |
| John L. Thornton | | | | | Chair | |
| David B. Yoffie | | | Co-Chair | Chair | ✓ | |

† Members are appointed by the Finance Committee.

*Audit Committee.* The Audit Committee assists the Board in its general oversight of our financial reporting, internal controls and audit functions, and is directly responsible for the appointment, retention, compensation and oversight of the work of our independent registered public accounting firm. In 2004, the Audit Committee held eight meetings. The responsibilities and activities of the Audit Committee are described in greater detail in "Report of the Audit Committee" and "Exhibit C: Charter of the Audit Committee."

*Compensation Committee.* The Compensation Committee reviews and determines salaries, performance-based incentives and other matters relating to executive compensation, and administers our stock option plans, including reviewing and granting stock options to our executive officers. The Compensation Committee also reviews and determines various other company compensation policies and matters. The Compensation Committee held two meetings in 2004 and also regularly acts by written consent. For more information, see "Report of the Compensation Committee on Executive Compensation."

*Corporate Governance and Nominating Committee.* In May 2004, we combined the Corporate Governance Committee and the Nominating Committee to form the Corporate Governance and Nominating Committee. The Corporate Governance and Nominating Committee reviews and reports to the Board on a periodic basis with regard to matters of corporate governance and corporate social responsibility, such as environmental, workplace or stakeholder issues. The Corporate Governance and Nominating Committee also reviews and assesses the effectiveness of the Board's Guidelines

on Significant Corporate Governance Issues; makes recommendations to the Board regarding proposed revisions to the Guidelines; and makes recommendations to the Board regarding the size and composition of the Board. In addition, the Corporate Governance and Nominating Committee makes recommendations to the Board regarding the agendas for our annual meetings, reviews stockholder proposals and makes recommendations to the Board for action on such proposals, and reviews and makes recommendations concerning compensation for the independent directors.

The Corporate Governance and Nominating Committee is responsible for reviewing with the Board, from time to time, the appropriate skills and characteristics required of Board members in the context of the current makeup of the Board. This assessment includes issues of diversity in numerous factors such as age; understanding of and experience in manufacturing, technology, finance and marketing; and international experience and culture. These factors, and others as considered useful by the Committee, are reviewed in the context of an assessment of the perceived needs of the Board at a particular point in time. As a result, the priorities and emphasis of the Committee and of the Board may change from time to time to take into account changes in business and other trends, and the portfolio of skills and experience of current and prospective Board members. The Corporate Governance and Nominating Committee establishes procedures for the nomination process, recommends candidates for election to the Board and also nominates officers for election by the Board.

As described in "Director Changes in 2005" on page 4, the Corporate Governance and Nominating Committee is currently considering candidates for the Board to succeed to the Board seat currently held by Dr. Grove. The Board expects to identify and appoint a new director at some time in 2005 following the annual meeting. We will make a public announcement if and when a new director is appointed.

Consideration of new Board nominee candidates typically involves a series of internal discussions, review of information concerning candidates and interviews with selected candidates. Board members or employees typically suggest candidates for nomination to the Board. In 2004, we did not employ a search firm or pay fees to other third parties in connection with seeking or evaluating Board nominee candidates. The Corporate Governance and Nominating Committee will consider candidates proposed by stockholders, and has from time to time received unsolicited candidate proposals from stockholders. The Committee evaluates candidates proposed by stockholders using the same criteria as for other candidates. A stockholder seeking to recommend a prospective nominee for the Corporate Governance and Nominating Committee's consideration should submit the candidate's name and qualifications to our Corporate Secretary via e-mail at *corporate.secretary@intel.com*, by fax to (408) 653-8050 or by mail to Cary Klafter, Corporate Secretary, Intel Corporation, M/S SC4-203, 2200 Mission College Blvd., Santa Clara, California 95052-8119.

The Corporate Governance and Nominating Committee held three meetings in 2004, the former Nominating Committee held one meeting in 2004 and the former Corporate Governance Committee held two meetings in 2004.

*Executive Committee.* The Executive Committee may exercise the authority of the Board between Board meetings, except to the extent that the Board has delegated authority to another committee or to other persons, and except as limited by applicable law. The Executive Committee held one meeting in 2004.

*Finance Committee.* The Finance Committee reviews and recommends matters related to our capital structure, including the issuance of debt and equity securities; our cash and dividend policy and dividend declarations; banking arrangements, including investment of corporate cash; and management of the corporate debt structure. In addition, the Finance Committee reviews and approves finance and other cash management transactions whose authorization is not otherwise approved by the Board or delegated to our management. During 2004, the Finance Committee held three meetings.

*Retirement Plans Investment Policy Committee.* The Finance Committee appoints the members of the Retirement Plans Investment Policy Committee, which is responsible for adopting and amending investment policies for our U.S. employee retirement plans. The members of this committee also include Board members and company officers.

*Attendance at Board, Committee and Annual Stockholders' Meetings.* The Board held six meetings in 2004. We expect each director to attend each meeting of the Board and the committees on which he or she serves, and also expect them to attend the annual meeting. In 2004, each director attended at least 75% of the meetings of the Board and the committees on which he or she served, and all directors except one attended the 2004 Annual Stockholders' Meeting. That meeting included reports from the independent-director chairs of the Audit and Compensation Committees.

8

The Board does not have a formal policy that seeks to limit the number of board seats held by an independent director, but the Board's guideline of 100% attendance at meetings reflects the Board's expectation that each director will meet his or her commitments to the position. The time commitments of directors vary substantially with regard to their individual involvement with their primary positions; their involvement with commercial, charitable and other organizations; and additional commitments. A director's involvement with other boards is just one factor to be considered in deciding if a director can devote the time and attention necessary to be an informed and effective director.

We have a policy, and an approval process, that generally limits each of our employees to serving on no more than one organization's board as a personal, non-Intel activity. The approval process considers both the time commitment involved and the potential for business conflicts between Intel and the other organization. This policy is applicable to our three management directors and our other officers.

*Communications from Stockholders to the Board.* The Board recommends that stockholders initiate any communications with the Board in writing and send them in care of our Corporate Secretary. Stockholders can send communications by e-mail at *corporate.secretary@intel.com*, by fax to (408) 653-8050 or by mail to Cary Klafter, Corporate Secretary, Intel Corporation, M/S SC4-203, 2200 Mission College Blvd., Santa Clara, California 95052-8119. This centralized process will assist the Board in reviewing and responding to stockholder communications in an appropriate manner. The name of any specific intended Board recipient should be noted in the communication. The Board has instructed our Corporate Secretary to forward such correspondence only to the intended recipients; however, the Board has also instructed our Corporate Secretary, prior to forwarding any correspondence, to review such correspondence and, in his discretion, not to forward certain items if he deems them to be of a commercial or frivolous nature or otherwise inappropriate for the Board's consideration. In such cases, our Corporate Secretary may forward some of that correspondence elsewhere in the company for review and possible response.

## CORPORATE GOVERNANCE GUIDELINES

The Board has adopted a set of Guidelines on Significant Corporate Governance Issues, and the Corporate Governance and Nominating Committee is responsible for overseeing the Guidelines and reporting and making recommendations to the Board concerning corporate governance matters. We have posted the Guidelines on our Investor Relations web site at *www.intc.com* under the "Corporate Governance & Social Responsibility" section.

Among other matters, the Guidelines include the following items concerning the Board:

- The Board believes that there should be a substantial majority of independent directors on the Board. The Board's general policy, based on experience, is that the positions of Chairman of the Board and Chief Executive Officer should be held by separate persons as an aid in the Board's oversight of management. The Board has an independent director designated as the Lead Independent Director, who is responsible for coordinating the activities of the other independent directors and performs various other duties.

- Independent directors meet on a regular basis apart from other Board members and management representatives, and the Lead Independent Director is responsible for setting the agenda and running the meetings.

- All directors stand for reelection every year.

- The Board has adopted a retirement policy for officers and directors. Under the policy, independent directors may not stand for reelection after age 72, and management directors, other than former Chief Executive Officers, may not stand for reelection after age 65. Following Dr. Barrett's tenure, the Chief Executive Officer may continue as CEO no later than the annual meeting at which the person is age 60; however, a former CEO may continue to be employed by the company in another capacity beyond that time, including until age 72 as a director or Chairman of the Board. Other corporate officers may continue as such no later than age 65.

- Board compensation should be a mix of cash and equity-based compensation. Management directors will not be paid for Board membership in addition to their regular employee compensation. Independent directors may not receive consulting, advisory or other compensatory fees from Intel in addition to their Board compensation. To the extent practicable, independent directors who are affiliated with our service providers will undertake to ensure that their compensation from such providers does not include amounts connected to payments by Intel.

9

- Board members must act at all times in accordance with the requirements of our Corporate Business Principles, which are applicable to each director in connection with his or her activities relating to Intel. This obligation includes adherence to our policies with respect to conflicts of interest, confidentiality, protection of our assets, ethical conduct in business dealings, and respect for and compliance with applicable law. We will report to the Board any waiver of the requirements of the Corporate Business Principles with respect to any individual director or executive officer, and such waiver is subject to the Board's approval.

- The Board appoints members of Board committees.

- The Audit, Compensation, and Corporate Governance and Nominating Committees consist entirely of independent directors.

- We expect the annual cycle of agenda items for Board meetings to change on a periodic basis to reflect Board requests and changing business and legal issues. The Board will have regularly scheduled presentations from Finance, Sales and Marketing, and our major business units and operations. The Board's annual agenda will include, among other items, our long-term strategic plan, capital projects, budget matters, evaluation of our Chief Executive Officer and management succession.

- The Board has access to, and may contact and meet with, any of our employees. The Board has a program for members to visit our sites and meet with local management and other employees on a worldwide basis.

- The Chief Executive Officer reports at least annually to the Board on succession planning and management development.

- At least annually, the Board evaluates the performance of the Chief Executive Officer and other senior management personnel.

- The Board has a process whereby the Board and its members are subject to periodic self-evaluation and self-assessment.

- The Board works with management to schedule new-director orientation programs and continuing education programs for directors. The orientation programs are designed to familiarize new directors with our businesses, strategies and challenges, and to assist new directors in developing and maintaining the skills necessary or appropriate for the performance of their responsibilities. Continuing education programs for Board members may include a mix of in-house and third-party presentations and programs.

The "Corporate Governance & Social Responsibility" section of our Investor Relations web site at *www.intc.com* also includes our Corporate Business Principles and Principles for Responsible Business, which the Board adopts. Our Corporate Business Principles is our code-of-ethics document for all employees and also applies to our independent directors with regard to their Intel-related activities. In addition to the Corporate Business Principles, we have adopted Principles for Responsible Business, which are intended to succinctly express our commitment to ethical and legal business practices on a worldwide basis. We discuss most of those topics in more detail in our Corporate Business Principles, and we cover other topics in other company policies and practices.

Directors and officers are encouraged to be Intel stockholders through their participation in our stock option and employee stock participation plans. The Board has established stock ownership guidelines for our independent directors and corporate officers to help ensure that they each maintain an equity stake in Intel, and by doing so, appropriately link their interests with those of our other stockholders. These stock ownership guidelines provide that within a five-year period following appointment or election, the covered individuals should attain and hold an investment position (not including unexercised stock options) of no less than a specified number of shares of our stock (for officers, approximating three to five times the sum of their annual baseline total cash compensation, depending on the individual's scope of responsibilities, and there is a similar guideline for independent directors). With limited exceptions, directors and officers may not invest in (purchase or otherwise receive, or write) derivatives of our securities, e.g., puts and calls on our securities, or enter into any "short sales" or "short positions" with respect to our securities. A short position is one in which the holder will profit if the market price of the securities either remains the same or decreases. We consider it inappropriate and contrary to the interests of Intel and our stockholders for directors and officers to take such investment positions.

**Policy on Poison Pill Plans**

In 2001, a stockholder submitted a request to us regarding the approval process for adopting stockholders' rights plans (also known as "poison pills"). We do not have a poison pill and are not presently considering the adoption of such a device. Following consideration of the stockholder's request, the Board adopted a statement of policy that it shall seek and

obtain stockholder approval before adopting any poison pill, provided, however, that the Board may revise or repeal this policy without prior public notice, and the Board may thereafter determine to act on its own to adopt a poison pill if, under the circumstances, the Board in its exercise of its fiduciary responsibilities, including the majority of the independent members of the Board, deems it to be in the best interests of our stockholders to adopt a poison pill without the delay in adoption that would come from the time reasonably anticipated to seek stockholder approval. The Board has directed the Corporate Governance and Nominating Committee to review this policy statement, including the proviso, on an annual basis and to report to the Board on any recommendations that it may have concerning the policy. The Committee last reported to the Board in February 2005 that the policy should continue in effect without change. The terms of the policy, as in effect, are included in our published Corporate Governance Guidelines and proxy statements.

## DIRECTORS' COMPENSATION

It is the Board's general policy that compensation for independent directors should be a mix of cash and equity-based compensation. We do not pay employee directors for Board service in addition to their regular employee compensation. Independent directors may not receive consulting, advisory or other compensatory fees from us in addition to their Board compensation. To the extent practicable, independent directors who are affiliated with our service providers ensure that their compensation from such providers does not include amounts connected to our payments.

In 2004, we paid each independent director an annual cash retainer of $60,000. The Lead Independent Director and the Chairman of the Audit Committee each receive an additional cash retainer of $20,000 per year; other committee chairs each receive an additional cash retainer of $10,000 per year. We reimburse our directors for their travel and related expenses in connection with attending Board meetings and Board-related activities and provide each director with a computer for his or her personal use. Directors' charitable contributions that meet the guidelines of our employee charitable matching gift program are eligible for matching funds from us in an amount up to $10,000 per year. Because we expect attendance at all meetings, and a substantial amount of the Board's work is done in committee meetings and outside of formal meetings, we do not pay meeting fees.

We also grant stock options to independent directors. In accordance with our 2004 Equity Incentive Plan, option grants to independent directors may not exceed 30,000 shares per director per year, and the option exercise price must be at least equal to the market value on the date of grant. During 2004, we granted each independent director an option to purchase a total of 15,000 shares at an exercise price of $27.53 per share. We also granted Ambassador Barshefsky a prorated stock option grant reflecting her period of service on the Board from her appointment in January 2004 to her election by stockholders in May 2004, to purchase a total of 5,000 shares at an exercise price of $32.06 per share.

We have a deferred compensation plan for our independent directors. Under this plan, our independent directors may elect to defer up to 100% of their annual cash fees and receive an investment return on the deferred funds as if the funds were invested in our common stock. Plan participants must irrevocably elect to receive the deferred funds either in a lump sum or in equal installments over 5 years or 10 years, and either to begin receiving distributions at retirement or at the earlier of retirement and a date specified at the time of the election, which cannot be less than 24 months from the election date. This deferred compensation is our unsecured obligation. Dr. Shaw and Mr. Hundt participated in the deferred compensation plan with respect to fees for 2004, and they and other directors have participated in prior years.

In 1998, the Board terminated its retirement program for independent directors. Independent directors serving at the time of termination were vested with the number of years served, and will receive an annual benefit equal to the annual retainer fee in effect at the time of payment, to be paid beginning at commencement of retirement and continuing for the lesser of the number of years served as an independent director or the life of the director.

*Review of Directors' Compensation.* In 2004, the Board decided that the Corporate Governance and Nominating Committee, instead of the Compensation Committee, should have the primary responsibility to review and consider any revisions to directors' compensation. Each of these committees consists solely of independent directors. The Corporate Governance and Nominating Committee is currently reviewing and considering revisions to directors' compensation, and expects to complete its work by June 2005 and make any recommendations to the full Board for action in July 2005. Because of this review process, the Board does not expect to grant stock options to the independent directors in May as has previously been the Board's practice. Instead, the Board is postponing consideration of any equity-related grant or award to await the results of the review. The Committee did request that this year's submission of the 2004 Equity Incentive Plan to stockholders include a proposed amendment authorizing the potential issuance to independent directors of the full range of equity incentive instruments available under the plan, in addition to stock options. This proposed

11

amendment is more fully described in "Proposal 3: Approval of Amendment and Extension of the 2004 Equity Incentive Plan." The Board expects that there will be a grant of equity instruments to the independent directors following completion of the review and any related Board action, and subject in part to results of the stockholders' vote on Proposal 3. We will publicly announce any revisions to directors' compensation.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

To our knowledge, the following table sets forth information regarding ownership of our common stock on February 25, 2005 by (i) each of our directors, our director emeritus and named executive officers, (ii) one holder of 5.2% of our common stock, and (iii) all of our directors, our director emeritus and executive officers as a group. Except as otherwise indicated and subject to applicable community property laws, each owner has sole voting and investment powers with respect to the securities listed.

| Stockholder | Number of Shares of Common Stock Beneficially Owned at February 25, 2005 | | Percent of Class |
|---|---|---|---|
| Barclays Global Investors, NA, et al | 320,052,009 | (1) | 5.2% |
| Gordon E. Moore, Director Emeritus and Chairman Emeritus of the Board | 173,992,357 | | 2.8% |
| Andrew S. Grove, Director and Chairman of the Board | 10,844,564 | (2) | ** |
| D. James Guzy, Director | 10,472,352 | (3) | ** |
| Craig R. Barrett, Director and Chief Executive Officer | 6,316,670 | (4) | ** |
| Paul S. Otellini, Director, President and Chief Operating Officer | 2,494,744 | (5) | ** |
| Arvind Sodhani, Senior Vice President and President, Intel Capital | 1,940,509 | (6) | ** |
| Andy D. Bryant, Executive Vice President and Chief Financial and Enterprise Services Officer | 1,302,179 | (7) | ** |
| Sean M. Maloney, Executive Vice President and General Manager, Mobility Group | 1,207,589 | (8) | ** |
| F. Thomas Dunlap, Jr., Former Senior Vice President and General Counsel | 696,806 | (9) | ** |
| Jane E. Shaw, Director | 303,695 | (10) | ** |
| David B. Yoffie, Director | 291,400 | (11) | ** |
| David S. Pottruck, Director | 119,350 | (12) | ** |
| E. John P. Browne, Director | 116,600 | (13) | ** |
| Reed E. Hundt, Director | 72,000 | (14) | ** |
| John L. Thornton, Director | 12,500 | (15) | ** |
| Charlene Barshefsky, Director | 6,700 | (16) | ** |
| All directors, director emeritus and executive officers as a group (24 individuals) | 218,344,636 | (17) | 3.5% |

** Less than 1%.

(1) Based on information set forth in a Schedule 13G filed with the Securities and Exchange Commission on February 14, 2005 by Barclays Global Investors, NA and certain related entities, reporting sole power to vote or direct the vote over 283,214,158 shares and sole power to dispose or direct the disposition of 320,052,009 shares.

(2) Includes outstanding options to purchase 2,927,696 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(3) Includes outstanding options to purchase 235,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 10,040,350 shares held by the Arbor Company, of which Mr. Guzy is a general partner.

(4) Includes outstanding options to purchase 3,159,196 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(5) Includes outstanding options to purchase 1,802,586 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 1,295 shares held by Mr. Otellini's spouse, and Mr. Otellini disclaims beneficial ownership of these shares.

(6) Includes outstanding options to purchase 1,165,420 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 4,000 shares held by Mr. Sodhani's mother.

(7) Includes outstanding options to purchase 1,152,130 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 1,600 shares held by Mr. Bryant's son and 1,000 shares held by Mr. Bryant's daughter, and Mr. Bryant disclaims beneficial ownership of these shares.

(8)  Includes outstanding options to purchase 1,129,946 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(9)  Includes outstanding options to purchase 456,312 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(10)  Includes outstanding options to purchase 155,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 148,695 shares held by a family trust for which Dr. Shaw shares voting and disposition authority.

(11)  Includes outstanding options to purchase 155,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(12)  Includes outstanding options to purchase 95,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Includes 800 shares held by Mr. Pottruck's daughter and 2,000 shares held by Mr. Pottruck's son. Includes an aggregate of 13,400 shares held in two separate annuity trusts for the benefit of Mr. Pottruck's brother for which Mr. Pottruck shares voting and disposition authority.

(13)  Includes outstanding options to purchase 115,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 1,596 shares held by Lord Browne for which he shares voting and disposition authority.

(14)  Includes outstanding options to purchase 65,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(15)  Includes outstanding options to purchase 12,500 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(16)  Includes outstanding options to purchase 5,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(17)  Includes outstanding options to purchase 17,933,150 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

## STOCK PRICE PERFORMANCE GRAPH

This section includes a line graph comparing the cumulative total stockholder return on our common stock with the cumulative total return of the Dow Jones Technology Index and the Standard & Poor's 500 Index for the five fiscal years ended December 25, 2004. The graph and table assume that $100 was invested on December 23, 1999 (the last day of trading for the fiscal year ended December 25, 1999) in each of our common stock, the Dow Jones Technology Index and the S&P 500 Index, and that all dividends were reinvested. Dow Jones and Company, Inc. and Standard & Poor's Compustat Services, Inc. furnished this data. Cumulative total stockholder returns for our common stock, the Dow Jones Technology Index and the S&P 500 Index are based on our fiscal year.

*COMPARISON OF FIVE-YEAR CUMULATIVE RETURN FOR INTEL, THE DOW JONES TECHNOLOGY INDEX AND THE S&P 500 INDEX*



|  | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| Intel Corporation | $100 | $72 | $78 | $40 | $76 | $58 |
| Dow Jones Technology Index | $100 | $64 | $47 | $29 | $42 | $43 |
| S&P 500 Index | $100 | $92 | $82 | $63 | $80 | $90 |

## REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

The Compensation Committee (the "Committee") administers Intel's compensation program for its executive officers. Intel's executive officers are those persons whose job responsibilities and policy-making authority are the broadest in the company. Currently, 14 of Intel's officers are designated as executive officers. In this regard, the Committee's role is to oversee Intel's compensation plans and policies, annually review and determine all executive officers' compensation, and administer Intel's equity incentive plans (including reviewing and approving grants to Intel's executive officers). The Committee's charter reflects these various responsibilities, and the Committee and the Board periodically review and revise the charter. The Board determines the Committee's membership, which is composed entirely of independent directors. The Committee meets at scheduled times during the year, and it also considers and takes action by written consent. The Committee Chairman reports on Committee actions and recommendations at Board meetings. Intel's Legal department, its Corporate Secretary, and the Compensation and Benefits Group in Intel's Human Resources (HR) department support the Committee in its work and in some cases act pursuant to delegated authority to fulfill various functions in administering Intel's compensation programs. In addition, the Committee has the authority to engage the services of outside advisers, experts and others to assist the Committee. For two of the past three years, the Committee has directly engaged an outside compensation consulting firm to assist the Committee in its review of the compensation for the executive officers. The Committee did not engage an outside firm in 2004 in connection with its work on 2005 executive compensation, but the Committee is undertaking a study during 2005 of Intel's executive compensation philosophy and design, and expects to engage outside service providers to assist in this work.

**General Compensation Philosophy**

Intel's general compensation philosophy is that total cash compensation should vary with Intel's performance in achieving financial and non-financial objectives, and that any long-term incentive compensation should be closely aligned with the stockholders' interests. This philosophy applies to all Intel employees, with a more significant level of variability and compensation at risk as an employee's level of responsibility increases. Intel's employees, including its executive officers, are employed at will and do not have employment agreements, severance payment arrangements or payment arrangements that would be triggered by a "change in control" of Intel.

The Committee's review of Intel's executive compensation programs and practices includes an analysis, for each of Intel's executives, of all elements of compensation, consisting of base and variable cash compensation; stock option grants; retirement programs; and health and welfare benefits. The Committee compared these compensation components separately and in the aggregate to compensation of companies that Intel uses as its "peer groups" for these purposes (the peer groups are also referred to in this report as the "market"). Intel's peer groups consist of a cross-industry subset of Fortune 50 companies as well as a technology industry subset of companies generally considered to be comparable to Intel, most of which are included in the Dow Jones Technology Index. As a result of this review, the Committee made determinations that it believes were appropriate and reasonable for the mix of fixed and variable compensation, and linked to both individual and corporate performance for Intel's executive officers. The Committee also reaffirmed Intel's key strategic compensation design priorities: pay-for-performance, employee retention, cost management, egalitarian treatment of employees, alignment with stockholders' interests and continued focus on corporate governance. This compensation review confirmed that, in the Committee's view, Intel's executive compensation program elements individually and in the aggregate strongly support and reflect the compensation philosophy and strategic design priorities. Specifically, the review confirmed the following:

- Intel's base salaries are less than the average of Intel's peer groups. Intel's performance-based cash incentives are a higher percentage of its total cash compensation than the average for its peer groups.

- Intel's philosophy is that total cash compensation (base salaries plus performance-based cash incentives) should approximate the average of its peer groups, with the potential for higher than average total cash compensation when Intel performs well. In setting executive compensation, the Committee considered other factors, including individual and business group performance. In 2004, Intel paid some of its executives above the market average cash compensation, based on their individual and business group performance in addition to Intel's overall performance. Intel paid other executives lower than the market average total cash compensation based on their relative newness to their positions or their individual and business group performance that was lower than expected.

- As an incentive for future performance, Intel intends for its annual stock option grants to be less than the average peer group levels, and Intel intends for its annual stock option grants to provide the appropriate performance-based focus on long-term stockholder value creation.

- As another means of long-term incentive and retention, Intel grants additional stock options at approximately seven-year intervals, with vesting typically beginning five years from the grant date.

Intel's executive compensation practices reflect a higher proportion of total compensation delivered through pay-for-performance cash incentive and long-term equity compensation, equating to more compensation risk for its executives than for the executives of its peer groups. This higher risk is due to the combination of lower-than-market base salaries and the potential for higher-than-market annual pay-for-performance incentive payments and Intel's use of infrequent, long-vesting stock option grants. The higher-than-market compensation variability that Intel employs is closely linked to Intel's annual financial results through lower-than-market total cash compensation in times of poor financial performance. Conversely, in times of excellent performance, Intel's compensation variability yields higher total cash compensation, rewarding its employees for excellent performance. Intel's philosophy is to pay higher-than-market average compensation over periods of sustained excellent performance. Despite continued improved company performance in 2004, Intel's aggregate executive cash compensation remained below the average of its peer groups because Intel's compensation philosophy requires that Intel outperform the relevant market over an extended period to deliver above-market compensation.

Intel has several performance-based compensation programs in which the majority of its employees are eligible to participate. Most Intel employees who are not compensated on a commission basis participate in a broad-based variable cash incentive program.

Total compensation for the majority of Intel employees, including executive officers, consists of the following components:

- Annual cash compensation consists of base salary, an annual pay-for-performance cash incentive dependent on Intel's earnings per share ("EPS") and level of satisfaction of performance goals for the performance period, and a semiannual cash award payment based on Intel's profitability.

- Intel employees realize long-term incentive compensation through the granting of market value, time-vesting stock options. All of Intel's general full-time and part-time employees, including executive officers, are eligible to receive stock options. Stock options require Intel's stock price to appreciate in order for Intel employees to realize any benefit, thus directly aligning the interests of employees and stockholders.

- Intel employees can also acquire Intel stock through a tax-qualified employee stock purchase plan, which is generally available to all employees. This plan allows participants to buy Intel stock at a discount to the market price with up to 10% of their salary and incentives (subject to IRS limits), with the objective of allowing employees to profit when the value of Intel stock increases over time. Under applicable tax law, no plan participant may purchase more than $25,000 in market value (based on the market value of Intel stock on the last trading day prior to the beginning of the enrollment period for each subscription period) of Intel stock in any calendar year.

- Intel offers retirement benefits to U.S. employees through tax-qualified plans, including an employee-funded 401(k) Savings Plan, a discretionary company-funded Profit Sharing Plan, and a company-funded Pension Plan, and through a non-qualified supplemental deferred compensation plan for certain highly compensated employees. For employees outside the U.S., Intel offers similar retirement benefits that are consistent with local market practices.

- Intel provides health and welfare benefits for substantially all of its employees. Intel shares the cost of health and welfare benefits with its employees, the cost of which is dependent on the level of benefits coverage an employee elects. Intel's health and welfare plans are the same for its executive officers and for its other employees.

*Determining Executive Compensation*

A substantial amount of the Committee's annual work relates to the determination of compensation for Intel's executive officers, including the Chief Executive Officer (CEO). In 2004, the Committee conducted a review of industry standards and "best practices" for evaluating and setting executive compensation compared to Intel's processes. Each year, the Committee determines the annual base salary and an individual pay-for-performance incentive baseline amount which is described below (together, base salary and incentive baseline are referred to as "BSIB") for each of Intel's executive officers. In determining these amounts, the Committee reviews the peer group executive compensation information that is derived from compensation surveys. The Committee also reviews Intel's executive officers' cash compensation levels for internal consistency relative to Intel's 100 most highly paid employees. Intel does not automatically intend for its 14 executive officers to be the 14 most highly paid employees. Intel's top 100 most highly paid employees include worldwide senior leaders in many functions, such as sales, engineering, marketing, technology, legal, finance and research. The Committee does not have specific guidelines to determine where Intel's executive officers fall within the top 100, but rather uses the data to monitor that executive officer compensation is not increasing at rates significantly beyond that of Intel's other highly valued employees.

The Committee most recently determined executive compensation in February 2005, when it determined incentive payments for 2004 and set compensation amounts for 2005. In determining 2005 compensation, the Committee reviewed the total remuneration that each of Intel's executive officers could potentially receive in each of the next 10 years, under scenarios of continuing employment with the company or upon retirement from the company. Total remuneration included all aspects of the executive officer's future cash-convertible benefits, total cash compensation (base salary plus incentive) from continuing employment, the future value of stock options under varying stock price growth assumptions and including as applicable the impact of accelerated vesting upon retirement, the value of any deferred compensation and profit sharing retirement benefits, and the value of health care benefits.

Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Tax Code") places a limit of $1,000,000 on the amount of compensation that Intel may deduct in any one year with respect to its CEO and each of the next four most highly compensated executive officers. Certain performance-based compensation approved by stockholders is not subject to the deduction limit. Intel's Executive Officer Incentive Plan (EOIP), provided that Intel's stockholders approve the amendment and extension as requested at the annual meeting, and Intel's stockholder-approved 2004 Equity Incentive Plan are qualified so that awards under such plans constitute performance-based compensation not subject to Section 162(m) of the Tax Code. To maintain flexibility in compensating Intel's executive officers in a manner designed to

16

promote varying corporate goals, the Committee has not adopted a policy that all compensation must be deductible. If Intel's stockholders do not approve the amendment and extension of the EOIP, any incentive payments to the top five most highly compensated executives will not be tax-deductible in 2005, or until such time as an incentive plan is approved by stockholders.

*Base Salary*

The Committee reviews the history of and proposals for the compensation of each of Intel's executive officers, including cash and equity-based components. In accordance with Intel's compensation philosophy that total cash compensation should vary with company performance, the Committee establishes Intel's executive officers' base salaries at levels that it believes are below the average base salaries of Intel's peer groups' executives. The Committee also determines Intel's executive officers' base salaries as a percentage of BSIB, taking into account each officer's level and amount of responsibility. As a result, a large part of each executive officer's potential total cash compensation is variable and dependent upon Intel's performance.

In general, executive officers with the highest level and amount of responsibility have the lowest percentage of their BSIB fixed as base salary and the highest percentage of their BSIB dependent on variable performance-based standards. For example, in 2004, the base salary for Dr. Barrett, Intel's Chief Executive Officer, was 50% of his total BSIB. The Committee determined Intel's other executives' base salaries in the same manner, but for 2004, their base salary as a percentage of BSIB ranged from 50% to 68%, depending on their job responsibilities. Once base salary is fixed, it does not depend on Intel's performance.

**Performance-Based Compensation**

*Executive Officer Incentive Plan (EOIP)*

The EOIP is an annual cash-based pay-for-performance incentive program, and its purpose is to motivate and reward eligible employees for their contributions to Intel's performance by making a large portion of their cash compensation variable and dependent upon Intel's annual financial performance. EOIP participants have a higher proportion of their total cash compensation delivered through this pay-for-performance incentive, which equates to more compensation risk for Intel's executives than for those of Intel's peer groups due to the relative mix of lower-than-market base salary and higher-than-market annual EOIP pay-for-performance incentive amounts.

The EOIP incentive formula has three variables: (1) the executive officer's annual incentive baseline amount, (2) Intel's EPS and (3) a factor pre-established each year by the Committee (the "Performance Factor"), all of which are further explained below. The Committee sets the incentive baseline amount annually for each EOIP participant and sets the Performance Factor for all participants in the EOIP. At the end of each year, Intel multiplies the individual's incentive baseline amount by Intel's EPS for the year and the Performance Factor to calculate the actual EOIP amount for that year. The EOIP has a cap limiting each individual's incentive payment to a maximum annual limit of $5,000,000. After Intel calculates the individual incentive amounts, the Committee reviews and authorizes each participant's actual incentive payments and has the discretion to reduce (but not increase) a participant's incentive payment. The EOIP does not specify criteria that the Committee must use in exercising its discretion to reduce EOIP payments, and it also does not require the Committee to make any reductions. The Committee has often reduced the incentive amounts below what the EOIP formula would allow, and it did so for the 2004 incentive payments.

17

Intel expects that the actual EOIP payout will be greater than the incentive baseline amount, because of the multiplier effect of the formula. However, the key feature of the formula is that the multiplier and the resulting payout are intended to be closely linked to Intel's financial and operational performance for the year. From year to year, the payout is much more affected by the pay-for-performance effect of the multiplier than by any adjustment in the baseline amount. Over the past five years, the corporate average multiplier approved by the Committee for EOIP purposes has ranged from 1.66 (for 2002) to 4.59 (for 2000). For the 2004 incentive payments, the corporate average multiplier was 2.88. This substantial variability in payout can be seen in the following graph.



¹EPS is net income divided by Intel's weighted average common shares outstanding, assuming dilution.
††Represents the total cash compensation average for the top six most highly compensated executive officers.

For purposes of this EOIP formula, EPS is the greater of (x) Intel's operating income or (y) Intel's net income divided by Intel's weighted average common shares outstanding, assuming dilution. The Committee may adjust Intel's operating income or its net income based on objective criteria selected by the Committee in its sole discretion and in compliance with IRS regulations. These adjustments may include, but are not limited to asset write-downs; litigation; claim judgments, settlements or tax settlements; the effects of tax law changes, changes in accounting principles or other such laws or provisions affecting reported results; accruals for reorganization and restructuring programs; gains or losses on investments; acquisition-related costs; and any extraordinary non-recurring items as described in Accounting Principles Board Opinion No. 30 and/or in management's discussion and analysis of financial condition and results of operations appearing in Intel's annual report to stockholders for the applicable year. Operating income does not include gains or losses on equity securities or interest and other income Intel earned, and does not include a deduction for interest expense and income taxes; as a result, EPS based on operating income generally exceeds EPS based on net income.

The Committee determines the Performance Factor annually for all participants in the EOIP. When determining the annual Performance Factor, the Committee considers Intel's past financial performance, Intel's internal estimates of current year financial performance, and the competitiveness of Intel's executive officers' base salary and incentive baseline amounts compared to Intel's peer groups.

In January 2004, the Committee established individual incentive baseline amounts ranging from $100,000 to $610,000 for each of Intel's executive officers (representing a range of 32% to 50% of BSIB) and set the Performance Factor as 2.98 for the 2004 performance period, a 15% reduction from 2003, which required improved financial performance to provide incentive payouts consistent with 2003. The 2004 financial results yielded an EPS based on operating income per share of $1.56**, which exceeded net income per share of $1.16 and led to an EPS value, as defined, of $1.56 to be used in the formula for determining the maximum incentive amount.

However, for the 2004 performance period, the Committee exercised its discretion in February 2005 to reduce incentive payments below what would have been allowed under the EOIP. Taking into account Intel's strong egalitarian philosophy, the Committee determined that it was appropriate to limit the incentive payments to the amounts that would

---

**Operating income per share is not defined under generally accepted accounting principles and is not a deemed alternative to measure performance under GAAP. As explained above, the EOIP is based on either operating income or net income, both of which can be adjusted by the Committee at its discretion. We have presented EPS based on operating income per share solely to indicate the inputs to the EOIP formula for 2004. EPS based on operating income adds to GAAP net income per share, the per share impact of income tax expense of $2,901 million, loss on equity securities, net of $2 million and subtracts interest and other, net of $289 million.

18

have resulted from calculating the incentive payments under Intel's broad-based employee annual cash incentive plan. This determination resulted in a 38% average reduction from the EOIP formula calculation. Intel's broad-based plan uses a Performance Factor in its calculation, as generally described above, although Performance Factors for the broad-based plan and the EOIP may differ. Intel's broad-based plan also takes into account whether certain business groups have met their objectives over the performance period. Intel sets the goals annually and they vary from year to year. In determining incentives payable to the executive officers with responsibility for Intel's overall performance, such as the Chief Executive Officer and the President, the Committee takes into account the corporate average score on achievement of business objectives. For executive officers with specific responsibility for a particular business group, achievement scores are based on either the individual business group's score or a combination of the group's score and the corporate average score. Incentives paid to Intel's executive officers for 2004 under the EOIP were on average 20% higher than incentive payments for 2003, which is in general accordance with the intent of the EOIP to reflect the relative level of Intel's financial performance from year to year, consistent with the significant earnings growth achieved in 2004.

*Semiannual Cash Award*

Intel's semiannual cash award offers cash incentive payments to Intel employees, including executive officers, based on Intel's corporate profitability. Twice a year, Intel awards eligible employees 0.55 day of pay (calculated based on eligible earnings for the six-month period, including one-half of incentive baseline amounts as applicable) for every two percentage points of corporate pretax margin (pretax profit as a percentage of revenue), or a total payment based on 4% of net income, whichever is greater. Intel makes cash award payments in the first and third quarters of each year based on corporate performance for the preceding two quarters. The plan also has a provision for rewarding employees with an additional day of pay for each six-month period for helping Intel achieve customer satisfaction goals under its Customer Excellence Program; however, Intel did not achieve these goals in 2004. Cash award payments earned in 2004 totaled 16.9 days of pay per employee, down from 18.4 days in 2003.

*Year-End Bonus*

In 2004, the Committee approved a special Year-End Bonus for all employees that varied by geography, in recognition of employees' commitment and dedication that resulted in improved operational and financial results. Intel awarded each of its executive officers a $1,000 bonus under this special program, the same amount that Intel awarded to its other employees in the relevant geographic location.

*Retirement Plans*

Intel offers retirement benefits to its U.S. employees through tax-qualified plans including an employee-funded 401(k) Savings Plan, a discretionary company-funded Profit Sharing Plan, and a company-funded Pension Plan. Intel refers to these tax-qualified plans collectively as the Sheltered Employee Retirement Plan ("SERP"). Intel also has a non-tax-qualified supplemental deferred compensation plan for certain highly compensated employees ("SERPLUS"). For employees outside the U.S., Intel offers similar retirement benefits consistent with local market practices.

The retirement benefits under these tax-qualified plans for Intel's executive officers are the same as those available for other eligible employees in the U.S. The plans differ, as described below, but each plan (other than the Pension Plan) results in individual participant balances that reflect a combination of: (1) a differing annual amount contributed by the company or the employee, or the employee deferring a portion of his or her cash compensation; (2) the annual contributions and/or deferred amounts being invested either at the direction of the company or the employee (the same investment choices are available to all participants); and (3), as in (2), the continuing reinvestment of the investment returns until the accounts are paid out. This means that similarly situated employees, including Intel's executive officers, may have materially different account balances because of a combination of factors: the number of years that the person has participated in the plan; the amount of money contributed, or compensation deferred, at the election of the participant from year to year; and the investments chosen by the participant with regard to those plans providing for participant investment direction. Except with respect to the Pension Plan, these plans do not involve any guaranteed minimum returns or above-market returns; the investment returns are dependent upon actual investment results. When determining annual compensation for executive officers, the Compensation Committee reviewed the individuals' retirement plan balances and payout projections over a 10-year period.

The 401(k) Savings Plan in SERP provides a long-term savings vehicle that allows for pretax contributions by an employee and tax-deferred earnings. Employees may generally contribute up to 50% of eligible annual pay to the 401(k) Savings Plan, not to exceed the annual IRS limit ($13,000 for 2004). Employees at least 50 years of age by the end of 2004 were eligible to make 401(k) catch-up contributions to a maximum of $3,000. Employees direct their own investments in the 401(k) Savings Plan.

19

The Profit Sharing Plan is a defined contribution plan designed to accumulate retirement funds for Intel's employees, including executive officers, and to allow Intel to make contributions or allocations to those funds. The Profit Sharing Plan features a discretionary cash contribution determined annually by the Committee and the Chief Executive Officer. Intel's contributions made under the plan vest beginning after three years of service in 20% annual increments until the employee is 100% vested after seven years. Additional company contributions made after the seven-year period are immediately vested. For 2004, Intel's discretionary contributions (including allocation of forfeitures) to the Profit Sharing Plan for all eligible U.S. employees, including executive officers, equaled 8% of eligible salary (which includes actual incentive payments as applicable). Intel invests all of its contributions in the Profit Sharing Plan in a diversified equity portfolio.

The Pension Plan in SERP is a so-called "floor offset" pension plan, which provides pension benefits in the event that an employee's Profit Sharing Plan account balance does not offer a minimum level of retirement income as determined by a pension formula based on final average pay, Social Security covered compensation, and length of service upon separation not to exceed 35 years. If the Profit Sharing Plan account balance does not provide a minimum level of retirement income, the Pension Plan makes up the difference. The Profit Sharing Plan balance for each of Intel's executive officers is above this minimum, and so none of those individuals would receive any payments from the Pension Plan if they retired today.

SERPLUS participants can elect to defer their salary in excess of the qualified plan limit and their year-end cash incentive payment without regard to such limits. SERPLUS salary deferrals commence upon the participant's deferrals and contributions reaching the annual IRS limit in the 401(k) Savings Plan ($13,000 for 2004). Participants direct the investment of their deferrals in SERPLUS among the same investment options as are available in the 401(k) Savings Plan; thus, there is no guaranteed return. Upon enrollment, participants make a one-time irrevocable distribution election, from among several distribution options, to be effective following separation from employment. SERPLUS also has a profit sharing component that credits contributions on behalf of eligible employees that could not be credited to their individual accounts under the Profit Sharing Plan because of Tax Code limitations, particularly that found in Section 401(a)(17) governing maximum eligible compensation. SERPLUS amounts representing the profit sharing component are subject to the same vesting and investment provisions as under the Profit Sharing Plan. For 2004, where Tax Code limits applied, Intel allocated the excess, up to 8% of eligible salary, to SERPLUS for eligible employees, including executive officers. All deferral and credit balances in SERPLUS are unfunded obligations of Intel; increases and decreases based on "investment" of the balances are also unfunded amounts reflected as hypothetical returns equal to the actual returns of investments designated by a participant or the company.

## Stock Options

To reward and retain employees, Intel uses stock options as its primary long-term incentive vehicle. With Intel's strong belief in the alignment of all employees with stockholders, the Committee decided for 2004 and 2005 to continue its use of stock options for executive officers and the broad-based employee population. Intel conducted an evaluation of performance stock, including both the positive and negative consequences that could result by providing compensation through performance stock versus stock options tied to stock price improvement. Intel intends to further evaluate the use of performance stock as well as the use of other equity vehicles through the 2005 compensation study considering industry comparables, Intel's culture and best practices for driving long-term pay-for-performance.

Through May 2004, Intel had two stock option plans under which it granted stock options. Intel's stockholder-approved 1984 Stock Option Plan, as amended, expired in May 2004 and Intel generally used it for making annual grants to officers and directors as a part of its executive performance review process, and Intel also used it for infrequently granted long-term executive performance incentive and retention grants. Intel's 1997 Stock Option Plan, under which it granted the majority of its stock options, was used for stock options granted to employees other than officers and directors, and was not a stockholder-approved plan. In May 2004, Intel's stockholders approved the Intel 2004 Equity Incentive Plan (the "2004 Plan"), replacing both the 1984 and 1997 Stock Option Plans. Intel cancelled all remaining shares available in the expired 1984 Stock Option Plan and the 1997 Stock Option Plan. The 2004 Plan has a duration of two years, and each year, beginning in 2005, Intel will ask its stockholders to amend the Plan to extend the term by an additional year, which provides stockholders with more frequent opportunities to review Intel's use of equity compensation and the opportunity to approve Intel's equity incentive plan. The Board has reviewed and approved the 2004 Plan amendments for which Intel is seeking stockholder approval at the annual meeting (see "Proposal 3: Approval of Amendment and Extension of the 2004 Equity Incentive Plan"). Under the 2004 Plan, Intel's directors, executives and broad employee base are eligible to receive stock options. The 2004 Plan also permits Intel to award restricted shares or units, stock appreciation rights and performance-based awards should the Committee determine that it is appropriate to do so.

20

Intel's stock option programs are broad-based, and in 2004, Intel granted stock options to more than 90% of its employees. The Compensation Committee has established a policy that in any one year Intel may not grant more than 5% of the shares subject to all options granted in that year to the Chief Executive Officer and the next four most highly compensated executive officers (five in 2004). In 2004, approximately 99% of the options that Intel granted went to employees other than its top six most highly compensated executive officers; for the period 2000 to 2004, only 1.2% of all options that Intel granted went to its top five most highly compensated executive officers (top six for 2004). (See the "Option Grants in Last Fiscal Year" table under the heading "Executive Compensation.")

Annual stock option grants for executives are a key element of Intel's market-competitive total compensation. In 2004, the Committee approved annual stock option grants for Intel's executive officers. The Committee based individual grant amounts on factors such as the relative job scope, expected future contributions to the growth and development of the company, and competitiveness of grants relative to Intel's peer groups.

In general, initial grants that employees receive when they begin employment at Intel and grants subsequent to hire vest over a four-year period. Intel grants stock options at a price equal to the market value of Intel stock on the date of grant. For all employees including executives (new hires and existing employees), Intel uses pre-established quarterly dates for the formal granting of stock options during the year, with limited exceptions; these dates typically occur shortly following publication of Intel's quarterly earnings releases.

**Stockholding Guidelines**

Because the Committee believes in linking the interests of management and stockholders, the Board has set stockholding guidelines for Intel's executive officers. The holding guidelines specify a number of shares that Intel's executive officers must accumulate and hold within five years of the later of the effective date of the program or the date of appointment as an officer. The specific share requirements are based on a multiple of annual baseline total cash compensation ranging from three to five times, with the higher multiples applicable to executive officers having the highest levels of responsibility.

**Personal Benefits**

Intel seeks to maintain an egalitarian culture in its facilities and operations. Intel's officers are not entitled to operate under different standards than other employees. Intel does not provide its officers with reserved parking spaces or separate dining or other facilities, nor does Intel have programs for providing personal-benefit perquisites to officers, such as permanent lodging or defraying the cost of personal entertainment or family travel. Intel's office-building layouts are cubicle-based for all employees, including officers. Company-provided air travel for Intel's officers is for business purposes only: Intel's company-owned aircraft each hold approximately 40 passengers and are used in regularly scheduled shuttle routes between Intel's major U.S. facility locations, and Intel's use of non-commercial aircraft on a time-share or rental basis is limited to appropriate business-only travel. Intel's health care, insurance and other welfare and employee-benefit programs are the same for all eligible employees, including Intel's officers. Intel's loan programs, although modest in nature, are not available to Intel's executive officers. Intel has no outstanding loans of any kind to any of its executive officers, and since 2002, federal law has prohibited Intel from making any new loans to its executive officers. Intel expects its officers to be role models under its Corporate Business Principles, which are applicable to all employees, and Intel's officers are not entitled to operate under lesser standards.

**Company Performance and CEO Compensation**

The company's compensation program is designed to promote the achievement of corporate and business objectives. This pay-for-performance program is most clearly exemplified in the compensation of Intel's Chief Executive Officer, Dr. Barrett. The Committee determines Dr. Barrett's BSIB in the same manner as described for all executive officers. In setting compensation levels for the Chief Executive Officer, the Committee considers comparative compensation information from Intel's peer groups for the prior year. However, consistent with the Committee's general practice and discretionary authority, Dr. Barrett's 2004 salary and individual pay-for-performance incentive baseline amount were not tied directly to the comparative compensation data but set at levels believed to be below the average of Intel's peer groups. In January 2004, the Committee set Dr. Barrett's base salary at 58% of the market average and set his BSIB at 45% of the market average, with the expectation that actual cash compensation would be closer to or ahead of the market average depending on company performance as reflected in the operation of the EOIP formula.

Under the EOIP, Dr. Barrett's actual pay-for-performance incentive for 2004 (paid in 2005) was $1,756,800. This incentive, like the incentives paid to each of Intel's other executive officers under the EOIP, was less than the maximum amount payable under the EOIP formula. Although Dr. Barrett's BSIB was 45% of the average total baseline

21

compensation disclosed by Intel's peer groups, due to the higher variability in Intel's total compensation program, his actual cash compensation (base salary and incentive) for 2004 was 90% of the average total actual cash compensation disclosed by Intel's peer groups.

In April 2004, the Committee awarded Dr. Barrett 350,000 stock options, which become exercisable in 2005 through 2008 in 25% annual increments. These stock options expire 10 years from the grant date. In 2004, Intel also contributed $16,400 to Dr. Barrett's account under the tax-qualified retirement plan and allocated $154,300 to Dr. Barrett's account under the non-qualified retirement plan. In general, Dr. Barrett's retirement plan accounts are available to Dr. Barrett only upon retirement or termination from Intel as an employee, or upon disability or death.

In November 2004, the Board of Directors elected Paul S. Otellini as President and Chief Executive Officer and Dr. Barrett as Chairman of the Board, effective as of the 2005 annual meeting. In February 2005, the Committee approved the salary and other compensation arrangements of Mr. Otellini and Dr. Barrett, as described below, for 2005.

The Committee set Mr. Otellini's base salary for 2005 at $550,000 per year, effective as of January 1, 2005. Effective June 1, 2005 following his promotion to Chief Executive Officer, his base salary will increase to $650,000 per year. In addition to base salary, Mr. Otellini's individual incentive baseline amount for 2005 under the EOIP is currently set at $600,000. Effective June 1, 2005, his incentive baseline amount will increase to $750,000. The Committee granted Mr. Otellini a long-term executive performance stock option grant of 400,000 shares in February 2005. This grant vests in 25% annual increments beginning four years from the date of grant. Mr. Otellini has also been recommended to receive a stock option grant covering 500,000 shares in April in connection with Intel's annual stock option grant program. Annual stock option grants vest in 25% annual increments beginning one year from the date of grant.

The Committee set Dr. Barrett's base salary for 2005 at $610,000, and set his individual incentive baseline amount for 2005 under the EOIP at $700,000. As with Mr. Otellini, his actual payout under the EOIP will be determined in early 2006 based on Intel's performance for 2005. Dr. Barrett has also been recommended to receive a stock option grant covering 250,000 shares in April in connection with Intel's annual stock option grant program. As noted above, annual stock option grants vest in 25% annual increments beginning one year from the date of grant, and actual payouts under the EOIP, which will be based on Intel's fiscal 2005 results, will not be determined until early 2006.

The Committee is pleased to submit this report to Intel's stockholders and believes that Intel's pay-for-performance executive compensation sets the standard for best-in-class executive compensation practices.

**Compensation Committee:**

Reed E. Hundt, Chairman
E. John P. Browne
David S. Pottruck

# EMPLOYMENT CONTRACTS AND CHANGE IN CONTROL ARRANGEMENTS

All of our employees, including our executive officers, are employed at will and do not have employment agreements.

From time to time, we have implemented voluntary separation programs to encourage headcount reduction in particular parts of the company, and these programs have offered separation payments to departing employees. However, executive officers have not historically been eligible for any of these programs, nor do we retain executive officers following retirement on a part-time or consultancy basis. In 2002, we received a request from a stockholder to adopt a policy that, absent stockholder approval by vote, we would not pay severance to a departing executive officer in excess of 2.99 times that officer's most recent annual salary and cash incentives. We have no practice of making such payments, nor do we have any plans to do so in the future, but the stockholder still requested that we adopt this policy so as to cover any such payments that we might make in the future. Following discussions with the stockholder, the Board adopted a policy that we will seek stockholder approval for future severance agreements with senior executives that provide benefits in an amount exceeding three times the executive's base compensation. For this purpose, "future severance agreements" means any such agreements that we may enter into after adoption of this policy by the Board in February 2003, and includes employment agreements containing severance provisions, retirement agreements and agreements renewing, modifying or extending such agreements, but does not include retirement plans, deferred compensation plans, early retirement

programs, or similar plans or programs available to more than 50 employees on reasonably similar terms. "Senior executive" means any of our top five most highly compensated executives in the calendar year preceding termination of employment, and any executive listed in the compensation table in our annual proxy statement in any of the five years preceding termination of employment. "Benefits" include lump-sum cash payments (including payments in lieu of medical and other benefits) and the estimated present value of periodic retirement payments, fringe benefits and consulting fees (including reimbursable expenses) to be paid to the executive. "Benefits" does not include settlement of a legal claim, such as a cash payment in exchange for the surrender of vested stock options, or payments to settle pending or threatened litigation. "Base compensation" shall be determined consistent with federal regulations under Tax Code Section 280G, and generally means the executive's average W-2 compensation over the five full calendar years preceding termination of employment. The Board may in its discretion revise or terminate this policy in the future, but will at that time publicly disclose any such action on its part.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

*Our Policies.* It is our policy that all employees must avoid any activity that is or has the appearance of being hostile, adverse or competitive with Intel, or that interferes with the proper performance of their duties, responsibilities or loyalty to Intel. These policies are included in our Corporate Business Principles, which cover our directors, executive officers and other employees. Each director and executive officer is instructed to always inform the Board when confronted with any situation that may be perceived as a conflict of interest, even if the person does not believe that the situation would violate our guidelines. If in a particular circumstance the Board concludes that there is or may be a perceived conflict of interest, the Board will instruct our legal department to work with our relevant business units to determine if there is a conflict of interest. Any waivers to these conflict rules with regard to a director or executive officer require the prior approval of the Board or the Audit Committee.

*NASDAQ Rules.* The NASDAQ rules defining "independent" director status also govern conflict of interest situations. Each of our directors other than Messrs. Barrett, Grove and Otellini qualifies as "independent" in accordance with the NASDAQ rules. The NASDAQ rules include a series of objective tests that would not allow a director to be considered independent if the director had certain employment, business or family relationships with the company. The NASDAQ independence definition includes a requirement that the Board also review the relations of each independent director to the company on a subjective basis. In accordance with that review, the Board has made a subjective determination as to each independent director that no relationships exist that, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. In making these determinations, the directors reviewed and discussed information provided by the directors and Intel with regard to each director's business and personal activities as they may relate to Intel and Intel's management.

*SEC Rules.* In addition to the Intel and NASDAQ policies and rules described above, the SEC has specific disclosure requirements covering certain types of transactions involving Intel and a director, executive officer or other specified party. There was one such transaction in 2004 that requires disclosure: We retained the law firm of Wilmer Cutler Pickering Hale and Dorr LLP to perform legal services in 2004. Ambassador Barshefsky, one of our directors, is Senior International Partner of this firm. We began using Wilmer Cutler Pickering Hale and Dorr LLP before Ambassador Barshefsky was elected to the Board. In accordance with our Corporate Governance Guidelines, Ambassador Barshefsky's compensation from Wilmer Cutler Pickering Hale and Dorr LLP does not include amounts connected to payments we made to the law firm. Due to Ambassador Barshefsky's affiliation with Wilmer Cutler, the Board has established a special process which requires that use of that firm is subject to the prior approval of the Chief Executive Officer, the Board's Audit Committee and the Board. To date, we have not used the Wilmer Cutler firm in 2005.

Further, with regard to SEC rules, we have not engaged in any transaction, or series of similar transactions, since the beginning of 2004, or any currently proposed transaction, or series of similar transactions, to which Intel or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000 and in which any of our directors, executive officers, nominees for election as a director, beneficial owners of more than 5% of our common stock or members of their immediate family had, or will have, a direct or indirect material interest.

In addition, none of the following persons has been indebted to Intel or its subsidiaries at any time since the beginning of 2004: any of our directors or executive officers; any nominee for election as a director; any member of the immediate family of any of our directors, executive officers or nominees for director; any corporation or organization of which any of our directors, executive officers or nominees is an executive officer or partner or is, directly or indirectly, the beneficial owner of 10% or more of any class of equity securities (except trade debt entered into in the ordinary course of business); and any trust or other estate in which any of the directors, executive officers or nominees for director has a substantial beneficial interest or for which such person serves as a trustee or in a similar capacity.

*Business Relationships.* We are a large business organization with worldwide operations, and we engage in thousands of purchase, sale and other transactions annually. We have various types of business arrangements with corporations and other organizations in which one of our directors, executive officers or nominees for director may also be a director, trustee or investor, or have some other direct or indirect relationship. We would usually enter into these arrangements in the ordinary course of our business, and they typically will involve Intel receiving or providing some good or service on a non-exclusive basis and at arms-length negotiated rates or in accordance with regulated price schedules. We do not believe that in any material circumstance either Intel or the other corporation or organization is a sole-source supplier to the other with regard to the relevant good or service. We also do not believe that in any case the director, executive officer or nominee for director receives any compensation from the other corporation or organization that is directly linked to the revenue or profits of the Intel-related business. Any revenue or profits from Intel-related business may, of course, be indirectly reflected in the overall revenue or profits of the other corporation or organization, which in turn may affect the individual's overall compensation or the value of his or her investments in the corporation or organization.

Under our Intel Capital program, we make equity investments in companies around the world to further our strategic objectives and support our key business initiatives. Our Intel Capital program generally focuses on investing in companies and initiatives to stimulate growth in the digital economy, create new business opportunities for us and expand global markets for our products. The investments may support, among other things, our product initiatives, emerging trends in the technology industry or worldwide Internet deployment. This strategic investment program helps advance our overall mission to be the preeminent supplier of building blocks to the worldwide digital economy. Many of our investments are in private companies, including development-stage companies with little or no revenue from current product offerings. We invest in companies that develop software, hardware or services supporting our technologies. Any one or more of these companies may be a supplier, vendor, customer, joint-venture partner or investment of a corporation or other organization with which one of our directors, executive officers or nominees for director, or one of their family members, is affiliated.

We have a corporate charitable donations program and have established the Intel Foundation for similar activity. Our charitable activities focus primarily on pre-collegiate mathematics, science and computer-related programs on a worldwide basis. We have a program whereby we will match certain charitable donations of individual employees up to $10,000 per employee per year. Directors and executive officers are eligible to participate in this matching program on the same terms as our other employees. It is possible that through this matching program and/or other parts of our corporate donation programs or the Intel Foundation, we may make charitable contributions to organizations at which one of our directors, executive officers or nominees for director, or one of their family members, is a director, trustee, consultant or employee.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

All members of the Compensation Committee during 2004 were independent directors, and none of them were our employees or former employees. During 2004, none of our executive officers served on the compensation committee (or equivalent), or the board of directors, of another entity whose executive officer(s) served on our Compensation Committee or Board.

## EXECUTIVE COMPENSATION

The following tables set forth the annual compensation for our Chief Executive Officer and our five other most highly compensated executive officers in 2004.

### SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Annual Compensation | | | Long-Term Compensation Awards | All Other Compensation ($)(3) |
| | | Salary ($) | Bonus ($)(1) | Other Annual Compensation ($) | Securities Underlying Options (#)(2) | |
| --- | --- | --- | --- | --- | --- | --- |
| Craig R. Barrett . . . . . . . . . . . . . . . . . . . | 2004 | 610,000 | 1,844,000 | — | 350,000 | 170,700 |
| Chief Executive Officer | 2003 | 610,000 | 1,512,100 | — | 1,350,000 | 134,800 |
| | 2002 | 610,000 | 1,070,400 | — | 584,000 | 134,900 |
| Paul S. Otellini . . . . . . . . . . . . . . . . . . | 2004 | 450,000 | 1,359,700 | — | 300,000 | 106,400 |
| President and Chief Operating Officer | 2003 | 350,000 | 867,600 | — | 900,000 | 77,200 |
| | 2002 | 350,000 | 612,600 | — | 664,000 | 73,000 |
| Andy D. Bryant . . . . . . . . . . . . . . . . . . . | 2004 | 305,000 | 913,500 | — | 200,000 | 84,600 |
| Executive Vice President | 2003 | 290,000 | 746,700 | — | 200,000 | 66,000 |
| Chief Financial and | 2002 | 280,000 | 532,300 | — | 1,332,852 | 59,900 |
| Enterprise Services Officer | | | | | | |
| F. Thomas Dunlap, Jr. (4). . . . . . . . . . . . . . . | 2004 | 270,000 | 671,200 | — | 100,000 | 69,300 |
| Former Senior Vice President | 2003 | 270,000 | 590,100 | — | 100,000 | 51,800 |
| and General Counsel | 2002 | 270,000 | 375,500 | — | 569,568 | 50,300 |
| Sean M. Maloney . . . . . . . . . . . . . . . . . . . . . | 2004 | 250,000 | 716,000 | — | 200,000 | 63,600 |
| Executive Vice President | 2003 | 225,000 | 538,500 | — | 200,000 | 44,100 |
| General Manager, Mobility Group | 2002 | 225,000 | 325,100 | — | 1,333,707 | 46,500 |
| Arvind Sodhani . . . . . . . . . . . . . . . . . . . . . | 2004 | 215,000 | 681,500 | — | 60,000 | 65,600 |
| Senior Vice President and | 2003 | 210,000 | 603,800 | — | 75,000 | 47,800 |
| President, Intel Capital | 2002 | 210,000 | 386,600 | — | 413,568 | 46,000 |

(1) This amount includes the annual performance incentive payments earned under the EOIP and as semiannual cash awards for 2002, 2003 and 2004. The incentive payment paid under the EOIP and the semiannual cash awards program for the second half of the relevant year are typically paid in the first quarter of the year following the year in which they were earned. See "Report of the Compensation Committee on Executive Compensation" for a description of the EOIP, the semiannual cash awards and the other major aspects of our executive compensation program. We awarded Mr. Sodhani an additional $50,000 bonus for 2004 in recognition of certain services performed during the year, and we awarded each of the executive officers a special $1,000 year-end bonus, as further described in "Year-End Bonus" in that report.

(2) Indicates the number of shares of common stock underlying options.

(3) All amounts listed in this column are composed of tax-qualified discretionary company contributions to the Profit Sharing Plan of $16,400 in 2004 ($16,000 in each of 2003 and 2002) for each of the named executives, plus discretionary company contributions made under Intel's non-tax-qualified SERPLUS. These amounts are to be paid out to the named executives only upon retirement, termination, disability or death.

(4) A portion of these grants terminated upon Mr. Dunlap's retirement from the company in January 2005.

*OPTION GRANTS IN LAST FISCAL YEAR*

| Name | Number of Securities Underlying Options Granted (#)(1) | Percent of Total Options Granted to Employees in Fiscal Year (2) | Exercise or Base Price ($/Share)(3) | Expiration Date | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term ($)(4) 5% | 10% |
|---|---|---|---|---|---|---|
| C. Barrett | 350,000 | 0.31 | 27.00 | 4/15/14 | 5,942,000 | 15,058,100 |
| P. Otellini | 300,000 | 0.26 | 27.00 | 4/15/14 | 5,093,100 | 12,906,900 |
| A. Bryant | 200,000 | 0.17 | 27.00 | 4/15/14 | 3,395,400 | 8,604,600 |
| T. Dunlap (5) | 100,000 | 0.09 | 27.00 | 4/15/14 | 1,697,700 | 4,302,300 |
| S. Maloney | 200,000 | 0.17 | 27.00 | 4/15/14 | 3,395,400 | 8,604,600 |
| A. Sodhani | 60,000 | 0.05 | 27.00 | 4/15/14 | 1,018,600 | 2,581,400 |

(1) Options granted to executives on April 15, 2004 are exercisable in 25% annual increments beginning on April 15, 2005.

(2) Based on a total of 115 million shares subject to options granted to employees under our option plans in 2004.

(3) Under all stock option plans, the option purchase price is equal to the market price at the date of the grant. We granted options to executives on April 15, 2004.

(4) In accordance with SEC rules, these columns show gains that could accrue for the respective options, assuming that the market price of our common stock appreciates from the date of grant over a period of 10 years at an annualized rate of 5% and 10%, respectively. For example, the options that we granted to Dr. Barrett would produce a pre-tax gain of $15,058,100 only if Intel's stock price appreciates by 10% per year for the next 10 years and rises from $27.00 to $70.02 per share before Dr. Barrett exercises his options. Such an increase in share price of 159% would result in a significant increase in Intel's aggregate market capitalization. If the stock price does not increase above the exercise price at the time of exercise, realized value to the named executives from these options will be zero.

(5) A portion of this grant terminated upon Mr. Dunlap's retirement from the company in January 2005.

*AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR*
*AND FISCAL YEAR-END OPTION VALUES*

| Name | Shares Acquired on Exercise (#) | Value Realized ($) | Number of Securities Underlying Unexercised Options at December 25, 2004 (#)(1) Exercisable | Unexercisable | Value of Unexercised In-the-Money Options at December 25, 2004 ($)(2) Exercisable | Unexercisable |
|---|---|---|---|---|---|---|
| C. Barrett | 384,000 | 10,667,300 | 2,666,200 | 3,142,500 | 21,771,000 | 10,636,800 |
| P. Otellini | 192,000 | 5,356,700 | 1,608,600 | 2,345,000 | 11,478,500 | 6,799,500 |
| A. Bryant | 400,000 | 5,390,100 | 852,100 | 1,714,400 | 7,181,800 | 1,942,800 |
| T. Dunlap | — | — | 866,900 | 941,800 | 7,573,200 | 1,046,100 |
| S. Maloney | — | — | 840,600 | 1,701,800 | 4,903,200 | 1,944,200 |
| A. Sodhani | 628,000 | 10,274,700 | 1,059,700 | 680,000 | 9,400,500 | 765,400 |

(1) These amounts represent the total number of shares subject to stock options held by the named executives at December 25, 2004. These options were granted on various dates during the years 1995 through 2004. Unexercisable options are those that are not yet vested.

(2) These amounts represent the difference between the exercise price of the stock options and the price of our common stock on December 24, 2004 (the last day of trading for the fiscal year ended December 25, 2004) for all in-the-money options held by the named executive. The in-the-money stock option exercise prices range from $5.71 to $20.23. These stock options were granted at the market price of the stock on the grant date.

*PENSION PLAN TABLE*

| Eligible Compensation | Years of Service | | | | |
|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 |
| $205,000 and above ........................................... | 38,537 | 51,383 | 64,229 | 77,075 | 89,920 |

The Pension Plan provides for minimum pension benefits determined by a participant's years of service credited under the plan and final average compensation (taking into account the participant's social security wage base), reduced by the participant's balance in the Profit Sharing Plan. If the pension benefit exceeds the participant's balance in the Profit Sharing Plan, the participant will receive a combination of pension and profit sharing amounts equal to the pension benefit. However, the participant will receive only the benefit from the Profit Sharing Plan if that benefit is greater than the value of the pension benefit. Compensation includes regular earnings and most cash incentives. However, maximum eligible compensation for 2004 is $205,000, in accordance with Section 401(a)(17) of the Tax Code. This amount is subject to cost-of-living adjustments in accordance with Section 415(d) of the Tax Code.

The table above illustrates the estimated annual benefits payable in the form of a straight-life annuity upon retirement at age 65 under the Pension Plan to persons in the specified compensation and years of service classifications for social security benefits. The Employee Retirement Income Security Act of 1974 limits the amount of benefits that may be paid under pension plans qualified under the Tax Code. The amounts shown are subject to reduction to the extent that they exceed such limits.

The majority of our employees, including executive officers, are not expected to receive a pension benefit upon separation. Historically, we have contributed 8% to 12.5% of participants' eligible compensation to the Profit Sharing Plan on an annual basis, which has caused the value of our employees' Profit Sharing Plan accounts to typically exceed their Pension Plan benefits, resulting in no payments being made from the Pension Plan.

For each of our employees named in the Summary Compensation Table, the years of credited service as of year-end 2004 under the Pension Plan are: Dr. Barrett (30), Mr. Otellini (30), Mr. Bryant (23), Mr. Dunlap (30), Mr. Maloney (22) and Mr. Sodhani (23). Credited service equals the actual number of years the named executives have been fully employed at Intel; our executive officers do not receive extra or bonus credits for this purpose.

## REPORT OF THE AUDIT COMMITTEE

The ultimate responsibility for good corporate governance rests with the Board, whose primary roles are oversight, counseling and direction to Intel's management in the best long-term interests of the company and its stockholders. The Audit Committee has been established for the purpose of overseeing Intel's accounting and financial reporting processes and audits of Intel's annual financial statements and internal control over financial reporting.

The Audit Committee is made up solely of independent directors, as defined in the applicable NASDAQ and SEC rules, and it operates under a written charter adopted by the Board, a copy of which is included in this proxy statement as Exhibit C. Intel intends for the composition of the Audit Committee, and the attributes of its members and its responsibilities, as reflected in its charter, to be in accordance with applicable requirements for corporate audit committees. The Audit Committee reviews and assesses the adequacy of its charter on an annual basis, and the Board last revised the charter in February 2005.

As described more fully in its charter, the purpose of the Audit Committee is to assist the Board in its general oversight of Intel's financial reporting, internal controls and audit functions. Management is responsible for the preparation, presentation and integrity of Intel's financial statements; accounting and financial reporting principles; internal controls; and procedures designed to reasonably assure compliance with accounting standards, applicable laws and regulations. Intel has a full-time Internal Audit department that reports to the Audit Committee and to management. This department is responsible for objectively reviewing and evaluating the adequacy, effectiveness and quality of Intel's system of internal controls relating, for example, to the reliability and integrity of Intel's financial information and the safeguarding of Intel's assets. Ernst & Young LLP, Intel's independent registered public accounting firm, is responsible for performing an independent audit of Intel's consolidated financial statements in accordance with generally accepted auditing standards and expressing opinions on management's assessment of the effectiveness of Intel's internal control over financial reporting and the effectiveness of Intel's internal control over financial reporting. In accordance with law, the Audit Committee has ultimate authority and responsibility to select, compensate, evaluate and, when appropriate, replace Intel's independent audit firm. The Audit Committee has the authority to engage its own outside advisers, including experts in particular areas of accounting, as it determines appropriate, apart from counsel or advisers hired by management.

The Audit Committee members are not professional accountants or auditors, and their functions are not intended to duplicate or to certify the activities of management and the independent audit firm, nor can the Audit Committee certify that the independent audit firm is indeed "independent" under applicable rules. The Audit Committee serves a board-level oversight role, in which it provides advice, counsel and direction to management and the auditors on the basis of the information it receives, discussions with management and the auditors, and the experience of the Audit Committee's members in business, financial and accounting matters.

The Audit Committee has an agenda for the year that includes reviewing Intel's financial statements, internal control over financial reporting and audit matters. The Audit Committee meets each quarter with Ernst & Young, the Chief Audit Executive and management to review Intel's interim financial results before the publication of Intel's quarterly earnings press releases. Management's and the independent audit firm's presentations to and discussions with the Audit Committee cover various topics and events that may have significant financial impact and/or are the subject of discussions between management and the independent audit firm. In addition, the Audit Committee generally oversees Intel's internal compliance programs. In accordance with law, the Audit Committee is responsible for establishing procedures for the receipt, retention and treatment of complaints received by Intel regarding accounting, internal accounting controls or auditing matters, including the confidential, anonymous submission by Intel's employees, received through established procedures, of any concerns regarding questionable accounting or auditing matters.

Among other matters, the Audit Committee monitors the activities and performance of Intel's internal and independent auditors, including the audit scope, external audit fees, auditor independence matters and the extent to which the independent audit firm may be retained to perform non-audit services. Intel's independent audit firm provides the Audit Committee with the written disclosures and the letter required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees," and the Audit Committee discusses with the independent audit firm and management that firm's independence.

The Audit Committee has reviewed and discussed with management its assessment and report on the effectiveness of Intel's internal control over financial reporting as of December 25, 2004, which it made using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework. The Audit Committee has also reviewed and discussed with Ernst & Young its attestation report on management's assessment of internal control over financial reporting and its review and report on Intel's internal control over financial reporting. Intel published these reports in its Annual Report on Form 10-K for the year ended December 25, 2004.

In accordance with Audit Committee policy and the requirements of law, the Audit Committee pre-approves all services to be provided by Ernst & Young. Pre-approval includes audit services, audit-related services, tax services and other services. In some cases, the full Audit Committee provides pre-approval for up to a year, related to a particular defined task or scope of work and subject to a specific budget. In other cases, the Chairman of the Audit Committee has the delegated authority from the Audit Committee to pre-approve additional services, and the Chairman then communicates such pre-approvals to the full Audit Committee. To avoid certain potential conflicts of interest, the law prohibits a publicly traded company from obtaining certain non-audit services from its independent audit firm. Intel obtains these services from other service providers as needed. The Audit Committee has been reducing the scope and amount of permissible non-audit services obtained from Ernst & Young and obtaining other providers for those services. This activity continued in 2004 and will continue in 2005. See "Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm" for more information regarding fees paid to Ernst & Young for services in fiscal years 2004 and 2003.

The Audit Committee has reviewed and discussed the consolidated financial statements for fiscal year 2004 with management and Ernst & Young; management represented to the Audit Committee that Intel's consolidated financial statements were prepared in accordance with generally accepted accounting principles; and Ernst & Young represented that their presentations included the matters required to be discussed with the independent registered public accounting firm by Statement on Auditing Standards No. 61, as amended, "Communication with Audit Committees." This review included a discussion with management of the quality, not merely the acceptability, of Intel's accounting principles, the reasonableness of significant estimates and judgments, and the clarity of disclosure in Intel's financial statements, including the disclosures related to critical accounting estimates. In reliance on these views and other discussions, and the reports of Ernst & Young, the Audit Committee has recommended to the Board, and the Board has approved, the inclusion of the audited financial statements in Intel's Annual Report on Form 10-K for the year ended December 25, 2004 which Intel filed with the SEC on February 22, 2005.

**Audit Committee:**
Jane E. Shaw, Chairman
E. John P. Browne
D. James Guzy

## PROPOSAL 2: RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Ernst & Young has been our independent audit firm since our incorporation in 1968, and the Audit Committee has selected Ernst & Young as our independent audit firm for the fiscal year ending December 31, 2005. Among other matters, the Audit Committee concluded that current requirements for audit partner rotation, auditor independence through limitation of services and other regulations affecting the audit engagement process substantially assist in supporting auditor independence despite the long-term nature of Ernst & Young's services to us. In accordance with applicable regulations on partner rotation, Ernst & Young's primary engagement partner for our audit has changed for 2005, and the concurring/reviewing partner for our audit was changed in 2004.

Ernst & Young has recently notified the SEC, the Public Company Accounting Oversight Board and our Audit Committee that certain non-audit work that Ernst & Young previously performed in China (for us and other companies) has raised questions regarding Ernst & Young's independence with respect to its performance of audit services. With respect to us, during fiscal years 2001 and 2002, Ernst & Young's affiliated firm in China performed tax calculation and return preparation services for a small number of employees of one of our representative offices in China. Ernst & Young's China affiliate made payment of the relevant taxes on our behalf, which involved the handling of our funds in the amount of approximately $65,000 in 2001 and $41,000 in 2002. The fees that we paid to Ernst & Young's China affiliate for the performance of these services were approximately $1,200 in 2001 and $600 in 2002. These services were discontinued in 2002. Ernst & Young has also informed us that in 2002, when Ernst & Young acquired the New Zealand practice of the firm Arthur Andersen, the Andersen firm had been providing a cash handling service to us in connection with fringe benefit tax returns. Ernst & Young stopped providing this service to us in June 2003, and from the time of the acquisition until June 2003, total fees that we paid to Ernst & Young with respect to this service totaled approximately $9,000, and Ernst & Young handled a total of approximately $90,000 in cash for us. Our Audit Committee has reviewed the facts surrounding these services provided by Ernst & Young, and is monitoring the outcome of the SEC's consideration of the China matter. Ernst & Young has informed the Audit Committee that Ernst & Young does not believe that performance of these services impaired its independence. Subject to the SEC completing its consideration of the China matter, neither we nor our Audit Committee believes that Ernst & Young's independence was impaired by the performance of these services in light of the de minimis fees paid to Ernst & Young, the ministerial nature of the actions performed by Ernst & Young, and the fact that the revenue, operating profit and total assets of our representative offices involved were not material to our consolidated financial statements and not subject to any audit procedures by Ernst & Young.

As a matter of good corporate governance, the Audit Committee has determined to submit its selection of independent audit firm to stockholders for ratification. In the event that this selection of Ernst & Young is not ratified by a majority of the shares of common stock present or represented at the annual meeting and entitled to vote on the matter, the Audit Committee will review its future selection of an independent registered public accounting firm.

Representatives of Ernst & Young attended all meetings of the Audit Committee in 2004. The Audit Committee pre-approves and reviews audit and non-audit services performed by Ernst & Young as well as the fees charged by Ernst & Young for such services. In its pre-approval and review of non-audit service fees, the Audit Committee considers, among other factors, the possible effect of the performance of such services on the auditors' independence. To avoid certain

potential conflicts of interest in maintaining auditor independence, the law prohibits a publicly traded company from obtaining certain non-audit services from its independent registered public accounting firm. Except as noted above, in recent years, we have not obtained any of these prohibited services from Ernst & Young, and we are able to obtain such services from other large registered public accounting firms and other service providers. We use Deloitte & Touche LLP, KPMG LLP and PricewaterhouseCoopers LLP for various types of non-audit services. The Audit Committee has been reducing the scope and amount of permissible non-audit services obtained from Ernst & Young and has been moving this work to the other firms named above. This activity continued in 2004 and continues in 2005. For additional information concerning the Audit Committee and its activities with Ernst & Young, see "The Board, Board Committees and Meetings" and "Report of the Audit Committee."

We expect that a representative of Ernst & Young will attend the annual meeting, and the representative will have an opportunity to make a statement if he or she so desires. The representative will also be available to respond to appropriate questions from stockholders.

### Fees Paid to Ernst & Young

The following table shows the fees that we paid or accrued for audit and other services provided by Ernst & Young for fiscal years 2004 and 2003. All figures are net of Value Added Tax and other similar taxes assessed by certain non-U.S. jurisdictions on the amount billed by Ernst & Young. All of the services described in the following fee table were approved in conformity with the Audit Committee's pre-approval process.

|  | 2004 | 2003 |
|---|---|---|
| Audit Fees | $11,167,000 | $ 7,867,000 |
| Audit-Related Fees | $ 743,000 | $ 1,647,000 |
| Tax Fees | $ 1,305,000 | $ 1,905,000 |
| All Other Fees | $ 135,000 | $ 162,000 |
| **Total** | **$13,350,000** | **$11,581,000** |

*Audit Fees ($11,167,000; $7,867,000).* This category includes the audit of our annual financial statements, the audit of management's assessment of our internal control over financial reporting and Ernst & Young's own audit of our internal control over financial reporting, review of financial statements included in our Form 10-Q quarterly reports, and services that are normally provided by the independent registered public accounting firm in connection with statutory and regulatory filings or engagements for those fiscal years. This category also includes advice on accounting matters that arose during, or as a result of, the audit or the review of interim financial statements, statutory audits required by non-U.S. jurisdictions and the preparation of an annual "management letter" on internal control matters.

*Audit-Related Fees ($743,000; $1,647,000).* This category consists of assurance and related services provided by Ernst & Young that are reasonably related to the performance of the audit or review of our financial statements and are not reported above under "Audit Fees." The services for the fees disclosed under this category include benefit plan audits, vendor compliance audits, royalty audits and distributor count compliance audits.

*Tax Fees ($1,305,000; $1,905,000).* This category consists of tax services generally for tax compliance and tax preparation. In 2004, $1,171,000 was for tax compliance and preparation services rendered by Ernst & Young, including the preparation of original and amended tax returns, claims for refunds, support during income tax audits or inquiries, and tax payment planning in certain overseas jurisdictions. The remaining $134,000 was for tax advice and transfer pricing studies.

*All Other Fees ($135,000; $162,000).* This category consists of fees for the following: an audit of an investment fund owned by us and a group of corporations that manufacture and/or use 64-bit Intel® Itanium®-based systems (as the managing partner of the fund, we are responsible for coordinating the fund's financial audit); agreed-upon procedures for a research and development grant program audit in Ireland; agreed-upon procedures as required by the State of California for companies handling hazardous waste materials; translation services for certain statutory financial filings outside the U.S.; and an annual subscription fee to Ernst & Young for accounting literature.

### Recommendation of the Board

**The Board of Directors recommends that you vote "FOR" the ratification of the appointment of Ernst & Young as our independent registered public accounting firm for 2005.**

# EXHIBIT 2 – PART B

**PROPOSAL 3: APPROVAL OF AMENDMENT AND EXTENSION OF THE 2004 EQUITY INCENTIVE PLAN**

In 2004, we first asked our stockholders to approve the Intel Corporation 2004 Equity Incentive Plan (the "2004 Plan"), and we said that we planned to submit the 2004 Plan to our stockholders for re-approval on an annual basis. Annual approval of the 2004 Plan affords our stockholders the opportunity to consider and review our equity compensation program on a yearly basis, and to evaluate and vote on continuation of the plan. The approval in 2004 covers the 2004 Plan to 2006, and we are now asking for our first annual re-approval, which will extend the 2004 Plan to 2007.

We are requesting that our stockholders vote in favor of amendments to the 2004 Plan to extend the term of the plan by an additional year, through June 30, 2007; provide for the addition of 130 million shares to cover awards under the 2004 Plan through its amended term; allow for grants of restricted stock and stock units to our non-employee directors should we elect to use these instruments; provide for the use of up to 100,000 shares for employee recognition stock awards having no minimum vesting period; and clarify our share-counting methodology. We continue to firmly believe that a broad-based stock option program is a necessary and powerful employee incentive and retention tool that benefits all of our stockholders, and we also believe that the amendments to the 2004 Plan are in the best interests of our stockholders and the company. The following summary of the amendments to the 2004 Plan is subject to the specific provisions contained in the full text of the 2004 Plan, as amended and restated, set forth as Exhibit A.

We are seeking approval of the following amendments to the 2004 Plan:

1. **Extension of the term of the 2004 Plan until June 30, 2007.** The 2004 Plan is currently scheduled to expire on June 30, 2006. Approval of this amendment would extend the expiration date of the 2004 Plan by an additional year, until June 30, 2007. As indicated in our 2004 proxy statement, the Board and management intend to submit annually for stockholder approval an extension of the 2004 Plan. Given the limited two-year duration of the 2004 Plan, this annual renewal cycle gives our stockholders more frequent opportunities to evaluate and vote on continuation of the plan. This short duration also will give us greater flexibility should future revisions be considered necessary to respond to market-competitive changes in equity compensation practices.

2. **The addition of a sufficient number of shares to provide for awards under the 2004 Plan for an additional year.** The total number of shares currently authorized for issuance under the 2004 Plan is 240 million. The Board is recommending the addition of 130 million shares to the total shares available under the 2004 Plan to enable us to meet our expected annual needs over the next two years. Of the 130 million additional shares, we would allot 2 million shares to long-term executive retention stock option grants having a term no longer than 10 years.

We grant the majority of our options early in the second quarter of the year in conjunction with our annual employee performance evaluation program. At the time of our annual meeting, we estimate that we will have granted approximately 125 million options pursuant to the 2004 Plan. If approved, the additional shares will provide us with an estimated 245 million shares available for issuance under the 2004 Plan over the next two years. The following table illustrates the net effect of this amendment on the shares available for issuance under the 2004 Plan:

**Share Reservation Under the 2004 Equity Incentive Plan**

| | |
|---|---|
| Initial shares approved by stockholders in 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 240 million |
| Estimated shares awarded (May 2004–May 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (125 million) |
| Estimated shares available for issuance (as of May 2005) . . . . . . . . . . . . . . . . . . . . . . . | 115 million |
| Additional shares requested in this proposal (May 2005) . . . . . . . . . . . . . . . . . . . . . . . . | 130 million |
| **Estimated total shares available for issuance (2005–2007)** . . . . . . . . . . . . . . . . . . . . | **245 million** |

We do not expect the additional shares that we are requesting stockholders to approve to significantly impact our "overhang" from equity plans. Overhang is the total number of shares related to options granted but not yet exercised, plus shares available for grant, divided by total shares outstanding at the end of the reporting period. We expect that overhang will decline over time, as the majority of the options issuable under the 2004 Plan will have a maximum term of seven years. Historically, options granted under our stock option programs have generally had a term of 10 years.

3. **The ability to utilize various equity vehicles, including stock options, restricted stock or stock units, performance-based stock awards or stock appreciation rights, in making awards to non-employee directors.** The 2004 Plan currently allows us to grant a limited number of restricted stock and stock unit awards to employees, but provides for only stock option grants to non-employee directors. This amendment would expand the types of awards that

we could make to non-employee directors, subject to the 2004 Plan's share limitations on non-employee director awards. We have historically utilized stock options as our sole form of equity compensation for non-employee directors. The Board is currently undertaking a comprehensive review of our director compensation programs (see "Directors' Compensation"); accordingly, we are seeking to amend the 2004 Plan to provide the flexibility to use other forms of equity compensation as appropriate in light of the results of that review.

4. **The ability to use up to 100,000 shares for employee recognition stock awards having no minimum vesting period.** We have programs that we use to recognize and reward the outstanding achievements of our employees with awards of small amounts of stock (typically no more than 100–150 shares per recipient) that vest immediately. NASDAQ rules now require that any equity awards to employees be approved by stockholders or be made pursuant to a plan approved by stockholders. We want to continue to use stock awards as part of these recognition programs, and we are requesting approval of an amendment to the 2004 Plan to allow the use of up to an aggregate of 100,000 shares for employee recognition awards having no minimum vesting period. The amendment would not increase the shares available for issuance under the 2004 Plan; rather, we would take the shares used for such recognition awards from the shares allocated to restricted stock and stock unit awards.

5. **Clarification of our share-counting methodology.** Our policy is that the following types of shares are not available for future issuance as awards under our equity plans: (1) shares not issued or delivered as a result of the net share settlement of outstanding stock appreciation rights, (2) shares used to pay the exercise price or withholding taxes in connection with the exercise of an outstanding stock option or receipt of an award, and (3) shares acquired in the open market using the proceeds from the payment of the exercise price in connection with the exercise of an outstanding stock option. The amendment would put this policy into the written provisions of the 2004 Plan and make clear that such practices are expressly prohibited.

## Background on Stock Compensation at Intel

The use of stock options has long been a vital component of our overall compensation philosophy, which is premised on the principle that any long-term pay-for-performance incentive compensation should be closely aligned with stockholders' interests. We believe that over the years, we have been very successful in achieving this objective through the use of fixed-price stock options for the majority of our employees. Fixed-price stock options align employees' interests directly with those of our other stockholders, because an increase in stock price after the date of award is necessary for employees to realize any value, thus rewarding employees only upon improved stock price performance.

We believe that stock options, the core of our long-term employee incentive and retention program, have been very effective in enabling us to attract and retain the talent critical for an innovative and growth-focused company. We believe that broad-based stock options focus employees at every level of the company on the same performance improvement goals, and have embedded in our culture the necessity for employees to think and act as stockholders. Our general compensation philosophy is that total cash compensation should vary with our performance in achieving financial and non-financial objectives, and that any long-term incentive compensation should be closely aligned with stockholders' interests. Our total compensation goal is to deliver lower total compensation than our peer groups in periods of poor company performance, but provide a premium for superior company performance (see "Report of the Compensation Committee on Executive Compensation" for additional information on our pay-for-performance compensation programs). Without the ability to award equity compensation, we would need to consider cash replacement alternatives to provide a market-competitive total compensation package necessary to attract, retain and motivate the employee talent that is critical to our future success.

We have a long history of linking employee compensation to our long-term stock performance. For more than 25 years, we have been granting stock options to our officers and other key employees. Beginning in 1997, we expanded our stock option program by making it broad-based as well as global. As a result, under our current stock option program, all general full-time and part-time employees are eligible for stock option grants, with annual grants made to more than 90% of the eligible employee population. While we grant employee stock options from time to time during the year, we make most of our option grants in the second quarter of each year as part of our company-wide employee performance evaluation program. We strongly believe that stock-based compensation should not be limited to senior management and that all employees, regardless of role or responsibility, should have a stake in our future. Accordingly, Compensation Committee policy limits grants to our five most highly compensated executive officers (six in 2004) to no more than 5% of total options granted in any one year. Over the last five years, we awarded only 1.2% of all option grants to our five most highly compensated executive officers (six in 2004).

32

Although we believe that employee stock ownership is a significant contributing factor in achieving superior corporate performance, we recognize that the expansion to a broad-based stock option program has led to an increase in our stock overhang. Our fiscal 2004 stock overhang was 17.7%. The following factors have contributed to the increase in overhang: (1) historically long stock option vesting periods, with stock option grants made in the years up to and including 2002 generally vesting five years from grant date; and (2) long employee exercise periods, with grants generally having 10-year terms. We have a long-term goal to limit our annual dilution (total stock options or equity awards granted less cancellations, divided by shares outstanding at the beginning of the year) to less than 2%. Over the last five years, our annual dilution from stock options has averaged 1.8%. We expect that overhang will decline over time, as the majority of options issuable under the 2004 Plan will have a maximum term of seven years.

We strongly believe that our stock option programs and emphasis on employee stock ownership have been integral to our success in the past and will be important to our ability to achieve consistently superior performance in the years ahead. We believe that consistently superior performance is achieved through the ability to attract, retain and motivate the employee talent critical to attaining long-term improved company performance and stockholder returns. Therefore, we consider approval of the amendments to the 2004 Plan vital to our future success in that it will enable us to continue offering equity awards to our employees.

In 2004, we granted 114.7 million options to our employees, including executive officers, and non-employee directors, with approximately 99% of the options granted to employees other than our Chief Executive Officer and the next five most highly compensated executive officers. The 2004 burn rate, defined as the total options granted in a year divided by our common shares outstanding at the beginning of the year, was 1.77%, which was higher than the 2003 burn rate of 1.67%, primarily due to growth in our employee population. Our 2004 annual dilution was 1.3%.

As of March 25, 2005, we have granted approximately 23.8 million options under the 2004 Plan to our employees, 0.1 million options to our non-employee directors and 0.8 million options to executive officers (including 0.4 million options to Mr. Otellini, Intel's President and Chief Operating Officer and CEO-elect). Because we grant the majority of our stock options in the second quarter in conjunction with our annual employee performance evaluation program, we estimate that at the time of the annual meeting we will have granted approximately 125 million options to our employees, including our executive officers, pursuant to the 2004 Plan.

**Equity Compensation Plan Information**

The 2004 Plan replaced our stockholder-approved 1984 Stock Option Plan, which expired in 2004, and our non-stockholder-approved 1997 Stock Option Plan (the "1997 Plan"). We will not make future awards under either of those plans.

Information as of December 25, 2004 regarding equity incentive plans approved and not approved by stockholders is summarized in the following table (shares in millions):

| Plan Category | (A) Number of Shares to Be Issued Upon Exercise of Outstanding Options | (B) Weighted Average Exercise Price of Outstanding Options | (C) Number of Shares Remaining Available for Future Issuance Under Equity Incentive Plans (Excluding Shares Reflected in Column A) |
|---|---|---|---|
| Equity incentive plans approved by stockholders .......... | 154.6 | $18.73 | 287.9 (1) |
| Equity incentive plans not approved by stockholders (2) .... | 722.8 | $27.97 | — |
| Total ......................................... | 877.4 (3) | $26.34 | 287.9 |

(1) Includes 67.5 million shares available under our 1976 Employee Stock Participation Plan.

(2) Consists of shares underlying options granted under the 1997 Plan.

(3) Total excludes 6.5 million shares issuable under outstanding options, with a weighted average exercise price of $16.26, originally granted under plans we assumed in connection with acquisitions. The 1997 Plan was terminated as to future grants when the 2004 Plan was approved by stockholders in May 2004.

The 1997 Plan provided for the grant of stock options to employees other than officers and directors. When our stockholders approved the 2004 Plan in May 2005, we terminated this plan, which was not approved by stockholders. The Compensation Committee administers the 1997 Plan, and it has the power to determine matters relating to outstanding option awards under the plan, including conditions of vesting and exercisability. Options granted under the 1997 Plan expire no later than 10 years from the grant date. Options granted under this plan generally vest within five years, with some options granted in 2003 and 2004 vesting in increments over four or five years from the date of grant, and certain grants to key employees having delayed vesting generally beginning six years from the date of grant.

## Purpose of the 2004 Plan

As amended and restated, the 2004 Plan will allow us to make broad-based grants of stock options, restricted stock, stock units and stock appreciation rights, any of which may or may not require the satisfaction of performance objectives, to employees and to non-employee directors through June 30, 2007. The purpose of these stock awards is to attract and retain talented employees and non-employee directors, further align employee and stockholder interests, continue to closely link employee compensation with company performance, and maintain a culture based on employee stock and company ownership.

## Key Terms

The following is a summary of the key provisions of the 2004 Plan, as amended and restated. The proposed amendments to the 2004 Plan are in bold type in the following table.

| | |
|---|---|
| *Plan Term:* | May 19, 2004 to **June 30, 2007** |
| *Eligible Participants:* | All of our full-time and part-time employees, where legally eligible to participate, and our non-employee directors |
| *Shares Authorized:* | **370,000,000** over the **three-year term** of the plan, subject to adjustment only to reflect stock splits and similar events; **includes 130,000,000 shares in addition to the 240,000,000 shares approved by stockholders in 2004**. |
| *Award Types (available to all eligible participants, including non-employee directors):* | (1) Stock options<br>(2) Restricted stock<br>(3) Stock units<br>(4) Stock appreciation rights |
| *Award Terms:* | Stock options and stock appreciation rights will have a term no longer than seven years, except that up to **10 million** shares may be utilized for long-term executive retention stock option grants having a term no longer than 10 years; **includes 2 million shares allocated to long-term retention grants in addition to the 8 million shares approved by stockholders in 2004.** |
| *162(m) Share Limits:* | So that awards may qualify under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Tax Code"), which permits performance-based compensation meeting the requirements established by the IRS to be excluded from the limitation on deductibility of compensation in excess of $1 million paid to certain specified senior executives, the 2004 Plan limits awards to an individual participant in any calendar year to:<br><br>(1) No more than 3 million shares subject to stock options or stock appreciation rights to an individual participant annually, or<br><br>(2) No more than 2 million shares subject to restricted stock or stock unit awards to an individual participant annually.<br><br>These limits are greater than the number of options that we have granted to any individual in the past. |

| | | |
|---|---|---|
| *Other Share Limitations:* | (1) | No more than 35 million shares may be issued under restricted stock and restricted stock unit awards. |
| | (2) | No more than 30,000 shares may be subject to awards granted to a non-employee director in any calendar year. |
| *Vesting:* | | Determined by the Compensation Committee or the Board of Directors within the following limits (subject to exceptions for death, disability or retirement): |
| | (1) | Restricted stock or stock units shall not vest in less than pro rata installments over three years unless vesting is based on the achievement of performance criteria, in which case such awards shall not vest in less than one year. **Up to an aggregate of 100,000 shares may be used for employee recognition stock awards having no minimum vesting period.** |
| | (2) | Stock options or stock appreciation rights shall not first become exercisable in less than one year. |
| | (3) | Performance vesting criteria, if any, will be established by award at grant date. |
| *Not Permitted:* | (1) | Granting stock options or stock appreciation rights at a price below the market value of Intel stock on the date of grant. |
| | (2) | Repricing, or reducing the exercise price of a stock option or stock appreciation right without stockholder approval. |
| | (3) | Reload grants or the granting of options conditional upon delivery of shares to satisfy the exercise price and/or tax withholding obligation under another employee stock option. |
| | (4) | **Adding shares back to the number available for issuance when a stock appreciation right is net settled, when shares are retained or delivered to us to pay the exercise price and/or tax obligations associated with an award, or when we repurchase shares on the open market using the proceeds from payment of the exercise price in connection with the exercise of an outstanding stock option.** |

### Eligibility

Only employees of Intel and its subsidiaries and our non-employee directors are eligible to receive awards under the 2004 Plan. The Compensation Committee determines which employees will participate in the 2004 Plan, and the Board determines the terms of grants to non-employee directors. As of February 25, 2005, there were approximately 85,400 employees and eight non-employee directors eligible to participate in the 2004 Plan.

### Awards

The 2004 Plan allows the grant of stock options, stock appreciation rights, restricted stock or stock units, any or all of which may be made contingent upon the achievement of performance criteria. Subject to plan limits, the Compensation Committee has the discretionary authority to determine the size of awards to employees. The use of performance-based requirements will be considered in the context of our total compensation program and the significant level of pay-for-performance requirements already incorporated into our compensation practices.

### Non-Employee Director Awards

Each year, non-employee directors may receive award(s) for a number of shares established by the Board, but no more than 30,000 shares annually. Subject to limits in the plan terms applicable to awards under the 2004 Plan, the Board has the discretion to determine the form and terms of awards to non-employee directors. We granted each non-employee director options for 15,000 shares in 2004, except for Ms. Barshefsky, to whom we awarded an additional prorated grant of 5,000 stock options for the period from the date of her appointment (January 21, 2004) to the annual election of directors in May 2004.

### Vesting and Exercise of Stock Options

The exercise price of stock options granted under the 2004 Plan may not be less than the market value (the average of the high and low market price) of the common stock on the date of grant. For example, on February 24, 2005, the average

of the highest and lowest quoted sales prices of our common stock was $23.44 per share, which would have been the grant price for any stock options granted on that date. The option term may not be longer than seven years in the case of stock options vesting in full in less than five years, and may not be longer than 10 years in the case of stock options vesting in full in five or more years (long-term executive retention grants). The Compensation Committee (or, for non-employee director awards, the Board) will determine when each stock option becomes exercisable, including the establishment of required performance vesting criteria, if any, and provided that no stock option may be exercised less than one year from the date of grant (except upon the death, disability or retirement of the participant). We may require, prior to issuing common stock under the 2004 Plan, that the participant remit an amount in cash or common stock sufficient to satisfy tax withholding requirements.

### Vesting of Restricted Stock and Stock Unit Awards

The Compensation Committee (or, for non-employee director awards, the Board) may make the grant, issuance, retention and/or vesting of restricted stock and stock unit awards contingent upon continued employment with Intel, the passage of time, or such performance criteria and the level of achievement versus such criteria as it deems appropriate. Except in the case of death, disability or retirement of the participant, stock issued upon exercise or settlement of options or stock appreciation rights, restricted stock and stock unit awards that are contingent upon the achievement of performance objectives shall not vest in less than one year from the date of grant, and awards that are contingent upon continued employment or the passage of time shall not fully vest in less than pro rata installments over three years from the date of grant. Notwithstanding the limitations of the preceding sentence, up to 100,000 shares shall be available for use as employee recognition stock awards having no minimum vesting period.

### Eligibility Under Section 162(m)

Awards may, but need not, include performance criteria that satisfy Section 162(m) of the Tax Code. To the extent that awards are intended to qualify as "performance-based compensation" under Section 162(m), the performance criteria will be based on one or more of the factors set forth in the 2004 Plan (which may be adjusted as provided in the plan), applied either individually, alternatively or in any combination, to either the company as a whole or to a business unit or subsidiary, either individually, alternatively or in any combination, and measured either annually or cumulatively over a period of years, on an absolute basis or relative to a pre-established target, to previous years' results or to a designated comparison group, in each case as specified by the Compensation Committee in the award.

To the extent that an award under the 2004 Plan is designated as a "performance award," but is not intended to qualify as performance-based compensation under Section 162(m), the performance criteria can include the achievement of strategic objectives as determined by the Board.

Notwithstanding satisfaction of any performance criteria to the extent specified at the time of grant of an award, the number of shares of common stock, stock options or other benefits granted, issued, retainable and/or vested under an award on account of satisfaction of performance criteria may be reduced by the Compensation Committee on the basis of such further considerations as the Compensation Committee in its sole discretion determines.

### Transferability

Awards granted under the 2004 Plan are transferable by will or the laws of descent and distribution, or to the extent otherwise determined by the Compensation Committee. The Compensation Committee has sole discretion to permit the transfer of an award.

### Administration

The Compensation Committee, which is made up entirely of independent directors, administers the 2004 Plan. The Compensation Committee will select the employees who receive awards, determine the number of shares covered thereby, and, subject to the terms and limitations expressly set forth in the 2004 Plan, establish the terms, conditions and other provisions of the grants. The Compensation Committee may interpret the 2004 Plan and establish, amend and rescind any rules relating to the 2004 Plan. The Compensation Committee may delegate to a committee of one or more directors the ability to grant awards and take certain other actions with respect to participants who are not executive officers, and may delegate certain administrative or ministerial functions under the 2004 Plan to an officer or officers. The Compensation Committee has delegated authority to the CEO-elect, one of our directors, to grant awards to non-executive employees within limits and a budget pre-approved by the Compensation Committee.

**Amendments Requiring Stockholder Approval**

The Board may terminate, amend or suspend the 2004 Plan, provided that no action may be taken by the Board (except those described in "Adjustments") without stockholder approval to:

- Increase the number of shares that may be issued under the 2004 Plan;

- Permit granting of stock options at less than the market value;

- Permit the repricing of outstanding stock options;

- Amend the maximum shares set forth that may be granted as stock options, stock appreciation rights, restricted stock or stock units to any participant or in total;

- Extend the term of the 2004 Plan;

- Change the class of persons eligible to participate in the 2004 Plan; or

- Otherwise implement any amendment required to be approved by stockholders under NASDAQ rules.

**Adjustments**

In the event of a stock dividend, recapitalization, stock split, combination of shares, extraordinary dividend of cash or assets, reorganization, or exchange of our common stock or any similar event affecting our common stock, the Compensation Committee shall adjust the number and kind of shares available for grant under the 2004 Plan, and subject to the various limitations set forth in the 2004 Plan, the number and kind of shares subject to outstanding awards under the 2004 Plan, and the exercise or settlement price of outstanding stock options and of other awards.

The impact of a merger or other reorganization of Intel on outstanding stock options, stock appreciation rights, restricted stock and stock units granted under the 2004 Plan shall be specified in the agreement relating to the merger or reorganization, subject to the limitations and restrictions set forth in the 2004 Plan. Such agreement may provide for, among other things, assumption of outstanding awards, accelerated vesting or accelerated expiration of outstanding awards, or settlement of outstanding awards in cash.

**U.S. Tax Consequences**

Stock option grants under the 2004 Plan may be intended to qualify as incentive stock options under Section 422 of the Tax Code or may be non-qualified stock options governed by Section 83 of the Tax Code. Generally, no federal income tax is payable by a participant upon the grant of a stock option and no deduction is taken by the company. Under current tax laws, if a participant exercises a non-qualified stock option, he or she will have taxable income equal to the difference between the market price of the common stock on the exercise date and the stock option grant price. We will be entitled to a corresponding deduction on our income tax return. A participant will have no taxable income upon exercising an incentive stock option after the applicable holding periods have been satisfied (except that alternative minimum tax may apply), and we will receive no deduction when an incentive stock option is exercised. The treatment for a participant of a disposition of shares acquired through the exercise of an option depends on how long the shares were held and on whether the shares were acquired by exercising an incentive stock option or a non-qualified stock option. We may be entitled to a deduction in the case of a disposition of shares acquired under an incentive stock option before the applicable holding periods have been satisfied.

Restricted stock is also governed by Section 83 of the Tax Code. Generally, no taxes are due when the award is initially made, but the award becomes taxable when it is no longer subject to a "substantial risk of forfeiture" (i.e., becomes vested or transferable). Income tax is paid on the value of the stock or units at ordinary rates when the restrictions lapse, and then at capital gain rates when the shares are sold.

The American Jobs Creation Act of 2004 added Section 409A to the Tax Code, generally effective January 1, 2005. The IRS has so far issued only limited guidance on the interpretation of this new law. Section 409A covers most programs that defer the receipt of compensation to a succeeding year. It provides strict rules for elections to defer (if any) and for timing of payouts. There are significant penalties placed on the individual employee for failure to comply with Section 409A. However, it does not impact our ability to deduct deferred compensation.

Section 409A does not apply to incentive stock options, non-qualified stock options (that are not discounted) and restricted stock (provided there is no deferral of income beyond the vesting date). Section 409A also does not cover stock

appreciation right plans if the stock appreciation rights are issued by a public company on its traded stock, the exercise price is never less than the fair market value of the underlying stock on the date of grant, the rights are settled in such stock and no features defer the recognition of income beyond the exercise date.

Section 409A does apply to restricted stock units, performance units and performance shares. Grants under such plans will continue to be taxed at vesting but will be subject to new limits on plan terms governing when vesting may occur.

As described above, awards granted under the 2004 Plan may qualify as "performance-based compensation" under Section 162(m) of the Tax Code in order to preserve our federal income tax deductions with respect to annual compensation required to be taken into account under Section 162(m) that is in excess of $1 million and paid to one of our five most highly compensated executive officers. To so qualify, options and other awards must be granted under the 2004 Plan by a committee consisting solely of two or more "outside directors" (as defined under Section 162 regulations) and satisfy the 2004 Plan's limit on the total number of shares that may be awarded to any one participant during any calendar year. In addition, for awards other than options to qualify, the grant, issuance, vesting or retention of the award must be contingent upon satisfying one or more of the performance criteria, as established and certified by a committee consisting solely of two or more "outside directors."

For a discussion of our executive compensation philosophy, see "Report of the Compensation Committee on Executive Compensation."

## Recommendation of the Board

**The Board of Directors recommends that you vote "FOR" approval of amendment and extension of the Intel Corporation 2004 Equity Incentive Plan.**

## PROPOSAL 4: APPROVAL OF AMENDMENT AND EXTENSION OF THE EXECUTIVE OFFICER INCENTIVE PLAN

### Introduction

Our Executive Officer Incentive Plan (EOIP) was established in 1994, amended and restated in 1995, and our stockholders last approved it in 2000. The EOIP is a cash-based, pay-for-performance incentive program, and its purpose is to motivate and reward our executive officers, including our Chief Executive Officer (CEO), for their contributions to our performance. To ensure that performance-based compensation over $1,000,000 payable to the CEO and our four other most highly compensated executive officers is tax-deductible and qualifies under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Tax Code"), the material terms of performance-based compensation plans, including the employees eligible to receive compensation under the plan, a description of the business criteria on which the performance goal is based and the maximum amount of compensation that could be paid to any employee under the plan (or the formula used to calculate the amount of compensation to be paid to the employee), must be approved by our stockholders. The EOIP is designed to provide for this type of performance-based compensation.

In accordance with current tax laws, stockholder approval lasts for approximately five years, and this plan now needs re-approval to be tax qualified. We are asking our stockholders to extend qualification of the EOIP under Section 162(m) of the Tax Code for incentives established within five years from the date of the 2005 Annual Stockholders' Meeting, to approve amendments to the EOIP to clarify the Compensation Committee's authority under the EOIP, and to address the terms and conditions for executive officer participation in the EOIP.

Our EOIP is a cash-based, pay-for-performance incentive program that effectively links our financial performance with the total cash compensation paid to our executive officers. This is accomplished through our executive officers having a lower percentage of their total cash compensation in base salary and a higher percentage of their total cash compensation in variable pay through the EOIP program, which is linked to our earnings per share ("EPS"). As a result, our executive officers have a large percentage of their total cash compensation at risk, and their total cash compensation varies with our financial performance.

The Board's Compensation Committee, which consists solely of independent directors, determines payments under this plan. The Compensation Committee recommends that our stockholders re-approve this plan, and, as described below,

it has utilized the plan to set 2005 incentive baseline amounts for our executive officers. If our stockholders do not approve the EOIP at the annual meeting, we will terminate the EOIP plan, and we will not pay any incentives under this plan for the 2005 performance year. However, we expect to make incentive payments to the executive officers in amounts similar to those that would have otherwise been paid under the BOIP; the difference is that we will lose a portion of the tax deductibility that would have otherwise been available to us. The Compensation Committee has not adopted a policy that all compensation paid must be tax-deductible and qualified under Section 162(m) of the Tax Code. If we cannot deduct incentives from our taxes, it will increase the overall cost of these incentive payouts to us and thus to our stockholders through reduced net income.

The full text of the amended and restated EOIP appears in Exhibit B. The principal features are outlined below and should be reviewed along with the information in the text of the plan.

## Purpose of the EOIP

The EOIP is a cash-based, pay-for-performance incentive program, and its purpose is to motivate and reward eligible employees for their contributions to our performance by making a large portion of their cash compensation variable and dependent upon our performance. As a result of having a lower percentage of their total cash compensation in base salary and a higher percentage of their total cash compensation in performance-based incentives, our executives generally have more compensation risk than executives of our peer groups. As an example, in 2004 the total cash compensation of CEO Craig R. Barrett was $2,454,000, of which $1,756,800, or 72%, of his total cash compensation was performance-based under the EOIP. This is compared to CEOs at our peer groups who have on average 61% of their total cash compensation incentive performance-based. As previously described in "Report of the Compensation Committee on Executive Compensation," our peer groups (also referred to as "the market") consist of a cross-industry subset of Fortune 50 companies as well as a technology industry subset of companies generally considered to be comparable to Intel.

We believe that we have effectively linked our executive officers' total cash compensation to our financial performance through the EOIP, and as a result of lower-than-market base salary and higher-than-market incentive payouts. In times of poor financial performance, our total cash compensation is lower than market. Conversely, in times of sustained excellent financial performance, our higher variability yields higher-than-market total cash compensation, motivating and rewarding executive officers for excellent performance.

In support of our pay-for-performance philosophy, we intend for the actual EOIP payouts to be closely linked to our financial performance for the fiscal year. The pay-for-performance variability in the EOIP is illustrated in the following graph. From 1998 to 2000, average total cash compensation of our top five most highly compensated executive officers increased 38%, while our EPS grew 76%. In 2001, our EPS declined 87%, and, as we intended, the average total cash compensation of our top five most highly compensated executives declined by 51%. Since 2001, the average total cash compensation of our top five most highly compensated executives (top six for 2004) has grown 26% and our EPS has grown 511% in the same time period.



†EPS is net income divided by Intel's weighted average common shares outstanding, assuming dilution.
††Represents the total cash compensation average for the top six most highly compensated executive officers.

### Eligibility

Our executive officers, as determined by the Compensation Committee, are eligible to participate in the EOIP. Currently, each of our 14 executive officers participates in the EOIP. Executive officer eligibility is defined more broadly than the Section 162(m) requirements of the Tax Code to ensure consistent alignment of our executives to our financial goals.

### Payout Formula/Maximum Payout

The EOIP includes a formula to calculate the maximum annual incentive payout for each executive officer; however, we cannot pay EOIP incentives in excess of $5,000,000 annually to any executive officer. In 1997, Andrew S. Grove earned $2,669,100, the highest payout under the EOIP to date. The EOIP formula is composed of three variables: (1) the executive officer's annual incentive baseline amount, which the Compensation Committee determines annually; (2) our EPS; and (3) a factor pre-established each year by the Committee (the "Performance Factor"). At the end of each year, we multiply the individual's incentive baseline amount by our EPS for the year and the Performance Factor to calculate the maximum EOIP incentive for that year.

For purposes of the EOIP incentive formula, "EPS" means the greater of our operating income or our net income per weighted average common shares outstanding, assuming dilution. Operating income does not include gains or losses on equity securities or interest or other income we earned, and does not include a deduction for interest expense or income taxes; as a result, EPS based on operating income generally exceeds EPS based on net income. The Compensation Committee, in its sole discretion and in compliance with IRS regulations, may adjust our operating income or net income for unusual, extraordinary or one-time events. These adjustments may include but are not limited to asset write-downs; acquisition-related charges; litigation, claim judgments, settlements or tax settlements; the effects of changes in tax law, changes in accounting principles or other such laws or provisions affecting reported results; accruals for reorganization and restructuring programs; gains or losses on investments (realized or unrealized); and any extraordinary non-recurring items as described in Accounting Principles Board Opinion No. 30 and/or in management's discussion and analysis of financial condition and results of operations appearing in the annual report to stockholders for the applicable year. Adjustments made in the past have generally been made to eliminate the impact on EPS of large non-recurring expenses or settlements that cannot be planned for, such as acquisition-related expenses and tax or legal settlements, among other things.

The Committee determines the Performance Factor annually for all participants in the EOIP. When determining the annual Performance Factor, the Committee considers Intel's past financial performance, its internal estimates of current year financial performance, and the competitiveness of its executive officers' base salary and incentive baseline amounts compared to its peer groups.

### Actual Awards

Under the EOIP, the Compensation Committee has discretion to reduce, but not to increase, an individual's maximum incentive payout. The EOIP does not specify the factors that the Compensation Committee evaluates in the exercise of its discretion to reduce nor does it require the Compensation Committee to make such a reduction. In past years, the Compensation Committee has traditionally exercised its discretion and has reduced the incentive payouts below what the EOIP formula yielded. For an example, see the "Report of the Compensation Committee on Executive Compensation" for a discussion on the reduction made in 2004.

### U.S. Income Tax Consequences

As described above, we intend incentives granted under the EOIP to qualify as "performance-based compensation" under Section 162(m) of the Tax Code. By so doing, we preserve our federal income tax deductions with respect to annual compensation required to be taken into account under Section 162(m) that is in excess of $1 million and paid to one of our five most highly compensated executive officers. To qualify, incentive awards must be granted under the stockholder-approved EOIP by a committee consisting solely of two or more "outside directors" (as defined under Section 162 regulations). In addition, the performance criteria must be set by a committee consisting solely of two or more "outside directors" within the first ninety (90) days of the service period, and the extent to which amounts payable under the performance criteria must likewise be certified by the committee.

Effective generally January 1, 2005, plans that are not tax-qualified under which compensation may be deferred must comply with Section 409A of the Tax Code (as added by The American Jobs Creation Act of 2004). Section 409A

provides specific rules for deferral elections, distributions and funding mechanisms under non-qualified deferred compensation plans. Failure to comply would result in significant penalties and interest for the individual but would not impact our tax deduction for deferred compensation.

## Amendments to the EOIP

We are also requesting that our stockholders approve amendments to the EOIP. The purpose of these amendments is to clarify the Compensation Committee's authority under the EOIP and to address our executive officers' terms and conditions of participation. The full text of the amendments appears in Exhibit B. The principal features of the EOIP, including the proposed amendments, are outlined below (other than those features that have already been discussed in the preceding pages) and should be reviewed along with the text of the plan.

- Section 5. *Payment of Incentive:* Requires that the executive officer be employed by Intel on the last day of the EOIP performance period in order to be eligible for incentive payouts. The Compensation Committee, in its sole discretion, can make exceptions to this requirement in the case of death, disability or retirement.

- *Section 6. Amendment and Termination:* The Board of Directors or the Compensation Committee can amend or terminate the EOIP at any time, but stockholder approval will be required for amendments to change the class of executives eligible to participate in the plan, change the performance criteria on which amounts payable under the plan are conditioned, change the maximum amount of compensation that can be paid to any one employee under the plan, or otherwise, in each case to the extent required to satisfy Section 162(m) of the Tax Code.

- *Section 7. Income Tax Withholding:* We have the right to make all incentive payouts under the EOIP net of any federal, state or local taxes.

- *Section 8. Severability:* If a court or other regulatory body declares any term or condition of the EOIP to be unlawful, the other terms and conditions of the EOIP will remain in effect.

- *Section 9. Non-assignability:* No executive officer may sell, assign or gift any incentives under the EOIP until these incentives have actually been paid.

- *Section 10. Non-exclusivity of Plan:* The adoption of the EOIP by the Board of Directors and submission of the EOIP to stockholders for approval do not create any limitation on the power of the Compensation Committee or the Board to adopt other cash or equity-based compensation programs.

- *Section 11. Employment at Will:* Executive officers who participate in the EOIP are not guaranteed continued employment; we have the sole discretion to discharge any participant in the EOIP.

- *Section 12. No Vested Interest or Right:* Executive officers do not accrue or receive a vested right in their EOIP payout until the actual payout is made to the executive officer. We have no obligation to treat participants identically under the EOIP.

- *Section 13. Governing Law:* The EOIP will be interpreted under the laws of the State of Delaware and applicable federal law.

We are requesting that our stockholders approve the amended and restated EOIP so that incentive payments under the EOIP qualify as performance-based compensation and continue to be deductible for federal income tax purposes. We believe that this is in the best interests of the company and our stockholders.

## Recommendation of the Board

**The Board of Directors recommends that you vote "FOR" amendment and extension of the Intel Corporation Executive Officer Incentive Plan.**

## ADDITIONAL MEETING INFORMATION

*Meeting Proposals.* There are no other matters that the Board intends to present, or has reason to believe others will present, at the annual meeting. If other matters are properly presented for voting at the annual meeting, the persons named as proxies will vote in accordance with their best judgment on such matters.

*Proxy Solicitation.* We will bear the expense of soliciting proxies, and we have retained D. F. King & Co., Inc. for a fee of $15,000 plus a reasonable amount to cover expenses. Certain of our directors, officers and other employees, without additional compensation, may also solicit proxies personally or in writing, by telephone, e-mail or otherwise. We are required to request that brokers and nominees who hold stock in their names furnish our proxy material to the beneficial owners of the stock, and we must reimburse such brokers and nominees for the expenses of doing so in accordance with certain statutory fee schedules. We currently estimate that this reimbursement will cost us more than $4.5 million. The actual amount will depend on variables such as the number of proxy materials, the number of stockholders receiving electronic delivery and postage cost. See "Electronic Delivery of Our Stockholder Communications" for information on how you can help us reduce printing and mailing costs.

## OTHER MATTERS

*Section 16(a) Beneficial Ownership Reporting Compliance.* Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our directors and executive officers, among others, to file with the SEC and NASDAQ an initial report of ownership of our stock on a Form 3 and reports of changes in ownership on a Form 4 or a Form 5. Persons subject to Section 16 are required by SEC regulations to furnish us with copies of all Section 16(a) forms that they file. Under SEC rules, certain forms of indirect ownership and ownership of company stock by certain family members are covered by these reporting requirements. As a matter of practice, our administrative staff assists our executive officers and directors in preparing initial ownership reports and reporting ownership changes, and typically files these reports on their behalf.

Based solely on a review of the copies of such forms in our possession, and on written representations from certain reporting persons, we believe that during fiscal 2004, all of our executive officers and directors filed the required reports on a timely basis under Section 16(a), except that Dr. Moore made a gift of 227,200 shares to the California Institute of Technology in 2001 that was not timely reported. A corrective filing has since been made.

*2006 Stockholder Proposals or Nominations.* From time to time, our stockholders submit proposals that they believe should be voted on at the annual meeting or recommend persons who they believe should be nominated for election to the Board. Pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, some stockholder proposals may be eligible for inclusion in our 2006 proxy statement. Any such stockholder proposals must be submitted, along with proof of ownership of our stock in accordance with Rule 14a-8(b)(2), to our principal executive offices, in care of our Corporate Secretary, via e-mail at corporate.secretary@intel.com, by fax to (408) 653-8050 or mailed to Cary Klafter, Intel Corporation, M/S SC4-203, 2200 Mission College Blvd., Santa Clara, California 95052-8119. Failure to deliver a proposal by one of these means may result in it not being deemed timely received. We must receive all submissions no later than November 29, 2005. We strongly encourage any stockholder interested in submitting a proposal to contact our Corporate Secretary in advance of this deadline to discuss the proposal, and stockholders may want to consult knowledgeable counsel with regard to the detailed requirements of applicable securities laws. Submitting a stockholder proposal does not guarantee that we will include it in our proxy statement. The Corporate Governance and Nominating Committee reviews all stockholder proposals and makes recommendations to the Board for action on such proposals. For information on recommending individuals for consideration as nominees, see "The Board, Board Committees and Meetings."

Alternatively, under our Bylaws, if a stockholder does not want to submit a proposal for the 2006 annual meeting in our proxy statement under Rule 14a-8, or intends to nominate a person as a candidate for election to the Board, the stockholder may submit the proposal or nomination not less than 45 days or more than 120 days prior to the anniversary of the date on which we first mailed our proxy materials for the 2005 annual meeting, unless the date of the 2006 annual meeting is advanced by more than 30 days or delayed (other than as a result of adjournment) by more than 30 days from the anniversary of the 2005 annual meeting. For our 2006 annual meeting, we must receive such proposals and nominations no earlier than November 29, 2005 and no later than February 12, 2006. If the date of the 2006 annual meeting is advanced by more than 30 days or delayed (other than as a result of adjournment) by more than 30 days from the anniversary of the 2005 annual meeting, the stockholder must submit any such proposal or nomination no later than the close of business on the later of the 60th day prior to the 2006 annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made. The stockholder's submission must include certain specified information concerning the proposal or nominee, as the case may be, and information as to the stockholder's ownership of our stock. We will not entertain any proposals or nominations at the annual meeting that do not meet these

requirements. If the stockholder does not also comply with the requirements of Rule 14a-4(c)(2) under the Securities Exchange Act of 1934, we may exercise discretionary voting authority under proxies that we solicit to vote in accordance with our best judgment on any such stockholder proposal or nomination. To make a submission or to request a copy of our Bylaws, stockholders should contact our Corporate Secretary via e-mail at *corporate.secretary@intel.com*, by fax to (408) 653-8050 or by mail to Cary Klafter, Intel Corporation, M/S SC4-203, 2200 Mission College Blvd., Santa Clara, California 95052-8119. Our Bylaws are also available on our web site at *www.intel.com/intel/finance/docs/bylaws.pdf*. We strongly encourage stockholders to seek advice from knowledgeable counsel before submitting a proposal or a nomination.

*Financial Statements*. Our financial statements for the year ended December 25, 2004 are included in our 2004 Annual Report to Stockholders, which we are sending to our stockholders at the same time as this proxy statement. We encourage our stockholders to conserve natural resources, as well as reduce mailing and printing costs, by signing up for electronic delivery of our stockholder communications. For more information, see "Electronic Delivery of Our Stockholder Communications." If you have not received or had access to the annual report, please call our Investor Relations department at (408) 765-1480, and we will send a copy to you. Our annual report and this proxy statement are available on the Internet at *www.intel.com/intel/annualreports/2004*.

## COMMUNICATING WITH US

From time to time, we receive calls from stockholders asking how they can communicate with us. The following communication options are available.

If you would like to *receive information* about us, you may use one of the following methods:

1.  Our main Internet site, located at *www.intel.com*, contains product and marketing information as well as job listings. Our Investor Relations site, located at *www.intc.com*, contains press releases, earnings releases, financial information and stock quotes, as well as corporate governance information and links to our SEC filings. This proxy statement and our 2004 Annual Report to Stockholders are both available on the Internet at *www.intel.com/intel/annualreports/2004*.

2.  To have information such as our latest Form 10-Q or annual report mailed to you, please call our transfer agent, Computershare Investor Services, LLC, at (800) 298-0146 (within the U.S. and Canada) or (312) 360-5123 (outside the U.S. and Canada). You can view your Intel stock holdings electronically and perform other transactions by enrolling in Computershare's Investor Center at *www.computershare.com*.

If you would like to *contact us*, call our Investor Relations department at (408) 765-1480, or send correspondence to Intel Corporation, Attn: Investor Relations, M/S RN5-24, 2200 Mission College Blvd., Santa Clara, California 95052-8119.

## STOCKHOLDERS SHARING THE SAME LAST NAME AND ADDRESS

In accordance with notices that we sent to certain stockholders, we are sending only one copy of our annual report and proxy statement to stockholders who share the same last name and address, unless they have notified us that they want to continue receiving multiple copies. This practice, known as "householding," is designed to reduce duplicate mailings and save significant printing and postage costs as well as natural resources.

If you received a householded mailing this year and you would like to have additional copies of our annual report and/or proxy statement mailed to you, or you would like to opt out of this practice for future mailings, please submit your request to our Corporate Secretary via e-mail at *corporate.secretary@intel.com*, by fax to (408) 653-8050 or by mail to Cary Klafter, Intel Corporation, M/S SC4-203, 2200 Mission College Blvd., Santa Clara, California 95052-8119, or call our Investor Relations department at (408) 765-1480. We will promptly send additional copies of the annual report and/or proxy statement upon receipt of such request. You may also contact us if you received multiple copies of the annual meeting materials and would prefer to receive a single copy in the future.

Unfortunately, householding for bank and brokerage accounts is limited to accounts within the same bank or brokerage firm. For example, if you and your spouse share the same last name and address, and you and your spouse each have two accounts containing Intel stock at two different brokerage firms, your household will receive two copies of our annual meeting materials—one from each brokerage firm. To reduce the number of duplicate sets of annual meeting materials your household receives, you may want to enroll some or all of your accounts in our electronic delivery program. See "Electronic Delivery of Our Stockholder Communications."

By Order of the Board of Directors

By: Cary I. Klafter
*Corporate Secretary*

Santa Clara, California
March 29, 2005

*Intel, the Intel logo, Pentium and Itanium are trademarks or registered trademarks of Intel Corporation or its subsidiaries in the United States and other countries. *Other names and brands may be claimed as the property of others.*

44

**EXHIBIT A**

**INTEL CORPORATION**

**2004 EQUITY INCENTIVE PLAN**

**AS AMENDED AND RESTATED, EFFECTIVE MAY 18, 2005**

## 1. PURPOSE

The purpose of this Intel Corporation 2004 Equity Incentive Plan (the "Plan") is to advance the interests of Intel Corporation, a Delaware corporation, and its Subsidiaries (hereinafter collectively "Intel" or the "Corporation"), by stimulating the efforts of employees who are selected to be participants on behalf of Intel, aligning the long-term interests of participants with those of stockholders, heightening the desire of participants to continue in working toward and contributing to the success of Intel, assisting Intel in competing effectively with other enterprises for the services of new employees necessary for the continued improvement of operations, and to attract and retain the best available individuals for service as directors of the Corporation. This Plan permits the grant of stock options, stock appreciation rights, restricted stock and stock units, each of which shall be subject to such conditions based upon continued employment, passage of time or satisfaction of performance criteria as shall be specified pursuant to the Plan.

## 2. DEFINITIONS

(a) "Award" means a stock option, stock appreciation right, restricted stock or stock unit granted to a Participant pursuant to the Plan.

(b) "Board of Directors" means the Board of Directors of the Corporation.

(c) "Code" shall mean the Internal Revenue Code of 1986, as such is amended from time to time, and any reference to a section of the Code shall include any successor provision of the Code.

(d) "Committee" shall mean the committee appointed by the Board of Directors from among its members to administer the Plan pursuant to Section 3.

(e) "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time, and any reference to a section of the Exchange Act shall include any successor provision of the Exchange Act.

(f) "Outside Director" shall mean a member of the Board of Directors who is not otherwise an employee of the Corporation.

(g) "Participants" shall mean those individuals to whom Awards have been granted from time to time and any authorized transferee of such individuals.

(h) "Performance Award" means an Award that vests only upon the satisfaction of one or more of the Qualifying Performance Criteria specified in Section 10(b).

(i) "Plan" means this Intel Corporation 2004 Equity Incentive Plan.

(j) "Share" shall mean a share of common stock, $.001 par value, of the Corporation or the number and kind of shares of stock or other securities which shall be substituted or adjusted for such shares as provided in Section 11.

(k) "Subsidiary" means any corporation or entity in which Intel Corporation owns or controls, directly or indirectly, fifty percent (50%) or more of the voting power or economic interests of such corporation or entity.

## 3. ADMINISTRATION

(a) *Composition of Committee.* This Plan shall be administered by the Committee. The Committee shall consist of two or more Outside Directors who shall be appointed by the Board of Directors. The Board of Directors shall fill vacancies on the Committee and may from time to time remove or add members of the Committee. The Board of Directors, in its sole discretion, may exercise any authority of the Committee under this Plan in lieu of the Committee's exercise thereof, and in such instances references herein to the Committee shall refer to the Board of Directors.

(b) *Delegation and Administration.* The Committee may delegate to one or more separate committees (any such committee a "Subcommittee") composed of one or more directors of the Corporation (who may but need not be members

of the Committee) the ability to grant Awards and take the other actions described in Section 3(c) with respect to Participants who are not executive officers, and such actions shall be treated for all purposes as if taken by the Committee. Any action by any such Subcommittee within the scope of such delegation shall be deemed for all purposes to have been taken by the Committee, and references in this Plan to the Committee shall include any such Subcommittee. The Committee may delegate the administration of the Plan to an officer or officers of the Corporation, and such administrator(s) may have the authority to execute and distribute agreements or other documents evidencing or relating to Awards granted by the Committee under this Plan, to maintain records relating to the grant, vesting, exercise, forfeiture or expiration of Awards, to process or oversee the issuance of Shares upon the exercise, vesting and/or settlement of an Award, to interpret the terms of Awards and to take such other actions as the Committee may specify, provided that in no case shall any such administrator be authorized to grant Awards under the Plan. Any action by any such administrator within the scope of its delegation shall be deemed for all purposes to have been taken by the Committee and references in this Plan to the Committee shall include any such administrator, provided that the actions and interpretations of any such administrator shall be subject to review and approval, disapproval or modification by the Committee.

(c) *Powers of the Committee.* Subject to the express provisions and limitations set forth in this Plan, the Committee shall be authorized and empowered to do all things necessary or desirable, in its sole discretion, in connection with the administration of this Plan, including, without limitation, the following:

(i)   to prescribe, amend and rescind rules and regulations relating to this Plan and to define terms not otherwise defined herein;

(ii)   to determine which persons are Participants, to which of such Participants, if any, Awards shall be granted hereunder and the timing of any such Awards, and to grant Awards;

(iii)   to grant Awards to Participants and determine the terms and conditions thereof, including the number of Shares subject to Awards and the exercise or purchase price of such Shares and the circumstances under which Awards become exercisable or vested or are forfeited or expire, which terms may but need not be conditioned upon the passage of time, continued employment, the satisfaction of performance criteria, the occurrence of certain events, or other factors;

(iv)   to establish or verify the extent of satisfaction of any performance goals or other conditions applicable to the grant, issuance, exercisability, vesting and/or ability to retain any Award;

(v)   to prescribe and amend the terms of the agreements or other documents evidencing Awards made under this Plan (which need not be identical);

(vi)   to determine whether, and the extent to which, adjustments are required pursuant to Section 11;

(vii)   to interpret and construe this Plan, any rules and regulations under this Plan and the terms and conditions of any Award granted hereunder, and to make exceptions to any such provisions in good faith and for the benefit of the Corporation; and

(viii)   to make all other determinations deemed necessary or advisable for the administration of this Plan.

(d) *Effect of Change in Status.* The Committee shall have the discretion to determine the effect upon an Award and upon an individual's status as an employee under the Plan (including whether a Participant shall be deemed to have experienced a termination of employment or other change in status) and upon the vesting, expiration or forfeiture of an Award in the case of (i) any individual who is employed by an entity that ceases to be a Subsidiary of the Corporation, (ii) any leave of absence approved by the Corporation or a Subsidiary, (iii) any transfer between locations of employment with the Corporation or a Subsidiary or between the Corporation and any Subsidiary or between any Subsidiaries, (iv) any change in the Participant's status from an employee to a consultant or member of the Board of Directors, or vice versa, and (v) at the request of the Corporation or a Subsidiary, any employee who becomes employed by any partnership, joint venture, corporation or other entity not meeting the requirements of a Subsidiary.

(e) *Determinations of the Committee.* All decisions, determinations and interpretations by the Committee regarding this Plan shall be final and binding on all Participants. The Committee shall consider such factors as it deems relevant to making such decisions, determinations and interpretations including, without limitation, the recommendations or advice of any director, officer or employee of the Corporation and such attorneys, consultants and accountants as it may select. A Participant or other holder of an Award may contest a decision or action by the Committee with respect to such person or Award only on the grounds that such decision or action was arbitrary or capricious or was unlawful, and any review of such decision or action shall be limited to determining whether the Committee's decision or action was arbitrary or capricious or was unlawful.

**4. PARTICIPANTS**

Awards under the Plan may be granted to any person who is an employee or Outside Director of the Corporation. Outside Directors may be granted Awards only pursuant to Section 8(i)9 of the Plan. The status of the Chairman of the Board of Directors as an employee or Outside Director shall be determined by the Committee. Any person designated by the Corporation as an independent contractor shall not be treated as an employee and shall not be eligible for Awards under the Plan.

**5. EFFECTIVE DATE AND EXPIRATION OF PLAN**

(a) *Effective Date*. This Plan was approved by the Board of Directors on February 20, 2004 and ~~will become~~ became effective on May 19, 2004~~, subject to approval by the affirmative vote of the holders of a majority of the votes cast at the 2004 Annual Meeting of Stockholders~~.

(b) *Expiration Date*. The Plan shall remain available for the grant of Awards until June 30, ~~2006~~ 2007 or such earlier date as the Board of Directors may determine. The expiration of the Committee's authority to grant Awards under the Plan will not affect the operation of the terms of the Plan or the Corporation's and Participants' rights and obligations with respect to Awards granted on or prior to the expiration date of the Plan. .

**6. SHARES SUBJECT TO THE PLAN**

(a) *Aggregate Limits*. Subject to adjustment as provided in Section 11, the aggregate number of Shares authorized for issuance as Awards under the Plan is ~~240,000,000~~ 370,000,000, of which no more than an aggregate of 35,000,000 Shares may be issued as restricted stock or stock units and no more than an aggregate of ~~8,000,000~~ 10,000,000 Shares shall be available for issuance as stock options under any program providing for stock option grants that vest in full in five or more years and that have a maximum term of ten years. The Shares subject to the Plan may be either Shares reacquired by the Corporation, including Shares purchased in the open market, or authorized but unissued Shares. Any Shares subject to an Award which for any reason expires or terminates unexercised or is not earned in full may again be made subject to an Award under the Plan. <u>The following Shares may not again be made available for issuance as Awards under the Plan: (i) Shares not issued or delivered as a result of the net settlement of an outstanding Stock Appreciation Right, (ii) Shares used to pay the exercise price or withholding taxes related to an outstanding Award, or (iii) Shares repurchased on the open market with the proceeds of the option exercise price.</u>

(b) *Tax Code Limits*. The aggregate number of Shares subject to stock options or stock appreciation rights granted under this Plan during any calendar year to any one Participant shall not exceed 3,000,000. The aggregate number of Shares subject to restricted stock or stock unit Awards granted under this Plan during any calendar year to any one Participant shall not exceed 2,000,000. Notwithstanding anything to the contrary in this Plan, the foregoing limitations shall be subject to adjustment under Section 11, but only to the extent that such adjustment will not affect the status of any Award intended to qualify as "performance-based compensation" under Section 162(m) of the Code. The aggregate number of Shares issued pursuant to incentive stock options granted under the Plan shall not exceed ~~240,000,000~~ 370,000,000, which limitation shall be subject to adjustment under Section 11 only to the extent that such adjustment is consistent with adjustments permitted of a plan authorizing incentive stock options under Section 422 of the Code.

**7. PLAN AWARDS**

(a) *Award Types*. The Committee, on behalf of the Corporation, is authorized under this Plan to grant, award and enter into the following arrangements or benefits under the Plan provided that their terms and conditions are not inconsistent with the provisions of the Plan: stock options, stock appreciation rights, restricted stock and stock units. Such arrangements and benefits are sometimes referred to herein as "Awards." The Committee, in its discretion, may determine that any Award granted hereunder shall be a Performance Award.

(i) *Stock Options*. A "Stock Option" is a right to purchase a number of Shares at such exercise price, at such times, and on such other terms and conditions as are specified in or determined pursuant to the document(s) evidencing the Award (the "Option Agreement"). The Committee may grant Stock Options intended to be eligible to qualify as incentive stock options ("ISOs") pursuant to Section 422 of the Code and Stock Options that are not intended to qualify as ISOs ("Non-qualified Stock Options"), as it, in its sole discretion, shall determine.

(ii) *Stock Appreciation Rights*. A "Stock Appreciation Right" or "SAR" is a right to receive, in cash or stock (as determined by the Committee), value with respect to a specific number of Shares equal to or otherwise based on the excess of (i) the market value of a Share at the time of exercise over (ii) the exercise price of the right, subject to such terms and conditions as are expressed in the document(s) evidencing the Award (the "SAR Agreement").

(iii) *Restricted Stock*. A "Restricted Stock" Award is an award of Shares, the grant, issuance, retention and/or vesting of which is subject to such conditions as are expressed in the document(s) evidencing the Award (the "Restricted Stock Agreement").

A-3

(iv) *Stock Unit*. A "Stock Unit" Award is an award of a right to receive, in cash or stock (as determined by the Committee) the market value of one Share, the grant, issuance, retention and/or vesting of which is subject to such conditions as are expressed in the document(s) evidencing the Award (the "Stock Unit Agreement").

(b) *Grants of Awards*. An Award may consist of one of the foregoing arrangements or benefits or two or more of them in tandem or in the alternative.

## 8. ~~GRANT, TERMS AND CONDITIONS OF STOCK OPTIONS AND SARS~~ EMPLOYEE PARTICIPANT AWARDS

### (a) *Grant, Terms and Conditions of Stock Options and SARs*

The Committee may grant Stock Options or SARs at any time and from time to time prior to the expiration of the Plan to eligible employee Participants selected by the Committee. No Participant shall have any rights as a stockholder with respect to any Shares subject to Stock Options or SARs hereunder until said Shares have been issued. Each Stock Option or SAR shall be evidenced only by such agreements, notices and/or terms or conditions documented in such form (including by electronic communications) as may be approved by the Committee. Each Stock Option grant will expressly identify the Stock Option as an ISO or as a Non-qualified Stock Option. Stock Options or SARs granted pursuant to the Plan need not be identical but each must contain or be subject to the following terms and conditions:

(i) *Price*. The purchase price (also referred to as the exercise price) under each Stock Option or SAR granted hereunder shall be established by the Committee. The purchase price per Share shall not be less than 100% of the market value of a Share on the date of grant. For purposes of the Plan, "market value" shall mean the average of the high and low sales prices of the Corporation's common stock. The exercise price of a Stock Option shall be paid in cash or in such other form if and to the extent permitted by the Committee, including without limitation by delivery of already owned Shares, withholding (either actually or by attestation) of Shares otherwise issuable under such Stock Option and/or by payment under a broker-assisted sale and remittance program acceptable to the Committee.

(ii) *No Repricing*. Other than in connection with a change in the Corporation's capitalization (as described in Section 11 of the Plan), the exercise price of ~~ena~~ Stock Option or SAR may not be reduced without stockholder approval.

(iii) *No Reload Grants*. Stock Options shall not be granted under the Plan in consideration for and shall not be conditioned upon the delivery of Shares to the Corporation in payment of the exercise price and/or tax withholding obligation under any other employee stock option.

(iv) *Duration, Exercise and Termination of Stock Options and SARs*. Each Stock Option or SAR shall be exercisable at such time and in such installments during the period prior to the expiration of the Stock Option or SAR as determined by the Committee. The Committee shall have the right to make the timing of the ability to exercise any Stock Option or SAR subject to continued employment, the passage of time and/or such performance requirements as deemed appropriate by the Committee. At any time after the grant of a Stock Option, the Committee may reduce or eliminate any restrictions on the Participant's right to exercise all or part of the Stock Option, except that no Stock Option shall first become exercisable within one (1) year from its date of grant, other than upon the death, disability or retirement of the person to whom the Stock Option was granted, in each case as specified in the Option Agreement.

Each Stock Option or SAR that vests in full in less than five (5) years (standard grants) must expire within a period of not more than seven (7) years from the grant date and each Stock Option or SAR that vests in full in five (5) or more years (long-term retention grants) must expire within a period of not more than ten (10) years from the grant date. In each case, the Option Agreement or SAR Agreement may provide for expiration prior to the end of the stated term of the Award in the event of the termination of employment or service of the Participant to whom it was granted.

(v) *Suspension or Termination of Stock Options and SARs*. If at any time (including after a notice of exercise has been delivered) the Committee, including any Subcommittee or administrator authorized pursuant to Section 3(b) (any such person, an "Authorized Officer"), reasonably believes that a Participant, other than an Outside Director, has committed an act of misconduct as described in this Section, the Authorized Officer may suspend the Participant's right to exercise any Stock Option or SAR pending a determination of whether an act of misconduct has been committed. If the Committee or an Authorized Officer determines a Participant, other than an Outside Director, has committed an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to Intel, breach of fiduciary duty or deliberate disregard of Corporation rules resulting in loss, damage or injury to the Corporation, or if a Participant makes an unauthorized disclosure of any Corporation trade secret or confidential information, engages in any conduct constituting unfair competition, induces any customer to breach a contract with the Corporation or

A-4

induces any principal for whom Intel acts as agent to terminate such agency relationship, neither the Participant nor his or her estate shall be entitled to exercise any Stock Option or SAR whatsoever. Any determination by the Committee or an Authorized Officer with respect to the foregoing shall be final, conclusive and binding on all interested parties. For any Participant who is an "executive officer" for purposes of Section 16 of the Exchange Act, the determination of the Committee or of the Authorized Officer shall be subject to the approval of the Board of Directors.

(vi) *Conditions and Restrictions Upon Securities Subject to Stock Options or SARs.* Subject to the express provisions of the Plan, the Committee may provide that the Shares issued upon exercise of a Stock Option or SAR shall be subject to such further conditions or agreements as the Committee in its discretion may specify prior to the exercise of such Stock Option or SAR, including, without limitation, conditions on vesting or transferability, forfeiture or repurchase provisions. The obligation to make payments with respect to SARs may be satisfied through cash payments or the delivery of Shares, or a combination thereof as the Committee shall determine. The Committee may establish rules for the deferred delivery of Common Stock upon exercise of a Stock Option or SAR with the deferral evidenced by use of "Stock Units" equal in number to the number of Shares whose delivery is so deferred.

(vii) *Other Terms and Conditions.* Stock Options and SARs may also contain such other provisions, which shall not be inconsistent with any of the foregoing terms, as the Committee shall deem appropriate.

(viii) *ISOs.* Stock Options intending to qualify as ISOs may only be granted to employees of the Corporation within the meaning of the Code, as determined by the Committee. No ISO shall be granted to any person if immediately after the grant of such Award, such person would own stock, including stock subject to outstanding Awards held by him or her under the Plan or any other plan established by the Corporation, amounting to more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Corporation. To the extent that the Option Agreement specifies that a Stock Option is intended to be treated as an ISO, the Stock Option is intended to qualify to the greatest extent possible as an "incentive stock option" within the meaning of Section 422 of the Code, and shall be so construed; provided, however, that any such designation shall not be interpreted as a representation, guarantee or other undertaking on the part of the Corporation that the Stock Option is or will be determined to qualify as an ISO. If and to the extent that any Shares are issued under a portion of any Stock Option that exceeds the $100,000 limitation of Section 422 of the Code, such Shares shall not be treated as issued under an ISO notwithstanding any designation otherwise. Certain decisions, amendments, interpretations and actions by the Committee and certain actions by a Participant may cause a Stock Option to cease to qualify as an ISO pursuant to the Code and by accepting a Stock Option the Participant agrees in advance to such disqualifying action.

(ix) ~~Outside Director Stock Options. Each Outside Director shall be granted a Non-qualified Stock Option (an "Outside Director Option") once each fiscal year for not more than 30,000 Shares, as determined by the Board of Directors, provided that if an Outside Director is elected to begin serving as a director on a date not coincident with the grant date for such annual grant, then he or she will be granted an initial Outside Director Option as of the date of the first meeting of the Board of Directors at which he or she serves for a prorated number of Shares based on the number of months remaining until the next annual Outside Director Option grant. Notwithstanding anything to the contrary in this Plan, the foregoing limitations shall be subject to adjustment under Section 11. The number of Shares subject to each Outside Director Option, or the formula pursuant to which such number shall be determined, the date of grant and the vesting, expiration and other terms applicable to such Stock Options shall be specified from time to time by the Board of Directors, subject to the terms of this Plan applicable to Stock Options in general.~~

### 9. ~~GRANT, TERMS AND CONDITIONS OF RESTRICTED STOCK AND STOCK UNITS~~

(b) *Grant, Terms and Conditions of Restricted Stock and Stock Units*

The Committee may grant Restricted Stock or Stock Units at any time and from time to time prior to the expiration of the Plan to eligible employee Participants selected by the Committee. A Participant shall have rights as a stockholder with respect to any Shares subject to a Restricted Stock Award hereunder only to the extent specified in this Plan or the Restricted Stock Agreement evidencing such Award. Awards of Restricted Stock shall be evidenced only by such agreements, notices and/or terms or conditions documented in such form (including by electronic communications) as may be approved by the Committee. Awards of Restricted Stock or Stock Units granted pursuant to the Plan need not be identical but each must contain or be subject to the following terms and conditions:

(i) *Terms and Conditions.* Each Restricted Stock Agreement and each Stock Unit Agreement shall contain provisions regarding (a) the number of Shares subject to such Award or a formula for determining such, (b) the purchase price of the Shares, if any, and the means of payment for the Shares, (c) the performance criteria, if any, and level of achievement versus these criteria that shall determine the number of Shares granted, issued, retainable and/or

A-5

vested, (d) such terms and conditions on the grant, issuance, vesting and/or forfeiture of the Shares as may be determined from time to time by the Committee, (e) restrictions on the transferability of the Shares and (f) such further terms and conditions as may be determined from time to time by the Committee, in each case not inconsistent with this Plan.

(ii) *Sale Price*. Subject to the requirements of applicable law, the Committee shall determine the price, if any, at which Shares of Restricted Stock or Stock Units shall be sold or awarded to a Participant, which may vary from time to time and among Participants and which may be below the market value of such Shares at the date of grant or issuance.

(iii) *Share Vesting*. The grant, issuance, retention and/or vesting of Shares under Restricted Stock or Stock Unit Awards shall be at such time and in such installments as determined by the Committee or under criteria established by the Committee. The Committee shall have the right to make the timing of the grant and/or the issuance, ability to retain and/or vesting of Shares under Restricted Stock or Stock Unit Awards subject to continued employment, passage of time and/or such performance criteria and level of achievement versus these criteria as deemed appropriate by the Committee, which criteria may be based on financial performance and/or personal performance evaluations. Up to 100,000 Shares shall be available for issuance to employee Participants as Awards having no minimum vesting period. No condition that is based on performance criteria and level of achievement versus such criteria shall be based on performance over a period of less than one year, and no condition that is based upon continued employment or the passage of time shall provide for vesting in full of a Restricted Stock or Stock Unit Award in less than pro rata installments over three years from the date the Award is made, other than with respect to such Awards that are issued upon exercise or settlement of Stock Options or SARs or upon the death, disability or retirement of the Participant, in each case as specified in the agreement evidencing such Award. Notwithstanding anything to the contrary herein, the performance criteria for any Restricted Stock or Stock Unit that is intended to satisfy the requirements for "performance-based compensation" under Section 162(m) of the Code shall be a measure based on one or more Qualifying Performance Criteria selected by the Committee and specified at the time the Restricted Stock Award is granted.

(iv) *Termination of Employment*. The Restricted Stock or Stock Unit Agreement may provide for the forfeiture or cancellation of the Restricted Stock or Stock Unit Award, in whole or in part, in the event of the termination of employment or service of the Participant to whom it was granted.

(v) *Stock Units*. Except to the extent this Plan or the Committee specifies otherwise, Stock Units represent an unfunded and unsecured obligation of the Corporation and do not confer any of the rights of a stockholder until Shares are issued thereunder. Settlement of Stock Units upon expiration of the deferral or vesting period shall be made in Shares or otherwise as determined by the Committee. The number of Shares, or other settlement medium, to be so distributed may be increased by an interest factor or by dividend equivalents. Until a Stock Unit is so settled, the number of Shares represented by a Stock Unit shall be subject to adjustment pursuant to Section 11. Any Stock Units that are settled after the Participant's death shall be distributed to the Participant's designated beneficiary(ies) or, if none was designated, the Participant's estate.

## 9. OUTSIDE DIRECTOR AWARDS

Each Outside Director may be granted Awards (each an "Outside Director Award") each fiscal year for up to 30,000 Shares, as determined by the Board of Directors. Notwithstanding anything to the contrary in this Plan, the foregoing limitation shall be subject to adjustment under Section 11. The number of Shares subject to each Outside Director Award, or the formula pursuant to which such number shall be determined, the type or types of Awards included in the Outside Director Awards, the date of grant and the vesting, expiration and other terms applicable to such Outside Director Awards shall be specified from time to time by the Board of Directors, subject to the terms of this Plan, including the terms specified in Section 8. If the Board of Directors reasonably believes that an Outside Director has committed an act of misconduct as specified in Section 8(a)(v), the Board of Directors may suspend the Outside Director's right to exercise any Stock Option or SAR and/or the vesting of any Restricted Stock or Stock Unit Award pending a determination of whether an act of misconduct has been committed. If the Board of Directors determines that an Outside Director has committed an act of misconduct, neither the Outside Director nor his or her estate shall be entitled to exercise any Stock Option or SAR whatsoever and shall forfeit any unvested Restricted Stock or Stock Unit Award.

## 10. OTHER PROVISIONS APPLICABLE TO AWARDS

(a) *Transferability*. Unless the agreement or other document evidencing an Award (or an amendment thereto authorized by the Committee) expressly states that the Award is transferable as provided hereunder, no Award granted

under this Plan, nor any interest in such Award, may be sold, assigned, conveyed, gifted, pledged, hypothecated or otherwise transferred in any manner prior to the vesting or lapse of any and all restrictions applicable thereto, other than by will or the laws of descent and distribution. The Committee may grant an Award or amend an outstanding Award to provide that the Award is transferable or assignable (a) in the case of a transfer without the payment of any consideration, to any "family member" as such term is defined in Section 1(a)(5) of the General Instructions to Form S-8 under the Securities Act of 1933, as such may be amended from time to time, and (b) in any transfer described in clause (ii) of Section 1(a)(5) of the General Instructions to Form S-8 under the 1933 Act as amended from time to time, *provided* that following any such transfer or assignment the Award will remain subject to substantially the same terms applicable to the Award while held by the Participant to whom it was granted, as modified as the Committee shall determine appropriate, and as a condition to such transfer the transferee shall execute an agreement agreeing to be bound by such terms; *provided further*, that an ISO may be transferred or assigned only to the extent consistent with Section 422 of the Code. Any purported assignment, transfer or encumbrance that does not qualify under this Section 10(a) shall be void and unenforceable against the Corporation.

(b) *Qualifying Performance Criteria.* For purposes of this Plan, the term "Qualifying Performance Criteria" shall mean any one or more of the following performance criteria, either individually, alternatively or in any combination, applied to either the Corporation as a whole or to a business unit or Subsidiary, either individually, alternatively or in any combination, and measured either annually or cumulatively over a period of years, on an absolute basis or relative to a pre-established target, to previous years' results or to a designated comparison group, in each case as specified by the Committee in the Award: (a) cash flow, (b) earnings per share, (c) earnings before interest, taxes and amortization, (d) return on equity, (e) total stockholder return, (f) share price performance, (g) return on capital, (h) return on assets or net assets, (i) revenue, (j) income or net income, (k) operating income or net operating income, (l) operating profit or net operating profit, (m) operating margin or profit margin, (n) return on operating revenue, (o) return on invested capital, (p) market segment share, (q) product release schedules, (r) new product innovation, (s) product cost reduction through advanced technology, (t) brand recognition/acceptance, (u) product ship targets, or (v) customer satisfaction. The Committee may appropriately adjust any evaluation of performance under a Qualifying Performance Criteria to exclude any of the following events that occurs during a performance period: (i) asset write-downs, (ii) litigation or claim judgments or settlements, (iii) the effect of changes in tax law, accounting principles or other such laws or provisions affecting reported results, (iv) accruals for reorganization and restructuring programs and (v) any extraordinary non-recurring items as described in Accounting Principles Board Opinion No. 30 and/or in management's discussion and analysis of financial condition and results of operations appearing in the Corporation's annual report to stockholders for the applicable year. Notwithstanding satisfaction of any completion of any Qualifying Performance Criteria, to the extent specified at the time of grant of an Award, the number of Shares, Stock Options, SARs, Stock Units or other benefits granted, issued, retainable and/or vested under an Award on account of satisfaction of such Qualifying Performance Criteria may be reduced by the Committee on the basis of such further considerations as the Committee in its sole discretion shall determine.

(c) *Dividends.* Unless otherwise provided by the Committee, no adjustment shall be made in Shares issuable under Awards on account of cash dividends that may be paid or other rights that may be issued to the holders of Shares prior to their issuance under any Award. The Committee shall specify whether dividends or dividend equivalent amounts shall be paid to any Participant with respect to the Shares subject to any Award that have not vested or been issued or that are subject to any restrictions or conditions on the record date for dividends.

(d) *Documents Evidencing Awards.* The Committee shall, subject to applicable law, determine the date an Award is deemed to be granted. The Committee or, except to the extent prohibited under applicable law, its delegate(s) may establish the terms of agreements or other documents evidencing Awards under this Plan and may, but need not, require as a condition to any such agreement's or document's effectiveness that such agreement or document be executed by the Participant, including by electronic signature or other electronic indication of acceptance, and that such Participant agree to such further terms and conditions as specified in such agreement or document. The grant of an Award under this Plan shall not confer any rights upon the Participant holding such Award other than such terms, and subject to such conditions, as are specified in this Plan as being applicable to such type of Award (or to all Awards) or as are expressly set forth in the agreement or other document evidencing such Award.

(e) *Additional Restrictions on Awards.* Either at the time an Award is granted or by subsequent action, the Committee may, but need not, impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any resales by a Participant or other subsequent transfers by a Participant of any Shares issued under an Award, including without limitation (a) restrictions under an insider trading policy, (b) restrictions designed to delay and/or coordinate the timing and manner of sales by the Participant or Participants, and (c) restrictions as to the use of a specified brokerage firm for such resales or other transfers.

(f) *Subsidiary Awards.* In the case of a grant of an Award to any Participant employed by a Subsidiary, such grant may, if the Committee so directs, be implemented by Intel issuing any subject Shares to the Subsidiary, for such lawful consideration as the Committee may determine, upon the condition or understanding that the Subsidiary will transfer the Shares to the Participant in accordance with the terms of the Award specified by the Committee pursuant to the provisions of the Plan. Notwithstanding any other provision hereof, such Award may be issued by and in the name of the Subsidiary and shall be deemed granted on such date as the Committee shall determine.

## 11. ADJUSTMENT OF AND CHANGES IN THE COMMON STOCK

(a) The existence of outstanding Awards shall not affect in any way the right or power of the Corporation or its shareholders to make or authorize any or all adjustments, recapitalizations, reorganizations, exchanges, or other changes in the Corporation's capital structure or its business, or any merger or consolidation of the Corporation or any issuance of Shares or other securities or subscription rights thereto, or any issuance of bonds, debentures, preferred or prior preference stock ahead of or affecting the Shares or other securities of the Corporation or the rights thereof, or the dissolution or liquidation of the Corporation, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise. Further, except as expressly provided herein or by the Committee, (i) the issuance by the Corporation of shares of stock or any class of securities convertible into shares of stock of any class, for cash, property, labor or services, upon direct sale, upon the exercise of rights or warrants to subscribe therefor, or upon conversion of shares or obligations of the Corporation convertible into such shares or other securities, (ii) the payment of a dividend in property other than Shares, or (iii) the occurrence of any similar transaction, and in any case whether or not for fair value, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number of Shares subject to Stock Options or other Awards theretofore granted or the purchase price per Share, unless the Committee shall determine, in its sole discretion, that an adjustment is necessary or appropriate.

(b) If the outstanding Shares or other securities of the Corporation, or both, for which the Award is then exercisable or as to which the Award is to be settled shall at any time be changed or exchanged by declaration of a stock dividend, stock split, combination of shares, extraordinary dividend of cash and/or assets, recapitalization, reorganization or any similar event affecting the Shares or other securities of the Corporation, the Committee may appropriately and equitably adjust the number and kind of Shares or other securities which are subject to this Plan or subject to any Awards theretofore granted, and the exercise or settlement prices of such Awards, so as to maintain the proportionate number of Shares or other securities without changing the aggregate exercise or settlement price.

(c) No right to purchase fractional Shares shall result from any adjustment in Stock Options or SARs pursuant to this Section 11. In case of any such adjustment, the Shares subject to the Stock Option or SAR shall be rounded down to the nearest whole share.

(d) Any other provision hereof to the contrary notwithstanding (except Section 11(a)), in the event Intel is a party to a merger or other reorganization, outstanding Awards shall be subject to the agreement of merger or reorganization. Such agreement may provide, without limitation, for the assumption of outstanding Awards by the surviving corporation or its parent, for their continuation by Intel (if Intel is a surviving corporation), for accelerated vesting and accelerated expiration, or for settlement in cash.

## 12. LISTING OR QUALIFICATION OF COMMON STOCK

In the event that the Board of Directors determines in its discretion that the listing or qualification of the Shares available for issuance under the Plan on any securities exchange or quotation or trading system or under any applicable law or governmental regulation is necessary as a condition to the issuance of such Shares, a Stock Option or SAR may not be exercised in whole or in part and a Restricted Stock or Stock Unit Award shall not vest unless such listing, qualification, consent or approval has been unconditionally obtained.

## 13. TERMINATION OR AMENDMENT OF THE PLAN

The Board of Directors may amend, alter or discontinue the Plan and the Board or the Committee may to the extent permitted by the Plan amend any agreement or other document evidencing an Award made under this Plan, provided, however, that the Corporation shall submit for stockholder approval any amendment (other than an amendment pursuant to the adjustment provisions of Section 11) required to be submitted for stockholder approval by NASDAQ or that otherwise would:

(a) Increase the maximum number of Shares for which Awards may be granted under this Plan;

(b) Reduce the price at which Stock Options may be granted below the price provided for in Section 8(a);

(c) Reduce the option price of outstanding Stock Options;

(d) Extend the term of this Plan;

(e) Change the class of persons eligible to be Participants; or

(f) Increase the limits in Section 6.

In addition, no such amendment or alteration shall be made which would impair the rights of any Participant, without such Participant's consent, under any Award theretofore granted, provided that no such consent shall be required with respect to any amendment or alteration if the Committee determines in its sole discretion that such amendment or alteration either (i) is required or advisable in order for the Corporation, the Plan or the Award to satisfy any law or regulation or to meet the requirements of any accounting standard, or (ii) is not reasonably likely to significantly diminish the benefits provided under such Award, or that any such diminishment has been adequately compensated.

## 14. WITHHOLDING

To the extent required by applicable federal, state, local or foreign law, the Committee may and/or a Participant shall make arrangements satisfactory to the Corporation for the satisfaction of any withholding tax obligations that arise with respect to any Stock Option, SAR, Restricted Stock or Stock Unit Award, or any sale of Shares. The Corporation shall not be required to issue Shares or to recognize the disposition of such Shares until such obligations are satisfied. To the extent permitted or required by the Committee, these obligations may or shall be satisfied by having the Corporation withhold a portion of the Shares of stock that otherwise would be issued to a Participant under such Award or by tendering Shares previously acquired by the Participant.

## 15. GENERAL PROVISIONS

(a) *Employment At Will.* Neither the Plan nor the grant of any Award nor any action by the Corporation, any Subsidiary or the Committee shall be held or construed to confer upon any person any right to be continued in the employ of the Corporation or a Subsidiary. The Corporation and each Subsidiary expressly reserve the right to discharge, without liability but subject to his or her rights under this Plan, any Participant whenever in the sole discretion of the Corporation or a Subsidiary, as the case may be, its interest may so require.

(b) *Governing Law.* This Plan and any agreements or other documents hereunder shall be interpreted and construed in accordance with the laws of the State of Delaware and applicable federal law. The Committee may provide that any dispute as to any Award shall be presented and determined in such forum as the Committee may specify, including through binding arbitration. Any reference in this Plan or in the agreement or other document evidencing any Award to a provision of law or to a rule or regulation shall be deemed to include any successor law, rule or regulation of similar effect or applicability.

(c) *Unfunded Plan.* Insofar as it provides for Awards, the Plan shall be unfunded. Although bookkeeping accounts may be established with respect to Participants who are granted Awards under this Plan, any such accounts will be used merely as a bookkeeping convenience. The Corporation shall not be required to segregate any assets which may at any time be represented by Awards, nor shall this Plan be construed as providing for such segregation, nor shall the Corporation or the Committee be deemed to be a trustee of stock or cash to be awarded under the Plan.

## 16. NON-EXCLUSIVITY OF PLAN

Neither the adoption of this Plan by the Board of Directors nor the submission of this Plan to the shareholders of the Corporation for approval shall be construed as creating any limitations on the power of the Board of Directors or the Committee to adopt such other incentive arrangements as either may deem desirable, including, without limitation, the granting of stock options, stock appreciation rights, restricted stock or stock units otherwise than under this Plan, and such arrangements may be either generally applicable or applicable only in specific cases.

## 17. COMPLIANCE WITH OTHER LAWS AND REGULATIONS

This Plan, the grant and exercise of Awards thereunder, and the obligation of the Corporation to sell, issue or deliver Shares under such Awards, shall be subject to all applicable federal, state and local laws, rules and regulations and to such approvals by any governmental or regulatory agency as may be required. The Corporation shall not be required to register in a Participant's name or deliver any Shares prior to the completion of any registration or qualification of such Shares under any federal, state or local law or any ruling or regulation of any government body which the Committee shall

A-9

determine to be necessary or advisable. To the extent the Corporation is unable to or the Committee deems it infeasible to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Corporation's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, the Corporation shall be relieved of any liability with respect to the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained. No Stock Option shall be exercisable and no Shares shall be issued and/or transferable under any other Award unless a registration statement with respect to the Shares underlying such Stock Option is effective and current or the Corporation has determined that such registration is unnecessary.

## 18. LIABILITY OF CORPORATION

The Corporation shall not be liable to a Participant or other persons as to: (a) the non-issuance or sale of Shares as to which the Corporation has been unable to obtain from any regulatory body having jurisdiction the authority deemed by the Corporation's counsel to be necessary to the lawful issuance and sale of any Shares hereunder; and (b) any tax consequence expected, but not realized, by any Participant or other person due to the receipt, exercise or settlement of any Stock Option or other Award granted hereunder.

**EXHIBIT B**

**INTEL CORPORATION**

**EXECUTIVE OFFICER INCENTIVE PLAN**

**AS AMENDED AND RESTATED EFFECTIVE MAY 18, 2005**

**1. PURPOSE**

The purpose of this amended and restated Executive Officer Incentive Plan ("Incentive Plan") is to motivate and reward eligible employees by making a portion of their cash compensation dependent on earnings per share ("EPS") of Intel Corporation (the "Company"). The Incentive Plan is designed to ensure that the annual incentive paid hereunder to executive officers of the Company is deductible without limit under Section 162(m) of the Internal Revenue Code of 1986, as amended, and the regulations and interpretations promulgated thereunder (the "Tax Code"). This amended and restated Incentive Plan is subject to stockholder approval.

**2. COVERED INDIVIDUALS**

The individuals entitled to incentive payments hereunder shall be the executive officers of the Company, as determined by the Compensation Committee (the "Committee").

**3. THE COMMITTEE**

(a) The Committee shall consist of at least two outside directors of the Company who satisfy the requirements of Section 162(m) of the Tax Code. The Committee shall have the sole discretion and authority to administer and interpret the Incentive Plan in accordance with Section 162(m) of the Tax Code.

(b) Subject to the express provisions and limitations set forth in the Incentive Plan, the Committee shall be authorized and empowered to do all things necessary or desirable, in its sole discretion, in connection with the administration of the Incentive Plan, including, without limitation, the following:

    (i) To prescribe, amend and rescind rules and regulations relating to the Incentive Plan and to define terms not otherwise defined herein;

    (ii) To determine which covered persons are eligible to be paid incentives and to which of such participants, if any, incentives hereunder are actually paid;

    (iii) To verify the Company's EPS and the extent to which the Company has satisfied any other performance goals or other conditions applicable to the payment of incentives under the Incentive Plan;

    (iv) To prescribe and amend the terms of any agreements or other documents under the Incentive Plan (which need not be identical);

    (v) To determine whether, and the extent to which, adjustments are required pursuant to Section 4;

    (vi) To interpret and construe the Incentive Plan, any rules and regulations under the Incentive Plan, and the terms and conditions of any incentive opportunities provided hereunder, and to make exceptions to any such provisions in good faith and for the benefit of the Company; and

    (vii) To make all other determinations deemed necessary or advisable for the administration of the Incentive Plan.

(c) All decisions, determinations and interpretations by the Committee regarding the Incentive Plan shall be final and binding on all covered individuals who are participants under the Incentive Plan. The Committee shall consider such factors as it deems relevant to making such decisions, determinations and interpretations including, without limitation, the recommendations or advice of any director, officer or employee of the Company and such attorneys, consultants and accountants as it may select. A covered individual or other person claiming any benefits under the Incentive Plan may contest a decision or action by the Committee with respect to such person or an actual or potential incentive under the Incentive Plan only on the grounds that such decision or action was arbitrary or capricious or was unlawful, and any review of such decision or action shall be limited to determining whether the Committee's decision or action was arbitrary or capricious or was unlawful.

**4. AMOUNT OF INCENTIVE**

Incentive payments are made in cash. The maximum incentive payment is the product of (i) an individual incentive baseline amount in dollars for the performance period set by the Committee in writing and (ii) the numerical value of EPS for the performance period multiplied by a factor (the "Performance Factor") that is set by the Committee in its sole discretion and is in writing. The term "performance period" shall mean the period for which the incentive is payable. For

this calculation, the term "EPS" shall mean the greater of operating income or net income per weighted average common shares outstanding, assuming dilution, for the performance period, in each case adjustable based upon qualifying objective criteria selected by the Committee in its sole discretion within the period prescribed by the U.S. Internal Revenue Service. Such criteria may include, but are not limited to asset write-downs; acquisition-related charges; litigation, claim judgments, settlements or tax settlements; the effects of changes in tax law, changes in accounting principles or other such laws or provisions affecting reported results; accruals for reorganization and restructuring programs; unrealized gains or losses on investments; and any extraordinary non-recurring items as described in Accounting Principles Board Opinion No. 30 and/or in management's discussion and analysis of financial condition and results of operations appearing in the annual report to stockholders for the applicable year. The individual incentive baseline amount, the Performance Factor and the EPS definition shall be adopted by the Committee in its sole discretion with respect to each performance period no later than the latest time permitted by the Tax Code. However, no incentive in excess of $5,000,000 will be paid to any executive officer for any performance period. In its sole discretion, the Committee may also reduce, but may not increase, an individual's incentive calculated under the preceding formula. In determining the amount of any reduced incentive, the Committee reserves the right to apply subjective, discretionary criteria to determine a revised incentive amount. The incentive payable hereunder shall be paid in lieu of any incentive payable under the Company's broad-based variable cash incentive program.

## 5. PAYMENT OF INCENTIVE

The payment of an incentive for a given performance period requires that the executive officer be on the Company's payroll as of the last day of the performance period. The Committee may make exceptions to this requirement in the case of retirement, death or disability, as determined by the Committee in its sole discretion. No incentive shall be paid unless and until the Committee makes a certification in writing as required to satisfy the conditions for exemption under Section 162(m) of the Tax Code.

## 6. AMENDMENT AND TERMINATION

The Company reserves the right to amend or terminate this Incentive Plan at any time with respect to future services of covered individuals. Incentive Plan amendments may be adopted by the Board of Directors or the Committee as defined in Section 3, and will require stockholder approval only to the extent required to satisfy the conditions for exemption under Section 162(m) of the Tax Code or otherwise.

## 7. TAX WITHHOLDING

The Company shall have the right to make all payments or distributions pursuant to the Incentive Plan to a participant, net of any applicable federal, state and local taxes required to be paid or withheld. The Company shall have the right to withhold from wages or other amounts otherwise payable to such participant such withholding taxes as may be required by law, or to otherwise require the participant to pay such withholding taxes. If the participant shall fail to make such tax payments as are required, the Company shall, to the extent permitted by law, have the right to deduct any such taxes from any payment of any kind otherwise due to such participant or to take such other action as may be necessary to satisfy such withholding obligations.

## 8. SEVERABILITY

If any provision of the Incentive Plan shall be held unlawful or otherwise invalid or unenforceable in whole or in part by a court of competent jurisdiction, such provision shall (a) be deemed limited to the extent that such court of competent jurisdiction deems it lawful, valid and/or enforceable and as so limited shall remain in full force and effect, and (b) not affect any other provision of the Incentive Plan or part thereof, each of which shall remain in full force and effect. If the making of any payment or the provision of any other benefit provided for under the Incentive Plan shall be held unlawful or otherwise invalid or unenforceable by a court of competent jurisdiction, such unlawfulness, invalidity or unenforceability shall not prevent any other payment or benefit from being made or provided under the Incentive Plan, and if the making of any payment in full or the provision of any other benefit provided for under the Incentive Plan in full would be unlawful or otherwise invalid or unenforceable, then such unlawfulness, invalidity or unenforceability shall not prevent such payment or benefit from being made or provided in part, to the extent that it would not be unlawful, invalid or unenforceable, and the maximum payment or benefit that would not be unlawful, invalid or unenforceable shall be made or provided under the Incentive Plan.

## 9. NON-ASSIGNABILITY

Unless the Committee expressly states otherwise, no participant in the Incentive Plan may sell, assign, convey, gift, pledge or otherwise hypothecate or alienate any incentive opportunity or amounts determined by the Committee to be payable under the Incentive Plan, until such amounts (if any) are actually paid.

## 10. NON-EXCLUSIVITY OF PLAN

Neither the adoption of the Incentive Plan by the Board of Directors nor the submission of the Incentive Plan to the stockholders of the Company for approval shall be construed as creating any limitations on the power of the Board of Directors or the Committee to adopt such other incentive arrangements as either may deem desirable, including, without limitation, cash or equity-based compensation arrangements, either tied to performance or otherwise, and any such other arrangements as may be either generally applicable or applicable only in specific cases.

## 11. EMPLOYMENT AT WILL

Neither the Incentive Plan, selection of a person as a covered person eligible to be paid incentives under the Incentive Plan nor the payment of any incentive to any participant under the Incentive Plan nor any action by the Company or the Committee shall be held or construed to confer upon any person any right to be continued in the employ of the Company. The Company expressly reserves the right to discharge any participant whenever in the sole discretion of the Company its interest may so require.

## 12. NO VESTED INTEREST OR RIGHT

At no time before the actual payout of an incentive to any participant under the Incentive Plan shall any participant accrue any vested interest or right whatsoever under the Incentive Plan, and the Company has no obligation to treat participants identically under the Incentive Plan.

## 13. GOVERNING LAW

The Incentive Plan and any agreements and documents hereunder shall be interpreted and construed in accordance with the laws of the State of Delaware and applicable federal law. The Committee may provide that any dispute concerning the Incentive Plan shall be presented and determined in such forum as the Committee may specify, including through binding arbitration.

**EXHIBIT C**

**CHARTER OF THE AUDIT COMMITTEE**

**AS AMENDED AND RESTATED, EFFECTIVE FEBRUARY 2, 2005**

**THE PURPOSE OF THE AUDIT COMMITTEE**

The purpose of the Audit Committee is to represent and assist the Board of Directors in its general oversight of the company's accounting and financial reporting processes, audits of the financial statements, and internal control and audit functions. Management is responsible for (a) the preparation, presentation and integrity of the company's financial statements; (b) accounting and financial reporting principles; and (c) the company's internal controls and procedures designed to promote compliance with accounting standards and applicable laws and regulations. The company's independent auditing firm is responsible for performing an independent audit of the consolidated financial statements in accordance with generally accepted auditing standards.

The Audit Committee members are not professional accountants or auditors and their functions are not intended to duplicate or to certify the activities of management and the independent auditor, nor can the Committee certify that the independent auditor is "independent" under applicable rules. The Audit Committee serves a board level oversight role where it oversees the relationship with the independent auditor, as set forth in this charter, receives information and provides advice, counsel and general direction, as it deems appropriate, to management and the auditors, taking into account the information it receives, discussions with the auditor, and the experience of the Committee's members in business, financial and accounting matters.

**MEMBERSHIP AND STRUCTURE**

The Audit Committee is comprised of at least three directors determined by the Board of Directors to meet the director and audit committee member independence requirements and financial literacy requirements of The NASDAQ Stock Market, Inc. ("NASDAQ"). At least one member of the Committee must be financially sophisticated, as determined by the Board, and no Committee member may have participated in the preparation of the financial statements of the company or any of the company's current subsidiaries at any time during the past three years, each as required by NASDAQ listing standards. Appointment to the Committee, including the designation of the Chair of the Committee and the designation of any Committee members as "audit committee financial experts", shall be made on an annual basis by the full Board upon recommendation of the Nominating Committee. Meetings of the Audit Committee shall be held at such times and places as the Audit Committee shall determine, including by written consent. When necessary, the Committee shall meet in executive session outside of the presence of any senior executive officer of the company. The Chair of the Audit Committee shall report on activities of the Committee to the full Board. In fulfilling its responsibilities the Audit Committee shall have authority to delegate its authority to subcommittees, in each case to the extent permitted by applicable law.

**RESPONSIBILITIES**

The Audit Committee:

- Is directly responsible for the appointment, replacement, compensation, and oversight of the work of the independent auditor. The independent auditor shall report directly to the Audit Committee.

- Obtains and reviews annually a report by the independent auditor describing the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review or peer review or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues.

- Reviews and discusses with the independent auditor the written statement from the independent auditor concerning any relationship between the auditor and the company or any other relationships that may adversely affect the independence of the auditor, and, based on such review, assesses the independence of the auditor.

- Establishes policies and procedures for the review and pre-approval by the Committee of all auditing services and permissible non-audit services (including the fees and terms thereof) to be performed by the independent auditor.

- Reviews and discusses with the independent auditor: (a) its audit plans, and audit procedures, including the scope, fees and timing of the audit; (b) the results of the annual audit examination and accompanying management letters; and (c) the results of the independent auditor's procedures with respect to interim periods.

- Reviews and discusses reports from the independent auditors on (a) all critical accounting policies and practices used by the company, (b) alternative accounting treatments within GAAP related to material items that have been discussed with management, including the ramifications of the use of the alternative treatments and the treatment preferred by the independent auditor, and (c) other material written communications between the independent auditor and management.

- Reviews and discusses with the independent auditor the independent auditor's judgments as to the quality, not just the acceptability, of the company's accounting principles and such further matters as the independent auditors present the Committee under generally accepted auditing standards.

- Discusses with management and the independent auditor quarterly earnings press releases, including the interim financial information and Business Outlook included therein, reviews the year-end audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, if deemed appropriate, recommends to the Board of Directors that the audited financial statements be included in the Annual Report on Form 10-K for the year.

- Reviews and discusses with management and the independent auditor various topics and events that may have significant financial impact on the company or that are the subject of discussions between management and the independent auditor.

- Reviews and discusses with management the company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

- Reviews and approves related-party transactions (as defined in the relevant NASDAQ requirements).

- Reviews and discusses with management, the independent auditor, and the company's chief audit executive (CAE): (a) the adequacy and effectiveness of the company's internal controls (including any significant deficiencies and significant changes in internal controls reported to the Committee by the independent auditor or management; (b) the company's internal audit procedures; and (c) the adequacy and effectiveness of the company's disclosures controls and procedures, and management reports thereon.

- Reviews annually with the CAE the scope of the internal audit program, and reviews annually the performance of both the internal audit group and the independent auditor in executing their plans and meeting their objectives.

- Reviews and concurs in the appointment, replacement, reassignment, or dismissal of the CAE.

- Reviews the use of auditors other than the independent auditor in cases such as management's request for second opinions.

- Reviews matters related to the corporate compliance activities of the company, including the review of reports from the company's Ethics and Compliance Oversight Committee and other related groups.

- Establishes procedures for the receipt, retention and treatment of complaints received by the company regarding accounting, internal accounting controls, or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

- Establishes policies for the hiring of employees and former employees of the independent auditor.

- Publishes the report of the Committee required by the rules of the Securities and Exchange Commission to be included in the company's annual proxy statement.

- When appropriate, designates one or more of its members to perform certain of its duties on its behalf, subject to such reporting to or ratification by the Committee as the Committee shall direct.

The Audit Committee will engage in an annual self-assessment with the goal of continuing improvement, and will annually review and reassess the adequacy of its charter, and recommends any changes to the full Board.

The Audit Committee shall have the authority to engage independent legal, accounting and other advisers, as it determines necessary to carry out its duties. The Audit Committee shall have sole authority to approve related fees and retention terms.

The Audit Committee shall meet at such times and places as the Audit Committee shall determine. The Audit Committee shall meet in executive session with the independent auditor, the CAE and management periodically. The Chairman of the Audit Committee shall report on Audit Committee activities to the full Board.

The Chairman of the Audit Committee is to be contacted directly by the CAE or the independent auditor (1) to review items of a sensitive nature that can impact the accuracy of financial reporting or (2) to discuss significant issues relative to the overall Board responsibility that have been communicated to management but, in their judgment, may warrant follow-up by the Audit Committee.

## Directions to the Santa Clara Convention Center
## 5001 Great America Parkway, Santa Clara, California



The Santa Clara Convention Center is located at the corner of Great America Parkway and Tasman Drive. Parking is available in front of the building and in a large parking garage behind the Convention Center. There is no charge for parking. The meeting will be held in the auditorium on the second level of the Convention Center.

**From San Francisco**
Take 101 South to the Great America Parkway exit. Go East onto Great America Parkway (a left turn). Follow for 1 ½ miles to Tasman Drive. Turn right onto Tasman Drive, and the Convention Center will be on your left.

**From Oakland**
Take 880 South to 237 West. Turn left at the Great America Parkway exit. Follow for about ¾ mile. Turn left onto Bunker Hill Drive (the Westin Hotel will be on your left). This will bring you directly into the parking garage for the Convention Center and the hotel.

**From San Jose/Monterey/Morgan Hill**
Take 101 North to the Great America Parkway exit. Go East onto Great America Parkway (a right turn). Follow for 1 ½ miles to Tasman Drive. Turn right onto Tasman Drive, and the Convention Center will be on your left.

**From Sacramento/Walnut Creek/Dublin**
Take 680 South to Calaveras Highway/237 West. See directions from Oakland (237 West).

**From Santa Cruz/Los Gatos**
Take 880 North to 101 North. See directions from San Jose.

# EXHIBIT 3 – PART A

DEF 14A 1 a07-6111_1def14a.htm DEF 14A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.          )

Filed by the Registrant  ☒
Filed by a Party other than the Registrant  ☐

Check the appropriate box:
☐  Preliminary Proxy Statement
☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Pursuant to §240.14a-12

**3M Company**
(Name of Registrant as Specified In Its Charter)

**N/A**
(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
☒  No fee required.
☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
    (1)  Title of each class of securities to which transaction applies:

    (2)  Aggregate number of securities to which transaction applies:

    (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)  Proposed maximum aggregate value of transaction:

    (5)  Total fee paid:

☐  Fee paid previously with preliminary materials.
☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
    (1)  Amount Previously Paid:

    (2)  Form, Schedule or Registration Statement No.:

    (3)  Filing Party:

    (4)  Date Filed:

**Persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

**George W. Buckley**
Chairman of the Board, President and
Chief Executive Officer



March 26, 2007

Dear Stockholder:

I am pleased to invite you to attend 3M's Annual Meeting of Stockholders, which will be held on Tuesday, May 8, 2007, at 10 a.m., at the RiverCentre, 175 West Kellogg Boulevard, St. Paul, Minnesota.

Details regarding admission to the meeting and the business to be conducted are more fully described in the accompanying Notice of Annual Meeting and Proxy Statement. I will report on Company operations and discuss our plans for growth. There will also be time for your questions and comments.

The fine attendance of our stockholders at Annual Meetings over the years has been very helpful in maintaining good communication. I sincerely hope you will be able to join us. **Your attendance cards to the Annual Meeting are located on the back cover of this proxy statement.**

Your vote is important. Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. You may vote on the Internet, by telephone, or by completing and mailing a traditional proxy card. Please review the instructions on the proxy card regarding each of these voting options.

Thank you for your ongoing support of 3M.

Sincerely,

**2007 ANNUAL MEETING OF STOCKHOLDERS**
**NOTICE OF ANNUAL MEETING AND PROXY STATEMENT**
**TABLE OF CONTENTS**

| | |
|---|---|
| **Notice of Annual Meeting of Stockholders** | iii |
| **Proxy Statement** | 1 |
| Purpose of the Annual Meeting | 1 |
| Annual Meeting Admission | 1 |
| Stockholders Entitled to Vote | 1 |
| Proposals You Are Asked to Vote On and the Board's Voting Recommendations | 2 |
| Voting Requirements to Elect Directors and Approve Each of the Proposals Described in this Proxy Statement | 3 |
| Voting Methods | 3 |
| Changing Your Vote | 4 |
| Counting the Vote | 4 |
| Confidentiality | 5 |
| Results of the Vote | 5 |
| Delivery of Proxy Materials | 5 |
| List of Stockholders | 5 |
| Electronic Delivery of Proxy Materials and Annual Report | 5 |
| Cost of Proxy Solicitation | 6 |
| Transfer Agent | 6 |
| **Governance of the Company** | 7 |
| Corporate Governance Guidelines | 7 |
| Executive Sessions | 7 |
| Lead Independent Director | 7 |
| Communication with Directors | 7 |
| Director Independence | 7 |
| Director Nomination Process | 8 |
| 3M Business Conduct Policies | 10 |
| Related Person Transaction Policy and Procedures | 11 |
| **Board and Committee Membership** | 12 |
| Audit Committee | 13 |
| Compensation Committee | 13 |
| Finance Committee | 14 |
| Nominating and Governance Committee | 15 |
| **Director Compensation and Stock Ownership Guidelines** | 16 |
| **Proposals To Be Voted On** | 18 |
| Proposal No. 1 — Election of Directors | 18 |
| Proposal No. 2 — Ratification of the Appointment of Independent Registered Public Accounting Firm | 21 |

Proposal No. 3 — Proposal to Amend the Company's Restated Certificate of Incorporation to
    Eliminate the Supermajority Vote Requirements 21

Proposal No. 4 — Proposal to Amend the Company's Restated Certificate of Incorporation to
    Eliminate the Fair Price Provision 22

Proposal No. 5 — Approve the Executive Annual Incentive Plan 25

Proposal No. 6 — Approve the Material Terms of the Performance Criteria Under the Performance
    Unit Plan 27

Proposal No. 7 — Stockholder Proposal on Executive Compensation Based on the Performance of
    Peer Companies 28

**Common Stock Ownership of Directors and Executive Officers** 30

  Beneficial Ownership Table 31

**Security Ownership of More Than 5 Percent Stockholders** 32

**Section 16(a) Beneficial Ownership Reporting Compliance** 32

**Executive Compensation** 32

  Compensation Discussion and Analysis 32

  Compensation Committee Report 39

  Summary Compensation Table 40

  Grants of Plan-Based Awards 42

  Outstanding Equity Awards at Fiscal Year-End 47

  Option Exercises and Stock Vested 48

  Pension Benefits 48

  Nonqualified Deferred Compensation 51

  Potential Payments Upon Termination or Change-in-Control. 52

**Compensation Committee Interlocks and Insider Participation** 58

**Audit Committee Report** 59

**Audit Committee Policy on Pre-Approval of Audit and Permissible Non-Audit Services of the
    Independent Registered Public Accounting Firm** 59

**Fees of the Independent Registered Public Accounting Firm** 60

**Requirements for Submission of Stockholder Proposals for Next Year's Annual Meeting** 61

**Appendix A — Director Independence Guidelines** A-1

**Appendix B — 3M Corporate Governance Guidelines** B-1

**Appendix C — Audit Committee Charter** C-1

**Appendix D — Compensation Committee Charter** D-1

**Appendix E — Finance Committee Charter** E-1

**Appendix F — Nominating and Governance Committee Charter** F-1

**Appendix G — Proposed Amendments to the Restated Certificate of Incorporation and the
    Proposed Certificate of Amendment** G-1

**Appendix H — Executive Annual Incentive Plan** H-1

# 3M COMPANY
## 3M Center, St. Paul, Minnesota 55144

### NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

| | |
|---|---|
| **TIME AND DATE** | 10:00 a.m. on Tuesday, May 8, 2007 |
| **PLACE** | RiverCentre<br>175 West Kellogg Boulevard<br>St. Paul, Minnesota |

**ITEMS OF BUSINESS**

(1) To elect ten members to the Board of Directors, each for a term of one year.
(2) To ratify the appointment of PricewaterhouseCoopers LLP as 3M's independent registered public accounting firm.
(3) To approve an amendment to the Company's Certificate of Incorporation to eliminate the supermajority vote requirements.
(4) To approve an amendment to the Company's Certificate of Incorporation to eliminate the fair price provision.
(5) To approve the Executive Annual Incentive Plan.
(6) To approve the material terms of the performance criteria under the Performance Unit Plan.
(7) To consider one stockholder proposal if properly presented at the meeting. See the Table of Contents for a description of the stockholder proposal.
(8) To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement.

| | |
|---|---|
| **ADJOURNMENTS AND POSTPONEMENTS** | Any action on the items of business described above may be considered at the Annual Meeting at the time and on the date specified above or at any time and date to which the Annual Meeting may be properly adjourned or postponed. |
| **RECORD DATE** | You are entitled to vote if you were a stockholder of record at the close of business on Friday, March 9, 2007. |
| **ANNUAL REPORT** | Our 2006 Annual Report, which is not part of the proxy soliciting materials, is enclosed. |
| **MEETING ADMISSION** | Either an admission ticket or proof of ownership of 3M stock, as well as a form of personal identification, must be presented in order to be admitted to the Annual Meeting. If you are a stockholder of record, your admission ticket is included on the back cover of this proxy statement. If your shares are held in the name of a bank, broker or other holder of record, you must bring a brokerage statement or other proof of ownership with you to the Meeting, or you may request an admission ticket in advance. Please refer to the section entitled "Annual Meeting Admission" on page 1 for further details. |
| **PROXY VOTING** | Your vote is very important. Whether or not you plan to attend the Annual Meeting, we encourage you to read this proxy statement and submit your proxy card as soon as possible. You may submit your proxy card for the Annual Meeting by completing, signing, dating and returning your proxy card in the pre-addressed envelope provided, or, in most cases, by using the telephone or the Internet. For specific instructions on how to vote your shares, please refer to the section entitled "Voting Methods" on page 3 of this proxy statement and the voting instructions on the proxy card. |

By Order of the Board of Directors,

**GREGG M. LARSON**
*Associate General Counsel and Secretary*

THIS PROXY STATEMENT AND PROXY CARD ARE BEING DISTRIBUTED ON OR ABOUT MARCH 26, 2007.

iii

# PROXY STATEMENT

The Board of Directors (the "Board") of 3M Company, a Delaware corporation ("3M" or the "Company") is soliciting proxies for the Annual Meeting of Stockholders. You are receiving a proxy statement because you own shares of 3M common stock that entitle you to vote at the meeting. By use of a proxy, you can vote whether or not you attend the meeting. The proxy statement describes the matters we would like you to vote on and provides information on those matters so you can make an informed decision.

The information included in this proxy statement relates to proposals to be voted on at the meeting (if properly presented), the voting process, 3M's Board and Board committees, the compensation of directors and certain executive officers, and other required information.

## Purpose of the Annual Meeting

The purpose of the Annual Meeting is to elect directors and to conduct the business described in the Notice of Annual Meeting.

## Annual Meeting Admission

Only stockholders are invited to attend the meeting. An admission ticket or proof of ownership of 3M stock, along with personal identification, must be presented in order to be admitted to the Annual Meeting. If you are a stockholder of record, your admission ticket is on the back of this proxy statement. If your shares are held in the name of a bank, broker or other holder of record, you must bring a brokerage statement or other proof of ownership with you to the Annual Meeting, or obtain an admission ticket in advance. Tickets are also available on the Internet voting site — www.eproxy.com/mmm. *If you do not provide photo identification or comply with the other procedures outlined above, you will not be admitted to the Annual Meeting.*

**No cameras (including cell phone cameras), recording equipment, electronic devices, large bags, briefcases, or packages will be permitted in the Annual Meeting.**

## Stockholders Entitled to Vote

Each share of our common stock outstanding as of the close of business on March 9, 2007, the record date, is entitled to one vote at the Annual Meeting on each matter properly brought before the meeting. As of that date, there were 727,566,923 shares of common stock issued and outstanding.

Most 3M stockholders hold their shares through a stockbroker, bank, trustee, or other nominee rather than directly in their own name. As summarized below, there are some distinctions between shares held of record and those owned beneficially:

- STOCKHOLDER OF RECORD — If your shares are registered directly in your name with 3M's Transfer Agent, Wells Fargo Bank, N.A., you are considered the stockholder of record of those shares and these proxy materials are being sent directly to you by 3M. As the stockholder of record, you have the right to grant your voting proxy directly to 3M or to vote in person at the meeting.

- BENEFICIAL OWNER — If your shares are held in a stock brokerage account, by a bank, trustee, or other nominee, you are considered the beneficial owner of shares held in street name and these proxy materials are being forwarded to you by your broker, trustee, or nominee who is considered the stockholder of record of those shares. As the beneficial owner, you have the right to direct your broker, trustee, or nominee on how to vote and are also invited to attend the meeting. However, since you are not the stockholder of record, you may not vote

1

these shares in person at the meeting. Your broker, trustee, or nominee is obligated to provide you with a voting instruction card for you to use.

- If your shares are held in your account in the 3M Voluntary Investment Plan and Employee Stock Ownership Plan or the 3M Savings Plan, you are considered the beneficial owner of these shares and the trustee of the plans is the stockholder of record. Participants in 3M's Voluntary Investment Plan and Employee Stock Ownership Plan or the 3M Savings Plan may direct the trustee how to vote the shares allocated to their account by following the voting instructions contained on the proxy card. Participants in 3M's Voluntary Investment Plan and Employee Stock Ownership Plan may also direct the trustee how to vote a proportionate number of allocated shares of common stock for which it has not received direction, and shares not allocated to individual participant accounts by following the same voting instructions. If you fail to direct the trustee how to vote your shares by following these voting instructions, the trustee will vote your shares as described in the voting instructions.

**Proposals You Are Asked to Vote On and the Board's Voting Recommendations**

The following proposals are scheduled to be voted on at the meeting. 3M's Board recommends that you vote your shares as indicated below.

| Proposals: | The Board's Voting Recommendations: |
|---|---|
| 1. The election of directors. | "FOR" each nominee to the Board |
| 2. The ratification of the appointment of PricewaterhouseCoopers LLP as 3M's independent registered public accounting firm. | "FOR" |
| 3. Proposal to amend the Company's Certificate of Incorporation to eliminate the supermajority vote requirements. | "FOR" |
| 4. Proposal to amend the Company's Certificate of Incorporation to eliminate the fair price provision. | "FOR" |
| 5. Proposal to approve the Executive Annual Incentive Plan. | "FOR" |
| 6. Proposal to approve the material terms of the performance criteria under the Performance Unit Plan. | "FOR" |
| 7. Stockholder proposal on executive compensation based on the performance of peer companies. | "AGAINST" |

Other than the proposals described in this proxy statement, the Board is not aware of any other matters to be presented for a vote at the Annual Meeting. If you grant a proxy by telephone, Internet, or by signing and returning your proxy card, any of the persons named as proxy holders — George W. Buckley, 3M's Chairman, President and CEO, Vance D. Coffman, and Rozanne L. Ridgway — will have the discretion to vote your shares on any additional matters properly presented for a vote at the meeting. If any of our nominees is unavailable as a candidate for director, the above-named proxy holders will vote your proxy for another candidate or candidates as may be nominated by the Board of Directors.

**Voting Requirements to Elect Directors and Approve Each of the Proposals Described in this Proxy Statement**

*Quorum* — The presence of the holders of a majority of the outstanding shares of common stock entitled to vote at the Annual Meeting, present in person or represented by proxy, is necessary to constitute a quorum. Abstentions and "broker non-votes" are counted as present and entitled to vote for purposes of determining a quorum. A "broker non-vote" occurs when a bank, broker, or other holder of record holding shares for a beneficial owner does not vote on a particular proposal because that holder does not have discretionary voting power for that particular item and has not received instructions from the beneficial owner.

If you are a beneficial owner (other than as a participant in the 3M Voluntary Investment Plan and Employee Stock Ownership Plan or the 3M Savings Plan), your bank, broker, or other holder of record is permitted to vote your shares on the election of directors, the ratification of PricewaterhouseCoopers LLP as our independent registered public accounting firm, and the Proposals to amend the Company's Restated Certificate of Incorporation to eliminate the supermajority and fair price provisions, even if the record holder does not receive voting instructions from you. The record holder may not vote on the stockholder proposal absent instructions from you. Without your voting instructions, a broker non-vote will occur.

*Election of Directors* — The nominees for election as directors at the Annual Meeting will be elected by a plurality of the votes cast at the meeting. This means that the director nominee with the most votes for a particular slot is elected for that slot. Votes withheld from one or more director nominees will have no effect on the election of any director from whom votes are withheld.

*Majority Vote Policy* — Our Corporate Governance Guidelines, which appear in Appendix B in this proxy statement, set forth our procedures if a director-nominee is elected, but receives a majority of "withheld" votes. In an uncontested election (i.e., an election where the only nominees are those recommended by the Board), any nominee for director who receives a greater number of votes "withheld" from his or her election than votes "for" such election is required to tender his or her resignation. The Nominating and Governance Committee is required to make recommendations to the Board with respect to any such letter of resignation. The Board is required to take action with respect to this recommendation and to disclose their decision-making process. Full details of this Policy are set out under "Proposal No. 1 — Election of Directors" and in paragraph B6 of the Corporate Governance Guidelines in Appendix B.

*The Proposals to Amend the Restated Certificate of Incorporation* — The affirmative "FOR" vote by the holders of at least eighty percent (80%) of the outstanding common stock entitled to vote is required to approve the amendments to the Company's Restated Certificate of Incorporation. An abstention on this proposal is not an affirmative vote and will have the same effect as a vote against this proposal.

*All Other Proposals* — The affirmative "FOR" vote of a majority of those shares present in person or represented by proxy at the meeting and entitled to vote on the matter is required to approve all other proposals. In tabulating the voting result for any particular proposal, shares that constitute broker non-votes are not considered entitled to vote on that proposal. The stockholder proposal is presented as a request to the Board to take action. Affirmative votes for this proposal will inform the Board about the level of support for this proposal.

**Voting Methods**

If you hold shares directly as the stockholder of record, you may vote by granting a proxy or, if you hold shares beneficially in street name, by submitting voting instructions to your broker or nominee. If you own shares beneficially as a participant in the 3M Voluntary Investment Plan and

3

Employee Stock Ownership Plan or the 3M Savings Plan, you may vote by submitting voting instructions to the trustee. In most instances, you will be able to do this over the Internet, by telephone, or by mail. Please refer to the summary instructions below and those included on your proxy card or, for shares held in street name, the voting instruction card included by your broker or nominee.

The Internet and telephone voting procedures are designed to authenticate stockholders by use of a control number and to allow you to confirm that your instructions have been properly recorded. If you vote by telephone or on the Internet, you do not need to return your proxy card. Telephone and Internet voting for stockholders of record will be available 24 hours a day, and will close at 12:00 p.m. (Central Time) on the day before the Annual Meeting. Participants in 3M's Voluntary Investment Plan and Employee Stock Ownership Plan and the 3M Savings Plan may instruct the trustee how to vote their shares via the Internet, by telephone, or by signing and returning the proxy card by 5:00 p.m. (Central Time) on May 4, 2007.

- VOTE BY INTERNET — www.eproxy.com/mmm — If you have Internet access, you may submit your proxy from any location in the world 24 hours a day, 7 days a week. Have your proxy card and the last four digits of your Social Security Number in hand when you access the Web site. When prompted, enter the last four digits of your Social Security Number, your 3-digit company number, and the 7-digit number from the upper right corner of the proxy card to create an electronic ballot.

- VOTE BY TELEPHONE — 1-800-560-1965 — If you live in the United States, you may use any touch-tone telephone to vote your proxy toll-free 24 hours a day, 7 days a week. Have your proxy card in hand when you call. When prompted, enter the 3-digit company number and the 7-digit number from the upper right corner of the proxy card. Follow the recorded instructions.

- VOTE BY MAIL — You may do this by signing your proxy card or, for shares held in street name, the voting instruction card included by your broker or nominee and mailing it. If you provide specific voting instructions, your shares will be voted as you instruct. If you sign, but do not provide instructions, your shares will be voted as the Board recommends. Mark, sign, and date your proxy card and return it in the postage-paid envelope provided so that it is received by May 7, 2007.

All shares that have been properly voted and not revoked will be voted at the Annual Meeting.

**Changing Your Vote**

You may change your proxy instructions at any time prior to the vote at the Annual Meeting. For shares held directly in your name, you may accomplish this by granting a new proxy or by voting in person at the Annual Meeting. For shares held beneficially by you, you may change your vote by submitting new voting instructions to your broker or nominee.

**Counting the Vote**

In the election of directors, you may vote "FOR" all of the nominees or your vote may be "WITHHELD" from one or more of the nominees. For the other proposals, you may vote "FOR," "AGAINST," or "ABSTAIN." If you "ABSTAIN," it has the same effect as a vote "AGAINST." If you sign your proxy card or broker voting instruction card with no further instructions, your shares will be voted in accordance with the recommendations of the Board. Shares held in your account in the 3M Voluntary Investment Plan and Employee Stock Ownership Plan or the 3M Savings Plan will be voted by the trustee as described in "Stockholders Entitled to Vote" on page 1.

4

Representatives of Wells Fargo Bank, N.A., 3M's transfer agent, will tabulate the votes and act as the inspectors of election.

**Confidentiality**

The Company's Board of Directors has a policy that all stockholder proxies, ballots, and tabulations that identify stockholders are to be maintained in confidence. No such document will be available for examination, and the identity and vote of any stockholder will not be disclosed, except as necessary to meet legal requirements and allow the inspectors of election to certify the results of the stockholder vote. The policy also provides that inspectors of election for stockholder votes must be independent and cannot be employees of the Company. Occasionally, stockholders provide written comments on their proxy card that may be forwarded to 3M management.

**Results of the Vote**

We will announce preliminary voting results at the meeting and publish final results in our Quarterly Report on Form 10-Q for the quarter ending June 30, 2007. A news release with voting results will be available on our Web site www.3M.com/profile/pressbox/index.jhtml.

**Delivery of Proxy Materials**

Securities and Exchange Commission rules now allow us to deliver a single copy of an annual report and proxy statement to any household at which two or more stockholders reside, if we believe the stockholders are members of the same family. This rule benefits both you and the Company. We believe it eliminates irritating duplicate mailings that stockholders living at the same address receive and it reduces our printing and mailing costs. This rule applies to any annual reports, proxy statements, proxy statements combined with a prospectus, or information statements. Each stockholder will continue to receive a separate proxy card or voting instruction card.

Your household may have received a single set of proxy materials this year. If you prefer to receive your own copy now or in future years, please request a duplicate set by contacting our transfer agent, Wells Fargo Bank, N.A. at 1-800-401-1952 (U.S.), 651-450-4064 (outside the U.S.), www.wellsfargo.com/shareownerservices, or in writing to 161 North Concord Exchange, South St. Paul, MN 55075.

If a broker or other nominee holds your shares, you may continue to receive some duplicate mailings. Certain brokers will eliminate duplicate account mailings by allowing stockholders to consent to such elimination, or through implied consent if a stockholder does not request continuation of duplicate mailings. Since not all brokers and nominees may offer stockholders the opportunity this year to eliminate duplicate mailings, you may need to contact your broker or nominee directly to discontinue duplicate mailings to your household.

**List of Stockholders**

The names of stockholders of record entitled to vote at the Annual Meeting will be available at the Annual Meeting and for ten days prior to the meeting for any purpose germane to the meeting, between the hours of 7:45 a.m. and 4:30 p.m. (Central Time), at our principal executive offices at 3M Center, St. Paul, Minnesota, by contacting the Secretary of the Company.

**Electronic Delivery of Proxy Materials and Annual Report**

We are able to distribute the annual report and proxy statement to 3M stockholders in a fast and efficient manner via the Internet. This reduces the amount of paper delivered to a stockholder's address and eliminates the cost of sending these documents by mail. Stockholders may elect to view

all future annual reports and proxy statements on the Internet instead of receiving them by mail. If you choose to view these materials online, you will continue to receive a proxy card in the mail. You may make this election when voting your proxy this year: simply follow the instructions to vote via the Internet or go directly to www.econsent.com/mmm to register your consent. Have your account number (found above your name and address on your dividend check stub) and your Social Security Number (if you have one) available. Your election to view proxy materials online continues until you revoke it. Future proxy cards will contain the Internet Web site address and instructions to view the materials. You will continue to have the option to vote your shares by telephone, mail, or via the Internet.

## Cost of Proxy Solicitation

3M will pay for the cost of preparing, assembling, printing, mailing, and distributing these proxy materials. You will need to obtain your own Internet access if you choose to access the proxy materials and/or vote over the Internet. In addition to mailing these proxy materials, the solicitation of proxies or votes may be made in person, by telephone, or electronic communication by our directors, officers, and employees, who do not receive any additional compensation for these solicitation activities. We have hired Georgeson Shareholder Communications, Inc. to assist us in the distribution of proxy materials and the solicitation of votes. We will pay Georgeson Shareholder Communications, Inc. a fee of $20,000 plus expenses for these services. We will also reimburse brokerage houses and other custodians, nominees, and fiduciaries for their reasonable out-of-pocket expenses for forwarding proxy and solicitation materials to beneficial owners of stock.

## Transfer Agent

Our Transfer Agent is Wells Fargo Bank, N.A. All communications concerning stockholders of record accounts, including address changes, name changes, common stock transfer requirements, and similar issues can be handled by contacting Wells Fargo Bank, N.A. at 1-800-401-1952 (U.S.), 651-450-4064 (outside the U.S.), www.wellsfargo.com/shareownerservices, or in writing, 161 North Concord Exchange, South St. Paul, MN 55075.

## GOVERNANCE OF THE COMPANY

**Corporate Governance Guidelines**

The Board has adopted Corporate Governance Guidelines that, along with the charters of the Board committees, provide the framework fo the governance of the Company. The Board's Nominating and Governance Committee is responsible for overseeing and reviewing the Guidelines at least annually, and recommending any proposed changes to the Board for approval. The Corporate Governance Guidelines are available on our Web site at www.3M.com, under Investor Relations — Corporate Governance. The Guidelines and charters of the Board committees are also attached to this proxy statement as Appendices B-F.

**Executive Sessions**

Independent directors regularly meet in executive sessions without the Chairman and CEO or other members of management present to review the criteria upon which the performance of the Chairman and CEO is based, the performance of the Chairman and CEO against that criteria, to ratify the compensation of the Chairman and CEO as approved by the Compensation Committee, and to discuss any other relevant matters.

**Lead Independent Director**

The 3M Board of Directors has appointed an independent director to serve in a lead capacity ("Lead Director") to coordinate the activities of the other non-management directors, and to perform such other duties and responsibilities as the Board of Directors may determine. Currentl the Lead Director is Vance D. Coffman. The Lead Director:

- presides at all meetings of the Board at which the Chairman is not present, including executive sessions of the independent directors;

- acts as a key liaison between the Chairman/CEO and the independent directors;

- assists the Chairman/CEO in setting the Board agenda and frequency of meetings;

- has the authority to call meetings of the independent directors; and

- communicates Board member feedback to the Chairman/CEO (except that the chair of the Compensation Committee leads the discussion of the Chairman/CEO's performance and communicates the Board's evaluation of that performance to the Chairman/CEO).

**Communication with Directors**

The Board of Directors has adopted the following process for stockholders and other interested parties to send communications to membe of the Board. Stockholders and other interested parties may communicate with the Lead Director, the chairs of the Audit, Compensation, Finance, and Nominating and Governance Committees of the Board, or with any of our other independent directors, by sending a letter to the following address: 3M Company, c/o Corporate Secretary, 3M Center, Building 220-13-W-39, St. Paul, MN 55144-1000.

**Director Independence**

Pursuant to New York Stock Exchange listing standards, the Board of Directors has adopted a formal set of categorical Director Independence Guidelines with respect to the determination of director independence, the full text of which is attached as Appendix A to this proxy statement. In accordance with these Guidelines, a director or nominee for director must be determined to have no material relationship with the Company other than as a director. The Guidelines specify the criteria by

7

which the independence of our directors will be determined, including strict guidelines for directors and their immediate families with respect to past employment or affiliation with the Company or its independent registered public accounting firm. The Guidelines also prohibit Audit Committee members from having any direct or indirect financial relationship with the Company, and restrict both commercial and not-for-profit relationships of all directors with the Company. Directors may not be given personal loans or extensions of credit by the Company, and all directors are required to deal at arm's length with the Company and its subsidiaries, and to disclose any circumstance that might be perceived as a conflict of interest.

In accordance with these Guidelines, the Board undertook its annual review of director independence. During this review, the Board considered transactions and relationships between each director (including nominees for director), or any member of his or her immediate family and the Company and its subsidiaries and affiliates in each of the most recent three completed fiscal years. The Board also considered whether there were any transactions or relationships between directors or any member of their immediate family (or any entity of which a director or an immediate family member is an executive officer, general partner, or significant equity holder). The Board considered that in the ordinary course of business, transactions may occur between the Company and its subsidiaries and companies at which some of our directors are or have been officers. In particular, with respect to each of the most recent three completed fiscal years, the Board evaluated for each of the directors (and the nominee for director), Coffman, Eskew, Farrell, Henkel (nominee for director), Liddy, and Sharer, the annual amount of sales to 3M by the company where he serves (or served) as an executive officer, and purchases by that company from 3M, and determined that the amount of sales and purchases in each fiscal year was below one percent of the annual revenues of each of those companies, the threshold set forth in the Director Independence Guidelines. The Board also considered charitable contributions to not-for-profit organizations of which our directors or immediate family members are affiliated, none of which approached the levels set forth in our Director Independence Guidelines.

As a result of this review, the Board affirmatively determined that the following directors (and the nominee for director), are independent under these Guidelines: Linda G. Alvarado, Vance D. Coffman, Michael L. Eskew, W. James Farrell, Herbert L. Henkel (nominee for director), Edward M. Liddy, Robert S. Morrison, Aulana L. Peters, Rozanne L. Ridgway, and Kevin W. Sharer. The Board has also determined that no members of the Audit Committee received any compensation from the Company other than directors' fees. George W. Buckley is considered an inside director because of his employment as Chairman of the Board, President and Chief Executive Officer of the Company.

**Director Nomination Process**

*Role of the Nominating and Governance Committee*

The Nominating and Governance Committee ("Committee") identifies individuals that the Committee believes are qualified to become Board members in accordance with the Board Membership Criteria set forth below, and recommends selected individuals to the Board for nomination to stand for election at the next meeting of stockholders of the Company in which directors will be elected. In the event there is a vacancy on the Board between meetings of stockholders, the Committee identifies individuals that the Committee believes are qualified to become Board members in accordance with the Board Membership Criteria set forth below, and recommends one or more of such individuals for appointment to the Board.

*Nominees Proposed by Stockholders for Consideration by the Committee*

The Committee has a policy to consider properly submitted stockholder nominees for candidates for membership on the Board of Directors. Stockholders proposing individuals for consideration by

8

the Committee must include at least the following information about the proposed nominee: the proposed nominee's name, age, business or residence address, principal occupation or employment, and whether such person has given written consent to being named in the proxy statement as a nominee and to serving as a director if elected. Stockholders should send the required information about the nominee to:

Corporate Secretary
3M Company
3M Center
Building 220-13-W-39
St. Paul, MN 55144-1000.

In order for an individual proposed by a stockholder to be considered by the Committee for recommendation as a Board nominee, the Corporate Secretary must receive the proposal no later than 5 p.m. Central Time on November 27, 2007. Such proposals must be sent via registered, certified, or express mail (or other means that allows the stockholder to determine when the proposal was received by the Company). The Corporate Secretary will send properly submitted stockholder proposed nominations to the Committee Chair for consideration at a future Committee meeting. Individuals proposed by stockholders in accordance with these procedures will receive the same consideration that individuals identified to the Committee through other means receive.

*Stockholder Nominations*

In addition, 3M's Bylaws permit stockholders to nominate directors at an annual meeting of stockholders or at a special meeting at which directors are to be elected in accordance with the notice of meeting. Stockholders intending to nominate a person for election as a director must comply with the requirements set forth in the Company's Bylaws. Our Bylaws require, among other things, that the Corporate Secretary receive written notice from the record stockholder no earlier than January 9, 2008, and no later than February 8, 2008. The notice must contain the information required by the Bylaws, a copy of which is available upon request to the Corporate Secretary. Nominations received after February 8, 2008, will not be acted upon at the Annual Meeting.

*Director Qualifications*

The Committee periodically reviews with the Board the requisite skills and characteristics of its members. 3M's Corporate Governance Guidelines contain Board Membership Criteria that apply to nominees for a position on 3M's Board. The Committee periodically reviews with the Board the appropriate skills and characteristics required of Board members given the current Board composition. It is the intent of the Board that the Board, itself, will be a high performance organization creating competitive advantage for the Company. To perform as such, the Board will be comprised of individuals who have distinguished records of leadership and success in their arena of activity and who will make substantial contributions to Board operations and effectively represent the interests of all stockholders. The Committee's and the Board's assessment of Board candidates includes, but is not limited to, consideration of:

(i)   Roles and contributions valuable to the business community;

(ii)  Personal qualities of leadership, character, judgment, and whether the candidate possesses and maintains throughout service on the Board a reputation in the community at large of integrity, trust, respect, competence, and adherence to the highest ethical standards;

(iii) Relevant knowledge and diversity of background and experience in such things as business, manufacturing, technology, finance and accounting, marketing, international business, government, and the like; or

(iv)  Whether the candidate is free of conflicts and has the time required for preparation, participation, and attendance at all meetings.

In addition to these minimum requirements, the Committee will also evaluate whether the nominee's skills are complementary to the existing Board members' skills, the Board's needs for particular expertise in fields such as business, manufacturing, technology, financial, marketing, international, governmental, or other areas of expertise, and assess the nominees' impact on Board dynamics and effectiveness.

*Identification, Evaluation, and Selection of Nominees*

The Committee periodically reviews the appropriate size and composition of the Board and anticipates future vacancies and needs of the Board. In the event the Committee recommends an increase in the size of the Board or a vacancy occurs, the Committee considers qualified nominees from several sources, including current Board members and nominees recommended by stockholders and other persons.

The Committee may from time to time retain a director search firm to help the Committee identify qualified director nominees for consideration by the Committee.

The Committee evaluates qualified director nominees at regular or special Committee meetings against the current Board Membership Criteria described above and reviews qualified director nominees with the Board. The Committee and the Chairman of the Board interview candidates that meet the Board Membership Criteria and the Committee selects nominees that best suit the Board's current needs and recommends one or more of such individuals for election to the Board. Of the ten nominees for election as directors at the 2007 Annual Meeting of Stockholders, nine are current directors and one is a new nominee who was identified by the Chief Executive Officer and recommended to the Board by the Nominating and Governance Committee.

**3M Business Conduct Policies**

More than a century of operating with honesty and integrity has earned 3M trust from our customers, credibility with our communities, and dedication from our employees. All of our employees, including our Chief Executive Officer, Chief Financial Officer, and Principal Accounting Officer, are required to abide by 3M's business conduct policies to ensure that our business is conducted in a consistently legal and ethical manner. These policies form the foundation of a comprehensive process that includes compliance with corporate policies and procedures and a companywide focus on uncompromising honesty and integrity in every aspect of our operations. Our business conduct policies cover many topics, including antitrust and competition law, conflicts of interest, financial reporting, protection of confidential information, and compliance with all laws and regulations applicable to the conduct of our business.

Employees are required to report any conduct that they believe in good faith to be an actual or apparent violation of the business conduct policies. The Audit Committee has adopted procedures to receive, retain, and treat complaints received regarding accounting, internal accounting controls, or auditing matters, and to allow for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

The Board of Directors adopted a Code of Business Conduct and Ethics for directors of the Company. This Code incorporates long-standing principles of conduct the Company and the Board follow to ensure the Company's business and the activities of the Board are conducted with integrity, adherence to the highest ethical standards, and in compliance with the law.

The Company's Business Conduct Policies for employees and the Code of Business Conduct and Ethics for Directors are available on our Web site at www.3M.com under Investor Relations — Corporate Governance and copies of these policies are also available to any stockholder upon request to Investor Relations.

10

**Related Person Transaction Policy and Procedures**

The Board of Directors has adopted a written policy requiring that the Nominating and Governance Committee shall review and approve or ratify any transaction between the Company and any related person that is required to be disclosed. For purposes of this practice the terms "transaction" and "related person" have the meaning contained in Item 404 of Regulation S-K. In the course of its review and approval or ratification of a transaction, the Committee shall consider:

1.  the nature of the related person's interest in the transaction;

2.  the material terms of the transaction, including whether the transaction is on terms no less favorable than terms generally available to an unaffiliated third-party under the same or similar circumstances;

3.  the significance of the transaction to the related person;

4.  the significance of the transaction to the Company;

5.  whether the transaction would impair the judgment of a director or executive officer to act in the best interest of the Company; and

6.  any other matters the Committee deems appropriate.

Any Committee member who is a related person with respect to a transaction under review may not participate in the deliberations or vote respecting such approval or ratification, provided, however, that such director may be counted in determining the presence of a quorum at a meeting of the Committee which considers the transaction.

11

## BOARD AND COMMITTEE MEMBERSHIP

The Board currently has ten directors and the following four Committees: Audit, Compensation, Finance, and Nominating and Governance. In May 2006, the Board dissolved the Public Issues Committee, reassigned most of its duties to the Compensation and Nominating and Governance Committees, and formed a Finance Committee. The membership during 2006 and the function of each Committee are described below.

During 2006, the Board of Directors held five regularly scheduled meetings and three special meetings. Seven and two of our incumbent directors attended 100 and 95 percent, respectively, of the regularly scheduled and special meetings of the Board and Board Committees on which they served in 2006. Kevin W. Sharer, who is not standing for re-election, attended 71 percent of the regularly scheduled and special meetings of the Board and Board Committees on which he served in 2006. Mr. Sharer, who is Chairman of the Board and Chief Executive Officer of Amgen Inc., did not attend several meetings to avoid even the appearance of a potential conflict of interest relating to the Company's sale of its branded pharmaceuticals business.

The Company has a long-standing policy that directors are expected to attend the Annual Meeting of Stockholders unless extenuating circumstances prevent them from attending. All directors attended last year's Annual Meeting of Stockholders, except one director who was unable to attend due to illness.

The Board and each Committee conducted an evaluation of their performance in 2006.

| Name of Non-Employee Director | Audit | Compensation | Finance | Nominating and Governance |
|---|---|---|---|---|
| Linda G. Alvarado | X | | X | |
| Vance D. Coffman | | X* | | X |
| W. James Farrell | X | | X | |
| Michael L. Eskew | X | | X* | |
| Edward M. Liddy | X* | | | X |
| Robert S. Morrison | | X | | X |
| Aulana L. Peters | | X | X | |
| Rozanne L. Ridgway | | X | | X* |
| Kevin W. Sharer | | X | X | |

X = Committee Member; * = Chair

12

**Audit Committee**

In 2006, the Audit Committee met eight times. The Committee assists the Board in its oversight of the integrity of the Company's financial statements, compliance with legal and regulatory requirements, the qualifications, independence, and performance of the Company's independent registered public accounting firm (the "Independent Accounting Firm"), and the performance of the Company's internal auditing department. In addition, the Committee:

- Reviews the annual audited and quarterly consolidated financial statements;

- Reviews the Company's financial reporting process and disclosure and internal controls and procedures, including major issues regarding accounting principles and financial statement presentation, and critical accounting policies to be used in the consolidated financial statements;

- Reviews and discusses with management and the Independent Accounting Firm the Company's internal controls report and the Independent Accounting Firm's attestation of the report;

- By delegation to the chair, reviews earnings press releases prior to issuance;

- Appoints, oversees, and approves compensation of the Independent Accounting Firm;

- Reviews with the Independent Accounting Firm the scope of the annual audit, including fees and staffing, and approves all audit and permitted non-audit services provided by the Independent Accounting Firm;

- Reviews findings and recommendations of the Independent Accounting Firm and management's response to the recommendations of the Independent Accounting Firm;

- Discusses policies with respect to risk assessment and risk management, the Company's major risk exposures, and the steps management has taken to monitor and mitigate such exposures; and

- Reviews compliance with the Company's business conduct policies.

The Board of Directors has determined that all of the Audit Committee members are "independent," "financially literate," and have "accounting or related financial management expertise" under the New York Stock Exchange listing standards. The Board has also determined that all of the Audit Committee members — Edward M. Liddy (chair), Linda G. Alvarado, Michael L. Eskew, and W. James Farrell — are "audit committee financial experts" as that term is defined by applicable SEC regulations. The charter of the Audit Committee is available at www.3M.com under Investor Relations — Corporate Governance — Committee Composition and attached as Appendix C to this proxy statement.

**Compensation Committee**

In 2006, the Compensation Committee met seven times. The Committee reviews the Company's compensation practices and policies, annually reviews and approves (subject to ratification by the independent directors of the Board) the compensation for the CEO, annually reviews and approves the compensation for the other senior executives, evaluates CEO performance, reviews and discusses with management of the Company the Compensation Discussion and Analysis prepared in accordance with the SEC's disclosure rules for executive compensation, and furnishes a report for inclusion in the Company's proxy statement. In addition, the Committee:

- Approves the adoption, amendment, and termination of incentive compensation and deferred compensation programs for employees of the Company;

- Approves, subject to ratification by the independent directors of the Board, employment agreements and severance arrangements for the CEO, as appropriate;

- Approves for the senior executives of the Company (other than the CEO) employment agreements and severance arrangements, as appropriate;

- Interprets and supervises the administration of the Company's stock and long-term incentive compensation programs, and determines the employees who receive awards and the size of their awards under such programs;

- Reviews and makes recommendations to the Board of Directors concerning the design of the pension and other postretirement benefit plans that have a material financial impact upon the Company; and

- Periodically reviews human resource issues relating to the Company's polices and practices with respect to workforce diversity and equal employment opportunities.

The Board of Directors has determined that all Compensation Committee members are "independent" under the New York Stock Exchange listing standards. The Board has also determined that each Compensation Committee member qualifies as a "Non-Employee Director" under Rule 16b-3 of the Securities Exchange Act of 1934 and that each member (except Robert S. Morrison due to his service as interim CEO), qualifies as an "outside director" under Section 162(m) of the Internal Revenue Code. The charter of the Compensation Committee is available at www.3M.com under Investor Relations — Corporate Governance — Committee Composition and attached as Appendix D to this proxy statement.

## Finance Committee

The Finance Committee, created by the Board in May 2006, met two times in 2006. The Committee assists the Board with its oversight of the Company's capital structure, financing, investment, and other financial matters of importance to the Company. In addition, the Committee:

- Reviews and recommends for approval by the Board the dividend policy and the declaration of dividends or other forms of distributions on the Company's stock, such as stock splits in the form of a stock dividend;

- Reviews and recommends for approval by the Board the repurchase of the Company's stock;

- Reviews and recommends for approval by the Board the Company's short- and long-term borrowings;

- Reviews and recommends for approval by the Board the registration and issuance of the Company's debt or equity securities, except in the case of the issuance of debt or equity securities in connection with a merger or acquisition transaction which is presented to the Board;

- Periodically reviews the Company's ratings from credit rating agencies;

- Reviews and recommends for approval by the Board an annual capital expenditure budget and revisions to that budget;

- Reviews and recommends for approval by the Board capital expenditures in excess of $50,000,000;

14

- Reviews and evaluates any risks associated with the Company's use of or investment in financial products, including derivatives used to manage risk related to foreign currencies, commodity prices, and interest rates;

- Periodically reviews the Company's insurance coverage; and

- Periodically reviews the funding of the Company's pension and other benefit plans.

The Board of Directors has determined that all Finance Committee members are "independent" under the New York Stock Exchange listing standards. The charter of the Finance Committee is available at www.3M.com under Investor Relations — Corporate Governance — Committee Composition and attached as Appendix E to this proxy statement.

## Nominating and Governance Committee

In 2006, the Nominating and Governance Committee met five times. The Committee establishes Board membership criteria, assists the Board by identifying individuals qualified to become Board members, recommends to the Board matters of corporate governance, facilitates the annual review of the performance of the Board and its Committees, and periodically reviews CEO and management succession plans. In addition, the Committee:

- Selects and recommends candidates to the Board of Directors to be submitted for election at the Annual Meeting and candidates to fill any vacancies on the Board, including stockholder nominees for director (submitted in accordance with the Company's Bylaws). The Committee considers all candidates in light of the Board membership criteria adopted by the Board of Directors;

- Reviews and makes recommendations to the Board of Directors concerning the composition and size of the Board and its Committees Board membership criteria, frequency of meetings, and directors' fees;

- Reviews the Company's Corporate Governance Guidelines at least annually, and recommends any proposed changes to the Board for approval;

- Develops and recommends to the Board standards to be applied in making determinations on the types of relationships that constitute material relationships between the Company and a director for purposes of determining director independence;

- Reviews and approves or ratifies any transaction between the Company and any related person, which is required to be disclosed under the rules of the Securities and Exchange Commission;

- Develops and recommends to the Board for its approval an annual self-assessment process of the Board and its Committees and oversees the process;

- Reviews periodically with the Chairman/CEO succession plans relating to positions held by elected corporate officers, and makes recommendations to the Board with respect to the selection of individuals to occupy these positions; and

- Periodically reviews the corporate contribution program and the activities of the 3M Foundation.

The Board of Directors has determined that all Nominating and Governance Committee members are "independent" under the New York Stock Exchange listing standards. The charter of the Nominating and Governance Committee is available at www.3M.com under Investor Relations — Corporate Governance — Committee Composition and attached as Appendix F to this proxy statement.

## DIRECTOR COMPENSATION AND STOCK OWNERSHIP GUIDELINES

Annual compensation for nonemployee directors for 2006 was comprised of the following components: cash compensation, consisting of annual retainer and committee fees; and equity compensation, consisting of the annual stock award. Each of these components is described in more detail below. The total 2006 compensation of our nonemployee directors is shown in the following table:

| Director | Fees Earned or Paid in Cash($) | Stock Awards ($) | Total ($)(1) |
|---|---|---|---|
| Linda G. Alvarado | $ 75,000 | $ 95,000 | $ 170,000 |
| Vance D. Coffman* | 125 | 179,559 | 179,684 |
| Michael L. Eskew* | | 179,684 | 179,684 |
| W. James Farrell | 28,533 | 36,438 | 64,971 |
| Edward M. Liddy* | | 185,000 | 185,000 |
| Robert S. Morrison | | 170,000 | 170,000 |
| Aulana L. Peters | 80,357 | 95,000 | 175,357 |
| Rozanne L. Ridgway* | | 185,000 | 185,000 |
| Kevin W. Sharer | | 170,000 | 170,000 |

\*    Chair of Committee

(1)   Includes fees associated with chairing a board committee

**Annual Board/Committee Chair Fees.** Nonemployee directors received an annual cash retainer of $75,000 per year. In addition, the cha of a Board committee received an additional annual fee of $15,000. In lieu of the cash fees, a director may elect to receive common stock of the Company at current fair market value.

**Stock Awards.** Each nonemployee director is entitled to receive $95,000 payable in May of each year in common stock of the Company pursuant to the terms of the Company's 1992 Directors Stock Ownership Program.

**Deferred Compensation.** Each nonemployee director may defer all or part of their annual cash fees or stock award until they cease to be members of the Board. For directors who have made an election to defer their fees payable in cash, the Company will credit their account with compensation due on the 45th day of each calendar quarter. Interest at the prime rate (as charged by Wells Fargo Bank on the first day of each calendar quarter) will be credited to each account from the date of deposit, at the end of each calendar quarter and immediately preceding any distribution. For directors who have made an election to defer their annual stock award or annual cash fees into a common stock equivalents account, the Company shall credit their account with 3M common stock equivalents (including fractional share equivalents) which could have been purchased on the first day of the calendar quarter using the closing price of 3M common stock on the New York Stock Exchange on the last business day immediately preceding such date. 3M common stock equivalents equal to dividends paid on 3M common stock shall be credited to such an account on each dividend payment date. The share equivalents shall be determined by using the closing price of 3M commo stock on the New York Stock Exchange on the sixth business day preceding the dividend record date. Appropriate adjustments shall be made to the accounts for stock splits, stock dividends, merger, consolidation, payment of dividends in other than cash, and similar circumstances affecting 3M common stock.

**Expenses.** Nonemployee directors are reimbursed for their expenses in connection with attending Board meetings (including expenses related to spouses when they are invited to attend

Board events). Nonemployee directors may use the Company aircraft for travel to and from 3M Board meetings.

**Stock Ownership Guidelines.** The Board has adopted stock ownership guidelines that provide that each director should attain over three successive terms an investment position in 3M's stock (including deferred common stock equivalents) equal to two times the annual retainer. All directors currently meet these stock ownership guidelines except for W. James Farrell who has been a director for less than one year. Information regarding accumulated stock and deferred stock units is set forth in the section entitled "Common Stock Ownership of Directors and Executive Officers." Currently, 85 percent of director compensation is paid in 3M stock or 3M common stock equivalents.

**Matching Gift Program.** The nonemployee directors are eligible to participate in the matching gift program on the same terms as 3M employees. Under this program, the 3M Foundation will match up to a total of $5,000 a year in contributions by the director to eligible institutions of higher education or public broadcasting organizations.

**Process for Setting Director Compensation.** The Nominating and Governance Committee periodically receives reports on the status of Board compensation in relation to other large U.S. companies and is responsible for recommending to the Board changes in compensation for nonemployee directors. Periodically, the Company, through its human resources department, requests Frederic W. Cook & Co., Inc. to conduct a survey of director compensation at other large U.S. companies. Neither the Company nor the Nominating and Governance Committee has any contractual arrangement with any other compensation consultant who has a role in determining or recommending the amount or form of director compensation.

17

## PROPOSALS TO BE VOTED ON

### PROPOSAL NO. 1
### ELECTION OF DIRECTORS

The Board of Directors currently has ten members. Except for Kevin W. Sharer, each of the Board members is standing for re-election to hold office until the next Annual Meeting of Stockholders. A new nominee, Herbert L. Henkel, is also standing for election.

A plurality of votes cast is required for the election of directors. However, under the Company's Corporate Governance Guidelines, any nominee for director in an uncontested election (i.e., an election where the only nominees are those recommended by the Board) who receives a greater number of votes "withheld" from his or her election than votes "for" such election (a "Majority Withheld Vote") will promptly tender his or her resignation for consideration by the Nominating and Governance Committee.

The Nominating and Governance Committee will promptly consider the best interests of 3M and its stockholders and recommend to a committee of independent directors of the Board whether to accept the tendered resignation or to take some other action, such as rejecting the resignation and addressing the apparent underlying causes of the withheld votes.

The Board will create a committee of all the independent directors who did not receive a Majority Withheld Vote to consider the Nominating and Governance Committee's recommendation and take action within 90 days following the uncontested election. Thereafter, the committee of independent directors will promptly disclose its decision and an explanation of how the decision was reached in a Current Report on Form 8-K filed with the Securities and Exchange Commission.

If one or more members of the Nominating and Governance Committee receive a Majority Withheld Vote, then the Board will create a committee of independent directors who did not receive a Majority Withheld Vote to consider the resignation offers of all directors receiving a Majority Withheld Vote and determine whether to accept the tendered resignation(s) or to take some other action and promptly disclose their decision as described above.

Except as provided in the next sentence, a director receiving a Majority Withheld Vote shall remain active and engaged in Board activities during this Nominating and Governance Committee and Board process. Any director who receives a Majority Withheld Vote and tenders his or her resignation pursuant to this provision will not participate in the committee action regarding whether to accept the tendered resignation offer or take some other action. However, if the only directors who did not receive a Majority Withheld Vote in the same election constitute three or fewer independent directors, then all independent directors may participate in the committee action regarding whether to accept the resignation offer(s) or to take some other action.

Each nominee elected as a director will continue in office until his or her successor has been elected and qualified, or until his or her earlier death, resignation, or retirement.

We expect each nominee for election as a director to be able to serve if elected. If any nominee is not able to serve, proxies will be voted in favor of the remainder of those nominated and may be voted for substitute nominees, unless the Board chooses to reduce the number of directors serving on the Board.

The principal occupation and certain other information about the nominees is set forth on the following pages.

The Proxy Committee appointed by the Board of Directors intends to vote the proxy (if you are a stockholder of record) for the election of each of these nominees, unless you indicate on the proxy card that your vote should be withheld from any or all of the nominees.

**The Board of Directors unanimously recommends a vote "FOR" the election of these nominees as directors.**

18

**Nominees for Directors:**



**Linda G. Alvarado,** 55, *President and Chief Executive Officer, Alvarado Construction, Inc.* In 1976, Ms. Alvarado founded Alvarado Construction, Inc. and has overseen the growth of that enterprise as a commercial general contracting firm. Ms. Alvarado is on the boards of the following public companies in addition to 3M: Lennox International Inc., Pitney Bowes, Inc., The Pepsi Bottling Group, Inc., and QWEST Communications International, Inc. *Director since 2000.*



**George W. Buckley,** 60, *Chairman of the Board, President and Chief Executive Officer since December 2005.* Before joining 3M in 2005, Mr. Buckley was Chairman of the Board, President and Chief Executive Officer of the Brunswick Corporation since 2000, and served in other executive positions at Brunswick Corporation from 1997 to 2000. Mr. Buckley is on the board of the following public company in addition to 3M: The Black & Decker Corporation. *Director since 2005.*



**Vance D. Coffman,** 62, *Retired Chairman of the Board and Chief Executive Officer, Lockheed Martin Corporation, a high technology aerospace and defense company.* Dr. Coffman served in various executive capacities at Lockheed Martin Corporation before becoming Chairman and Chief Executive Officer in 1998. He retired as Chief Executive Officer in 2004 and as Chairman of the Board in 2005. Dr. Coffman is on the boards of the following public companies in addition to 3M: Bristol-Myers Squibb Company and Deere & Company. *Director since 2002.*



**Michael L. Eskew,** 57, *Chairman of the Board and Chief Executive Officer, United Parcel Service, Inc., a provider of specialized transportation and logistics services, since 2002.* Mr. Eskew was appointed Executive Vice President in 1999 and Vice Chairman in 2000 before becoming Chairman and Chief Executive Officer in January 2002. Mr. Eskew is on the board of the following public company in addition to 3M and United Parcel Service: International Business Machines Corp. *Director since 2003.*



**W. James Farrell,** 64, *Retired Chairman and Chief Executive Officer, Illinois Tool Works Inc., a multi-national manufacturer of highly engineered fasteners, components, assemblies and systems.* Mr. Farrell served in various executive capacities since joining ITW before becoming Chairman and Chief Executive Officer in 1996. He retired as Chief Executive Officer in 2005 and as Chairman in 2006. Mr. Farrell is on the boards of the following public companies in addition to 3M: Abbott Laboratories, The Allstate Corporation, and UAL Corporation. *Director since 2006.*



**Herbert L. Henkel,** 59, *Chairman of the Board (since May 2000), President and Chief Executive Officer (since October 1999), Ingersoll-Rand Company Limited, a manufacturer of industrial products and components.* Mr. Henkel served as President and Chief Operating Officer of Ingersoll-Rand from April 1999 to October 1999. Mr. Henkel is on the board of the following public company in addition to 3M and Ingersoll-Rand Company Limited: C.R. Bard, Inc. *New nominee.*



**Edward M. Liddy,** 61, *Chairman and Former Chief Executive Officer of The Allstate Corporation, the parent of Allstate Insurance Company, a personal lines insurance company.* He served as President and Chief Operating Officer of The Allstate Corporation from 1994 to 1998. Mr. Liddy is on the board of the following public company in addition to 3M and The Allstate Corporation: Goldman Sachs Group, Inc. *Director since 2000.*



**Robert S. Morrison,** 64, *Retired Vice Chairman of PepsiCo, Inc., a processor of packaged foods and beverages.* Mr. Morrison served as Vice Chairman of PepsiCo, Inc. from 2001 to February 2003. From 1997 until the 2001 merger with PepsiCo, Mr. Morrison was Chairman, President and Chief Executive Officer of The Quaker Oats Company. From June 30 to December 6, 2005, Mr. Morrison served as interim Chairman of the Board and Chief Executive Officer of 3M Company. Mr. Morrison is on the boards of the following public companies in addition to 3M: AON Corporation, Illinois Tool Works, Inc., and the Tribune Company. *Director since 2002.*



**Aulana L. Peters,** 65, *Retired Partner, Gibson, Dunn & Crutcher LLP.* Mrs. Peters is a retired partner of the law firm of Gibson, Dunn & Crutcher where she was a partner from 1980 to 1984 and 1988 to 2000. From 1984 to 1988, she served as a Commissioner of the Securities and Exchange Commission. From January 2001 to April 2002, Mrs. Peters served as a member of the Public Oversight Board ("POB") of the American Institute of Certified Public Accountants. Mrs. Peters has also served as a member of the Steering Committee for Financial Accounting Standards Board's Financial Reporting Project and a member of the POB's Blue Ribbon Panel on Audit Effectiveness. Currently, Mrs. Peters serves on the U.S. Comptroller General's Accountability Advisory Panel and is a member of the International Public Interest Oversight Board which oversees the standard setting process of the International Federation of Accountants for auditing, assurance, independence and ethics standards. Mrs. Peters is on the boards of the following public companies in addition to 3M: Deere & Company, Merrill Lynch & Co., Inc., and Northrop Grumman Corporation. *Director since 1990.*



**Rozanne L. Ridgway,** 71, *Former Assistant Secretary of State for Europe and Canada.* Ambassador Ridgway served in the U.S. Foreign Service from 1957 to 1989, including assignments as Ambassador for Oceans and Fisheries Affairs, Ambassador to Finland and to the German Democratic Republic, and from 1985 and until her retirement in 1989, Assistant Secretary of State for European and Canadian Affairs. Ambassador Ridgway served as President until 1993 and Co-Chair until mid-1996 of the Atlantic Council of the United States, an association to promote better understanding of major foreign policy issues. Ambassador Ridgway is on the boards of the following public companies in addition to 3M: The Boeing Company, Emerson Electric Co., Manpower Inc., and Sara Lee Corporation. She is also a director in three funds in the American Funds complex. *Director since 1989.*

20

## PROPOSAL NO. 2
### RATIFICATION OF THE APPOINTMENT OF
### INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Audit Committee has appointed PricewaterhouseCoopers LLP as the independent registered public accounting firm to audit the Company's consolidated financial statements for the year ending December 31, 2007. If the stockholders do not ratify the selection of PricewaterhouseCoopers LLP, the Audit Committee will reconsider the selection.

During 2006, PricewaterhouseCoopers LLP served as the Company's independent registered public accounting firm and also provided certain tax and other audit-related services. For a description of those services and the fees paid, see section entitled "Fees of Independent Registered Public Accounting Firm."

Representatives of PricewaterhouseCoopers LLP are expected to attend the Annual Meeting where they will be available to respond to questions and, if they desire, to make a statement.

### Recommendation of the Board

**The Board of Directors recommends a vote "FOR" the ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm. Proxies solicited by the Board of Directors will be voted "FOR" ratification unless a contrary vote is specified.**

## PROPOSAL NO. 3

### PROPOSAL TO AMEND THE COMPANY'S RESTATED CERTIFICATE OF INCORPORATION TO
### ELIMINATE THE SUPERMAJORITY VOTE REQUIREMENTS

Stockholders are being asked to approve an amendment to the Company's Restated Certificate of Incorporation to eliminate the supermajority vote requirements and fair price provision by deleting Article ELEVENTH ("Amendment No.1").

In determining whether Amendment No. 1 is in the best interests of the Company's stockholders, the Nominating and Governance Committee and the Board considered arguments for and against the supermajority vote requirement that was adopted by the Board and approve by the stockholders in 1986. The Board considered that the provisions that require a supermajority vote to amend certain provisions of the Restated Certificate of Incorporation can be viewed as facilitating corporate governance stability by requiring broad stockholder consensus to effect changes.

The Board also considered the views of investors who believe that these provisions are inconsistent with principles of good corporate governance in that they limit stockholders' ability to participate effectively in corporate governance. According to some investors, the requirement of a supermajority vote can limit the ability of a majority of the stockholders at any particular time to effect change by essentially providing a veto to a large minority stockholder or group of stockholders. In addition, a lower threshold for stockholder votes can increase stockholders' ability to participate effectively in corporate governance.

After weighing all of these considerations, the Nominating and Governance Committee recommended the elimination of the supermajority vote requirements, and the Board agreed and determined that Amendment No. 1 is advisable and in the best interests of the Company and its stockholders. The Board of Directors has adopted resolutions approving and declaring the advisability of Amendment No. 1 and recommends that the stockholders approve Amendment No. 1 by voting in favor of this Proposal. The current supermajority vote provision and the proposed amendment are described in greater detail below.

21

*Supermajority Vote Requirements*

Article ELEVENTH of our Restated Certificate of Incorporation requires the affirmative vote of at least 80 percent of our outstanding voting stock to amend, alter, or repeal our Bylaws or certain provisions of the Restated Certificate of Incorporation. The proposed Amendment No. 1 would remove the 80 percent supermajority vote requirement currently in place to approve, alter, amend, or repeal the provisions of the Restated Certificate of Incorporation relating to:

- To amend, alter, or repeal any provision of our Bylaws; and
- To amend, alter, or repeal Article ELEVENTH or Article THIRTEENTH of the Restated Certificate of Incorporation. (The Company has separately asked stockholders to repeal Article THIRTEENTH in Proposal No. 4.)

If stockholders approve Amendment No. 1, the principal effect will be that those provisions may be amended, altered, or repealed upon approval of the Board of Directors and the vote of the holders of a majority of 3M's outstanding stock entitled to vote on such amendment.

The Board has separately proposed to repeal other provisions of the Restated Certificate of Incorporation, as discussed in *"Proposal No. 4: Proposal to Amend the Company's Restated Certificate of Incorporation to Eliminate the Fair Price Provision."* The amendments to the Restated Certificate of Incorporation proposed under Proposal No. 3 and Proposal No. 4 are set forth in Appendix G-1, with deletions indicated by strikeout and additions indicated by underline that will be made to the extent stockholders approve the amendments. The current provisions and proposed amendment described above are qualified in their entirety by reference to the actual text as set forth in Appendix G-1.

*Vote Required:*   The affirmative vote of at least 80 percent of all outstanding shares of Common Stock is required for approval of this proposal. An abstention on this proposal is not an affirmative vote and therefore will have the same effect as a vote against this proposal.

*Effective Date:*   If approved by the stockholders, the amendment to the Restated Certificate of Incorporation would become effective upon the filing with the Secretary of State of Delaware of a Certificate of Amendment, which is set forth in Appendix G-2 attached hereto (in a form assuming both amendments to the Restated Certificate of Incorporation described in Proposal No. 3 and Proposal No. 4 are approved, which will be modified to the extent stockholders do not approve both amendments), which filing is expected to take place shortly after the stockholders approve the amendment.

**Recommendation of the Board**

**The Board of Directors unanimously recommends that stockholders vote "FOR" this proposal to amend the Restated Certificate o Incorporation to eliminate all supermajority vote requirements. Proxies solicited by the Board of Directors will be voted "FOR" this proposal unless a contrary vote is specified.**

**PROPOSAL NO. 4**

**PROPOSAL TO AMEND THE COMPANY'S RESTATED CERTIFICATE OF INCORPORATION TO ELIMINATE THE FAIR PRICE PROVISION**

Stockholders are being asked to approve an amendment to the Company's Restated Certificate of Incorporation to eliminate the fair price provision by deleting Article THIRTEENTH ("Amendment No. 2").

Our Board, after careful consideration and upon recommendation of the Nominating and Governance Committee, has concluded that it is in the best interests of the Company's stockholders

to propose Amendment No. 2 to the Company's Restated Certificate of Incorporation to repeal the fair price provision and to request stockholder approval of that amendment.

A fair price provision is an anti-takeover measure designed to help companies defend against certain kinds of tender offers, known as coercive, two-tiered tender offers. In this type of takeover, a potential acquirer will offer one price for the shares needed to gain control of a target company and then offer a lower price or other less favorable consideration for the remaining shares, thereby creating pressure for stockholders to tender their shares for the tender offer price, regardless of their value. Standard fair price provisions encourage a potential acquirer to negotiate with a company's board of directors by requiring the potential acquirer to pay a "fair" price for all shares as determined under a specified formulation, unless the acquirer's offer has satisfied specified board or stockholder approval requirements.

Section 203 of the Delaware General Corporation Law ("DGCL") contains provisions that provide similar protection to those under Article THIRTEENTH. When Article THIRTEENTH of our Restated Certificate of Incorporation was adopted in 1986, Section 203 of the DGCL had not yet been enacted. The Board believes the protection afforded by Section 203 of the DGCL is sufficient, and that a separate provision in the Restated Certificate of Incorporation is no longer necessary.

After weighing all of these considerations, the Nominating and Governance Committee recommended the elimination of the fair price provision, and the Board agreed and determined that Amendment No. 2 is advisable and in the best interests of the Company and its stockholders. The Board of Directors has adopted resolutions approving and declaring the advisability of Amendment No. 2 and recommends that the stockholders approve Amendment No. 2 by voting in favor of this Proposal. The current fair price provision and the proposed amendment are described in greater detail below.

*Fair Price Provision*

Article THIRTEENTH of our Restated Certificate of Incorporation, which is sometimes referred to as a "fair price" provision, currently requires the affirmative vote of the holders of at least 80 percent of the outstanding voting stock to approve certain transactions involving any person or group that beneficially owns at least 10 percent of our outstanding voting stock (a "Related Person"). Under the proposed amendments, this Article would be deleted in its entirety. The current requirements of Article THIRTEENTH apply to the following transactions between a Related Person and 3M:

- A merger or consolidation;
- Any sale, lease, exchange, transfer, or other disposition of all or any substantial part (more than five percent of the fair market value) of the assets of 3M or any of its subsidiaries;
- Any sale, lease, exchange, transfer, or other disposition of all or any substantial part (more than five percent of the fair market value) of the assets of an entity to 3M or any of its subsidiaries;
- The issuance, sale, exchange, transfer, or other disposition by 3M or its subsidiaries of any securities of 3M or its subsidiaries;
- Any recapitalization or reclassification of the securities of 3M or other transaction that would have the effect of increasing the voting power of a Related Person or reducing the number of shares of each class of voting stock outstanding; or
- Any liquidation, spin-off, split-off, split up, or dissolution of 3M.

This 80 percent voting requirement does not apply to (a) transactions approved by the vote of the majority of the Continuing Directors (directors who were directors prior to the time the Related Person became a Related Person, and directors recommended for election by such directors) and (b) in the

23

case of any business transaction involving a merger or consolidation or sale of substantially all of the assets, the aggregate amount of cash to be received per share in connection with such business transaction is at least equal in value to the highest price per share of common stock paid by the Related Person in the transaction which resulted in such Related Person becoming a Related Person or within one year prior to the date such Related Person became a Related Person, whichever is higher. Article THIRTEENTH also includes a requirement that Article THIRTEENTH can only be amended, altered, or repealed with the affirmative vote of the holders of at least 80 percent of all of the then outstanding shares of voting stock, voting together as a single class.

The repeal of Article THIRTEENTH will have two principal effects on stockholder voting: First, those transactions covered by Article THIRTEENTH that would otherwise require a stockholder vote under the Delaware General Corporation Law would require the vote of the holders of a majority of our outstanding stock, rather than an 80 percent supermajority vote. Second, the Board of Directors will be able to effect, without obtaining stockholder approval, those transactions covered by Article THIRTEENTH that do not otherwise require stockholder approval under Delaware law.

3M will continue to be subject to Section 203 of the Delaware General Corporation Law without regard to whether the proposed amendments are approved. Section 203 provides, in general, that a transaction constituting a "business combination" within the meaning of Section 203 involving a person owning 15 percent or more of our voting stock (referred to as an "interested stockholder"), cannot be completed for a period of three years after the date the person became an interested stockholder unless (1) the Board of Directors approved either the business combination or the transaction that resulted in the person becoming an interested stockholder prior to such business combination or transaction, (2) upon consummation of the transaction that resulted in the person becoming an interested stockholder, that person owned at least 85 percent of our outstanding voting stock (excluding shares owned by persons who are directors and also officers of 3M and shares owned by certain 3M employee benefit plans), or (3) the business combination was approved by the Board of Directors and by the affirmative vote of at least 66⅔ percent of our outstanding voting stock not owned by the interested stockholder.

The Board has separately proposed to repeal other provisions of the Restated Certificate of Incorporation, as discussed in "*Proposal No. 3: Proposal to Amend the Company's Restated Certificate of Incorporation to Eliminate the Supermajority Vote Requirements.*" The amendments to the Restated Certificate of Incorporation proposed under Proposal No. 3 and Proposal No. 4 are set forth in Appendix G-1, with deletions indicated by strikeout and additions indicated by underline that will be made to the extent stockholders approve the amendments. The current provisions and proposed amendment described above are qualified in their entirety by reference to the actual text as set forth in Appendix G-1.

*Vote Required:*   The affirmative vote of at least 80 percent of all outstanding shares of Common Stock is required for approval of this proposal. An abstention on this proposal is not an affirmative vote and therefore will have the same effect as a vote against this proposal.

*Effective Date:*   If approved by the stockholders, the amendment to the Restated Certificate of Incorporation would become effective upon the filing with the Secretary of State of Delaware of a Certificate of Amendment, which is set forth in Appendix G-2 attached hereto (in a form assuming both amendments to the Restated Certificate of Incorporation described in Proposal No. 3 and Proposal No. 4 are approved, which will be modified to the extent stockholders do not approve both amendments), which filing is expected to take place shortly after the stockholders approve the amendment.

**Recommendation of the Board**

The Board of Directors unanimously recommends that stockholders vote "FOR" this proposal to amend the Restated Certificate o Incorporation to eliminate the "fair price" provision. Proxies solicited by the Board of Directors will be voted "FOR" this proposal unless a contrary vote is specified.

**PROPOSAL NO. 5**

**PROPOSAL TO APPROVE THE EXECUTIVE ANNUAL INCENTIVE PLAN**

At its meeting on February 11, 2007, the Compensation Committee of the Board of Directors (the "Committee") adopted the 3M Executive Annual Incentive Plan (the "Annual Incentive Plan" or the "Plan"). This Annual Incentive Plan replaces the Executive Profit Sharing Plan by which the Company previously provided short-term incentive compensation to certain of its executive officers. This change is part of the Company's strategy of replacing quarterly profit sharing as its primary vehicle for delivering short-term incentive compensation to employees with annual incentive compensation. This strategy is intended to accomplish a number of objectives, all of which are consistent with delivering increased stockholder value.

The Annual Incentive Plan is intended to comply with the requirements of Section 162(m) of the Internal Revenue Code, so that the Company is able to deduct for federal income tax purposes payments of annual incentive compensation made to its Named Executive Officers (as identified in the Summary Compensation Table in this proxy statement). In general, Section 162(m) imposes a limit on the amount of compensation paid to a corporation's Named Executive Officers that may be deducted for federal income tax purposes. This limit does not apply to compensation that is considered "performance-based" for purposes of Section 162(m). One of the conditions for compensation to be considered "performance-based" under Section 162(m) requires that the material terms under which such compensation will be paid, including the performance goals, be disclosed to and approved by stockholders. Thus, when the Compensation Committee adopted the Annual Incentive Plan, it made its approval subject to the condition that the Plan be approved by a majority vote of the Company's stockholders at the Company' next annual meeting.

*Summary of the Annual Incentive Plan*

The following is only a summary of the material terms of the Annual Incentive Plan and is qualified in its entirety by reference to the full plan document for the Plan, which is attached as Appendix H to this proxy statement.

1. *What are the purposes of the Annual Incentive Plan?* — The purposes of the Plan are to attract and retain highly qualified individuals to serve as executive officers of the Company, to focus their attention on achieving certain business objectives established for the Company and its business units, and to provide these individuals with incentive compensation that is designed to qualify as performance-based compensation for purposes of Section 162(m) of the Internal Revenue Code.

2. *Who is eligible to participate in the Annual Incentive Plan?* — Participation in the Plan is limited to the Named Executive Officers of the Company and those other senior executives of the Company whose compensation is approved by the Compensation Committee of the Board of Directors. The Named Executive Officers are those individuals covered by the SEC's disclosure requirements for executive compensation (as reflected in the Summary Compensation Table in this proxy statement).

3. *Who administers the Annual Incentive Plan?* — The Compensation Committee will administer the Plan. The Committee has full power and authority to interpret the Plan, establish, amend

25

# EXHIBIT 3 – PART B

and rescind any rules, forms or procedures as it deems necessary for the proper administration of the Plan, determine the manner and time of payment of the annual compensation payable under the Plan, and to take any other action as it deems necessary or advisable in connection with the Plan. The Committee may delegate any of its administrative responsibilities in connection with the Plan to the appropriate employees of the Company.

4. *How are the amounts of annual incentive compensation paid under the Plan determined?* — The Plan establishes limits on the maximum annual incentive payable to any participating individual for any year. For the Named Executive Officers of the Company, this limit is one quarter of one percent (0.25%) of the adjusted net income of the Company for the year. For all other individuals participating in the Plan, this limit is one tenth of one percent (0.1%) of the adjusted net income of the Company for the year. Subject to these limits, the Committee determines the amount of each individual's annual incentive opportunity for each year and has the discretion to reduce the annual incentive payable to such individual below the applicable limit.

5. *How are annual incentive compensation payments made under the Plan?* — Payments may be made in the form of cash or in the form of shares of 3M common stock, restricted stock, or restricted stock units delivered pursuant to the Company's Management Stock Ownership Program. All payments for a year will be made no later than March 15 of the following year, but not until the Committee has certified in writing that the performance goal for the year has been satisfied and that the limits on the maximum annual incentive payable to any individual participating in the Plan have not been exceeded.

6. *Under what circumstances may an individual lose the right to receive annual incentive compensation under the Plan?* — If an individual's employment with 3M ends for any reason other than retirement or death, that individual's participation in the Plan will end and any annual incentive compensation that would otherwise have been payable to such individual for the year in which his or her employment ended will be forfeited.

7. *What are the federal income tax consequences of the annual incentive compensation paid under the Plan?* — Annual incentive compensation payments made in cash or shares of 3M common stock will be taxed to the recipient as ordinary income in the year of receipt. Annual incentive compensation delivered in the form of restricted stock or restricted stock units will be taxed to the recipient as ordinary income when the shares of restricted stock or the restricted stock units vest. Assuming that 3M's stockholders approve the Plan and that the other requirements for performance-based compensation under Section 162(m) of the Internal Revenue Code are satisfied, the Company will be entitled to a deduction for federal income tax purposes equal to the amount of income recognized by participants in the Plan in each year that such income is recognized.

8. *How long will the Annual Incentive Plan remain in effect, and may it be changed?* — The Plan became effective on January 1, 2007, subject to the requirement that it be approved by a majority vote of the Company's stockholders at the Company's next annual meeting. Once approved, the Plan will remain in effect until terminated by the Compensation Committee. The Committee may amend the Plan at any time, except that no amendment which would (a) increase the limit on the annual incentive compensation payable to any participant, or (b) revise the performance goal available for determining the amount of annual incentive compensation payable under the Plan, will become effective until it has been approved by a majority vote of the Company's stockholders.

26

**Recommendation of the Board**

The Board of Directors recommends a vote "FOR" the proposal to approve the adoption of the 3M Executive Annual Incentive Plan as well as the material terms under which compensation would be paid to individuals participating in such 3M Plan. Proxies solicited by the Board of Directors will be voted "FOR" this proposal unless a contrary vote is specified.

The affirmative "FOR" vote of a majority of those shares present in person or represented by proxy at the meeting and entitled to vote is required to approve this proposal. If the proposal is not approved, the Committee would need to decide whether to implement the Annual Incentive Plan without stockholder approval, resume the previous Executive Profit Sharing Plan, or select another method of delivering short-term incentive compensation.

## PROPOSAL NO. 6

### PROPOSAL TO APPROVE THE MATERIAL TERMS OF THE PERFORMANCE CRITERIA UNDER THE PERFORMANCE UNIT PLAN

As described in the Compensation Discussion and Analysis, the Performance Unit Plan is one element of the Company's compensation program for its executives. The Plan provides long-term incentive compensation payable annually based on the Company's attainment of the performance criteria selected by the Compensation Committee for each year's awards. This performance is measured over rolling three-year periods.

The Plan was first approved by the Company's stockholders in 1981, and they have since approved amendments to the Plan in 1994, 1997, and 2002. The last amendment expanded the available performance criteria to include improvement in economic profit as well as improvement in certain asset or financial measures. The performance criteria used in making awards under the Plan since 2005 have been improvement in economic profit and real worldwide sales growth.

At its meeting on February 11, 2007, the Compensation Committee approved an amendment to the Plan which amends the available performance criteria to include adjusted net income or improvement in adjusted net income, earnings per share or improvement in earnings per share, net sales, cash flow, gross margin, operating margin, earnings before interest and taxes, EBITDA, economic value added, stock price, return on assets or net assets, and operating income or improvement in operating income. As amended, the performance criteria available to the Compensation Committee under the Plan now include return on capital employed, return on assets or net assets, net sales, sales growth, cash flow, earnings per share or improvement in earnings per share, return on equity, stock price, gross margin, operating margin, total shareholder return, economic value added, economic profit or improvement in economic profit, earnings before interest and taxes, EBITDA, operating income or improvement in operating income, improvements in certain asset or financial measures, reductions in certain asset or cost areas, net income or variations of net income in varying time periods, and comparisons with other peer companies or industry groups or classifications with regard to one or more of these criteria. As amended, the criteria may now apply either to the Company as a whole or to any of its business segments.

In order to preserve the Company's ability to deduct for federal income tax purposes the payments made under the Plan to certain of its executives, Section 162(m) of the Internal Revenue Code and the regulations issued thereunder require that the Company's stockholders approve the material terms of these performance criteria as amended by the Compensation Committee.

**Recommendation of the Board**

The Board of Directors recommends a vote "FOR" the proposal to approve the material terms of the performance criteria under the Performance Unit Plan. Proxies solicited by the Board of Directors will be voted "FOR" this proposal unless a contrary vote is specified.

The affirmative "FOR" vote of a majority of those shares present in person or represented by proxy at the meeting and entitled to vote is required to approve this proposal. If the proposal is not approved, the available performance criteria under the Plan will remain the same; however, some of the compensation paid to certain executives under the Plan may not be deductible, resulting in additional costs to the Company.

**PROPOSAL NO. 7**

**STOCKHOLDER PROPOSAL ON EXECUTIVE COMPENSATION
BASED ON THE PERFORMANCE OF PEER COMPANIES**

3M has received a stockholder proposal from the United Brotherhood of Carpenters Pension Fund (the "Proponent"). The Proponent has requested the Company to include the following proposal and supporting statement in its proxy statement for the Annual Meeting of Stockholders. The proposal may be voted on at the Annual Meeting only if properly presented by the Proponent or the Proponent's qualified representative.

*Proponent's Proposal:*

*Resolved: That the shareholders of 3M Company ("Company") request that the Board of Director's Executive Compensation Committee establish a pay-for-superior-performance standard in the Company's executive compensation plan for senior executives ("Plan"), by incorporating the following principles into the Plan:*

1. *The annual incentive or bonus component of the Plan should utilize defined financial performance criteria benchmarked against a disclosed peer group of companies, and provide that an annual bonus should be awarded only when the Company's performance exceeds its peers' median or mean performance on the selected financial criteria;*

2. *The long-term compensation component of the Plan should utilize defined financial and/or stock price performance criteria benchmarked against a disclosed peer group of companies. Options, restricted shares, or other equity or non-equity compensation used in the Plan should be structured so that compensation is received only when the Company's performance exceeds its peers' median or mean performance on the selected financial and stock price performance criteria; and*

3. *Plan disclosure should be sufficient to allow shareholders to determine and monitor the pay and performance correlation established in the Plan.*

*Supporting Statement:*

*We feel it is imperative that compensation plans for senior executives be designed and implemented to promote long-term corporate value. A critical design feature of a well-conceived executive compensation plan is a close correlation between the level of pay and the level of corporate performance relative to industry peers. We believe the failure to tie executive compensation to superior corporate performance; that is, performance exceeding peer group performance, has fueled the escalation of executive compensation and detracted from the goal of enhancing long-term corporate value.*

28

*We believe that common compensation practices have contributed to excessive executive compensation. Compensation committees typically target senior executive total compensation at the median level of a selected peer group, then they design any annual and long-term incentive plan performance criteria and benchmarks to deliver a significant portion of the total compensation target regardless of the company's performance relative to its peers. High total compensation targets combined with less than rigorous performance benchmarks yield a pattern of superior-pay-for-average-performance. The problem is exacerbated when companies include annual bonus payments among earnings used to calculate supplemental executive retirement plan (SERP) benefit levels, guaranteeing excessive levels of lifetime income through inflated pension payments.*

*We believe the Company's Plan fails to promote the pay-for-superior-performance principle. Our Proposal offers a straightforward solution: The Compensation Committee should establish and disclose financial and stock price performance criteria and set peer group-related performance benchmarks that permit awards or payouts in its annual and long-term incentive compensation plans only when the Company's performance exceeds the median of its peer group. A senior executive compensation plan based on sound pay-for-superior-performance principles will help moderate excessive executive compensation and create competitive compensation incentives that will focus senior executives on building sustainable long-term corporate value.*

**Board's Statement Opposing the Proposal**

After careful consideration, and for the reasons set forth below, the Board believes that the proposal to require the Compensation Committee (the "Committee") to establish a pay-for-superior-performance standard by using the performance of peer companies in addition to 3M's performance to determine the amount of payments under 3M's performance-based compensation plans for senior executives is not in the best interests of 3M or its stockholders for the following reasons:

1.  3M's compensation program for its executives does not provide "excessive executive compensation" as implied by this proposal. As described in the Compensation Discussion and Analysis, the Compensation Committee relies on frequent and multiple surveys of the executive compensation practices of a premier group of comparator companies to ensure that the compensation delivered to 3M's executives remains competitive with and in the appropriate relationship to such compensation at these comparator companies. When these surveys reveal that the compensation paid to executives at these comparator companies declines, as it recently did with respect to long-term incentive compensation, the long-term incentive compensation provided by 3M to its executives declines as well.

2.  Total compensation must be competitive to attract the best talent to 3M; motivate employees to perform at their highest levels; reward outstanding achievement; and retain those individuals with the leadership abilities and skills necessary for building long-term stockholder value. Senior executives are effectively motivated when their performance-based compensation is directly tied to 3M's performance and not to the performance of "peer companies" over which 3M's senior executives have no control. Compensation plan that would pay nothing for outstanding performance that merely matched the performance of 3M's peer companies would not accomplish these purposes. Linking 3M's executive compensation to the Company's relative performance as compared to peer companies may have unintended and undesirable consequences due to the varying and unforeseeable circumstances that may impact such other companies.

3.  3M already believes strongly in, and has a long history of, linking executive compensation to Company performance. The Board believes that 3M's current performance-based compensation programs work well and have been a strong contributing factor to the Company's success over the years, providing real value to its stockholders. The Board

29

believes that it is in the best interests of stockholders to give the Committee the flexibility and discretion to use performance-based compensation and equity incentive tools as appropriate based on the circumstances and information available at the time. For this reason and the other reasons stated above, the Board believes that the adoption of the stockholder proposal is unnecessary and would be detrimental to the long-term interests of the Company's stockholders.

**Recommendation of the Board**

The Board of Directors recommends a vote "AGAINST" this proposal for the reasons discussed above. Proxies solicited by the Board of Directors will be voted "AGAINST" this proposal unless a stockholder indicates otherwise in voting the proxy.

## COMMON STOCK OWNERSHIP OF DIRECTORS AND EXECUTIVE OFFICERS

The following table sets forth information concerning beneficial ownership of the Company's common stock as of February 28, 2007, for: (a) each director and the nominees for director; (b) Named Executive Officers set forth in the Summary Compensation Table; and (c) the directors and executive officers as a group. Unless otherwise indicated, each person has sole investment and voting power (or shares such powers with his or her spouse) with respect to the shares set forth in the following table.

The number of shares beneficially owned by each director or executive officer is determined under the rules of the Securities and Exchange Commission, and the information is not necessarily indicative of beneficial ownership for any other purpose. Under such rules, beneficial ownership includes any shares as to which the individual has the sole or shared voting power or investment power and also any shares that the individual has the right to acquire as of April 29, 2007 (60 days after February 28, 2007), through the exercise of any stock option or other right. Options exercisable within 60 days after February 28, 2007, are shown separately.

30

## Beneficial Ownership Table

| Name and Principal Position | Common Stock Beneficially Owned (1) | Options Exercisable (2) | Shares Held as Deferred Stock (3) | Total |
|---|---|---|---|---|
| Linda G. Alvarado, Director | 6,214 | — | 5,319 | 11,533 |
| Vance D. Coffman, Director | 2,663 | — | 8,471 | 11,134 |
| Michael L. Eskew, Director | 0 | — | 8,942 | 8,942 |
| W. James Farrell, Director | 0 | — | 454 | 454 |
| Herbert L. Henkel, New Nominee | 0 | — | 0 | 0 |
| Edward M. Liddy, Director | 0 | — | 15,809 | 15,809 |
| Robert S. Morrison, Director | 4,506 | 30,567 | 7,289 | 42,362 |
| Aulana L. Peters, Director | 2,345 | — | 34,287 | 36,632 |
| Rozanne L. Ridgway, Director | 2,576 | — | 46,446 | 49,022 |
| Kevin W. Sharer, Director | 878 | — | 10,548 | 11,426 |
| George W. Buckley, Director, Chairman of the Board, President and Chief Executive Officer | 194,538(4) | 50,000 | 0 | 244,538 |
| Patrick D. Campbell, Chief Financial Officer | 21,718 | 219,346 | 0 | 241,064 |
| Moe S. Nozari, Executive Vice President | 97,215 | 328,767 | 0 | 425,482 |
| Frederick J. Palensky, Executive Vice President | 40,809 | 186,398 | 0 | 227,207 |
| Richard F. Ziegler, Senior Vice President | 16,297(5) | 107,531 | 0 | 123,828 |
| All Directors and Executive Officers as a Group (26 persons) (6) | 603,318 | 2,106,057 | 137,565 | 2,846,940 |

### FOOTNOTES TO BENEFICIAL OWNERSHIP TABLE

(1) "Common Stock Beneficially Owned" includes (a) stock held in joint tenancy, (b) stock owned as tenants in common, (c) stock owned or held by spouse or other members of the nominee's household, and (d) stock in which the nominee either has or shares voting and/or investment power, even though the nominee disclaims any beneficial interest in such stock. Options exercisable within 60 days after February 28, 2007, are shown separately.

(2) Option prices for these shares range from $43.3500 to $87.75 per share.

(3) "Shares Held as Deferred Stock" by nonemployee directors represent the number of shares of the Company's common stock, as of February 28, 2007, which the directors will receive upon termination of membership on the Board of Directors for any reason. These shares result from the voluntary election by the nonemployee directors to defer the payment of directors' fees. No shares of common stock have as yet been issued, and the directors have neither voting nor investment powers in these shares of deferred stock.

(4) Ownership includes restricted stock units that generally vest over a five-year period if the executive remains continuously employed by the Company and are subject to forfeiture under certain circumstances.

(5) Ownership includes restricted shares that generally vest in increments of one-third over a seven-year period if the executive remains continuously employed by the Company and are subject to forfeiture under certain circumstances.

(6) All directors and executive officers as a group owned beneficially less than one percent of the outstanding common stock of the Company.

## SECURITY OWNERSHIP OF MORE THAN 5 PERCENT STOCKHOLDERS

The following table sets forth information regarding beneficial ownership of more than 5 percent of the outstanding 3M stock as of February 28, 2007.

| Name/Address | Shares Beneficially Owned | Percent of Stock Outstanding |
|---|---|---|
| State Street Bank and Trust Company ("State Street") (1) 225 Franklin Street Boston, MA 02110 | 55,377,278 | 7.5 |

(1) State Street holds 7.5 percent of our outstanding common stock as trustee for certain 3M savings plans, including the Company's Voluntary Investment Plan and Employee Stock Ownership Plan, a 401(k) retirement savings plan. Under the terms of the plans, State Street is required to vote shares allocated to the accounts of the participants in accordance with instructions received from such participants. Information is based on a Schedule 13G filed with the SEC on February 12, 2007. State Street disclaims beneficial ownership of all of the shares listed above.

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934 requires our directors and executive officers to file with the Securities Exchange Commission reports regarding their ownership and changes in ownership of our stock. 3M believes that during 2006, its directors and executive officers complied with all Section 16(a) filing requirements. In making this statement, 3M has relied upon examination of the copies of Forms 4, and 5 and the written representations of its directors and executive officers.

## EXECUTIVE COMPENSATION

### Compensation Discussion and Analysis

### Overview

3M pays its executives compensation to recognize their contributions to the success of its business and provide incentives for them to deliver performance that meets the growth and other objectives of the Company. All elements of this compensation are determined by the Compensation Committee of the Board of Directors (the "Committee"), which is composed solely of independent nonemployee directors. However, the Committee's decisions concerning the compensation of 3M's Chief Executive Officer are subject to ratification by the independent directors of the Board of Directors.

As of December 31, 2006, the members of the Committee were Vance D. Coffman, Robert S. Morrison, Aulana L. Peters, Rozanne L. Ridgway, and Kevin W. Sharer. The Committee operates pursuant to a Charter attached to this proxy statement as Appendix D. During 2006, the Committee was assisted by its independent compensation consultant, George B. Paulin of Frederic W. Cook & Co., Inc. In addition to participating in the meetings of the Committee, Mr. Paulin provided significant assistance and advice during an extensive review of the Company's short-term and long-term incentive compensation plans. Frederic W. Cook & Co., Inc., along with two other compensation consulting firms, provides executive compensation survey data relied upon by the Committee in establishing competitive compensation for 3M's executives.

3M's executive officers (especially Mr. Buckley) assist the Committee with the process of determining the compensation of the Company's executives.

**Objectives of 3M's compensation program**

3M believes that the compensation of its executives should be closely tied to the performance and growth of the Company, so that their interests are aligned with the interests of 3M stockholders. Consistent with this philosophy, the following core principles provide a framework for the Company's executive compensation program:

- Total compensation must be competitive to attract the best talent to 3M, motivate executives to perform at their highest levels, reward outstanding achievement, and retain those individuals with the leadership abilities and skills necessary for building long-term stockholder value;

- The portion of an executive's total compensation that varies with performance and is therefore at risk should increase with the level of an individual's responsibility;

- The goals for any variable pay plans must be consistent with the Company's business objectives and increasing stockholder value; and

- Executives are most effectively motivated to build long-term stockholder value when a significant portion of their personal net worth is invested in 3M stock.

In order to accomplish the objective of providing competitive total compensation, 3M annually surveys the executive compensation practices of a premier group of comparator companies. The survey data is obtained from three independent consultants (Hewitt Associates, Frederic W. Cook & Co., Inc., and Towers Perrin). With this information, the Committee aims to provide the Company's executives with short term cash compensation at or very close to the median of this comparator group and long-term incentive compensation at the average of the 50th and 75th percentiles of this comparator group. The comparator group consists of the companies in the Dow Jones Industrial Average, modified to exclude financial services companies, and other companies with annual revenue exceeding $10 billion that participate in the consultants' executive compensation surveys. Survey data is adjusted to recognize the different sizes of the comparator companies (based on annual revenues) as compared to the size of 3M.

**What the compensation program is designed to reward**

3M's executive compensation program is designed to link individual rewards to the profitability and growth of the Company's business. 3M believes that an individual's pay should reflect his or her sustained performance and contributions to the Company. The program is also designed to reward increasing stockholder value through a combination of equity and cash based long-term incentives. All of the incentive compensation elements of the program are designed to incent performance that meets or exceeds the growth and profitability objectives of the Company.

**Elements of the compensation program**

During 2006, the compensation program for 3M's executives consisted of the following elements: base salary, short-term cash incentive in the form of profit sharing, long-term cash incentive in the form of a Performance Unit Plan, and long-term equity incentive in the form of stock options (and in appropriate circumstances, restricted stock or restricted stock units). These executives also participated in various benefit plans made available to most of 3M's U.S. employees, were eligible to participate in several deferred compensation plans, and received other benefits and perquisites. The entire program applied to approximately 110 executives during 2006, including all five of the individuals named in the Summary Compensation Table (George W. Buckley, Chairman of the Board, President and Chief Executive Officer; Patrick D. Campbell, Senior Vice President and Chief Financial Officer; Moe S. Nozari, Executive Vice President, Consumer and Office Business; Frederick J. Palensky, Executive Vice President, Research and Development and Chief Technology Officer; and Richard F. Ziegler, Senior Vice President, Legal Affairs and General Counsel).

**Base salary**

3M pays each of its executives a base salary in cash on a monthly basis. The amount of this base salary is reviewed annually, and does not necessarily vary with the performance of the Company.

**Short-term incentive**

During 2006, 3M provided short-term incentive compensation to its executives and many other global employees through profit sharing plans. Profit sharing is performance-based compensation based on the quarterly economic profit of the Company and its business units. Economic profit is defined as quarterly net operating income minus a charge for operating capital used by the business. The economic profit measurement is directly related to the creation of stockholder value since it emphasizes the effective use of capital and solid profitable growth. Compensation paid under the profit sharing plans fluctuates based on the performance of the Company and its business units. All profit sharing payments are made in cash.

Following a comprehensive review of 3M's short-term and long-term incentive compensation plans, the Committee has decided to replace the current profit sharing plans with an annual incentive plan. The new annual incentive plan will be based on three performance metrics: organic growth, operating income, and economic profit. This change will be effective in 2007 for the Company's executives and in 2008 for the remaining employees currently participating in the profit sharing plans. Implementation of the new plan is being phased in over a two-year period due to the extensive revisions in 3M's financial and human resource information systems necessary to administer the plan.

**Long-term incentives**

3M provides long-term incentive compensation to its executives through its Performance Unit Plan and its Management Stock Ownership Program. Both plans deliver performance-based compensation to these executives, although the basis for measuring this performance varies by plan.

The Performance Unit Plan provides variable compensation to 3M's executives based on the Company's long-term performance. The Committee makes annual awards of performance units under the Plan to these executives. The amount payable with respect to each performance unit granted is determined by and is contingent upon attainment of the performance criteria selected each year by the Committee over the applicable three-year performance period. Although the Plan authorizes the payment of performance units in either cash or shares of 3M common stock, the Company has consistently made these payments in the form of cash.

34

The Management Stock Ownership Program provides compensation to 3M's executives based on the value of and increases in the value of the Company's common stock. The Program authorizes the Committee to grant stock options, restricted stock, restricted stock units, stock appreciation rights, and other stock awards to management employees of the Company. The Committee makes annual grants of stock options under the Program to 3M's executives and other management employees. These options have an exercise price equal to the market price of the Company's common stock on the grant date, and generally expire ten years after the grant date. Historically, the Committee has made grants of restricted stock and restricted stock units under the Program only to selected executives and other management employees in appropriate circumstances. These circumstances have included the hiring of new executives as well as the need to retain current executives. These shares of restricted stock and restricted stock units vest over periods ranging from one to five years after the grant date, which encourage the executives to remain employed by the Company until the shares or units have vested.

In addition to annual stock option grants, executives who exercise nonqualified stock options granted before 2005 may qualify for the receipt of new progressive stock options (also known as "reloads"). When an executive exercises a nonqualified option granted before 2005 and pays the exercise price of such option using shares of 3M common stock already owned by the executive (a method of exercise known as a "stock swap"), the executive is automatically granted a new progressive stock option for the number of shares used to pay the exercise price as well as the number of shares withheld to pay withholding taxes. The new progressive stock option carries an exercise price equal to the fair market value of a share of 3M common stock on the date of exercise of the pre-2005 nonqualified stock option, and may only be exercised through the original expiration date of such pre-2005 nonqualified stock option. 3M offered progressive stock options with respect to nonqualified stock options granted before 2005 to encourage executives to acquire and accumulate actual shares of 3M common stock by exercising their stock options early rather than holding such options until the end of their term and then exercising them for cash. Stock options granted since 2004 have not been eligible for the grant of new progressive stock options upon their exercise.

New progressive stock option grants are reflected in the Summary Compensation Table and the Grants of Plan-Based Awards Table for those Named Executive Officers who received them during 2006. The values for such grants reflected in these Tables were determined in accordance with FAS 123(R). However, the Committee did not consider these new progressive stock option grants to represent incremental compensation value when determining an individual's annual stock option grant for 2006, because the progressive stock options are merely extensions of the exercised pre-2005 nonqualified stock options.

### Benefits and perquisites

3M's executives participate in most of the same health care, disability, life insurance, pension, and 401(k) benefit plans made available generally to the Company's U.S. employees. In addition, these executives are eligible to participate in several deferred compensation programs that allow them to voluntarily defer the receipt of cash compensation otherwise payable by the Company. These deferred compensation programs enable participating executives to earn the same returns paid on the investment funds offered to participants in the Company's 401 (k) plan or, at the executive's election, a fixed rate of return based on corporate bond yields. Payment of this deferred compensation and the earnings thereon generally occurs following the end of the executives' employment with the Company. Executives also receive perquisites described in more detail in footnote 5 to the Summary Compensation Table. Three executives (Mr. Buckley, Mr. Campbell, and Mr. Ziegler) earn supplemental retirement benefits pursuant to their employment agreements with the Company, which were negotiated at the time they agreed to leave their previous employers and join 3M. These supplemental benefits are designed to replace a portion of the pension benefits they failed to earn

35

under the plans of their previous employers because they ended their employment before becoming eligible to retire.

### Why 3M chooses to pay each element

3M pays base salary as the core of its executives' cash compensation, which is necessary to provide competitive total compensation. 3M pays additional cash compensation through a short-term incentive in order to recognize and reward improving business performance. 3M provides long-term incentive compensation through awards under its Performance Unit Plan in order to increase its executives' focus on and recognize their leadership role in achieving the performance goals selected by the Committee, which are regarded as critical for creating sustainable stockholder value over time. 3M also provides long-term incentive compensation through stock options and restricted stock grants under the Management Stock Ownership Program to better align the interests of its executives with the Company's stockholders, encourage 3M stock ownership and reward executives for appreciation in 3M's stock price.

### How 3M determines the amount for each element

All amounts are determined by the Committee in recognition of the Company's annual surveys of the compensation practices of its comparator companies (with the exception of the compensation of Mr. Buckley, which was determined through the negotiation of his employment agreement when he agreed to join the Company as 3M's Chief Executive Officer in December 2005). With this information, the Committee aims to provide short-term cash compensation that is at or very close to the median of this comparator group and long-term incentive compensation at the average of the 50th and 75th percentiles of this comparator group. By targeting long-term incentive compensation at the average of the 50th and 75th percentiles of this comparator group, 3M is able to reward good performance with long-term awards closer to the 50th percentile and outstanding performance with long-term awards closer to the 75th percentile.

#### Base salary

Changes in the base salaries of executives are considered annually by the Committee. Any adjustments are made in recognition of changing conditions in the external market along with the individual's performance during the preceding annual period. Excluding Mr. Buckley (who did not receive an increase during 2006), the Committee increased the base salaries for the executives named in the Summary Compensation Table by an average of 8.1 percent during 2006.

#### Short-term incentive

During 2006, the Committee chose to deliver short-term incentive compensation in the form of quarterly profit sharing. Profit sharing payouts were based on a single metric, economic profit, although economic profit was measured at different levels of the Company. All executives received at least a portion of their profit sharing based on the quarterly economic profit of the Company as a whole, while some executives received a portion of their profit sharing based on the quarterly economic profit of their respective business units. Mr. Buckley's target annual profit sharing was established in his employment agreement at $2,600,000, or 162 percent of his annual base salary, and has not subsequently been changed. The target annual planned profit sharing for the other executives named in the Summary Compensation Table was established at 67 percent of their annual base salaries.

Total economic profit of the Company for 2006 amounted to $1.998 billion, an increase of 2 percent over 3M's total economic profit for 2005. As a result, the profit sharing payments made to those executives who received profit sharing based solely on the results of the Company as a whole

36

throughout the entire year were 102 percent of their target annual planned profit sharing for the year. For example, Mr. Buckley received profit sharing payments of $2,654,408 for 2006, 2 percent above his target annual planned profit sharing of $2,600,000.

**Long-term incentives**

During 2006, the Committee chose to deliver two-thirds of the value of the long-term incentive compensation provided to 3M's executive (other than Mr. Buckley, whose amounts were determined through the negotiation of his employment agreement) in the form of stock options and the remaining one-third in the form of awards under the Performance Unit Plan. Starting in 2007, the Committee intends to change this mix so that one-half of the value of these executives' long-term incentive compensation is delivered through stock options and the other one-half is delivered through awards under the Performance Unit Plan. This change is being made to better balance rewards for long-term financial performance with the rewards for stock price appreciation.

The Committee takes into account and recognizes individual performance in determining the size of annual stock option grants under the Management Stock Ownership Program. Once the desired value of the annual grant is determined for each executive, the value is converted int a number of option shares by dividing this amount by a Black-Scholes value that is the average of the Black-Scholes values for 3M stock options as provided by three independent consultants (Hewitt Associates, Frederic W. Cook & Co., Inc., and Towers Perrin). Annual stock option grants occur on the date of the Annual Meeting of Stockholders in May, and the exercise price for these options is set at the fair market value of a share of 3M stock on that date (as required by the provisions of the Management Stock Ownership Program last approved by 3M's stockholders in 2005). As provided in the plan document for the Management Stock Ownership Program, the fair market value of a share of 3M stock is computed as the average of the high and low prices at which 3M common stock traded on the New York Stock Exchange, rounded up to the nearest $0.05. Annual stock options granted under this Program expire ten years after the grant date, and become exercisable in equal installments on the first three anniversaries of the grant date.

During 2006, the Committee approved a special grant of 7,500 shares of restricted stock to Dr. Nozari for retention purposes. These share: of restricted stock will vest on June 12, 2009 (or upon Dr. Nozari's retirement from the Company, with the consent of the Nominating and Governance Committee of the Board of Directors, if earlier), if he remains employed by the Company until that date.

As part of their approval of the Performance Unit Plan, 3M's stockholders authorized the Committee to select the performance criteria for each year's units awarded under the Plan from a set of preapproved measures. These preapproved measures include return on capital employed sales growth, return on equity, total shareholder return, and economic profit or improvement in economic profit. The performance criteria selected by the Committee for performance units granted during 2006 were designed to focus management attention on two key factors that create stockholder value: Economic Profit Growth and Sales Growth.

Economic Profit Growth is the average annual percentage amount by which the economic profit of the Company grows over the three-yea measurement period (2006 through 2008 for the performance units granted during 2006). Sales Growth is the average annual percentage amoun by which the Company's worldwide organic sales growth (sales growth adjusted for acquisitions, inflation, and currency effects) exceeds worldwide real sales growth as reflected in the Industrial Production Index, as published by the Federal Reserve, during the three-year measurement period.

The amount payable for each performance unit granted in 2006 is linked to the performance criteria of Economic Profit Growth and Sales Growth, with approximately 60 percent of this amount determined by Economic Profit Growth and the remaining 40 percent determined by Sales Growth.

The amount payable may be anywhere from $0 to $360 per unit, depending on the performance of the Company during the three-year performance period ending on December 31, 2008.

The Committee approved the following formula for determining the amount payable for these performance units:

| Economic Profit Growth | Payout/Unit | Sales Growth Exceeding IPI | Payout/Unit |
|---|---|---|---|
| 20% or higher | $ 216 | 5% | $ 144 |
| 15% | $ 144 | 3% | $ 96 |
| 10% | $ 72 | 1% | $ 48 |
| 5% | $ 12 | 0% | $ 8 |
| Below 5% | $ 0 | Below 0% | $ 0 |

**The above formula is not a prediction of how 3M will perform during the years 2006 through 2008. The sole purpose of this formula, which was approved by the Committee in February 2006, is to establish a method for determining the payment of long-term incentive compensation under the Performance Unit Plan. 3M is not providing any guidance, nor updating any prior guidance, of its future performance with the disclosure of this formula, and you are cautioned not to rely on this formula as a prediction of 3M's future performance.**

**Benefits and perquisites**

3M provides benefits to its executives and its other employees for the purposes of delivering competitive total compensation and protecting the health and welfare of these employees and their families. Perquisites are provided for a variety of reasons, including the delivery of competitive total compensation and protecting the health and safety of key employees.

**How each element and the decisions regarding that element fit into the Company's overall compensation objectives, and affect decisions regarding other elements**

All elements of 3M's compensation program, including base salary, short-term incentive, long-term incentives, benefits, and perquisites, are designed to provide overall value at or above the median of 3M's comparator group of premier companies. By doing so, 3M is able to attract and retain the talent necessary to lead and grow the Company. In addition, the incentive compensation elements are designed to recognize the uniqueness and diversity of 3M's businesses while supporting the Company's overall business objectives and focus on increasing stockholder value.

**Stock ownership guidelines**

The Company's stock ownership guidelines apply to all Section 16 Reporting Officers. They are designed to increase an executive's equity stake in 3M and more closely align his or her interests with those of 3M's stockholders. The guidelines provide that the CEO should attain beneficial ownership of 3M stock equal to five times his or her annual base salary at the time of appointment, Executive and Senior Vice Presidents should attain beneficial ownership of 3M stock equal to three times their annual base salary at the time of appointment, and Vice Presidents should attain beneficial ownership of 3M stock equal to two times their annual base salary at the time of appointment. While the stock ownership guidelines provide that executives should attain this beneficial ownership of 3M stock within five years of their appointment to these positions, most of our executives have already attained or exceeded these ownership levels. During 2006, the Committee decided that beginning in 2007, future payments of performance units awarded under the Performance Unit Plan will be made in shares of 3M stock instead of cash to the extent an executive has not met these stock ownership guidelines.

**Policy on reimbursement of incentive payments ("Clawback")**

The Company's Board of Directors has adopted a policy requiring the reimbursement of excess payments made to an executive in the event that 3M is required to make a material restatement of its financial statements and that executive's intentional misconduct caused the need for the restatement. This policy applies to the Section 16 officers of the Company. The policy has been filed electronically with the Company's most recent Annual Report on Form 10-K as Exhibit 10.17.

**Limit on tax-deductible compensation**

Section 162(m) of the Internal Revenue Code prohibits 3M from deducting compensation paid in any year to an executive named in the Summary Compensation Table in excess of $1 million, but does not subject performance-based compensation to this limit. The Committee continues to emphasize performance-based compensation for executives and thus minimize the effect of Section 162(m). However, the Committee believes that its primary responsibility is to provide a compensation program that attracts, retains, and rewards the executive talent necessary for the Company's success. Consequently, in any year the Committee may authorize nonperformance-based compensation in excess of $1 million. The Committee recognizes that the loss of the tax deduction may be unavoidable under these circumstances.

**Severance or change in control arrangements**

With the exception of three Named Executive Officers who have entered into employment agreements with the Company, 3M does not have severance plans or arrangements with any of its executives. Nor does 3M have arrangements providing for payments or other compensation in the event of a change in control of the Company, other than the payment, exercise, or delivery of long-term incentive compensation awards issued prior to a change in control.

## COMPENSATION COMMITTEE REPORT

In accordance with the SEC's disclosure requirements for executive compensation, the Compensation Committee of the Board of Directors of 3M Company (the "Committee") has reviewed and discussed with 3M Management the Compensation Discussion and Analysis. Based on this review and these discussions with 3M Management, the Committee recommended to the Board of Directors that this Compensation Discussion and Analysis be included in the 2007 proxy statement of 3M Company.

Submitted by the Compensation Committee

Vance D. Coffman, Chair
Robert S. Morrison
Aulana L. Peters
Rozanne L. Ridgway
Kevin W. Sharer

## Summary Compensation Table

The following table shows the compensation earned or received during 2006 by each of 3M's Named Executive Officers (as determined pursuant to the SEC's disclosure requirements for executive compensation in Item 402 of Regulation S-K).

### Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(1) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($)(3) | Change in Pension Value and Nonqualified Deferred Compensation Earnings (4) | All Other Compensation ($) | | Total ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| George W. Buckley Chairman of the Board, President and Chief Executive Officer | 2006 | 1,600,000 | 4,117,500(6) | 4,670,100 | 2,153,646 | 3,330,740 | 54,869 | 651,246 | $ | 16,578,1( |
| Patrick D. Campbell Senior Vice President and Chief Financial Officer | 2006 | 675,878 | | | 1,223,934 | 751,406 | 492,731 | 94,517 | $ | 3,238,4( |
| Moe. S. Nozari Executive Vice President, Consumer and Office Business | 2006 | 616,964 | | 65,455 | 2,672,504 | 713,626 | 208,751 | 51,741 | $ | 4,329,0( |
| Frederick J. Palensky Executive Vice President, Research and Development and Chief Technology Officer | 2006 | 417,259 | | | 1,516,235 | 618,060 | 336,802 | 42,603 | $ | 2,930,9! |
| Richard F. Ziegler Senior Vice President, Legal Affairs and General Counsel | 2006 | 714,595 | | 81,185 | 613,711 | 778,328 | 904 | 117,853 | $ | 2,306,5; |

### FOOTNOTES TO SUMMARY COMPENSATION TABLE

(1)  The amounts in the Stock Awards column reflect the dollar amounts recognized for financial statement reporting purposes for the fiscal year ended December 31, 2006, in accordance with FAS 123(R), (excluding the impact of estimated forfeitures related to service-based vesting conditions), for awards pursuant to the Management Stock Ownership Program, and thus may include amounts attributable to awards granted during and before 2006. Assumptions made in the calculation of these amounts are included in Note 16 to the Company's audited financial statements for the fiscal year ended December 31, 2006, included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on February 26, 2007.

(2)  The amounts in the Option Awards column reflect the dollar amounts recognized for financial statement reporting purposes for the fiscal year ended December 31, 2006, in accordance with FAS 123(R), (excluding the impact of estimated forfeitures related to service-based vesting conditions), for awards pursuant to the Management Stock Ownership Program, and thus may include amounts attributable to awards granted during and before 2006. Assumptions made in the calculation of these amounts are included in Note 16 to the Company's audited financial statements for the fiscal year ended December 31, 2006, included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on February 26, 2007.

(3) The amounts in the Non-Equity Incentive Plan Compensation column reflect the sum of (i) profit sharing earned during 2006 under the Company's profit sharing plans, (ii) the value of awards made under the Performance Unit Plan, which were earned during 2006 upon the completion of the respective performance period (the three-year period ended December 31, 2006), and (iii) only with respect to Dr. Palensky, earnings on a previous award made under the Performance Unit Plan which had already been earned but which was not paid to him until 2007.

(4) The amounts in the Change in Pension Value and Nonqualified Deferred Compensation Earnings column reflect the actuarial increase in the present value of each individual's pension benefits under all defined benefit pension plans of the Company determined using the same interest rate and mortality assumptions as those used for financial statement reporting purposes. There were no above-market earnings on deferred compensation under the Company's nonqualified deferred compensation programs.

(5) The amounts in the All Other Compensation column reflect for each individual: (a) Company contributions made on behalf of the individual under all of the Company's qualified and nonqualified defined contribution plans, (b) the dollar amount of premiums paid on behalf of the individual under the whole life or universal life insurance policies issued to them under the Executive Life Insurance Plan, (c) tax gross-ups on income imputed to the individual for travel by the individual's spouse on corporate aircraft to attend certain Company functions involving spouse participation, and (d) amounts paid to provide the individual with financial planning services. Mr. Campbell's amount includes $18,174 of Company contributions under its defined contribution plans and $62,151 of premiums paid under such life insurance policies. Dr. Nozari's amount includes $36,906 of premiums paid under such life insurance policies. Dr. Palensky's amount includes $20,462 of premiums paid under such life insurance policies. Mr. Ziegler's amount includes $18,791 of Company contributions under its defined contribution plans and $84,654 of premiums paid under such life insurance policies. Mr. Buckley's amount includes $87,860 of premiums paid under such life insurance policies, in addition to $123,422 for the reimbursement of legal fees pursuant to his employment agreement and the Company's relocation program, $44,966 for vehicle rentals and the value attributable to personal use of Company-provided automobiles and ground transportation, $224,460 for the incremental cost to the Company of his personal use of corporate aircraft (much of which occurred during the first part of 2006 when he commuted between Minnesota and his home in Illinois until his family completed its move to Minnesota) and $122,178 in tax gross-ups paid on his behalf pursuant to his employment agreement and the Company's relocation program. In addition, the amount reported in the All Other Compensation column for Mr. Buckley reflects the following additional types of personal benefits: payment of housing and other living expenses in Minnesota before he purchased a home, security provided at his personal residence, and personal use of the Company's conference center. The incremental cost to the Company of Mr. Buckley's personal use of corporate aircraft was calculated by combining the variable operating costs of such travel, including the cost of fuel, landing fees, on-board catering and crew travel expenses.

(6) The amount in the Bonus column for Mr. Buckley reflects a cash payment made to him (pursuant to his employment agreement) to replace the annual bonus and long-term incentive compensation he forfeited as a result of leaving his previous employer.

41

## Grants of Plan-Based Awards

| Name | Grant Date | Units (#)(1) | Estimated Future Payouts Under Non-Equity Incentive Plan Awards (2) | | | Estimated Future Payouts Under Equity Incentive Plan Awards (3) | | | All Other Stock Awards: Number of Shares of Stock or Units (#) | Exercise or Base Price of Option Awards ($/sh)(4) | Closing Market Price on Date of Grant ($/sh) | Grant Date Fair Value of Stock and Option Awards($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | | |
| George W. Buckley | n/a | 16,667 | $ 0 | $ 2,000,040 | $ 6,000,120 | | 286,807 | | | | | |
| | 05/09/06 | | | | | | | | | $ 87.35 | $ 87.58 | $ 5,687,383 |
| | 03/12/06 | | | | | | | | 318(6) | | | $ 23,000 |
| | 06/12/06 | | | | | | | | 288(6) | | | $ 23,146 |
| | 09/12/06 | | | | | | | | 323(6) | | | $ 23,278 |
| | 12/12/06 | | | | | | | | 297(6) | | | $ 23,427 |
| Patrick D. Campbell | n/a | 6,200 | $ 0 | $ 744,000 | $ 2,232,000 | | | | | | | |
| | 05/09/06 | | | | | | 73,000 | | | $ 87.35 | $ 87.58 | $ 1,447,590 |
| Moe S. Nozari | n/a | 4,400 | $ 0 | $ 528,000 | $ 1,584,000 | | | | | | | |
| | 05/09/06 | | | | | | 52,000 | | | $ 87.35 | $ 87.58 | $ 1,031,160 |
| | 05/08/06 | | | | | | 30,318 | | | $ 87.75 | $ 88.13 | $ 410,809 |
| | 05/08/06 | | | | | | 13,065 | | | $ 87.75 | $ 88.13 | $ 177,031 |
| | 05/08/06 | | | | | | 2,270 | | | $ 87.75 | $ 88.13 | $ 30,759 |
| | 05/08/06 | | | | | | 52,795 | | | $ 87.75 | $ 88.13 | $ 715,372 |
| | 08/14/06 | | | | | | | | 7,500(7) | | | $ 540,000 |
| Frederick J. Palensky | n/a | 4,400 | $ 0 | $ 528,000 | $ 1,584,000 | | | | | | | |
| | 05/09/06 | | | | | | 52,000 | | | $ 87.35 | $ 87.58 | $ 1,031,160 |
| | 11/10/06 | | | | | | 9,684 | | | $ 79.05 | $ 79.19 | $ 87,834 |
| | 11/10/06 | | | | | | 17,610 | | | $ 79.05 | $ 79.19 | $ 159,723 |
| Richard F. Ziegler | n/a | 4,000 | $ 0 | $ 480,000 | $ 1,440,000 | | | | | | | |
| | 05/09/06 | | | | | | 43,000 | | | $ 87.35 | $ 87.58 | $ 852,690 |

### FOOTNOTES TO GRANTS OF PLAN-BASED AWARDS TABLE

**(1)** The amounts in the Units column reflect the numbers of Performance Unit Plan units granted to each individual during 2006.

**(2)** The amounts shown as the Estimated Future Payouts Under Non-Equity Incentive Plan Awards reflect the minimum, target, and maximum potential values of the performance units granted to each individual during 2006 under the Performance Unit Plan. The actual values of these units will be determined by the performance of the Company during the three-year performance period of 2006, 2007, and 2008, as measured against two performance criteria selected by the Compensation Committee. The first of these criteria, Economic Profit Growth, requires that the average annual increase in the Company's Economic Profit (net operating income, excluding any special items, minus a charge for the cost of capital) over the three-year performance period be at least five percent in order for participants to receive any payout under this portion of the units. The second of these criteria, Sales Growth, requires that the average annual increase in the Company's organic sales (total sales adjusted for acquisitions, inflation, and currency effects) over the three-year performance period at least equal the rate of worldwide real sales growth as reflected in the Industrial Production Index published by the Federal Reserve in order for participants to receive any payout under this portion of the units. For more information on the formula for determining the value of these units and on the provisions of the Performance Unit Plan in general, refer to the Compensation Discussion and Analysis.

**(3)** The amounts shown as the Estimated Future Payouts Under Equity Incentive Plan Awards reflect the numbers of nonqualified stock options granted to each individual during 2006 under the Management Stock Ownership Program. The options granted on May 9, 2006 were part of the Company's annual grant of stock options to the more than 10,000 employees participating in the Program, while the options granted on the other dates shown in this table reflect progressive stock options (commonly referred to as reloads) issued upon the exercise of options granted under

42

pre-2005 versions of the Management Stock Ownership Program which provided for the receipt of such reloads when the optionee makes payment of the exercise price in shares of the Company's common stock.

(4) The exercise price for all stock options granted under the Program is set at the fair market value of a share of 3M common stock on the option grant date (as required by the provisions of the Management Stock Ownership Program last approved by 3M's stockholders in 2005). As provided in the plan document for the Management Stock Ownership Program, the fair market value of a share of 3M common stock is computed as the average of the high and low prices at which 3M common stock traded on the New York Stock Exchange on the applicable date (rounded up to the nearest $0.05).

(5) The amounts in the Grant Date Fair Value of Stock and Option Awards column were determined in accordance with FAS 123(R). Assumptions made in the calculation of these amounts are included in Note 16 to the Company's audited financial statements for the fiscal year ended December 31, 2006, included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on February 26, 2007.

(6) These amounts reflect additional grants of restricted stock units to Mr. Buckley in lieu of dividend payments on a portion of his outstanding restricted stock units, as required by his employment agreement.

(7) This amount reflects a special restricted stock grant to Dr. Nozari described in the Compensation Discussion and Analysis.

### ADDITIONAL INFORMATION REGARDING THE EMPLOYMENT
### AGREEMENTS OF THE NAMED EXECUTIVE OFFICERS

Some of the grants and compensation reflected in the above tables are a direct result of the employment agreements that the Company has entered into with three of the Named Executive Officers. The following summary identifies the material terms of these agreements that impacted the compensation or grants of these individuals during 2006.

#### George W. Buckley

3M has entered into an employment agreement with George W. Buckley providing for his employment as President and Chief Executive Officer of the Company and for his election as Chairman of the Board of Directors of 3M. The agreement became effective December 6, 2005, and has an initial term of three years. Beginning on December 6, 2006, the agreement automatically extends itself so that the remaining term of the agreement is always two years. However, the term will end on Mr. Buckley's 65th birthday (February 23, 2012) unless the parties otherwise agree.

The agreement requires that Mr. Buckley receive an annual base salary of $1,600,000. This base salary will be reviewed at least annually and may be increased by the Compensation Committee of the Board, but may not be decreased without Mr. Buckley's consent. The agreement also requires that Mr. Buckley be eligible to participate in the Company's Executive Profit Sharing Plan, with a target annual bonus which is the greater of $2,600,000 and 150 percent of his annual base salary. For 2006 only, the agreement provided that the amount of Mr. Buckley's profit sharing compensation could not be less than $2,600,000.

Pursuant to the agreement, the Company granted to Mr. Buckley nonqualified options to purchase 250,000 shares of 3M common stock at the fair market value of a share of 3M common stock on the effective date of such agreement ($78.15). These options have a ten-year term, and become exercisable in increments of 20 percent on each of the first five anniversaries of the grant date assuming continued employment with the Company. These options become vested and exercisable

43

in full upon Mr. Buckley's death or termination due to disability, upon a termination of his employment by the Company without Cause, upon termination of his employment by Mr. Buckley for Good Reason, or upon a change of control of the Company.

Pursuant to the agreement, Mr. Buckley was also granted as of the agreement's effective date 50,000 restricted stock units with respect to shares of 3M common stock. These restricted stock units will vest in increments of 20 percent on each of the first five anniversaries of the gran date assuming continued employment with the Company. Dividend equivalents in the form of additional restricted stock units will be provided during the vesting period. These restricted stock units become vested in full upon Mr. Buckley's death or termination due to disability, upon a termination of his employment by the Company without Cause, upon a termination of his employment by Mr. Buckley for Good Reason, or upon a change of control of the Company.

The agreement required that Mr. Buckley receive a 2006 grant of nonqualified stock options having a Black-Scholes value of $6,000,000.

Pursuant to the agreement, the Company granted to Mr. Buckley as of the agreement's effective date 16,667 performance units under 3M Performance Unit Plan with respect to each of the performance periods beginning in 2004 and 2005. Upon the completion of the performance period for the 2004 units (at the end of 2006), Mr. Buckley became entitled to receive payment for one-third of the value of such units. Assuming that he remains employed by the Company through the end of the performance period for the 2005 units, Mr. Buckley will receive payment for two-thirds of the value of the 2005 units in early 2008.

The agreement required that Mr. Buckley receive a grant of 16,667 performance units under the Performance Unit Plan with respect to the three-year performance period beginning in 2006.

In order to replace the unvested restricted stock units that he forfeited as a result of leaving his previous employer, the agreement required the Company to grant Mr. Buckley (on the effective date of the agreement) 157,808 restricted stock units with respect to shares of 3M commor stock. 25,000 of these restricted stock units vested on December 31, 2006, and the remaining 132,808 restricted stock units will vest on December 6, 2010, assuming continued employment with the Company. Dividend equivalents in the form of cash will be paid to Mr. Buckley during the vesting period. These restricted stock units become vested in full upon Mr. Buckley's death or termination due to disability, upon a termination of his employment by the Company without Cause, upon a termination of his employment by Mr. Buckley for Good Reason, or upon a change of control of the Company.

In order to replace the annual bonus and long-term incentive compensation that he forfeited as a result of leaving his previous employer, the agreement required the Company to pay Mr. Buckley a cash bonus of $4,117,500 on or before March 15, 2006.

As amended, the agreement requires the Company to pay Mr. Buckley's reasonable expenses of relocating his primary residence to the Minneapolis-St. Paul area, consistent with the Company's relocation policies applicable to other senior executives (including the expenses of periodic travel between his residence in Illinois and Minneapolis-St. Paul through June 30, 2007). If payment of these relocation expenses results in taxable income to Mr. Buckley, the agreement requires the Company to make additional payments to Mr. Buckley (tax gross-ups) wi which he may pay the taxes on such income. While he remains employed by the Company, the agreement gives Mr. Buckley the right to have the Company purchase one of his residences in Illinois or Minnesota at its then prevailing value (to be determined by an appraiser mutually agreeable to both parties) if he is unable to complete the sale of such residence within 120 days after electing to exercise this right.

The agreement provides that Mr. Buckley will be eligible for the same perquisites that the Company makes available to its other senior executives. Both Mr. Buckley and his family will be entitled to use the aircraft owned by the Company for business and personal purposes. The Company

44

will provide Mr. Buckley with an automobile and driver for travel in the Minneapolis-St. Paul area, and with an additional luxury automobile for which the Company will pay all insurance, maintenance, gasoline, and other operating expenses. The Company will provide appropriate security at Mr. Buckley's personal residences.

The agreement provides that Mr. Buckley will earn a supplemental retirement benefit payable in the form of a lump-sum at the time of his termination of employment. The amount of this benefit will be the actuarially equivalent present value of the amount by which (a) a single life annuity payable for Mr. Buckley's lifetime commencing at age 60 (or, if later, on the date of his termination of employment) equal to 40 percent of his highest average annual cash compensation (base salary plus bonus) during any three consecutive years during his final ten years of employment, exceeds (b) the sum of his actual pension benefits payable at age 60 (or, if later, on the date of his termination of employment) under the plans of the Company and his previous employers. The benefit formula for this supplemental retirement benefit increases by 2 percent (from 40 percent) for each full year following Mr. Buckley's 60th birthday that he remains employed by the Company, up to a maximum of 50 percent. This supplemental retirement benefit vests in full on December 6, 2010, upon Mr. Buckley's death or termination due to disability, upon a termination of his employment by the Company without Cause, or upon a termination of his employment by Mr. Buckley for Good Reason. In the event of Mr. Buckley's death or termination due to disability prior to his 60th birthday, the benefit formula increases to 50 percent, the annuity amounts described in (a) and (b) above are those commencing at age 65, and the entire benefit amount is multiplied by a fraction, the numerator of which is Mr. Buckley's years of service with the Company through his date of death or termination and the denominator of which is 6.

The agreement requires the Company to pay Mr. Buckley's reasonable legal and other professional fees incurred in connection with the completion of his employment agreement, up to a maximum of $125,000, and pay him a tax gross-up payment with respect to its payments of such fees.

### Patrick D. Campbell

3M entered into an employment agreement with Patrick D. Campbell at the time he was hired to serve as the Senior Vice President and Chief Financial Officer of the Company. While most of this agreement's terms expired on the third anniversary of his employment commencement date (February 1, 2005), several of its provisions survived and remain in effect today.

The agreement requires the Company to provide Mr. Campbell supplemental retirement benefits. If he remains employed by 3M for at least ten years, the supplemental benefits will be payable in the form of an annuity payable for his lifetime commencing at age 60 and based on 45 percent of his highest average annual compensation over a four-year period. If Mr. Campbell is employed by 3M for less than ten years, the amount of these supplemental retirement benefits will be prorated accordingly. The amount of such benefits will be reduced by the amount of his benefits under 3M's other pension plans and the pension plans of his prior employer. Once he completed two years of employment with 3M, the agreement provided that the sum of these supplemental retirement benefits and the benefits payable under 3M's pension plans would not be less than $100,000 per year. These supplemental retirement benefits (other than the $100,000 minimum benefit, which vested after two years of employment with the Company) vest after five years of employment with the Company, although they vest immediately in the event of the termination of his employment by reason of death or disability, termination without cause, or termination for good reason.

### Richard F. Ziegler

3M has also entered into an employment agreement with Richard F. Ziegler providing for his employment as Senior Vice President, Legal Affairs and General Counsel of the Company. While most

of this agreement's terms expired on the third anniversary of his employment commencement date (January 1, 2006), several of its provisions survived and remain in effect today.

Pursuant to the agreement, the Company granted Mr. Ziegler 12,000 shares of restricted stock effective as of the agreement's effective date (February 1, 2003). These shares vest in increments of one-third on the 1st of January in the years 2006, 2008, and 2010, assuming he remains employed by the Company, although such vesting accelerates in the event of termination of Mr. Ziegler's employment by reason of death or disability, termination without cause, termination for good reason, or a change in control of the Company.

The agreement also requires 3M to provide Mr. Ziegler supplemental retirement benefits. If he remains employed by the Company for at least nine years, the supplemental benefits will be payable in the form of an annuity payable for his lifetime commencing at age 62 and based on 45 percent of his highest average annual compensation over a four-year period. If Mr. Ziegler is employed by the Company for less than nine years, the amount of these supplemental retirement benefits will be prorated accordingly. The amount of such benefits will be reduced by the amount of his benefits under 3M's other pension plans. Once he completed two years of employment with 3M, the agreement provided that the sum of these supplemental retirement benefits and the benefits payable under 3M's other pension plans would not be less $300,000 per year. These supplemental retirement benefits (other than the $300,000 minimum benefit, which vested after two years of employment with the Company) vest after five years of employment with the Company, although they vest immediately in the event of the termination of his employment by reason of death or disability, termination without cause, or termination for good reason.

On March 14, 2007, the Company entered into a letter agreement with Mr. Ziegler describing the terms of his retirement from the Company effective January 1, 2008 (the "Letter Agreement"), a copy of which is attached as Exhibit 10.1 to the Current Report on Form 8-K filed with the SEC on March 19, 2007. The terms of the Letter Agreement are consistent with previously disclosed grants and awards and the provisions of his employment agreement and of 3M's benefit plans and programs. The Letter Agreement also includes other customary provisions including a release of claims. Mr. Ziegler will cease to serve as Senior Vice President, Legal Affairs and General Counsel effective March 31, 2007, but will continue to be employed by 3M thereafter until his retirement.

## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END

| | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested | Market Value of Shares or Units of Stock That Have Not Vested ($) |
| George W. Buckley | 50,000 | 200,000(1) | $ 78.150 | 12/06/2015 | | |
| | | 286,807(2) | $ 87.350 | 05/09/2016 | | |
| | | | | | 254(5) | $ 19,794 |
| | | | | | 230(5) | $ 17,924 |
| | | | | | 259(5) | $ 20,184 |
| | | | | | 238(5) | $ 18,547 |
| | | | | | 40,000(5) | $ 3,117,200 |
| | | | | | 132,808(6) | $ 10,349,727 |
| Patrick D. Campbell | 35,301 | | $ 55.975 | 02/01/2012 | | |
| | 40,000 | | $ 64.500 | 05/14/2012 | | |
| | 44,000 | | $ 61.850 | 05/12/2013 | | |
| | 64,873 | | $ 84.400 | 05/09/2014 | | |
| | 23,491 | 47,694(3) | $ 76.800 | 05/10/2015 | | |
| | 7,289 | | $ 80.950 | 05/06/2011 | | |
| | | 73,000(2) | $ 87.350 | 05/09/2016 | | |
| Moe S. Nozari | 2,104 | | $ 47.500 | 05/10/2009 | | |
| | 2,306 | | $ 43.350 | 05/09/2010 | | |
| | 1,704 | | $ 58.625 | 05/08/2011 | | |
| | 15,769 | | $ 64.500 | 05/14/2012 | | |
| | 63,000 | | $ 84.400 | 05/09/2014 | | |
| | 16,670 | 33,848(3) | $ 76.800 | 05/10/2015 | | |
| | 13,065 | | $ 87.750 | 05/11/2007 | | |
| | 10,837 | | $ 86.650 | 05/12/2008 | | |
| | 2,270 | | $ 87.750 | 05/12/2008 | | |
| | 19,414 | | $ 86.650 | 05/11/2009 | | |
| | 18,381 | | $ 86.650 | 05/07/2010 | | |
| | 20,565 | | $ 86.000 | 05/06/2011 | | |
| | 30,351 | | $ 86.000 | 05/06/2011 | | |
| | 52,795 | | $ 87.750 | 05/14/2012 | | |
| | 29,218 | | $ 86.000 | 05/13/2013 | | |
| | 30,318 | | $ 87.750 | 05/13/2013 | | |
| | | 52,000(2) | $ 87.350 | 05/09/2016 | | |
| | | | | | 7,500(7) | $ 584,475 |
| Frederick J. Palensky | 1,071 | | $ 46.675 | 05/12/2008 | | |
| | 2,104 | | $ 47.500 | 05/10/2009 | | |
| | 2,306 | | $ 43.350 | 05/09/2010 | | |
| | 1,704 | | $ 58.625 | 05/08/2011 | | |
| | 26,517 | | $ 64.500 | 05/14/2012 | | |
| | 40,000 | | $ 61.850 | 05/12/2013 | | |
| | 44,891 | | $ 84.400 | 05/09/2014 | | |
| | 12,882 | 26,155(3) | $ 76.800 | 05/10/2015 | | |
| | 6,958 | | $ 63.525 | 05/12/2008 | | |
| | 822 | | $ 63.525 | 05/11/2009 | | |
| | 5,235 | | $ 85.500 | 05/11/2009 | | |
| | 6,540 | | $ 63.525 | 05/07/2010 | | |
| | 9,705 | | $ 85.500 | 05/06/2011 | | |
| | 25,663 | | $ 76.450 | 05/06/2011 | | |
| | | 9,684(4) | $ 79.050 | 05/06/2011 | | |
| | | 17,610(4) | $ 79.050 | 05/14/2012 | | |
| | | 52,000(2) | $ 87.350 | 05/09/2016 | | |
| Richard F. Ziegler | 42,175 | | $ 61.850 | 05/12/2013 | | |
| | 46,932 | | $ 84.400 | 05/09/2014 | | |
| | 15,155 | 30,771(3) | $ 76.800 | 05/10/2015 | | |
| | 3,269 | | $ 78.850 | 05/13/2013 | | |
| | | 43,000(2) | $ 87.350 | 05/09/2016 | | |
| | | | | | 8,000(8) | $ 623,440 |

FOOTNOTES TO OUTSTANDING EQUITY AWARDS
AT FISCAL YEAR-END TABLE

(1) These stock options vest in increments of 25 percent on each of December 6, 2007, December 6, 2008, December 6, 2009, and December 6, 2010. These options become vested and exercisable in full upon Mr. Buckley's death or termination due to disability, upon a termination of his employment by the Company without Cause, upon a termination of his employment by Mr. Buckley for Good Reason, or upon a change of control of the Company.

(2) These stock options vest in installments of one-third on May 9, 2007, one-third on May 9, 2008, and one-third on May 11, 2009.

(3) These stock options vest in installments of one-half on May 10, 2007, and one-half on May 12, 2008.

(4) These stock options vest in full on May 10, 2007.

(5) These restricted stock units vest in installments of 25 percent on each of December 6, 2007, December 6, 2008, December 6, 2009, an December 6, 2010. These restricted stock units become vested in full upon Mr. Buckley's death or termination due to disability, upon a termination of his employment by the Company without Cause, upon a termination of his employment by Mr. Buckley for Good Reason, or upon a change of control of the Company.

(6) These restricted stock units vest in full on December 6, 2010. These restricted stock units become vested in full upon Mr. Buckley's death or termination due to disability, upon a termination of his employment by the Company without Cause, upon a termination of his employment by Mr. Buckley for Good Reason, or upon a change of control of the Company.

(7) These shares of restricted stock vest in full on June 12, 2009, or upon the date Dr. Nozari retires from employment with the Company with the consent of the Nominating and Governance Committee of 3M's Board of Directors, if earlier.

(8) These shares of restricted stock vest in installments of one-half on January 1, 2008, and January 1, 2010. These shares of restricted stock vest in full upon Mr. Ziegler's death or termination due to disability, or upon a change in control of the Company. One-half of these shares of restricted stock will become vested upon a termination of Mr. Ziegler's employment by the Company without Cause, or upon a termination of his employment by Mr. Ziegler for Good Reason.

**OPTION EXERCISES AND STOCK VESTED**

| | Option Exercises and Stock Vested | | | |
|---|---|---|---|---|
| | Option Awards | | Stock Awards | |
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| George W. Buckley | | | 35,245 | $ 2,775,252 |
| Patrick D. Campbell | | | | |
| Moe S. Nozari | 129,843 | $ 3,166,576 | | |
| Frederick J. Palensky | 42,712 | $ 732,881 | | |
| Richard F. Ziegler | | | 4,000 | $ 310,000 |

**PENSION BENEFITS**

The following table shows the present value of the accumulated benefits payable to each of the Named Executive Officers, as well as the number of years of service credited to each individual, under each of the Company's defined benefit pension plans (including any supplementa arrangements pursuant to their employment agreements) determined using the same interest rate and mortality

assumptions as those used for financial statement reporting purposes. See Note 11 to the Company's audited financial statements for the fiscal year ended December 31, 2006, included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on February 26, 2007.

| Name | Plan Name | Pension Benefits | | |
|------|-----------|---|---|---|
| | | Number of Years Credited Service (#) | Present Value of Accumulated Benefits ($) | Payments During Last Fiscal Year ($) |
| George W. Buckley | Employee Retirement Income Plan | 1 | 36,304 | 0 |
| | Nonqualified Pension Plan | 1 | 659,067 | 0 |
| | Supplemental Retirement Plan | 1 | 8,587,354 | 0 |
| Patrick D. Campbell | Employee Retirement Income Plan | 4 | 113,377 | 0 |
| | Nonqualified Pension Plan | 4 | 529,719 | 0 |
| | Supplemental Retirement Plan | 4 | 599,623 | 0 |
| Moe S. Nozari | Employee Retirement Income Plan | 35 | 1,112,676 | 0 |
| | Nonqualified Pension Plan | 35 | 4,535,133 | 0 |
| Frederick J. Palensky | Employee Retirement Income Plan | 30 | 829,562 | 0 |
| | Nonqualified Pension Plan | 30 | 1,969,598 | 0 |
| Richard F. Ziegler | Employee Retirement Income Plan | 4 | 110,284 | 0 |
| | Nonqualified Pension Plan | 4 | 549,057 | 0 |
| | Supplemental Retirement Plan | 4 | 1,783,408 | 0 |

The Employee Retirement Income Plan ("ERIP") is a tax-qualified defined benefit pension plan maintained by 3M for its eligible employees in the United States. Effective January 1, 2001, the Company amended the ERIP to include a pension equity formula for (1) employees hired or rehired on or after January 1, 2001, and (2) employees who voluntarily elected the pension equity formula during the one-time choice election period in 2001. Of the Named Executive Officers, Dr. Nozari and Dr. Palensky participate under the non-pension equity formula of the ERIP (the Portfolio I Plan), while Mr. Buckley, Mr. Campbell, and Mr. Ziegler participate under the pension equity formula of the ERIP (the Portfolio II Plan). Retirement benefits under the ERIP are based on an employee's years of service and average annual earnings during the employee's four highest-paid consecutive years of service. As applied to the Named Executive Officers, earnings for purposes of the ERIP include base salary, profit sharing, and annual incentive compensation.

Under the Portfolio I Plan, employees earn annual benefits payable at retirement generally equal to 1.15 percent of their high-four average annual earnings multiplied by their years of service plus 0.35 percent of their high-four average annual earnings in excess of a Social Security breakpoint multiplied by their years of service (up to a maximum of 35 years). The Social Security breakpoint is an average of the Social Security taxable wage bases for each of the 35 years ending with the year each employee qualifies for receiving unreduced Social Security retirement benefits. Under the Portfolio I Plan, an employee may retire with an unreduced pension at age 60 (61 or 62 for employees born after 1942) and if the employee's age and service at the time of retirement total at least 90 (91 or 92 for employees born after 1942) the employee would receive a Social Security bridge payment until age 62. Dr. Nozari is entitled to retire with unreduced pension benefits payable under the Portfolio I Plan. Dr. Palensky is entitled to retire with reduced early retirement benefits under the Portfolio I Plan, with the reduction being equal to 5 percent of the pension otherwise payable for each year that he retires prior to his age 61.

Under the Portfolio II Plan, employees earn a total pension value payable at retirement based on the number of credits earned during year of employment multiplied by their high-four average annual earnings plus 50 percent of the number of such credits multiplied by the high-four average annual earnings in excess of a Social Security integration level. The Social Security integration level is 70 percent of the Social Security taxable wage base in effect for the year each employee retires or leaves 3M. Under the Portfolio II Plan, an employee may any time after age 55 with at least five years of service and their annual benefit payable is based on their total pension value determined at time of retirement converted to an actuarially equivalent annuity. Mr. Campbell is entitled to retire with actuarially reduced early retirement benefits under the Portfolio II Plan.

As a tax-qualified plan, the ERIP is subject to a variety of limits that apply to both the amount of any employee's earnings that may b considered when determining the benefits earned under the plan as well as the maximum amount of benefits that any employee may earn. Nonqualified Pension Plan is designed to provide additional benefits to employees, including the Named Executive Officers, affected by th limits. The amount of benefits earned under this Nonqualified Pension Plan generally equal the amount of benefits an employee was not al earn under the ERIP as a result of the limits imposed by federal tax laws. The benefits earned under this Nonqualified Pension Plan are generally paid at the same time and in the same form as an employee's benefits are paid under the ERIP.

Mr. Buckley, Mr. Campbell, and Mr. Ziegler also earn supplemental retirement benefits pursuant to their employment agreements wit Company. These supplemental benefits, which were negotiated at the time they agreed to leave their previous employers and join 3M, are designed to replace a portion of the pension benefits they failed to earn under the plans of their previous employers because they ended the employment before becoming eligible to retire. These supplemental benefits are described in detail in the section titled "Additional Inform Regarding the Employment Agreements of the Named Executive Officers" following the Grants of Plan-Based Awards Table.

50

## NONQUALIFIED DEFERRED COMPENSATION

The following table reflects the participation during 2006 by the Named Executive Officers in two nonqualified deferred compensation plans offered by the Company. The Deferred Compensation Plan allows eligible employees to defer for a number of years or until retirement from the Company the receipt of base salary, profit sharing, annual incentive compensation, and Performance Unit Plan award payouts. The VI Plus Plan allows eligible employees to defer until retirement from the Company the receipt of base salary, profit sharing, and annual incentive compensation. Earnings are credited to the amounts deferred under both plans based on the returns paid on the investment funds available to participants in 3M's qualified 401(k) plan or a fixed rate of return based on corporate bond yields (as selected by each participant).

| Name | Nonqualified Deferred Compensation | | | | |
| | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY ($) | Aggregate Earnings in Last FY ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last FYE ($) |
|---|---|---|---|---|---|
| George W. Buckley | 0 | 0 | 0 | 0 | 0 |
| Patrick D. Campbell | 115,685(1) | 8,411(2) | 69,229 | 0 | 576,802 |
| Moe S. Nozari | 0 | 0 | 55,779 | 0 | 329,366 |
| Frederick J. Palensky | 215,767(1) | 0 | 64,992 | 86,188 | 1,293,871 |
| Richard F. Ziegler | 109,882(1) | 9,028(2) | 18,722 | 0 | 279,710 |

### FOOTNOTES TO NONQUALIFIED DEFERRED COMPENSATION TABLE

(1) With the exception of the entire amount of the contributions by Dr. Palensky, and $12,008 of the contributions by Mr. Campbell, all of these amounts contributed by the executives are included in the Summary Compensation Table as Salary or Non-Equity Incentive Plan Compensation earned in 2006.

(2) Each of these amounts contributed by the Company on behalf of these executives is included in the "All Other Compensation" column of the Summary Compensation Table.

## POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE IN CONTROL

The Company has entered into employment agreements with three of the Named Executive Officers that will require it to make payments to these individuals in the event of the termination of their employment or change in control of the Company. In addition, many of the Company's executive compensation, benefit, and deferred compensation plans provide the Named Executive Officers with certain rights or the right to receive payments in the event of the termination of their employment or upon a change in control of the Company. The amounts payable to each of the Named Executive Officers in each situation is described below, assuming that each individual's employment had terminated or a change in control of the Company had occurred on December 29, 2006.

### Generally Available Compensation and Benefit Plans

Each of 3M's Named Executive Officers is eligible to participate in and receive compensation or benefits under several plans of the Company that provide for certain payments or rights in the event of the death of the individual or a change in control of the Company. Both of the Company's deferred compensation programs, the Deferred Compensation Plan and the VIP Plus Plan, provide that the plans will terminate and pay out the account balances of all participants immediately following a change in control of the Company. The Performance Unit Plan provides that the plan will terminate and the Company will immediately pay out the pro rata value of all outstanding performance units immediately following a change in control of the Company (based on the higher of the value of the units for the most recently completed performance period or the value of the outstanding units as if the performance of the Company during the remainder of each respective performance period equaled its performance to the date of the change in control). Upon the death of a participating executive, the Performance Unit Plan provides that all outstanding performance units granted to such executive will be paid out to the executive's beneficiaries or estate (based on the actual performance of the Company for any performance period completed prior to the death of the executive and at the par value of such units for any performance period that has not been completed by the date of death of an executive). The Nonqualified Pension Plan provides that, in the event of a change in control of the Company, the plan will terminate and pay out the remaining accrued benefits of all participants in either an immediate lump-sum cash payment or through the purchase of annuity contracts designed to pay the pension benefits that would otherwise have been paid following the retirement of each participant. The Management Stock Ownership Program provides that all outstanding stock options, restricted stock, and restricted stock units will immediately vest in full upon the death of the participant or a change in control of the Company. The Management Stock Ownership Program also provides that the outstanding stock options of an individual who retires from employment with the Company do not expire but may continue to be exercised (after they have vested) after the retirement of the individual for the remainder of the term of each option. The Management Stock Ownership Program also provides that the outstanding stock options of an individual who dies will immediately vest and may be exercised for up to two years following the death of such individual (but not beyond the original expiration date of an option). With the exception of the Management Stock Ownership Program, these plans define a change in control of the Company as the ownership by one person of at least 30 percent of the voting securities of the Company or the replacement of at least 50 percent of the members of the Company's Board of Directors. The Management Stock Ownership Program defines a change in control of the Company as the ownership by one person of at least 20 percent of the voting securities of the Company or the replacement of at least 50 percent of the members of the Company's Board of Directors.

The amounts shown below for each of the Named Executive Officers do not include payments and benefits generally provided on a non-discriminatory basis to all similarly situated salaried employees of the Company upon the termination of their employment with the Company, including: (a) accrued salary, profit sharing, and unused vacation benefits, (b) accrued pension benefits under

the Employee Retirement Income Plan and the Nonqualified Pension Plan, (c) retiree welfare benefits provided to substantially all of the Company's U.S. employees, including retiree medical and dental benefits, (d) distributions of account balances under the Company's qualified 401(k) plan, and (e) vesting of stock options granted under the Management Stock Ownership Program upon the death of an individual or a change in control of the Company, and the continued exercisability of stock options granted under such Program following the death or retirement of an individual.

## George W. Buckley

Mr. Buckley's employment agreement with the Company provides that in the event the Company terminates his employment without Cause or if he terminates his employment with Good Reason, he would receive: (a) cash severance equal to two times the sum of his annual base salary and target annual bonus payable in the form of 24 equal monthly installments (or in the form of an immediate lump-sum if the termination follows a Change of Control of the Company), (b) a pro rata portion of the annual bonus that he would otherwise have earned for the year in which his employment so terminates, (c) if a Change of Control of the Company causes any payment upon his termination of employment to be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code, a tax gross-up payment with which to pay such tax and the additional taxes payable as a result of such payment, and (d) immediate vesting of the stock options, restricted stock units, performance units, and supplemental retirement benefits provided under the agreement, and continued welfare benefits for the period that cash severance benefits are payable. No severance benefits (other than accrued salary, bonus, and benefits) are payable in the event of the termination of Mr. Buckley's employment by the Company for Cause or by Mr. Buckley without Good Reason. In the event of the termination of Mr. Buckley's employment due to his death or disability, no severance benefits are payable (other than accrued salary, bonus, and benefits, including the supplemental retirement benefits provided under the agreement) other than a pro rata portion of the annual bonus he would otherwise have earned for the year in which his employment so terminates. If any payment or other benefit provided to Mr. Buckley pursuant to his employment agreement would be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code, Mr. Buckley would be entitled to receive a tax gross-up payment with which to pay such tax and the additional taxes payable as a result of such payment. As a condition to receiving any cash severance, pro rata annual bonus or supplemental retirement benefits, Mr. Buckley will sign and deliver to the Company a standard release of claims. In his employment agreement with the Company and as confirmed in the release of claims, Mr. Buckley agrees that for a period of two years following the termination of his employment he will: (1) neither employ nor seek to employ any employee of the Company or encourage them to leave the Company, and (2) neither acquire an ownership interest in or perform certain services for a competitor of the Company.

For purposes of Mr. Buckley's employment agreement, Cause means any of the following: (i) his commission of a felony or misdemeanor involving fraud, dishonesty, or moral turpitude, (ii) his material breach of such employment agreement, (iii) willful or intentional material misconduct by Mr. Buckley in the performance of his duties, (iv) willful and intentional failure by Mr. Buckley to materially comply with a specific, written direction of the Board of Directors that is consistent with normal business practice and not inconsistent with his responsibilities under such employment agreement, (v) a material violation of the Company's conflict of interest policy, (vi) a material violation of any Company policy that would be grounds for the immediate dismissal of any senior executive of the Company, or (vii) an order or determination of any court, administrative agency, or other entity that has the effect of prohibiting Mr. Buckley from performing his responsibilities under such employment agreement. For purposes of Mr. Buckley's employment agreement, Good Reason means any of the following (unless he agrees in writing that a specific event shall not be Good Reason): (i) the Company's material breach of his employment agreement, (ii) the Company's failure to assign his employment agreement to a successor of the Company or such successor's failure to explicitly

assume and agree to be bound by such agreement, (iii) a requirement that Mr. Buckley be principally based at any office or location more than 30 miles from the Company's current headquarters in St. Paul, Minnesota, or (iv) upon or following a Change of Control of the Company, the failure to nominate and elect Mr. Buckley to serve as the chief executive officer, chairman of the board, or most senior executive officer of the Company or its top-tier parent entity. For purposes of Mr. Buckley's employment agreement, a Change of Control of the Company means any of the following (unless he agrees in writing that a specific event shall not be considered a Change of Control): (i) any person becomes the owner of 20 percent or more of the voting securities of the Company, (ii) the members of the Board of Directors of the Company as of December 6, 2005, and their approved successors fail to constitute at least 50 percent of the members of such Board of Directors, (iii) a merger, consolidation, or reorganization involving the Company if the beneficial owners of the Company's voting securities immediately before such transaction are not expected to own more than 50 percent of the voting power of such voting securities in the corporation resulting from such transaction, (iv) a plan or agreement for the sale or other disposition of substantially all of the assets of the Company (other than to an entity more than 50 percent owned by the Company or an entity more than 50 percent owned by the beneficial owners of the voting securities of the Company immediately before the sale or other disposition), or (v) approval of a plan of liquidation by the stockholders of the Company.

If Mr. Buckley's employment with the Company had ended as of December 29, 2006, due to either a termination without Cause by the Company or a termination with Good Reason by Mr. Buckley, he would have received the following amounts: (a) cash severance in the amount of $8,400,000 payable in 24 equal monthly installments, (b) two years of continued coverage under the Company's medical, dental, disability, life insurance, and other welfare benefit plans applicable to the other senior executives of the Company, with an estimated value of approximately $28,430 (based on current premium rates for COBRA continuation coverage and the assumption that these rates will increase approximately 6 percent per year), (c) 197,808 shares of common stock of the Company with a fair market value equal to $15,415,177 (based on a closing stock price of $77.93 per share on December 29, 2006), as the result of the vesting of his outstanding restricted stock units, (d) immediate vesting of 200,000 of the stock options that he received at the time his employment with the Company commenced, and the opportunity to exercise such options for a period of up to two years following the termination date, with an estimated value of $0 since the exercise price of these options ($78.15) exceeded the closing 3M stock price of $77.93 on December 29, 2006, (e) a cash payment of $1,987,871 in satisfaction of his outstanding performance units under the Performance Unit Plan, and (f) a cash payment of $12,282,823 as the lump-sum actuarial equivalent present value of his accrued supplemental retirement benefits under his employment agreement, as the result of the vesting of such supplemental retirement benefits.

If Mr. Buckley's employment with the Company had ended as of December 29, 2006 due to his death or disability, he or his beneficiaries would have received the following amounts: (a) 197,808 shares of common stock of the Company with a fair market value equal to $15,415,17 (based on a closing stock price of $77.93 per share on December 29, 2006), as the result of the vesting of his outstanding restricted stock units, (b) immediate vesting of 200,000 of the stock options that he received at the time his employment with the Company commenced, and the opportunity to exercise such options for a period of up to two years following the termination date, with an estimated value of $0 since the exercise price of these options ($78.15) exceeded the closing 3M stock price of $77.93 on December 29, 2006, (d) in the event of his death, life insurance proceeds in the amount of $11,600,000 under the policies issued to him under the Executive Life Insurance Plan, and (e) a cash payment of $1,955,000 as the lump-sum actuarial equivalent present value of his accrued supplemental retirement benefits under his employment agreement, as the result of the vesting of such supplemental retirement benefits.

If as of December 29, 2006, there had been a Change of Control of the Company, Mr. Buckley would have received the following amounts: (a) 197,808 shares of common stock of the Company with a fair market value equal to $15,415,177 (based on a closing stock price of $77.93 per share on December 29, 2006), as the result of the vesting of his outstanding restricted stock units, and (b) a cash payment of $1,987,871 in satisfaction of his outstanding performance units under the Performance Unit Plan.

### Patrick D. Campbell

Mr. Campbell's employment agreement with the Company provides that in the event the Company terminates his employment without Cause or if he terminates his employment with Good Reason, he would receive: (a) cash severance equal to two times the sum of his annual base salary and annual planned profit sharing if such termination occurs within the first five years following his employment commencement date and one times the sum of his annual base salary and annual planned profit sharing if such termination occurs more than five years but no more than ten years following his employment commencement date, (b) a period of two years following the termination date in which to exercise the stock options granted to him at the time his employment commenced and the stock options he received as his annual stock option grant for 2002, and (c) immediate vesting of the supplemental retirement benefits provided under the agreement. No severance benefits (other than accrued salary, profit sharing, and benefits) are payable in the event of the termination of Mr. Campbell's employment by the Company for Cause or by Mr. Campbell without Good Reason. In the event of the termination of Mr. Campbell's employment due to his death or disability, no severance benefits (other than accrued salary, bonus, and benefits, including the supplemental retirement benefits provided under the agreement) are payable. If any payment or other benefit provided to Mr. Campbell pursuant to his employment agreement would be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code, Mr. Campbell would be entitled to receive a tax gross-up payment with which to pay such tax and the additional taxes payable as a result of such payment. As a condition to receiving any cash severance, Mr. Campbell will sign and deliver to the Company a standard release of claims.

For purposes of Mr. Campbell's employment agreement, Cause means any of the following: (i) his indictment on or commission of a felony or misdemeanor involving fraud, dishonesty, or moral turpitude, (ii) his material breach of such employment agreement, (iii) willful or intentional material misconduct by Mr. Campbell in the performance of his duties, or (iv) willful or intentional failure by Mr. Campbell to materially comply with a specific, written direction of the Chief Executive Officer that is consistent with normal business practice and with his responsibilities under such employment agreement. For purposes of Mr. Campbell's employment agreement, Good Reason means any of the following (unless he agrees in writing that a specific event shall not be Good Reason): (i) the Company reduces his annual planned cash compensation by more than 15 percent, (ii) his relocation to a primary work site located more than 50 miles from his then current work site, or (iii) his reassignment to a position having primary responsibilities which are significantly less than those of his immediately previous position.

If Mr. Campbell's employment with the Company had ended as of December 29, 2006, due to either a termination without Cause by the Company or a termination with Good Reason by Mr. Campbell, he would have received the following amounts: (a) cash severance in the amount of $2,376,000 payable in a single lump-sum payment, (b) the opportunity to exercise the remaining balance of 35,301 of the stock options granted to him at the time his employment commenced for a period of up to two years following the termination date, with an estimated value of $775,033 (based on the difference between the exercise price of such options, $55.97, and the closing price of 3M common stock on December 29, 2006, $77.93), (c) a cash payment of $576,802 from his accounts in the VIP Plus Plan, and (d) a cash payment of $1,561,937 as the lump-sum actuarial equivalent present

value of his accrued supplemental retirement benefits under his employment agreement, as the result of the vesting of such supplemental retirement benefits.

If Mr. Campbell's employment with the Company had ended as of December 29, 2006, due to his death or disability, he or his beneficiaries would have received the following amounts: (a) a cash payment of $1,780,152 in satisfaction of his outstanding performance units under the Performance Unit Plan, (b) a cash payment of $576,802 from his accounts in the VIP Plus Plan, (c) in the event of his death, life insurance proceeds in the amount of $2,255,525 under the policies issued to him under the Executive Life Insurance Plan, and (d) a cash payment of $1,561,937 (in the event of a termination due to disability), or $1,582,154 (in the event of his death) as the lump-sum actuarial equivalent present value of his accrued supplemental retirement benefits under his employment agreement, as the result of the vesting of such supplemental retirement benefits.

If Mr. Campbell's employment with the Company had ended as of December 29, 2006, due to either a termination with Cause by the Company or a termination without Good Reason by Mr. Campbell, he would have received a cash payment of $576,802 from his accounts in the VIP Plus Plan.

If as of December 29, 2006, there had been a Change of Control of the Company, Mr. Campbell would have received the following amounts: (a) a cash payment of $1,563,338 in satisfaction of his outstanding performance units under the Performance Unit Plan, (b) a cash payment of $576,802 from his accounts in the VIP Plus Plan.

## Moe S. Nozari

Dr. Nozari does not have an employment agreement with the Company. As of December 29, 2006, he was eligible to immediately retire from employment with the Company.

If Dr. Nozari's employment with the Company had ended as of December 29, 2006, due to his voluntary or involuntary retirement, he would have received the following amounts: (a) payouts of his outstanding performance units granted under the Performance Unit Plan in 2004, 2005, and 2006 at the same time as the other executives participating in such plan, based on the performance of the Company during the respective performance periods, with an estimated value of $1,420,268, and (b) a cash payment of $329,366 from his account in the VIP Plus Plan.

If Dr. Nozari's employment with the Company had ended as of December 29, 2006, due to his death, his beneficiaries would have received the following amounts: (a) a cash payment of $1,348,152 in satisfaction of his outstanding performance units granted under the Performance Unit Plan, (b) 7,500 shares of common stock of the Company with a fair market value equal to $584,475 (based on a closing stock price of $77.93 per share on December 29, 2006), as the result of the vesting of the shares of restricted stock granted to him during 2006, and (c) life insurance proceeds in the amount of $2,020,429 under the policies issued to him under the Executive Life Insurance Plan.

If as of December 29, 2006, there had been a change in control of the Company, Dr. Nozari would have received the following amounts: (a) a cash payment of $1,194,284 in satisfaction of his outstanding performance units under the Performance Unit Plan, (b) 7,500 shares of common stock of the Company with a fair market value equal to $584,475 (based on a closing stock price of $77.93 per share on December 29, 2006), as the result of the vesting of the shares of restricted stock granted to him during 2006, and (c) a cash payment of $329,366 from his account in the VIP Plus Plan.

## Frederick J. Palensky

Dr. Palensky does not have an employment agreement with the Company. As of December 29, 2006, he was eligible to immediately retire from employment with the Company.

# EXHIBIT 3 – PART C

If Dr. Palensky's employment with the Company had ended as of December 29, 2006, due to his voluntary or involuntary retirement, he would have received the following amounts: (a) payouts of his outstanding performance units granted under the Performance Unit Plan in 2004 2005, and 2006 at the same time as the other executives participating in such plan, based on the performance of the Company during the respective performance periods, with an estimated value of $1,383,749, and (b) cash payments of $1,293,871 over the next ten years from his accounts in the Deferred Compensation Plan.

If Dr. Palensky's employment with the Company had ended as of December 29, 2006, due to his death, his beneficiaries would have received the following amounts: (a) a cash payment of $1,311,633 in satisfaction of his outstanding performance units granted under the Performance Unit Plan, (b) cash payments of $1,293,871 over the next ten years from his accounts in the Deferred Compensation Plan, and (c) life insurance proceeds in the amount of $1,357,661 under the policies issued to him under the Executive Life Insurance Plan.

If as of December 29, 2006, there had been a change in control of the Company, Dr. Palensky would have received the following amounts (a) a cash payment of $1,157,765 in satisfaction of his outstanding performance units under the Performance Unit Plan, (b) a cash payment of $1,293,871 from his accounts in the Deferred Compensation Plan.

## Richard F. Ziegler

Mr. Ziegler's employment agreement with the Company provides that in the event the Company terminates his employment without Cause or if he terminates his employment with Good Reason, he would receive: (a) cash severance equal to two times the sum of his annual base salary and annual planned profit sharing if such termination occurs within the first three years following his employment commencement date and one times the sum of his annual base salary and annual planned profit sharing if such termination occurs more than three years but no more than ten years following his employment commencement date, (b) immediate vesting of a portion of the shares of restricted stock and of the entire amount of supplemental retirement benefits provided under the agreement, and (c) a period of two years following the termination date in which to exercise the stock options he received as his annual stock option grant for 2003. No severance benefits (other than accrued salary, profit sharing, and benefits) are payable in the event of the termination of Mr. Ziegler's employment by the Company for Cause or by Mr. Ziegler without Good Reason. In the event of the termination of Mr. Ziegler's employment due to his death or disability, no severance benefits (other than accrued salary, bonus, and benefits, including the supplemental retirement benefits provided under the agreement) are payable. If any payment or other benefit provided to Mr. Ziegler pursuant to his employment agreement would be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code, Mr. Ziegler would be entitled to receive a tax gross-up payment with which to pay suc tax and the additional taxes payable as a result of such payment. As a condition to receiving any cash severance, Mr. Ziegler will sign and deliver to the Company a standard release of claims.

For purposes of Mr. Ziegler's employment agreement, Cause means any of the following: (i) his indictment on or commission of a felony or misdemeanor involving fraud, dishonesty, or moral turpitude, (ii) his material breach of such employment agreement, (iii) willful and intentional material misconduct by Mr. Ziegler in the performance of his duties, or (iv) willful or intentional failure by Mr. Ziegler to materiall comply with a specific, written direction of the Chief Executive Officer that is consistent with normal business practice and with his responsibilities under such employment agreement. For purposes of Mr. Ziegler's employment agreement, Good Reason means any of the following (unless he agrees in writing that a specific event shall not be Good Reason): (i) the Company reduces his annual planned cash compensation, (ii) the Company's material breach of his employment agreement, (iii) his relocation to a primary work site located more than 5 miles from his

then current work site, or (iv) the assignment to him of duties that are materially inconsistent with his position and duties described in such employment agreement.

If Mr. Ziegler's employment with the Company had ended as of December 29, 2006, due to either a termination without Cause by the Company or a termination with Good Reason by Mr. Ziegler, he would have received the following amounts: (a) cash severance in the amount of $1,199,000 payable in a single lump-sum payment, (b) 4,000 shares of common stock of the Company with a fair market value equal to $311,720 (based on a closing stock price of $77.93 per share on December 29, 2006), as the result of the vesting of one-third of the shares of restricted stock granted to him pursuant to his employment agreement, (c) the opportunity to exercise the remaining balance of 42,175 of the stock options he received as his annual stock option grant for 2003 for a period of up to two years following the termination date, with an estimated value of $678,174 (based on the difference between the exercise price of such options, $61.85, and the closing price of 3M common stock on December 29, 2006, $77.93), (d) a cash payment of $279,710 from his accounts in the VIP Plus Plan, and (e) a cash payment of $2,625,800 as the lump-sum actuarial equivalent present value of his accrued supplemental retirement benefits under his employment agreement, as the result of the vesting of such supplemental retirement benefits.

If Mr. Ziegler's employment with the Company had ended as of December 29, 2006, due to his death or disability, he or his beneficiaries would have received the following amounts: (a) 8,000 shares of common stock of the Company with a fair market value equal to $623,440 (based on a closing stock price of $77.93 per share on December 29, 2006), as the result of the vesting of the remaining shares of restricted stock granted to him pursuant to his employment agreement, (b) a cash payment of $1,252,152 in satisfaction of his outstanding performance units under the Performance Unit Plan, (c) a cash payment of $279,710 from his accounts in the VIP Plus Plan, (d) in the event of his death, life insurance proceeds in the amount of $2,339,000 under the policies issued to him under the Executive Life Insurance Plan, and (e) a cash payment of $2,625,800 (in the event of a termination due to disability), or $1,298,225 (in the event of his death) as the lump-sum actuarial equivalent present value of his accrued supplemental retirement benefits under his employment agreement, as the result of the vesting of such supplemental retirement benefits.

If Mr. Ziegler's employment with the Company had ended as of December 29, 2006, due to either a termination with Cause by the Company or a termination without Good Reason by Mr. Ziegler, he would have received a cash payment of $279,710 from his accounts in the VIP Plus Plan.

If as of December 29, 2006, there had been a Change of Control of the Company, Mr. Ziegler would have received the following amounts: (a) 8,000 shares of common stock of the Company with a fair market value equal to $623,440 (based on a closing stock price of $77.93 per share on December 29, 2006), as the result of the vesting of the remaining shares of restricted stock granted to him pursuant to his employment agreement, (b) a cash payment of $1,112,272 in satisfaction of his outstanding performance units under the Performance Unit Plan, and (c) a cash payment of $279,710 from his accounts in the VIP Plus Plan.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

The members of the Compensation Committee are named in the preceding section. No members of the Compensation Committee were officers or employees of 3M or any of its subsidiaries during the year, were formerly 3M officers (except that Robert S. Morrison served as interim Chairman of the Board and Chief Executive Officer from June 30, 2005, to December 6, 2005), or had any relationship otherwise requiring disclosure.

58

## AUDIT COMMITTEE REPORT

The role of the Audit Committee includes assisting the Board of Directors in its oversight of the Company's financial reporting process. In performing this oversight function, the Audit Committee has:

- Reviewed and discussed the audited consolidated financial statements with management, which has primary responsibility for the financial statements;

- Discussed with PricewaterhouseCoopers LLP (PwC), the Company's independent registered public accounting firm, the matters required to be discussed by the statement on Auditing Standards No. 61, *Communication with Audit Committees*, as currently in effect;

- Received the written disclosures and the letter from PwC required by Independence Standards Board Standard No.1, *Independence Discussions with Audit Committees*, as currently in effect, and discussed the independence of PwC with them; and

- Reviewed the services provided by PwC, other than their audit services, and concluded that the PwC's provision of such other services compatible with PwC's independence.

Based upon the review and discussions described above, the Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2006, for filing with the Securities and Exchange Commission.

Submitted by the Audit Committee

Edward M. Liddy, Chair
Linda G. Alvarado
Michael L. Eskew
W. James Farrell

### Audit Committee Policy on Pre-Approval of Audit and Permissible Non-Audit Services of the Independent Registered Public Accounting Firm

The Audit Committee is responsible for appointing and overseeing the work of the independent registered public accounting firm ("Independent Accounting Firm"). The Audit Committee has established the following procedures for the pre-approval of all audit and permissible non-audit services provided by the Independent Accounting Firm.

Before engagement of the Independent Accounting Firm for the next year's audit, the Independent Accounting Firm will submit a detailed description of services it expects to render to the Company during that year for each of the following categories of services to the Audit Committee for approval:

1. Audit services include audit work performed in the preparation of consolidated financial statements, as well as work that generally only the Independent Accounting Firm can reasonably be expected to provide, including comfort letters, statutory audits, and attest services and consultation regarding financial accounting and/or reporting standards.

2. Audit related services are for assurance and related services that are traditionally performed by the Independent Accounting Firm, including due diligence related to mergers and acquisitions, employee benefit plan audits, and special procedures required to meet certain regulatory requirements.

3. Tax services include all services performed by the Independent Accounting Firm's tax personnel except those services specifically related to the audit of the financial statements, and includes fees in the areas of tax compliance, tax planning, and tax advice.

4.  Other services are those services not captured in the other categories.

Before engagement, the Audit Committee pre-approves these services by category of service. The fees are budgeted and the Audit Committee requires the Independent Accounting Firm to report actual fees versus the budget periodically throughout the year by category of service. During the year, circumstances may arise when it may become necessary to engage the Independent Accounting Firm for additional services not contemplated in the original pre-approval. In those instances, the Audit Committee requires specific pre-approval before engaging the Independent Accounting Firm.

The Audit Committee has delegated pre-approval authority to the chair of the Committee. The chair must report, for informational purposes only, any pre-approval decisions to the Audit Committee at its next scheduled meeting.

### FEES OF THE INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The following table presents fees for professional services rendered by PricewaterhouseCoopers LLP for the audit of the Company's consolidated financial statements for the years ended December 31, 2005 and 2006, and fees billed for other services rendered by PricewaterhouseCoopers LLP during those periods.

**Audit and Non-Audit Fees ($ in millions)**

|  | 2005 | 2006 |
|---|---|---|
| Audit Fees: (1) | $ 10.9 | $ 11.4 |
| Audit Related Fees: (2) | 0.6 | 2.7 |
| Tax Fees: (3) | 1.3 | 1.3 |
| All Other Fees: | 0.0 | 0.1 |
| Total | $ 12.8 | $ 15.5 |

(1)  Audit fees consisted of audit work and review services, as well as work generally only the independent registered public accounting firm can reasonably be expected to provide, such as statutory audits, comfort letters, consents, and assistance with and review of documents filed with the Securities and Exchange Commission. Audit Fees for 2006 include fees associated with business combinations, corporatewide restructuring, and the sale of the Pharmaceuticals business.

(2)  Audit related fees consisted principally of carve-out audits related to the Pharmaceuticals business and audits of employee benefit plans.

(3)  Tax fees consist principally of tax planning and compliance.

## REQUIREMENTS FOR SUBMISSION OF STOCKHOLDER PROPOSALS
## FOR NEXT YEAR'S ANNUAL MEETING

In order for a stockholder proposal to be considered for inclusion in 3M's proxy statement for next year's Annual Meeting, our Corporate Secretary must receive the proposal no later than 5 p.m. Central Time on November 27, 2007. Such proposals must be sent via registered, certified, or express mail (or other means that allows the stockholder to determine when the proposal was received by the Corporate Secretary) to: Gregg M. Larson, Associate General Counsel and Secretary, 3M Company, 3M Center, Building 220-13-W-39, St. Paul, MN 55144-1000. Such proposals must contain the information required under 3M's Bylaws, and also must comply with the SEC's regulations regarding the inclusion of stockholder proposals in Company sponsored proxy materials, such as the stockholder continuing to own a minimum number of shares until the Annual Meeting and appearing in person or through an authorized representative at the meeting to present the proposal.

Alternatively, stockholders intending to present a proposal at next year's Annual Meeting without having it included in the Company's proxy statement must comply with the requirements set forth in the Company's Bylaws. Our Bylaws require, among other things, that our Corporate Secretary receive written notice from the record stockholder no earlier than January 9, 2008, and no later than February 8, 2008. The notice must contain the information required by the Bylaws, a copy of which is available upon request to our Corporate Secretary.

Proposals received by the Corporate Secretary after the dates mentioned will not be included in the proxy statement or acted upon at the Annual Meeting.

By Order of the Board of Directors.

GREGG M. LARSON
*Associate General Counsel and Secretary*

61

## APPENDIX A

### DIRECTOR INDEPENDENCE GUIDELINES

**Determination of Independence**

A director is "independent" if the Board affirmatively determines that the director has no material relationship with 3M (including its consolidated subsidiaries) directly or as a partner, shareholder or officer of an organization that has a relationship with 3M. The Board has established the following guidelines to assist it in determining director independence (including nominees for director), that conform to or are more exacting than the independence requirements in the New York Stock Exchange listing standards (NYSE Rules). In addition to applying these guidelines, the Board will consider all relevant facts and circumstances in making an independence determination not only from the standpoint of the director, but also from that of persons or organizations with which the director has an affiliation.

1. In no event will a director be considered independent if:

   a. *Employment Relationship* — A director is, or has been within the last three years, an employee of 3M, or whose immediate family member(1), is or has been within the last three years, an executive officer of 3M;

   b. *Payments >$100,000* — A director who received, or whose immediate family member received, more than $100,000 per year in direc compensation from 3M (other than director fees) within the last three years;

   c. *Auditor Relationships* — (i) A director, or whose immediate family member, is a current partner of 3M's internal or external auditor; (ii) a director is a current employee of such a firm; (iii) a director has an immediate family member who is a current employee of such a firm and who participates in the firm's audit, assurance or tax compliance (but not tax planning) practice; or (iv) a director, or whos immediate family member, was within the last three years (but is no longer) a partner or employee of such a firm who personally worked on 3M's audit within that time;

   d. *Compensation Committee Interlock* — A 3M executive officer is on the compensation committee of the board of directors of a company which employs the 3M director or an immediate family member as an executive officer;

   e. *Commercial Relationships* — A director is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, 3M for property or services in an amount which, in of the last three years, exceeds the greater of $1 million, or two percent of the director's company's consolidated gross revenues.

2. Audit Committee members may not accept any consulting, advisory, or other compensatory fee from 3M, other than directors' fees.

---

(1) New York Stock Exchange Rule 303A(2)(b) defines "immediate family" to include a person's spouse, parents, children, siblings, mothers- and fathers-in-law, sons- and daughters-in-law, brothers- and sisters-in-law, *and* anyone (other than employees) who share such person's home.

A-1

3.  The following commercial relationships will not be considered to be material relationships that would impair a director's independence:

    a.  If a 3M director is an executive officer or employee, or if an immediate family member is an executive officer, of another company that does business with 3M and the sales by that company to 3M or purchases by that company from 3M, in any single year within th last three years, are less than or equal to one percent of the annual consolidated gross revenues of that company; or

    b.  If a 3M director is an executive officer or employee, or if an immediate family member is an executive officer, of another company which is indebted to 3M, or to which 3M is indebted, and the total amount of either company's indebtedness to the other, in any singl year within the last three years, is less than or equal to one percent of the other company's total consolidated assets.

4.  Charitable relationships will not be considered to be material relationships that would impair a director's independence if a 3M director or immediate family member serves as an officer, director, or trustee of a charitable organization, and 3M's discretionary charitable contributions to the organization are less than or equal to one percent of that organization's consolidated annual gross revenues.

5.  The Board will annually make and publicly disclose its independence determination for each director. The Board may determine that a director who has a relationship that exceeds the limits described in paragraphs 3 (provided that such a relationship would not constitute a bar to independence under the NYSE Rules) or 4 is nonetheless independent. The Company will explain in the next proxy statement the basis for any Board determination that a relationship is immaterial despite the fact that it does not meet the categorical independence guidelines. For example, if a director is the CEO of a company that purchases products and services from 3M that are more than one percent of that company's annual revenues, the independent directors could determine, after considering all of the relevant circumstances, that such a relationship was immaterial, and that the director would be considered independent under the NYSE Rules.

6.  The Company will not make any personal loans or extensions of credit to directors.

7.  All directors are required to deal at arm's length with 3M and its subsidiaries and to disclose circumstances material to the director that might be perceived as a conflict of interest.

A-2

## APPENDIX B

### 3M CORPORATE GOVERNANCE GUIDELINES
(As amended February 12, 2007)

The Board of Directors (the "Board") of 3M Company ("3M" or the "Company") has adopted these guidelines, which in conjunction with the Certificate of Incorporation, Bylaws, and Board Committee charters, form the framework for governance of the Company.

## A. THE ROLES OF THE BOARD OF DIRECTORS AND MANAGEMENT

1. *The Board of Directors* — The business of the Company is conducted under the oversight of the Board of Directors. The Board selects the Chairman and Chief Executive Officer and delegates to the CEO the authority and responsibility to manage the Company's operations. The Board of Directors serves as elected representatives of the shareholders, acts as an advisor and counselor to the CEO and senior management, and oversees management performance on behalf of shareholders. The Board also oversees the Company's strategic and business planning process and reviews and assesses management's approach to addressing significant risks facing the Company.

2. *Management* — The CEO and senior management are responsible for running the Company's business operations.

## B. BOARD COMPOSITION AND LEADERSHIP

1. *Chairman of the Board and Chief Executive Officer* — The Board has the authority to decide whether the positions of Chairman and CEO should be held by the same person and shall determine the best arrangement for the Company and its shareholders in light of all relevant and changing circumstances. The Board currently believes that the same individual should hold the position of Chairman and CEO (Chairman/CEO).

2. *Size of the Board* — The number of directors should not exceed a number that can function efficiently. The Nominating and Governance Committee considers and makes recommendations to the Board concerning the appropriate size and needs of the Board.

3. *Board Independence* — The Board believes in having a substantial majority of independent directors on the 3M Board. A director is "independent" if the Board affirmatively determines that the director has no material relationship with the Company directly or as a partner, shareholder, or officer of an organization that has a relationship with the Company and otherwise meets the requirements for independence of the listing standards of the New York Stock Exchange. The independent directors will make the Board decisions on corporate governance matters.

4. *Board Membership Criteria* — The Nominating and Governance Committee periodically reviews with the Board the appropriate skills and characteristics required of Board members given the current Board composition. It is the intent of the Board that the Board, itself, will be a high performance organization creating competitive advantage for the Company. To perform as such, the Board will be comprised of individuals who have distinguished records of leadership and success in their arena of activity and who will make substantial contributions to Board operations and effectively represent the interests of all stockholders. The Board's assessment of Board candidates includes, but is not limited to, consideration of: (i) roles and contributions valuable to the business community, (ii) personal qualities of leadership, character, judgment, and whether the candidate possesses and maintains throughout service on the Board a reputation in the community at large of integrity, trust, respect, competence, and adherence to the highest ethical standards, (iii) relevant knowledge and diversity of background and experience in such things as business, manufacturing, technology, finance and accounting, marketing, international business,

B-1

government, and the like; or (iv) whether the candidate is free of conflicts and has the time required for preparation, participation, and attendance at all meetings. A director's qualifications in light of these criteria is considered at least each time the director is re-nominated for Board membership.

5. *Selection of New Director Candidates* — The Nominating and Governance Committee considers qualified director candidates from several sources, including stockholders, and evaluates candidates against the current board membership criteria described above. In addition to these minimum requirements, the Committee will also evaluate whether the candidate's skills are complementary to the existing Board members' skills, the Board's needs for particular expertise in fields such as business, manufacturing, technology, financial, marketing, international, governmental, or other areas of expertise, and assess the candidate's impact on Board dynamics and effectiveness. The Committee selects candidates that best suit the Board's current needs and recommends one or more of such individuals to the Board. Exacting membership criteria and a rigorous selection process help ensure that candidates recommended to the Board will effectively represent the balanced best interests of all stockholders.

6. *Voting for Directors* — Any nominee for director in an uncontested election (i.e., an election where the only nominees are those recommended by the Board) who receives a greater number of votes "withheld" from his or her election than votes "for" such election (a "Majority Withheld Vote") will promptly tender his or her resignation for consideration by the Nominating and Governance Committee.

   a. The Nominating and Governance Committee will promptly consider the best interests of 3M and its stockholders and recommend to a committee of independent directors of the Board whether to accept the tendered resignation or to take some other action, such as rejecting the resignation and addressing the apparent underlying causes of the withheld votes.

   b. The Board will create a committee of all the independent directors who did not receive a Majority Withheld Vote to consider the Nominating and Governance Committee's recommendation and take action within 90 days following the uncontested election. Thereafter, the committee of independent directors will promptly disclose its decision and an explanation of how the decision was reached in a Current Report on Form 8-K filed with the Securities and Exchange Commission.

   c. Except as provided below, a director receiving a Majority Withheld Vote shall remain active and engaged in Board activities during this Nominating and Governance Committee and Board process.

   d. If one or more members of the Nominating and Governance Committee receive a Majority Withheld Vote, then the Board will create committee of independent directors who did not receive a Majority Withheld Vote to consider the resignation offers of all directors receiving a Majority Withheld Vote and determine whether to accept the tendered resignation(s) or to take some other action and promptly disclose their decision as described in paragraph 6b above.

   e. Any director who receives a Majority Withheld Vote and tenders his or her resignation pursuant to this provision will not participate i the committee action regarding whether to accept the tendered resignation offer or take some other action. However, if the only directors who did not receive a Majority Withheld Vote in the same election constitute three or fewer independent directors, then all independent directors may participate in the committee action regarding whether to accept the resignation offer(s) or to take some other action.

    f.    This corporate governance guideline will be summarized in each proxy statement relating to an election of directors of 3M.

7.  *Director Orientation and Continuing Education* — The Company provides directors with an orientation and education program to familiarize them with the Company's business operations and plans, industry trends and corporate governance practices, as well as ongoing education on issues facing the Company and on subjects that would assist the directors in discharging their duties.

8.  *Directors Who Experience Change in Present Job Responsibilities or Other Relevant Circumstances* — When a director's principal occupation or business affiliation changes, or other circumstances arise which may raise questions about the director's continuing qualifications in relation to the Board Membership Criteria set forth above, then the director will tender her/his resignation, or the Nominating and Governance Committee will ask for such tender. The Nominating and Governance Committee will consider the tendered resignation and recommend to the Board the action to be taken.

9.  *Service On Other For-Profit Boards* — Independent directors are encouraged to evaluate carefully the time required to serve on other boards (excluding non-profit) taking into account board attendance, preparation, participation, and effectiveness on these boards. Independent directors must advise the Chairman/CEO before accepting an invitation to serve on another board to enable the Company to determine whether (i) any regulatory issues or potential conflicts are raised by the director accepting such an invitation and (ii) the director will have the time required for preparation, participation, and attendance at 3M Board meetings. Independent directors who also serve as CEOs of publicly traded companies should not serve on more than two boards of public companies in addition to the 3M Board, and other independent directors should not serve on more than five other boards of public companies in addition to the 3M Board.

10.  *Retirement Policy* — Each nonemployee director must tender her/his resignation at the annual meeting following her or his 72nd birthday. If circumstances dictate, the Nominating and Governance Committee may ask a director to continue to serve on the Board past age 72.

.11.  *Board Compensation Review* — The Nominating and Governance Committee will periodically receive reports on the status of Board compensation in relation to other large U.S. companies and is responsible for recommending to the Board changes in compensation for nonemployee directors.

12.  *Board's Interaction with Stakeholders* — The Chairman/CEO is responsible for establishing effective communications with the Company's stakeholders, including shareholders, customers, employees, communities, suppliers, creditors, governments, and corporate partners. It is the policy of the Board that management speaks for the Company. This policy does not preclude independent directors from meeting with stakeholders, but management where appropriate should be present at such meetings.

## C.  BOARD OPERATIONS

1.  *Selection of Agenda Items for Board Meetings* — At the first Board meeting of each year, the Chairman/CEO, in consultation with the lead director, will propose for the Board's approval agenda items to be discussed during the course of the year. Before each meeting, the Chairman/CEO will review proposed agenda items with the lead director and distribute the agenda in advance to the Board. Any Board member may ask to include items on the agenda.

2.  *Board Materials Distributed in Advance* — Board members receive materials related to agenda items sufficiently in advance of Board meetings so that the directors may prepare to discuss the

items at the meeting. Sensitive subjects may be discussed at the meeting without distributing written materials in advance or at the meetin

3. *Director Responsibilities* — Directors must exercise their business judgment to act in the best interests of the shareholders and the Company. In discharging this obligation, directors reasonably may rely on the Company's senior executives and its advisors and auditors. Directors are expected to attend the Annual Meeting of Stockholders and attend and participate in all meetings of the Board and of committees on which they serve and to spend the time needed and prepare for and meet as frequently as necessary to discharge their responsibilities.

4. *Board Presentations and Access to Employees* — Members of senior management may be invited to attend part or all of a Board meeting order to participate in discussions. Generally, the executive responsible for an area of the Company's operations the Board is to consider makes the presentation. Board members have complete access to all other members of management and Company employees.

5. *Board Access to Independent Advisors* — The Board and its committees may seek advice from outside advisors as appropriate. The Board shall have sole authority to approve related fees and retention terms.

6. *Executive Sessions* — As an agenda item for every regularly scheduled board meeting, independent directors have the opportunity to meet in executive sessions, without the Chairman/CEO or other members of management present, to consider such matters as they deem appropriate.

7. *Lead Independent Director* — The Board has selected an independent director to serve as lead director. The lead director will be elected periodically by a majority of the independent directors upon recommendation from the Nominating and Governance Committee. The lead director will:

    a.  preside at all meetings of the Board at which the Chairman is not present, including executive sessions of the independent directors;

    b.  act as a key liaison between the Chairman/CEO and the independent directors;

    c.  will assist the Chairman/CEO in setting the Board agenda and frequency of meetings;

    d.  has the authority to call meetings of the independent directors;

    e.  will communicate Board member feedback to the Chairman/CEO (except that the chair of the Compensation Committee leads the discussion of the Chairman/CEO's performance and communicates the Board's evaluation of that performance to the Chairman/CEO); and

    f.  perform such other duties as requested by the Board.

    The name of, and a means of contacting, the lead director will be made public in the Company's proxy statement for the Annual Meeting of Stockholders.

## D.  BOARD COMMITTEES

1. *Committees* — The current committees are Audit, Compensation, Finance, and Nominating and Governance.

2. *Assignment and Term of Service of Committee Members* — The Board is responsible for the appointment of committee members and chairs, based on recommendations of the Nominating and Governance Committee.

3. *Agenda, Frequency, Length, and Reports of Committee Meetings* — The chair of each committee approves the agenda, length of, and attendance at each committee meeting and determines the frequency of meetings. Materials related to agenda items are given to the committee members

sufficiently in advance to allow the members to prepare for discussing the items at the meeting. The committee chairs report a summary of their meeting to the Board following each regular committee meeting.

4. *Membership* — Only independent directors may serve on the Audit, Compensation, Finance, and Nominating and Governance Committees.

5. *Responsibilities* — The Board periodically reviews the responsibilities of each committee and approves the committee charters, copies of which are attached to these guidelines.

## E.  BOARD AND MANAGEMENT EVALUATION

1. *Formal Evaluation of the Chairman/CEO* — The Compensation Committee, in consultation with the Chairman/CEO, sets annual and long term performance goals for the Chairman/CEO. The chair of the Compensation Committee leads the discussion of the Chairman/CEO's performance against such goals with the independent directors and communicates the Board's evaluation to the Chairman/CEO. The Compensation Committee will use the evaluation when determining the compensation of the Chairman/CEO.

2. *Board Self-Assessment* — The Board will conduct an annual self-evaluation to determine whether it and its committees are functioning effectively. The Nominating and Governance Committee will receive comments from all directors and share those comments with the Board. Based on the comments and further discussion, the Board will make an assessment specifically reviewing areas in which the Board and/or the management believe improvements could be made to increase the effectiveness of the Board and its committees.

3. *Succession Planning* — The Board plans the succession to the position of Chairman/CEO and certain other senior management positions. To assist the Board, the Chairman/CEO annually assesses senior managers and their succession potential. The Chairman/CEO also provides the Board with an assessment of persons considered potential successors to certain senior management positions.

4. *Management Development* — The Chairman/CEO annually should report to the Board on the Company's program for management development.

### Policy on Adoption of a Rights Plan

In 2002 and 2003, a 3M stockholder submitted a shareholder proposal to 3M regarding the approval process for adopting a stockholders' rights plan (also known as a "poison pill"). 3M does not have a rights plan and is not currently considering adopting one. The Board continues to believe, however, that there may be circumstances under which adoption of a rights plan would be necessary to give the Board the negotiating power and leverage to obtain the best result for 3M stockholders in the context of a takeover effort.

Following consideration of the favorable vote the stockholder proposal received and in light of this belief, the Board has adopted and reaffirmed a statement of policy on this topic. The Board's policy is that it will only adopt a rights plan if either (1) stockholders have approved adoption of the rights plan or (2) the Board in its exercise of its fiduciary responsibilities, including a majority of the independent members of the Board, makes a determination that, under the circumstances existing at the time, it is in the best interests of 3M's stockholders to adopt a rights plan without the delay in adoption that would come from the time reasonably anticipated to seek stockholder approval.

The Board has directed the Nominating and Governance Committee to review this policy statement on an annual basis and to report to the Board on any recommendations it may have concerning the policy. The terms of the policy, as in effect, will be included in 3M's published Corporate Governance Guidelines and its proxy statement.

**APPENDIX C**

**3M Company Board of Directors**
**Audit Committee Charter**
(As Affirmed February 12, 2007)

A.  *Purpose*: The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of 3M Company (the "Company") is to assist the Board in its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the qualifications and independence of the Company's independent registered public accounting firm (the "Independent Accounting Firm"), and (iv) performance of the Company's internal auditing department ("Internal Audit") and the Independent Accounting Firm.

B.  *Membership*: The Committee's membership is determined by the Board upon recommendation of the Nominating and Governance Committee and consists of at least three directors. The members of the Committee shall meet the independence and experience requirements of the listing standards of the New York Stock Exchange and the requirements for audit committee service set forth in the Securities Exchange Act of 1934, as amended (the "Act"), and the rules and regulations of the Securities and Exchange Commission ("SEC"). At least one member of the Committee shall be an "audit committee financial expert" as determined by the Board in compliance with criteria established by the SEC. Committee members shall not serve on the audit committees of more than two other public companies unless the Board determines that such service does not impair the member's ability to serve effectively on the Committee.

C.  *Roles and Responsibilities*: The Committee's responsibility is one of oversight. The management of the Company is responsible for the preparation of complete and accurate annual and quarterly consolidated financial statements ("financial statements") in accordance with generally accepted accounting principles in the United States and for maintaining appropriate accounting and financial reporting principles and policies and internal controls designed to assure compliance with accounting standards and laws and regulations. The Independent Accounting Firm is responsible for planning and conducting in accordance with the standards of the Public Company Accounting Oversight Board an audit of the Company's annual consolidated financial statements and a review of the Company's quarterly financial statements. The Committee shall have the authority to take any and all acts that it deems necessary to carry out its oversight function, including but not limited to:

1.  *Financial Reporting and Disclosure*

    a.  Review and discuss the annual audited financial statements and quarterly financial statements with management and the Independent Accounting Firm, including the disclosures under the caption "Management Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall make a recommendation to the Board as to whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

    b.  Review the Company's financial reporting processes, disclosure and internal controls and procedures, and the process for the CEO and CFO quarterly certifications required by the SEC with respect to financial statements and the Company's disclosure and internal controls and procedures. Such review shall include a consideration of major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and any reports by the CEO and CFO regarding major issues as to the adequacy of the Company's disclosure and internal controls and procedures and any special audit steps adopted in light of identified deficiencies.

C-1

c.  Review and discuss with management (including the senior internal audit executive) and the Independent Accounting Firm the Company's internal controls report and the Independent Accounting Firm's attestation of the report prior to filing of the Company's Form 10-K.

d.  Obtain and periodically review a report from the Independent Accounting Firm, describing (i) all critical accounting policies and practices to be used in the financial statements, (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Accounting Firm, and (iii) other material written communications between the Independent Accounting Firm and management, such as any management letter or schedule of unadjusted differences. Review any reports on such topics or similar topics prepared by management, including any significant financial reporting issues and judgments made in connection with the preparation of the financial statements. Discuss with the Independent Accounting Firm any material issues raised in such reports.

e.  Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, provided that such discussions may be done generally (i.e., by discussing the types of information to be disclosed and the type of presentation to be made). The management will review with the chair of the Committee earnings press releases prior to issuance.

f.  Discuss with management and the Independent Accounting Firm the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, if any, on the Company's financial statements.

2.  *Internal Audit*

a.  Review the charter, annual plan and scope of work of Internal Audit, including its responsibilities and staffing.

b.  Review, as appropriate, the results of internal audits and discuss related significant internal control matters with the Company's internal auditor and Company management.

c.  Discuss the adequacy of the Company's internal controls with Internal Audit.

d.  Review the appointment and periodically evaluate the performance of the senior internal auditing executive, who shall have direct access to the Committee.

3.  *Independent Accounting Firm*

a.  Responsible for the appointment, retention, termination, compensation, and oversight of the Independent Accounting Firm. The Committee shall also be responsible for the resolution of disagreements between management and the Independent Accounting Firm. The Independent Accounting Firm shall report directly to the Committee.

b.  Review the scope of the annual audit and services to be provided by the Independent Accounting Firm during the year. Pre-approve all auditing services, internal control-related services, and permitted non-audit services to be provided to the Company by the Independent Accounting Firm, subject to any exceptions provided by the Act. The chair of the Committee may pre-approve any such services according to the procedures approved by the Committee, provided that any approval by the chair must be presented to the Committee at its next meeting.

    c.   Obtain and review, at least annually, a report from the Independent Accounting Firm describing: (i) the Independent Accounting Firm's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the Independent Accounting Firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years, respecting one or more independent audits carried out by the Independent Accounting Firm, and any steps taken to deal with any such issues; and (iii) all relationships between the Independent Accounting Firm and the Company, including the matters set forth in Independence Standards Board Standard No. 1. Discuss with the Independent Accounting Firm any issues or relationships disclosed in such report that, in the judgment of the Committee, may have an impact on the competence or independence of the Independent Accounting Firm.

    d.   Discuss with the Independent Accounting Firm the matters required to be discussed pursuant to the Statement on Auditing Standards No. 61, Communication with Audit Committees, as currently in effect, including any audit problems or difficulties encountered in performing the audit and management's response, and disagreements with management.

    e.   Obtain assurance from the Independent Accounting Firm that the audit was conducted in a manner consistent with Section 10A (b) of the Act.

    f.   Review and periodically evaluate the performance of the lead audit partner of the Independent Accounting Firm and assure the regular rotation of the lead audit partner and the audit partner responsible for reviewing the audit as required by law.

    g.   Establish policies for the Company's hiring of employees or former employees of the Independent Accounting Firm who participated in any capacity in the audit of the Company.

4.   *Risk Management and Compliance*

    a.   Discuss policies and procedures with respect to risk assessment and risk management, the Company's major risk exposures, and the steps management has taken to monitor and mitigate such exposures.

    b.   Review the effectiveness of the system for monitoring compliance with laws, regulations, and the Company's business conduct policies, and the results of management's investigation and follow-up on any fraudulent acts or accounting irregularities.

    c.   Periodically obtain reports from management regarding compliance.

    d.   Review with the Company's General Counsel legal matters that may have a material impact on the consolidated financial statements and any material reports or inquiries received from regulators or governmental agencies regarding compliance.

    e.   Establish procedures for (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters. Review periodically with management and Internal Audit these procedures and any significant complaints received.

5.   *Meetings, Reports, Charter Review, Performance Evaluation and Outside Advisors*

    a.   The Committee shall meet with such frequency and at such intervals as it shall determine is necessary to carry out its duties and responsibilities, but in any case, not

less than four times a year. The Committee shall meet separately, periodically, with management, with internal auditors, and wi' the Independent Accounting Firm. A majority of the members shall constitute a quorum. A majority of the members present sha decide any matter brought before the Committee.

b.  Report regularly to the Board.

c.  Prepare the report of the Committee required to be included in the Company's annual proxy statement.

d.  Review the adequacy of this Charter at least annually and recommend any proposed changes to the Board for approval.

e.  Conduct an annual performance evaluation of the Committee.

f.  The Committee shall have the authority to retain such outside legal, accounting, or other advisors, as the Committee may deem appropriate in its sole discretion. The Committee shall have sole authority to approve related fees and retention terms.

C-4

**APPENDIX D**

**3M Company Board of Directors**
**Compensation Committee Charter**
(As amended February 12, 2007)

A. *Purpose*: The Compensation Committee (the "Committee") of the Board of Directors of 3M Company reviews the Company's compensation practices and policies including equity compensation programs and postretirement benefit plans, annually reviews and approves (subject to ratification by the independent directors of the Board) the compensation for the CEO, annually reviews and approves the compensation for the other senior executives, evaluates CEO performance, annually reviews and discusses with management of the Company the Compensation Discussion and Analysis prepared in accordance with the SEC's disclosure rules for executive compensation and furnishes a report for inclusion in the Company's proxy statement.

B. *Membership*: The Committee's membership is determined by the Board and consists of at least three directors. All members of the Committee shall meet the independence requirements of the listing standards of the New York Stock Exchange and qualify as a "Nonemployee Director" for purposes of Rule 16b-3 under the Securities Exchange Act of 1934, as amended.

C. *Roles and Responsibilities*: The responsibilities of the Committee include:

 1. *Compensation Practices and Policies*

     a. Review compensation practices and policies of the Company to ensure they provide appropriate motivation for corporate performance and increased shareholder value.

     b. Oversee the administration of the Company's stock and deferred compensation programs, and determine the employees who receive awards and the size of those awards under the Company's Management Stock Ownership Program.

     c. Make recommendations to the Board of Directors regarding the adoption, amendment, or termination of equity compensation programs that require shareholder approval.

     d. Approve the adoption, amendment, and termination of incentive compensation and deferred compensation programs for employees of the Company.

     e. Oversee the administration of the Company's deferred compensation plans and programs for its nonemployee directors, and either approve or recommend for the approval of the Board of Directors amendments to such plans and programs.

     f. Review and make recommendations to the Board of Directors concerning the design of the pension and other postretirement benefit plans that have a material financial impact upon the Company.

     g. Periodically review human resource issues relating to the Company's polices and practices with respect to workforce diversity and equal employment opportunities.

 2. *Executive Compensation*

     a. Periodically survey the executive compensation practices of other large companies.

     b. Annually review and approve, for the senior executives of the Company (other than the CEO), (i) the annual base salary, (ii) annual incentive compensation, (iii) awards under the Company's Performance Unit Plan, and (iv) stock option grants and other stock awards under the Company's Management Stock Ownership Program.

    c.  Approve for the senior executives of the Company (other than the CEO) employment agreements, severance arrangements, change-in-control arrangements, and any special or supplemental benefits.

    d.  Establish and certify the satisfaction of performance goals for performance-based compensation as required under Section 162 (m) of the Internal Revenue Code.

    e.  Review shareholder proposals relating to executive compensation matters and recommend to the Board the Company's response to such proposals.

3.   *CEO Compensation*

    a.  Review and approve annual corporate goals and objectives for the CEO.

    b.  The Chairman of the Committee leads the discussion of the CEO's performance against such goals and objectives with the independent directors and communicates the Board's evaluation to the CEO.

    c.  Annually review and approve (based on this evaluation), subject to ratification by the independent directors of the Board, (i) the CEO's annual base salary, (ii) the CEO's annual incentive compensation, (iii) awards to the CEO under the Company's Performance Unit Plan, and (iv) stock option grants and other stock awards to the CEO under the Company's Management Stock Ownership Program. In determining the long-term incentive component of CEO compensation, the Committee will consider the Company's performance and relative shareholder return, the value of similar incentive awards to CEOs at other large companies and the awards given to the CEO in past years.

    d.  Approve, subject to ratification by the independent directors of the Board, for the CEO employment agreements, severance arrangements, change-in-control arrangements, and any special or supplemental benefits.

4.   *Meetings, Reports, Charter Review, Performance Evaluation and Outside Advisors*

    a.  Hold regular meetings of the Committee, reporting significant matters arising from such meetings to the Board. A majority of the members shall constitute a quorum. A majority of the members present shall decide any matter brought before the Committee.

    b.  Review and discuss with management of the Company the Compensation Discussion and Analysis prepared in accordance with the disclosure rules for executive compensation of the Securities and Exchange Commission, and furnish a report for inclusion in the Company's annual proxy statement.

    c.  Review and reassess the adequacy of this Charter at least annually and submit any changes to the Board for approval.

    d.  Conduct an annual performance evaluation of the Committee.

    e.  The Committee shall have the authority to retain such compensation consultants, outside counsel, and other advisors as the Committee may deem appropriate in its sole discretion. The Committee shall have sole authority to approve related fees and retention terms.

**APPENDIX E**

**3M Company Board of Directors**
**Finance Committee Charter**
(As Amended February 12, 2007)

A.  *Purpose*: The Finance Committee (the "Committee") of the Board of Directors of 3M Company assists the Board with its oversight of the Company's capital structure, financing, investment, and other financial matters of importance to the Company.

B.  *Membership*: The Committee's membership is determined by the Board upon recommendation of the Nominating and Governance Committee and consists of at least three directors. The members of the Committee shall meet the independence requirements of the New York Stock Exchange.

C.  *Roles and Responsibilities*: The responsibilities of the Committee include:

1.  *Capital Structure*

   a.  Review and recommend for approval by the Board the dividend policy and the declaration of dividends or other forms of distributions on the Company's stock, such as stock splits in the form of a stock dividend.

   b.  Review and recommend for approval by the Board the repurchase of the Company's stock.

   c.  Review and recommend for approval by the Board the Company's short- and long-term borrowings.

   d.  Review and recommend for approval by the Board the registration and issuance of the Company's debt or equity securities, except in the case of the issuance of debt or equity securities in connection with a merger or acquisition transaction which is presented to the Board.

   e.  Periodically review the Company's ratings from credit rating agencies.

2.  *Capital Expenditures*

   a.  Review and recommend for approval by the Board an annual capital expenditure budget and revisions to that budget.

   b.  Review and recommend for approval by the Board capital expenditures in excess of $50,000,000.

3.  *Treasury and Tax Matters*

   a.  Periodically review the Company's global treasury and tax planning activities.

   b.  Review and evaluate any risks associated with the Company's use of or investment in financial products, including derivatives used to manage risk related to foreign currencies, commodity prices, and interest rates.

   c.  Periodically review the Company's insurance coverage.

   d.  Periodically review the funding of the Company's pension and other benefit plans.

4.  *Transactions and Other Matters*

   a.  Review and recommend for approval by the Board the following contracts, transactions, or other commitments in excess of $50,000,000: (i) sale, lease, or purchase of real estate

E-1

and buildings; and (ii) sale or disposal of equipment, machinery, or other similar tangible assets.

b. To perform any other activities as the Committee deems appropriate, or as requested by the Board consistent with this Charter, the Company's Bylaws, and applicable law.

5. *Meetings, Reports, Charter Review, Performance Evaluation and Outside Advisors*

a. Hold regular meetings of the Committee, reporting significant matters arising from such meetings to the Board. A majority of th members shall constitute a quorum. A majority of the members present shall decide any matter brought before the Committee.

b. Review and reassess the adequacy of this Charter at least annually and submit any changes to the Board for approval.

c. Conduct an annual performance evaluation of the Committee.

d. The Committee shall have the authority to retain such outside legal, accounting, or other advisors, as the Committee may deem appropriate in its sole discretion. The Committee shall have sole authority to approve related fees and retention terms.

E-2

**APPENDIX F**

**3M Company Board of Directors**
**Nominating and Governance Committee Charter**
(As Amended February 12, 2007)

A. *Purpose:*  The Nominating and Governance Committee (the "Committee") of the Board of Directors of 3M Company establishes Board membership criteria, assists the Board by identifying individuals qualified to become Board members, recommends to the Board matters of corporate governance, facilitates the annual review of the performance of the Board and its committees, periodically reviews CEO and management succession plans, and periodically reviews other matters relating to the governance of the Company.

B. *Membership:*  The Committee's membership is determined by the Board and consists of at least three directors. The members of the Committee shall meet the independence requirements of the New York Stock Exchange.

C. *Roles and Responsibilities:*  The responsibilities of the Committee include:

1. *Board and Committee Membership*

   a. Periodically review with the Board the appropriate size of the Board and the requisite skills and characteristics of its members as set forth below.

   b. It is the intent of the Board that the Board, itself, will be a high performance organization creating competitive advantage for the Company. To perform as such, the Board will be comprised of individuals who have distinguished records of leadership and success in their arena of activity and who will make substantial contributions to Board operations and effectively represent the interests of all stockholders.

   c. The Board's assessment of Board candidates includes, but is not limited to, consideration of: (i) roles and contributions valuable to the business community; (ii) personal qualities of leadership, character, judgment, and whether the candidate possesses and maintains throughout service on the Board a reputation in the community at large of integrity, trust, respect, competence, and adherence to the highest ethical standards; (iii) relevant knowledge and diversity of background and experience in such things as business, manufacturing, technology, finance and accounting, marketing, international business, government, and the like; or (iv) whether the candidate is free of conflicts and has the time required for preparation, participation, and attendance at all meetings. A director's qualifications in light of these criteria is considered at least each time the director is re-nominated for Board membership.

   d. Review the resignation of directors whose principal occupation or business association changes, or other circumstances arise which may raise questions about the director's continuing qualifications in relation to the Board membership criteria referred to above and recommend to the Board what action the Board should take with respect to the resignation.

   e. Review the Board's committee structure and recommend to the Board the appointment of committee members and chairs.

2. *Selection of Qualified Director Candidates*

   a. Identify individuals that the Committee believes are qualified to become Board members in accordance with the Board Membership Criteria set forth above, and recommend that the Board select such nominee or nominees to stand for election at the next meeting of stockholders of the Company in which directors will be elected.

b. In the event there is a vacancy on the Board, identify individuals that the Committee believes are qualified to become Board members in accordance with the Board Membership Criteria set forth above, and recommend such person or persons for appointment to the Board.

c. Review and evaluate all stockholder nominees for director (submitted in accordance with the Company's Bylaws) in accordance with the Board Membership Criteria set forth above.

d. The Nominating and Governance Committee considers qualified director candidates from several sources, including stockholders, and evaluates candidates against the current Board Membership Criteria described above. In addition to these minimum requirements, the Committee will also evaluate whether the candidate's skills are complementary to the existing Board members' skills, the Board's needs for particular expertise in fields such as business, manufacturing, technology, financial, marketing, international, governmental, or other areas of expertise, and assess the candidate's impact on Board dynamics and effectiveness. The Committee selects candidates that best suit the Board's current needs and recommends one or more of such individuals to the Board. Exacting membership criteria and a rigorous selection process help ensure that candidates recommended to the Board will effectively represent the balanced best interests of all stockholders.

3. *Corporate Governance*

a. Review the Company's Corporate Governance Guidelines at least annually, and recommend any proposed changes to the Board for approval.

b. Develop and recommend to the Board standards to be applied in making determinations on the types of relationships that constitute material relationships between the Company and a director for purposes of determining director independence.

c. Review and approve or ratify any transaction between the Company and any related person, which is required to be disclosed under the rules of the Securities and Exchange Commission.

d. Review and recommend to the Board proposed changes to the Company's Certificate of Incorporation and Bylaws.

e. Review shareholder proposals relating to corporate governance and other matters and recommend to the Board the Company's response to such proposals.

4. *Board and Committee Self-Assessment.* Develop and recommend to the Board for its approval an annual self-assessment process of the Board and its committees and oversee the process. Based on this process, the Board will make an assessment reviewing areas in which the Board and/or Management believe improvements could be made to increase the effectiveness of the Board.

5. *Succession Planning.* Review periodically with the Chairman/CEO his assessment of corporate officers and succession plans relating to their positions, and to make recommendations to the Board with respect to the selection of individuals to occupy these positions.

6. *Miscellaneous Matters*

a. Periodically review and recommend to the Board changes in Board compensation.

    b.   Establish and periodically review and recommend to the Board director retirement policies.

    c.   Periodically review the corporate contribution program and the activities of the 3M Foundation.

7.   *Meetings, Reports, Charter Review, Performance Evaluation and Outside Advisors*

    a.   Hold regular meetings of the Committee, reporting significant matters arising from such meetings to the Board. A majority of the members shall constitute a quorum. A majority of the members present shall decide any matter brought before the Committee.

    b.   Review and reassess the adequacy of this Charter at least annually and submit any changes to the Board for approval.

    c.   Conduct an annual performance evaluation of the Committee.

    d.   The Committee shall have the authority to retain search firms to assist in identifying director candidates, and to retain outside counsel and any other advisors as the Committee may deem appropriate in its sole discretion. The Committee shall have sole authority to approve related fees and retention terms.

**APPENDIX G-1**

Amended to and includir
amendments of ~~May 15, 2006~~

## CERTIFICATE OF INCORPORATION OF
## 3M COMPANY
*(Original Certificate Filed on June 25, 1929)*

FIRST: The name of the Corporation is 3M COMPANY.

SECOND: The address of its registered office in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

THIRD: The nature of the business or purposes to be conducted or promoted is: to engage in any lawful act or activity for which Corporations may be organized under the General Corporation Law of Delaware.

FOURTH: A. The total number of shares of all classes of stock which this Corporation shall have authority to issue is 3,010,000,000 consisting of 10,000,000 shares of preferred stock without par value and 3,000,000,000 shares of common stock with a par value of $0.01 per share.

B. The designations, powers, preferences, and rights, and the qualifications, limitations, or restrictions of the preferred stock and the common stock of the Corporation are as follows:

1. The preferred stock may be issued from time to time as shares of one or more series in any amount, not exceeding in the aggregate, including all shares of any and all series previously issued, the total number of shares of preferred stock hereinabove authorized. All shares of any one series of preferred stock shall rank equally and be identical, except as to the times from which cumulative dividends, if any, thereon shall be cumulative.

2. The Board of Directors of the Corporation is hereby expressly authorized from time to time to issue preferred stock as preferred stock of any series, and in connection with the creation of each such series to fix by the resolution or resolutions, providing for the issue of shares thereof, the designations, preferences and relative, participating, optional, conditional, or other special rights, and qualifications, limitations, or restrictions thereof, of such series, to the full extent now or hereafter permitted by the laws of the State of Delaware, including, without limitation, the following matters:

(a) The designation of such series;

(b) The rate or amount and times at which, and the preferences and conditions under which, dividends shall be payable on shares of such series, the status of such dividends as cumulative or noncumulative, the date or dates from which dividends, if cumulative, shall accumulate, and the status of such series as participating or nonparticipating after the payment of dividends on shares which are entitled to any preference;

(c) The voting rights, if any, of shares of such series in addition to those required by law, which may be full, limited, multiple, fractional, or none, including any right to vote as a class either generally or in connection with any specified matter or matters;

(d) The amount, times, terms, and conditions, if any, upon which shares of such series shall be subject to redemption;

(e) The rights and preferences, if any, of the holders of shares of such series in the event of any liquidation, dissolution, or winding up of the Corporation;

(f)  Whether the shares of such series shall be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of such series, and if so entitled, the amount of such fund and the manner of its application; and

(g)  Whether the shares of such series shall be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock of the Corporation, and if made so convertible or exchangeable, the conversion price or prices, or the rates of exchange, and the adjustments, if any, at which such conversion or exchange may be made.

C.  Except for and subject to those rights expressly granted to the holders of preferred stock, or any series thereof, by the Board of Directors, pursuant to the authority hereby vested in the Board or as provided by the laws of the State of Delaware, the holders of the Corporation's common stock shall have exclusively all rights of shareholders and shall possess exclusively all voting power. Each holder of common stock of the Corporation shall be entitled to one vote for each share of such stock standing in such holder's name on the books of the Corporation.

FIFTH:  The Corporation is to have perpetual existence.

SIXTH:  In furtherance, and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized:

To make, alter, or repeal the Bylaws of the Corporation.

To authorize and cause to be executed mortgages and liens upon the real and personal property of the Corporation.

To set apart out of any funds of the Corporation available for dividends a reserve or reserves for any proper purpose and to abolish any such reserve in the manner in which it was created.

By a majority of the whole Board, to designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. The Bylaws may provide that in the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether the member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board of Directors, or in the Bylaws of the Corporation, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the Certificate of Incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease, or exchange of all or substantially all of the Corporation's property and assets recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, or amending the Bylaws of the Corporation; and, unless the resolution or Bylaws expressly so provide, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock.

When and as authorized by the stockholders in accordance with statute, to sell, lease, or exchange all or substantially all of the property and assets of the Corporation, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or property, including shares of stock in, and/or other securities of, any other Corporation or Corporations, as its Board of Directors shall deem expedient and for the best interest of the Corporation.

G1-2

SEVENTH:   Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of th
Corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be
designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

EIGHTH:   This Corporation reserves the right to amend, alter, change, or repeal any provision contained in this Certificate of
Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to thi
reservation.

NINTH:   Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or
between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the
application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers
appointed for this Corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in
dissolution or of any receiver or receivers appointed for this Corporation under the provisions of Section 279 of Title 8 of the Delaware Code,
order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be,
to be summoned in such manner as the said court directs. If the majority in number representing three-fourths in value of the creditors or class
of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangemei
and to any reorganization of this Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and
the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of
creditors, and/or on all the stockholders or class of stockholders, of this Corporation as the case may be, and also on this Corporation.

TENTH:   A.   The number of directors of the Corporation shall be fixed from time to time by or pursuant to the Bylaws of the
Corporation. At the 1986 Annual Meeting of Stockholders of the Corporation, the directors shall be divided, with respect to the terms for whicl
they severally hold office, into three classes, as nearly equal in number of directors as possible, as determined by the Board of Directors, with
the term of office of the first class to expire at the Annual Meeting of Stockholders to be held in 1987, the term of office of the second class to
expire at the Annual Meeting of Stockholders to be held in 1988, and the term of office of the third class to expire at the Annual Meeting of
Stockholders to be held in 1989, with each class of directors to hold office until their successors are duly elected and have qualified. At each
Annual Meeting of Stockholders following such initial classification and election until the 2007 Annual Meeting of Stockholders, directors
elected to succeed those directors whose terms expire at such annual meeting, other than those directors elected under particular circumstances
by a separate class vote of the holders of any class or series of stock having a preference over the common stock, of a par value of $0.01 per
share, of the Corporation (the "Common Stock") as to dividends or upon liquidation of the Corporation, shall be elected to hold office for a terr
expiring at the Annual Meeting of Stockholders in the third year following the year of their election and until their successors are duly elected
and have qualified. When the number of directors is changed, any newly created directorships or any decrease in directorships shall be so
apportioned among the classes as to make all classes as nearly equal in number of directors as possible, as determined by the Board of Director;
The terms of office of all directors who are in office immediately prior to the closing of the polls for the election of directors at the 2007 Annua
Meeting of Stockholders of the Corporation shall expire at such time. At each Annual Meeting of Stockholders beginning with the 2007 Annua
Meeting of Stockholders of the Corporation, the directors shall not be classified, and the directors shall be elected annually and shall hold office
for a term expiring at the next Annual Meeting of Stockholders and until their respective successors shall have been duly elected and qualified.
No decrease in the number of directors constituting the Board

G1-3

of Directors shall shorten the term of any incumbent director. The provisions of this Paragraph are subject to the provisions of Paragraph D of this Article.

B.   Except as may be provided in the terms of any class or series of stock having a preference over the Common Stock as to dividends or upon liquidation of the Corporation relating to the rights of the holders of such class or series to elect, by separate class vote, additional directors, prior to the 2007 Annual Meeting of Stockholders of the Corporation, no member of the Board of Directors may be removed from office except for cause. Except as may be provided in the terms of any class or series of stock having a preference over the Common Stock as t dividends or upon liquidation of the Corporation relating to the rights of the holders of such class or series to elect, by separate class vote, additional directors, from and after the 2007 Annual Meeting of Stockholders of the Corporation, any member of the Board of Directors may b removed from office with or without cause.

C.   Subject to the provisions of Paragraph D of this Article TENTH, newly created directorships resulting from an increase in the number of directors of the Corporation and vacancies occurring in the Board of Directors resulting from death, resignation, retirement, removal, or any other reason shall be filled by the affirmative vote of a majority of the directors, although less than a quorum, then remaining in office and elected by the holders of the capital stock of the Corporation entitled to vote generally in the election of directors or, in the event that there is only one such director, by such sole remaining director. Prior to the 2007 Annual Meeting of Stockholders of the Corporation, any director elected in accordance with the preceding sentence shall hold office for the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified.

D.   In the event that the holders of any class or series of stock of the Corporation having a preference over the Common Stock as to dividends or upon liquidation of the Corporation are entitled, by a separate class vote, to elect directors pursuant to the terms of such class or series, then the provisions of such class or series with respect to such rights of election shall apply to the election of such directors. The number of directors that may be elected by the holders of any such class or series of stock shall be in addition to the number fixed by or pursuant to the Bylaws. Except as otherwise expressly provided in the terms of such class or series, the number of directors that may be so elected by the holders of any such class or series of stock shall be elected for terms expiring at the next Annual Meeting of Stockholders and without regard to any classification of the remaining members of the Board of Directors, and vacancies among directors so elected by the separate class vote of any such class or series of stock shall be filled by the affirmative vote of a majority of the remaining directors elected by such class or series, or if there are no such remaining directors, by the holders of such class or series in the same manner in which such class or series initially elected a director.

If at any meeting for the election of directors, more than one class of stock, voting separately as classes, shall be entitled to elect one or more directors and there shall be a quorum of only one such class of stock, that class of stock shall be entitled to elect its quota of directors notwithstanding absence of a quorum of the other class or classes of stock.

ELEVENTH: Subject to any limitations imposed by this Certificate of Incorporation, the Board of Directors shall have power to adopt, amend, or repeal the Bylaws of the Corporation. Any Bylaws made by the directors under the powers conferred hereby may be amended or repealed by the directors or by the stockholders. Notwithstanding the foregoing and any other provisions of this Certificate of Incorporation or the Bylaws of this Corporation (and notwithstanding that a lesser percentage may be specified by law), no provisions of the Bylaws shall be adopted, amended, or repealed by the stockholders without an affirmative vote of the holders of not less than eighty percent (80%) of the voting power of all of the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, considered for the purposes of this Article as a single class.

~~Notwithstanding the foregoing and any other provisions of this Certificate of Incorporation or the Bylaws of the Corporation (and notwithstanding that a lesser percentage may be specified by law), the provisions of this Article ELEVENTH may not be amended or repealed unless such action is approved by the affirmative vote of the holders of not less than eighty percent (80%) of the voting power of all of the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, considered for purposes of this Article as a single class.~~

ELEVENTH: Intentionally omitted.

TWELFTH: No action required to be taken or which may be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, and the power of stockholders to consent in writing, without a meeting, to the taking of any action is specifically denied.

~~THIRTEENTH: A. In addition to the requirements of the provisions of any series of preferred stock which may be outstanding, and whether or not a vote of the stockholders is otherwise required, the affirmative vote of the holders of not less than eighty percent (80%) of the outstanding shares of the Common Stock shall be required for the approval or authorization of any Business Transaction with a Related Person or any Business Transaction in which a Related Person has an interest (other than only a proportionate interest as a stockholder of the Corporation); provided, however, that the eighty percent (80%) voting requirement shall not be applicable if (1) the Business Transaction is Duly Approved by the Continuing Directors; or (2) all of the following conditions are satisfied:~~

~~(a)  the Business Transaction is a merger or consolidation or sale of substantially all of the assets of the Corporation, and the aggregate amount of cash to be received per share (on the date of effectiveness of such merger or consolidation or on the date of distribution to stockholders of the Corporation of the proceeds from such sale of assets) by holders of Common Stock of the Corporation (other than such Related Person) in connection with such Business Transaction is at least equal in value to such Related Person's Highest Common Stock Purchase Price; and~~

~~(b)  after such Related Person has become the Beneficial Owner of not less than ten percent (10%) of the voting power of the Voting Stock and prior to the consummation of such Business Transaction, such Related Person shall not have become the Beneficial Owner of any additional shares of Voting Stock or securities convertible into Voting Stock, except (i) as a part of the transaction which resulted in such Related Person becoming the Beneficial Owner of not less than ten percent (10%) of the voting power of the Voting Stock or (ii) as a result of a pro rata stock dividend or stock split; and~~

~~(c)  prior to the consummation of such Business Transaction, such Related Person shall not have, directly or indirectly, (i) received the benefit (other than only a proportionate benefit as a stockholder of the Corporation) of any loans, advances, guarantees, pledges, or other financial assistance or tax credits provided by the Corporation or any of its subsidiaries, (ii) caused any material change in the Corporation's business or equity capital structure, including, without limitation, the issuance of shares of capital stock of the Corporation, or (iii) except as Duly Approved by the Continuing Directors, caused the Corporation to fail to declare and pay (y) at the regular date therefor any full quarterly dividends on any outstanding preferred stock or (z) quarterly cash dividends on the outstanding Common Stock on a per share basis at least equal to the cash dividends being paid thereon by the Corporation immediately prior to the date on which the Related Person became a Related Person.~~

B.  For the purpose of this Article THIRTEENTH:

1.  The term "Business Transaction" shall mean (a) any merger or consolidation involving the Corporation or a subsidiary of the Corporation, (b) any sale, lease, exchange, transfer, or other disposition (in one transaction or a series of related transactions), including, without limitation, a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation or of a subsidiary of the Corporation, (c) any sale, lease, exchange, transfer, or other disposition (in one transaction or a series of related transactions) of all or any Substantial Part of the assets of an entity to the Corporation or a subsidiary of the Corporation, (d) the issuance, sale, exchange, transfer, or other disposition (in one transaction or a series of related transactions) by the Corporation or a subsidiary of the Corporation of any securities of the Corporation or any subsidiary of the Corporation, (e) any recapitalization or reclassification of securities of the Corporation (including, without limitation, any reverse stock split) or other transaction that would have the effect of increasing the voting power of a Related Person or reducing the number of shares of each class of Voting Stock outstanding, (f) any liquidation, spin-off, split-off, split-up, or dissolution of the Corporation, and (g) any agreement, contract, or other arrangement providing for any of the transactions described in this definition of Business Transaction.

2.  The term "Related Person" shall mean and include (a) any individual, corporation, partnership, group, association, or other person or entity which, together with its Affiliates and Associates, is the Beneficial Owner of not less than ten percent (10%) of the voting power of the Voting Stock or was the Beneficial Owner of not less than ten percent (10%) of the voting power of the Voting Stock (i) at the time the definitive agreement providing for the Business Transaction (including any amendment thereof) was entered into, (ii) at the time a resolution approving the Business Transaction was adopted by the Board of Directors of the Corporation, or (iii) as of the record date for the determination of stockholders entitled to notice of and to vote on, or consent to, the Business Transaction, and (b) any Affiliate or Associate of any such individual, corporation, partnership, group, association, or other person or entity; provided, however, and notwithstanding anything in the foregoing to the contrary, the term "Related Person" shall not include the Corporation, a wholly-owned subsidiary of the Corporation, any employee stock ownership or other employee benefit plan of the Corporation or any wholly-owned subsidiary of the Corporation, or any trustee of, or fiduciary with respect to, any such plan when acting in such capacity.

3.  The term "Beneficial Owner" shall be defined by reference to Rule 13d-3 under the Securities Exchange Act of 1934, as amended, as in effect on May 13, 1986; provided, however, that any individual, corporation, partnership, group, association, or other person or entity which has the right to acquire any Voting Stock at any time in the future, whether such right is contingent or absolute, pursuant to any agreement, arrangement, or understanding or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed the Beneficial Owner of such Voting Stock.

G1-6

~~4.   The term "Highest Common Stock Purchase Price" shall mean the highest amount of consideration paid by such Related Person for a share of Common Stock of the Corporation (including any brokerage commissions, transfer taxes, and soliciting dealers' fees) in the transaction which resulted in such Related Person becoming a Related Person or within one year prior to the date such Related Person became a Related Person, whichever is higher; provided, however, that the Highest Common Stock Purchase Price shall be appropriately adjusted to reflect the occurrence of any reclassification, recapitalization, stock split, reverse stock split, or other similar corporate readjustment in the number of outstanding shares of Common Stock of the Corporation between the last date upon which such Related Person paid the Highest Common Stock Purchase Price to the effective date of the merger or consolidation or the date of distribution to stockholders of the Corporation of the proceeds from the sale of substantially all of the assets of the Corporation referred to in subparagraph (2)(a) of Section A. of this Article THIRTEENTH.~~

~~5.   The term "Substantial Part" shall mean more than five percent (5%) of the fair market value of the total assets of the entity in question, as reflected on the most recent consolidated balance sheet of such entity existing at the time the stockholders of the Corporation would be required to approve or authorize the Business Transaction involving any such Substantial Part.~~

~~6.   The term "Voting Stock" shall mean all outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, considered for the purpose of this Article THIRTEENTH as one class.~~

~~7.   The term "Continuing Director" shall mean a director who either was a member of the Board of Directors of the Corporation on May 13, 1986 or who became a director of the Corporation subsequent to such date and whose election, or nomination for election by the Corporation's stockholders, was Duly Approved by the Continuing Directors on the Board at the time of such nomination or election, either by a specific vote or by approval of the proxy statement issued by the Corporation on behalf of the Board of Directors in which such person is named as nominee for director, without due objection to such nomination; provided, however, that in no event shall a director be considered a "Continuing Director" if such director is a Related Person and the Business Transaction to be voted upon is with such Related Person or is one in which such Related Person has an interest (other than only a proportionate interest as a stockholder of the Corporation).~~

~~8.   The term "Duly Approved by the Continuing Directors" shall mean an action approved by the vote of at least a majority of the Continuing Directors then on the Board, except, if the votes of such Continuing Directors in favor of such action would be insufficient to constitute an act of the Board of Directors if a vote by all of its members were to have been taken, then such term shall mean an action approved by the unanimous vote of the Continuing Directors then on the Board so long as there are at least three Continuing Directors on the Board at the time of such unanimous vote.~~

~~9.   The term "Affiliate," used to indicate a relationship to a specified person, shall mean a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such specified person.~~

~~10.  The term "Associate," used to indicate a relationship with a specified person, shall mean (a) any corporation, partnership, or other organization of which such specified person is an officer or partner, (b) any trust or other estate in which such specified person has a substantial beneficial interest or as to which such specified person serves as trustee or in a similar fiduciary capacity, (c) any relative or spouse of such specified person, or any relative of such spouse who has the same home as such specified person, or who is a director or officer of the Corporation or any of its parents or subsidiaries, and (d) any person who is a director, officer, or partner of such specified person or of any corporation (other than the Corporation or any wholly owned subsidiary of the Corporation), partnership or other entity which is an Affiliate of such specified person.~~

~~C.  For the purpose of this Article THIRTEENTH, so long as Continuing Directors constitute at least a majority of the entire Board of Directors, the Board of Directors shall have the power to make a good faith determination, on the basis of information known to them, of: (1) the number of shares of Voting Stock of which any person is the Beneficial Owner, (2) whether a person is a Related Person or is an Affiliate or Associate of another, (3) whether a person has an agreement, arrangement, or understanding with another as to the matters referred to in the definition of Beneficial Owner herein, (4) whether the assets subject to any Business Transaction constitute a Substantial Part, (5) whether any Business Transaction is with a Related Person or is one in which a Related Person has an interest (other than only a proportionate interest as a stockholder of the Corporation), (6) whether a Related Person, has, directly or indirectly, received any benefits or caused any of the changes or caused the Corporation to fail to declare and pay any of the dividends referred to in subparagraph (2) (e) of Section A. of this Article THIRTEENTH, and (7) such other matters with respect to which a determination is required under this Article THIRTEENTH; and such determination by the Board of Directors shall be conclusive and binding for all purposes of this Article THIRTEENTH.~~

~~D.  Nothing contained in this Article THIRTEENTH shall be construed to relieve any Related Person of any fiduciary obligation imposed by law.~~

~~E.  The fact that any Business Transaction complies with the provisions of Section A. of this Article THIRTEENTH shall not be construed to impose any fiduciary duty, obligation, or responsibility on the Board of Directors, or any member thereof, to approve such Business Transaction or recommend its adoption or approval to the stockholders of the Corporation.~~

~~F.  Notwithstanding any other provisions of this Certificate of Incorporation or the Bylaws of the Corporation (and notwithstanding that a lesser percentage may be specified by law), the provisions of this Article THIRTEENTH may not be repealed or amended in any respect, unless such action is approved by the affirmative vote of the holders of not less than eighty percent (80%) of the outstanding shares of the Common Stock.~~

THIRTEENTH:  Intentionally omitted.

FOURTEENTH: The liability of the Corporation's Directors to the Corporation or its stockholders shall be eliminated to the fullest extent permitted by the General Corporation Law of the State of Delaware, as the same exists or may be amended from time to time.  Any repeal or amendment of this Article FOURTEENTH by the stockholders of the Corporation shall not adversely affect any right or protection of a director existing at the time of such repeal or amendment.

G1-8

**APPENDIX G-2**

**Certificate of Amendment of the
Certificate of Incorporation of
3M Company**

3M COMPANY, a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), does hereby certify that:

1. The Certificate of Incorporation of the Corporation is hereby amended by deleting Article ELEVENTH in its entirety and inserting the following in lieu thereof:

    "ELEVENTH:  Intentionally omitted."

2. The Certificate of Incorporation of the Corporation is hereby amended by deleting Article THIRTEENTH in its entirety and inserting the following in lieu thereof:

    "THIRTEENTH:  Intentionally omitted."

3. The foregoing amendments were duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Amendment to be executed by Gregg M. Larson, its Associate General Counsel and Secretary, on this      day of May 2007.

3M COMPANY

By: _____
Name: Gregg M. Larson
Office: Associate General Counsel and Secretary

G-2

## APPENDIX H

## 3M EXECUTIVE ANNUAL INCENTIVE PLAN

1. **Purposes.**

The purposes of the 3M Executive Annual Incentive Plan (the "Plan") are to attract and retain highly qualified individuals as executive officers of 3M; to focus their attention on achieving certain business objectives established for 3M and its business units; and to provide these individuals with incentive compensation that is intended to qualify as performance-based compensation under Section 162(m) of the Internal Revenue Code.

2. **Definitions.**

(a) "Adjusted Net Income" means the net income of 3M as reported in the Consolidated Statement of Income as adjusted to exclude special items.

(b) "Committee" means those members of the Compensation Committee of 3M's Board of Directors who qualify as outside directors for purposes of Section 162(m) of the Internal Revenue Code.

(c) "Named Executive Officers" means those executive officers of 3M covered by the SEC's disclosure requirements for executive compensation in Item 402 of Regulation S-K.

(d) "Participant" means an employee of 3M who is eligible to participate in this Plan pursuant to Section 4 and whose participation in the Plan has been approved by the Committee.

(e) "Plan" means this 3M Executive Annual Incentive Plan.

(f) "Plan Year" means the 12-month period ending on December 31.

(g) "Retirement" means the termination of a Participant's employment with 3M after meeting the requirements for retirement under any retirement plan of 3M (including, in the United States, the 3M Employee Retirement Income Plan).

3. **Term and Termination of the Plan.**

This Plan shall become effective on January 1, 2007, subject to approval by the affirmative vote of the holders of a majority of the shares of outstanding common stock of 3M voting at the 2007 Annual Meeting of Stockholders, and it shall remain in effect until it is terminated by the Committee.

4. **Participation.**

The individuals eligible to participate in this Plan shall be the Named Executive Officers of 3M, as well as any other senior executives of 3M whose compensation is approved by the Committee.

5. **Amounts of Annual Incentive.**

The maximum annual incentive payable to any Named Executive Officer for any Plan Year shall be one-quarter of one percent (0.25%) of the Adjusted Net Income for such Plan Year, while the maximum annual incentive payable for any Plan Year to any Participant who is not a Named Executive Officer shall be one-tenth of one percent (0.10%) of the Adjusted Net Income for such Plan Year. Subject to these maximums, the Committee shall determine the amount of each Participant's annual incentive opportunity for each Plan Year in its discretion. Notwithstanding anything to the contrary in this Plan document, the Committee in its sole discretion may decide to

H-1

reduce the annual incentive payable to a Participant for any Plan Year below the applicable maximum amount payable under this Section 5

6. **Payments of Annual Incentive.**

All annual incentive payments under this Plan shall be made in the form of cash or in the form of shares of 3M stock, restricted stock or restricted stock units delivered pursuant to the 3M Management Stock Ownership Program. All annual incentive payments for a Plan Year shall be completed no later than March 15 of the year following the end of such Plan Year; provided, however, that no payment shall be made under this Plan until the Committee has certified in writing that: (a) the performance goal for such Plan Year has been satisfied, and (b) the limitations described in Section 5 have not been exceeded.

7. **Plan Administration.**

This Plan will be administered by the Committee, which may delegate any of its administrative responsibilities in connection with the Plan to the appropriate employees of 3M. The Committee will have full power and authority to interpret the Plan, to establish, amend and rescind any rules, forms or procedures as it deems necessary for the proper administration of the Plan, to determine the manner and time of payment of the annual incentive compensation payable hereunder, and to take any other action as it deems necessary or advisable in connection with the Plan. Any decision made, action taken or interpretation made by the Committee or its delegate that is not inconsistent with the provisions of this Plan will be final, conclusive, and binding on all persons interested in the Plan.

8. **Amendments.**

The Committee may at any time amend this Plan, in whole or in part; provided no amendment which would (a) increase the maximum annual incentive payable to any Participant, or (b) revise the performance goal available for determining the amount of the annual incentive compensation payable hereunder, shall become effective until approved by the affirmative vote of the holders of a majority of the shares of outstanding common stock of 3M voting at a meeting of the corporation's stockholders.

9. **Rights of Participants.**

Nothing in this Plan or the fact that a person has received or become eligible to receive annual incentive compensation hereunder shall be deemed to give such person any right to be retained in the employ of 3M or to interfere with the right of 3M to discipline or terminate the employment of such person at any time for any reason whatsoever. No person shall have any claim or right to receive annual incentive compensation under this Plan, except as provided in accordance with the provisions of this Plan and as approved by the Committee. If a Participant's employment with 3M terminates for any reason other than death or Retirement, participation in this Plan will end and any annual incentive compensation that would otherwise have been payable to such Participant for the Plan Year in which such termination occurs shall be forfeited.

10. **Withholding.**

All payments of annual incentive compensation made pursuant to this Plan will be subject to withholding for all applicable taxes and contributions required by law to be withheld therefrom.

11. **No Assignment.**

No right or interest of a Participant under this Plan shall be assignable or transferable, or subject to the claims of any creditor or to any liens.

12. **Successors.**

All obligations of 3M under this Plan with respect to the payment of annual incentive compensation will be binding upon any successor to 3M, regardless of the reason or circumstances for such succession (whether by reason of merger, consolidation, or the purchase of substantially all of the business and assets of 3M).

13. **Validity.**

In the event any provision of this Plan should be determined to be illegal or invalid for any reason, it shall not affect the remaining provisions of the Plan which shall remain in effect as if the illegal or invalid provision had never been included herein. If any provision of this Plan would cause the annual incentive compensation payable hereunder not to qualify as performance-based compensation under Section 162(m) of the Internal Revenue Code, that provision will be deemed severed from the Plan without affecting the remaining provisions of the Plan.

14. **Governing Law.**

The provisions of this Plan shall be governed by, and interpreted and construed in accordance with, the laws of the State of Delaware.

H-3

**Attendance Card**

**3M**

Annual Meeting
of Stockholders

May 8, 2007
RiverCentre
175 West Kellogg Blvd.
St. Paul, Minnesota

This is your ticket to the 2007 Annual Meeting.
Please show it upon arrival. Annual Meeting
activities begin at 8:30 a.m. with product
demonstrations and displays. The meeting starts at
10:00 a.m. After the meeting, lunch will be served
and the 3M store will open.

The meeting will be held in the Roy Wilkins
Auditorium. Hosts and hostesses will show you the
way after you enter the RiverCentre.

Since parking space is limited, you are
urged to consider carpooling or public
transportation.

**Attendance Card**

**3M**

Annual Meeting
of Stockholders

May 8, 2007
RiverCentre
175 West Kellogg Blvd.
St. Paul, Minnesota

This is your ticket to the 2007 Annual Meeting.
Please show it upon arrival. Annual Meeting
activities begin at 8:30 a.m. with product
demonstrations and displays. The meeting starts at
10:00 a.m. After the meeting, lunch will be served
and the 3M store will open.

The meeting will be held in the Roy Wilkins
Auditorium. Hosts and hostesses will show you the
way after you enter the RiverCentre.

Since parking space is limited, you are
urged to consider carpooling or public
transportation.

Recycled Paper
40% Pre-consumer paper
10% Post-consumer paper

3M Company

### ANNUAL MEETING OF STOCKHOLDERS

**Tuesday, May 8, 2007**

**3M Center**
**St. Paul, Minnesota 55144**

**Receive Future Proxy Materials Electronically**

Help us make a difference by eliminating paper proxy mailings to your home or business. With your consent, we will send all future proxy voting materials to you by E-mail, along with a link to 3M's proxy voting site. To register for electronic delivery of future proxy materials, go t www.econsent.com/mmm and follow the prompts.

[GRAPHIC]

3M Company
3M Center
St. Paul, Minnesota 55144

prox

---

**The Board of Directors solicits this proxy for use at the Annual Meeting on Tuesday, May 8, 2007.**

The stockholder(s) whose signature(s) appear(s) on the reverse side of this proxy card hereby appoint(s) George W. Buckley, Vance D. Coffman, and Rozanne L. Ridgway or any of them, each with full power of substitution, as proxies, to vote all shares of common stock in 3M Company which the stockholder(s) would be entitled to vote on all matters which may properly come before the 2007 Annual Meeting of Stockholders and any adjournments thereof. THE PROXIES SHALL VOTE SUBJECT TO THE DIRECTION INDICATED ON THE REVERSE SIDE OF THIS CARD. THE PROXIES ARE AUTHORIZED TO VOTE IN THEIR DISCRETION UPON OTHER BUSINESS AS MAY PROPERLY COME BEFORE THE MEETING AND ANY ADJOURNMENTS OR POSTPONEMENTS THEREOF. THE PROXIES WILL VOTE AS THE BOARD OF DIRECTORS RECOMMENDS WHERE A CHOICE IS NOT SPECIFIED.

**FOR PARTICIPANTS IN 3M'S VOLUNTARY INVESTMENT PLAN AND EMPLOYEE STOCK OWNERSHIP PLAN (VIP), AND THE 3M SAVINGS PLAN:**

In accordance with the terms of the VIP and Savings Plan, shares allocated to my respective accounts in these plans on the record date will be voted by the trustee, State Street Bank and Trust Company, in accordance with the instructions indicated on the reverse side of this card, and in accordance with the judgment of the trustee upon other business as may properly come before the meeting and any adjournments or postponements thereof. In addition, participants in the VIP may instruct State Street (as VIP trustee) how to vote a proportionate number of botl the 3M shares held by the VIP that have not been allocated to accounts of participants and the allocated shares for which no instructions are received. If no instructions are provided or if this card is not received on or before May 3, 2007, shares held in my account for the Savings Plan will be voted by the trustee as directed by any one of the named proxies designated above. If no instructions are provided or if this card is not received on or before May 3, 2007, shares held in my account for the VIP will be voted by the trustee in the same proportion that the other participants in the VIP direct the trustee to vote shares in their VIP accounts.

*(Continued, and must be signed and dated on the other side)*

**VOTING INSTRUCTIONS:**
**THERE ARE THREE WAYS TO VOTE YOUR PROXY**

**VOTE BY INTERNET** — www.eproxy.com/mmm/ — **Quick \*\*\* Easy \*\*\* Immediate**

- Use the Internet to vote your proxy 24 hours a day, 7 days a week, until 12:00 p.m. (CT) on May 7, 2007.

- Please have your proxy card and the last four digits of your Social Security Number or Tax Identification Number available. Follow the simple instructions to obtain your records and create an electronic ballot.

**VOTE BY TELEPHONE** — **1-800-560-1965** — **Quick \*\*\* Easy \*\*\* Immediate**

- Use any touch-tone telephone to vote your proxy 24 hours a day, 7 days a week, until 12:00 p.m. (CT) on May 7, 2007.

- Please have your proxy card and the last four digits of your Social Security Number or Tax Identification Number available. Follow the simple instructions the voice provides you.

**VOTE BY MAIL**
Mark, sign, and date your proxy card and return it in the postage-paid envelope provided so that it is received by May 7, 2007 (by May 3, 2007, for participants in 3M's Voluntary Investment Plan and Employee Stock Ownership Plan and the 3M Savings Plan).
**Your Internet or telephone vote authorizes the named proxies to vote your shares in the same manner as if you marked, signed, and returned your proxy card. The deadline for Internet or telephone voting is 12:00 p.m. (Central Time) on May 7, 2007** (by May 3, 2007, for participants in 3M's Voluntary Investment Plan and Employee Stock Ownership Plan and the 3M Savings Plan).
**If you vote your shares on the Internet or by telephone, you do not need to mail back the proxy card.**
**YOUR VOTE IS IMPORTANT. THANK YOU FOR VOTING.**

**The Board of Directors Recommends a Vote "FOR" all Nominees:**

**1.** Election of Directors

| | |
|---|---|
| 01 Linda G. Alvarado | 06 Herbert L. Henkel |
| 02 George W. Buckley | 07 Edward M. Liddy |
| 03 Vance D. Coffman | 08 Robert S. Morrison |
| 04 Michael L. Eskew | 09 Aulana L. Peters |
| 05 W. James Farrell | 10 Rozanne L. Ridgway |

☐ Vote FOR all nominees (except as noted below)          ☐ Vote WITHHELD from all nominees

To withhold authority to vote for any nominee, write the number(s) of the nominee(s) in the box provided to the right.

*Please fold here*

**The Board of Directors Recommends a Vote "FOR" Items 2, 3, 4, 5, and 6:**

| | | | | |
|---|---|---|---|---|
| **2.** | Ratification of the Appointment of PricewaterhouseCoopers LLP as 3M's Independent Registered Public Accounting Firm | ☐ For | ☐ Against | ☐ Abstain |
| **3.** | Amendment of the Company's Restated Certificate of Incorporation to Eliminate the Supermajority Vote Requirements | ☐ For | ☐ Against | ☐ Abstain |
| **4.** | Amendment of the Company's Restated Certificate of Incorporation to Eliminate the Fair Price Provision | ☐ For | ☐ Against | ☐ Abstain |
| **5.** | Approval of the Executive Annual Incentive Plan | ☐ For | ☐ Against | ☐ Abstain |
| **6.** | Approval of the Material Terms of the Performance Criteria Under the Performance Unit Plan | ☐ For | ☐ Against | ☐ Abstain |

**The Board of Directors Recommends a Vote "AGAINST" the Stockholder Proposal in Item 7:**

| | | | | |
|---|---|---|---|---|
| **7.** | Executive Compensation based on the Performance of Peer Companies | ☐ For | ☐ Against | ☐ Abstain |

In their discretion, to vote upon other matters properly coming before the meeting.

**THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED. IF NO DIRECTION IS GIVEN, IT WILL BE VOTED "FOR" ALL NOMINEES AND "FOR" ITEMS 2, 3, 4, 5, AND 6, AND "AGAINST" ITEM 7.**

Address Change? Mark Box ☐    Indicate changes below:

Date _____

Signature(s) in Box
Please sign exactly as your name(s) appears on Proxy. If held in joint
tenancy, all persons should sign. Trustees, administrators, etc., should
include title and authority. Corporations should provide full name of
corporation and title of authorized officer signing the proxy.

## <u>CERTIFICATE OF SERVICE</u>

I, Brian D. Long, hereby certify that on this 21st day of August, 2007, that I have caused

foregoing Declaration of A. Arnold Gershon In Support of Plaintiff's Motion for Summary

Judgment to be filed via the CM/ECF System and served via e-mail upon the following counsel.

Daniel A. Dresibach, Esq.
Steven J. Fineman, Esq.
Geoffrey G. Grivner, Esq.
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801

*/s/ Brian D. Long*
Brian D. Long, Esq. (#4347)