## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INSULATORS AND ASBESTOS WORKERS )
LOCAL NO. 14 PENSION FUND, )
Derivatively On Behalf Of 3M Company, )    Civil Action No. 07-416 (GMS)
)
        Plaintiff, )
)
  v. )
)
GEORGE W. BUCKLEY, LINDA G. )
ALVARADO, VANCE D. COFFMAN, )
MICHAEL L. ESKEW, W. JAMES FARRELL,)
HERBERT L. HENKEL, EDWARD M. )
LIDDY, ROBERT S. MORRISON, AULANA )
L. PETERS, ROZANNE L. RIDGEWAY, )
PATRICK D. CAMPBELL, MOE S. NOZARI, )
FREDERICK J. PALENSKY, RICHARD F. )
ZIEGLER, )
)
        Defendants, )
)
    and )
)
3M COMPANY, a Delaware Corporation, )
)
        Nominal Defendant. )

## DECLARATION OF GREGG M. LARSON

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

*Attorneys for George W. Buckley, Patrick D.
Campbell, Moe S. Nozari, Frederick J.
Palensky, and Richard F. Ziegler*

Daniel A. Dreisbach (#2583)
Steven J. Fineman (#4025)
Geoffrey G. Grivner (#4711)
RICHARDS LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
dreisbach@rlf.com
fineman@rlf.com
grivner@rlf.com

*Attorneys for 3M Company, Linda G.
Alvarado, Vance D. Coffman, Michael L.
Eskew, W. James Farrell, Herbert L. Henkel,
Edward M. Liddy, Robert S. Morrison, Aulana
L. Peters, and Rozanne L. Ridgway*

OF COUNSEL:

Thomas F. Ryan
Walter C. Carlson
James W. Ducayet
Sharlene P.B. Hobson
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000

Dated: September 10, 2007

OF COUNSEL:

Paul H. Dawes
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, California  94025

J. Christian Word
Kevin H. Metz
LATHAM & WATKINS LLP
555 Eleventh St. NW
Washington, DC 20004

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INSULATORS AND ASBESTOS WORKERS )<br>LOCAL NO. 14 PENSION FUND, )<br>Derivatively On Behalf Of 3M Company, )<br>                                                 )<br>Plaintiff,                            )<br>                                                 )<br>v.                                       )<br>                                                 )<br>GEORGE W. BUCKLEY, LINDA G. )<br>ALVARADO, VANCE D. COFFMAN, )<br>MICHAEL L. ESKEW, W. JAMES FARRELL,)<br>HERBERT L. HENKEL, EDWARD M. )<br>LIDDY, ROBERT S. MORRISON, AULANA )<br>L. PETERS, ROZANNE L. RIDGEWAY, )<br>PATRICK D. CAMPBELL, MOE S. NOZARI, )<br>FREDERICK J. PALENSKY, RICHARD F. )<br>ZIEGLER,                            )<br>                                                 )<br>Defendants,                     )<br>                                                 )<br>And                                   )<br>                                                 )<br>3M COMPANY, A Delaware Corporation, )<br>                                                 )<br>Nominal Defendant.             ) | Case No. 07-cv-00416-GMS |

## DECLARATION OF GREGG M. LARSON

I, Gregg M. Larson, hereby testify as to the following matters within my personal knowledge:

1.      I am currently the Deputy General Counsel of 3M Company ("3M" or "the Company") and the Secretary to the Company's Board of Directors. I have been Secretary to the Company since January 1, 2002. I am providing this declaration in my capacity as Secretary, not in any capacity as a lawyer to the Company.

2.      I oversaw the preparation and creation of the Company's 2007 Proxy Statement ("Proxy Statement") by the Company's legal and financial advisors. The Proxy Statement was

prepared in anticipation of the Company's Annual Shareholder Meeting to be held on May 8, 2007.

3.     The 2007 Proxy Statement contained, among other things, a proposal for shareholder approval of the adoption of the Executive Annual Incentive Plan ("Plan"). As such, the Proxy Statement contained a section that provided the material terms of the Plan and noted that the Company's Board of Directors recommended approval of the adoption of the Plan as well as of the material terms under which compensation would be paid to individuals participating in such Plan.

4.     The Company's Compensation Committee reviewed the summary of the Plan in the Proxy Statement. The Proxy Statement also contained a lengthy discussion of the Company's compensation objectives and policies. The Proxy Statement was submitted to all members of the Board of Directors for their review.

5.     The Proxy Statement was distributed to the Company's shareholders on or about March 26, 2007.

6.     The Plan was intended to comply with the requirements of Section 162(m) of the Internal Revenue Code, which requires, *inter alia*, that the material terms of the performance goals under which compensation is to be paid are disclosed to and approved by shareholders.

7.     The Proxy Statement was examined by several proxy advisory firms such as Institutional Shareholder Services ("ISS") and PROXY Governance, Inc. ("PGI"). These firms unanimously recommended that the Company's shareholders approve the Plan. True and accurate copies of the recommendations of ISS and PGI are attached hereto as Exhibits A and B, respectively.

8.     The Company's Annual Meeting was held on May 8, 2007. At that meeting, the Plan as well the material terms under which compensation would be paid to individuals participating in such Plan were approved by shareholders. The shares voting in favor of the Plan totaled 566,033,236.479 (89% of the total share voting). The shares voting against the Plan

- ii -

totaled 53,992,509.653 (9%). A total of 12,986,929.057 shares abstained from voting on this proposal.

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 10, 2007

GREGG M. LARSON

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on September 10, 2007, the within

document was filed with the Clerk of the Court using CM/ECF which will send

notification of such filing(s) to the following; that the document was served on the

following counsel as indicated; and that the document is available for viewing and

downloading from CM/ECF.

### BY HAND DELIVERY

Seth D. Rigrodsky, Esq.
Brian D. Long, Esq.
Rigrodsky & Long, P.A.
919 N. Market Street, Suite 980
Wilmington, DE  19801
srigrodsky@rigrodskylong.com; blong@rigrodskylong.com

Daniel A. Dreisbach, Esq.
Steven J. Fineman, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE  19801
dreisbach@rlf.com; fineman@rlf.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: provner@potteranderson.com

# EXHIBIT A

**US Proxy Advisory Services**

Publication Date : April 19, 2007

## Company Info

| Ticker | MMM |
|---|---|
| Meeting | Annual May 8, 2007 |
| Record Date | March 9, 2007 |
| Incorporated | Delaware |

Diversified technology company (GICS:20105010 )

## Shareholder Returns

| | 1 yr% | 3 yr% | 5 yr% |
|---|---|---|---|
| Company | 2.97 | -0.80 | 7.87 |
| S&P 500 | 15.78 | 10.43 | 6.19 |
| GICS peers | 17.08 | 16.77 | 11.60 |

Annualized shareholder returns. Peer group is based on companies inside the same "Global Industry Classification Standard" code

## CGQ Rating

| Index Score | 61 |
|---|---|
| Industry Score | 92.9 |

MMM outperformed 61% of the companies in the S&P 500 and 92.9% of the companies in the Capital Goods group.

ISS calculate governance rankings for more than 8,000 companies worldwide based on up to 63 corporate governance variables.

# 3M CO

## Recommendations - US Standard Policy

| Item | Code* | Proposal | Mgt. Rec. | ISS Rec. |
|---|---|---|---|---|
| 1.1 | M0201 | Elect Director Linda G. Alvarado | FOR | FOR |
| 1.2 | M0201 | Elect Director George W. Buckley | FOR | FOR |
| 1.3 | M0201 | Elect Director Vance D. Coffman | FOR | FOR |
| 1.4 | M0201 | Elect Director Michael L. Eskew | FOR | FOR |
| 1.5 | M0201 | Elect Director W. James Farrell | FOR | FOR |
| 1.6 | M0201 | Elect Director Herbert L. Henkel | FOR | FOR |
| 1.7 | M0201 | Elect Director Edward M. Liddy | FOR | FOR |
| 1.8 | M0201 | Elect Director Robert S. Morrison | FOR | FOR |
| 1.9 | M0201 | Elect Director Aulana L. Peters | FOR | FOR |
| 1.10 | M0201 | Elect Director Rozanne L. Ridgway | FOR | FOR |
| 2 | M0101 | Ratify Auditors | FOR | FOR |
| 3 | M0608 | Reduce Supermajority Vote Requirement | FOR | FOR |
| 4 | M0614 | Rescind Fair Price Provision | FOR | FOR |
| 5 | M0535 | Approve Executive Incentive Bonus Plan | FOR | FOR |
| 6 | M0535 | Approve Executive Incentive Bonus Plan | FOR | FOR |
| 7 | S0520 | **Pay For Superior Performance** | **AGAINST** | **FOR** |

*S indicates shareholder proposal

## Report Contents

Proposals and recommendations
Performance Summary
Equity Capital
Audit Summary
Director Profiles
Executive Compensation
Vote Results
Proposals

*This issuer may have purchased self-assessment tools and publications from ISS Corporate Services, Inc. ("ICS"), a wholly-owned subsidiary of Institutional Shareholder Services Inc. ("ISS"), or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. No employee of ICS played a role in the preparation of this report. If you are an ISS institutional client, you may inquire about any issuer's use of products and services from ICS, by emailing disclosure@issproxy.com. If you have questions about this analysis call: 301-556-0576 or email to USResearch@issproxy.com*

## Corporate Governance Profile

**Governance Provisions:**
- Shareholders do not have cumulative voting rights in director elections
- The positions of chairman and CEO are combined
- The company does not have a poison pill in place
- A supermajority vote of shareholders is required to amend certain provisions of the charter or bylaws
- A supermajority vote of shareholders is required to approve certain types of mergers or business combinations
- Shareholders may not act by written consent
- Shareholders may not call special meetings
- The board may amend the bylaws without shareholder approval
- There is not a dual class capital structure in place
- Executives are subject to stock ownership guidelines
- Directors are subject to stock ownership guidelines

**Non-Shareholder Approved Incentive Plans:**
- All stock-based incentive plans have been approved by shareholders

**State Statutes:**
- The company is incorporated in a state with anti-takeover provisions
- The company is incorporated in a state without a control share acquisition statute
- The company is incorporated in a state without a cash out statute
- The company is subject to a freezeout provision
- The company is incorporated in a state without a fair price provision
- The company is incorporated in a state without stakeholder laws
- The state of incorporation does not endorse poison pills

## ISS Corporate Governance Rating

| Governance Factor | Positive | Negative |
|---|---|---|
| The audit committee is comprised solely of independent outside directors | x | |
| The average annual burn rate over the past three fiscal years is 2% or less, or is within one standard deviation of the industry mean | x | |
| All of the audit committee members are "financial experts" | x | |
| The board is controlled by a supermajority of independent outsiders (independent outsiders greater than 90%) | x | |
| There is no disclosure of mandatory holding periods for restricted stock after vesting | | x |
| The company does not utilize performance-based equity awards with specific performance criteria and hurdle rates disclosed | | x |
| There is no disclosure of mandatory holding periods for stock acquired upon exercise of options | | x |
| There is no disclosure as to whether the company's option plans permit repricing | | x |

## Performance Summary

|  | 1 year | 3 year | 5 year |
|---|---|---|---|
| Annualized Shareholder Returns - Company | 2.97% | -0.80% | 7.87% |
| Annualized Shareholder Returns - S&P 500 Index | 15.78% | 10.43% | 6.19% |
| Annualized Shareholder Returns - Company GICS peer group | 17.08% | 16.77% | 11.60% |

## Equity Capital

| Type | Votes per share | Issued |
|---|---|---|
| Common Stock | 1.00 | 727,566,923 |

| Ownership - Common Stock | Number of Shares | Percent of Class |
|---|---|---|
| State Street Bank and Trust | 55,377,278 | 7.50 |
| Officers and Directors as a group | 2,846,940 | 0.39 |

## Audit Summary

| Accountants | PricewaterhouseCoopers |
|---|---|
| Auditor Tenure | 32 |
| Audit Fees | |
| Audit Fees : | $ 11,400,000.00 |
| Audit-Related Fees: | $2,700,000.00 |
| Tax Compliance/Preparation*: | $0.00 |
| Other Fees: | $1,400,000.00 |
| Percentage of total fees attributable to non-audit ("other") fees: | 9.03% |

* Note: Only includes tax compliance/tax return preparation fees. If the proxy disclosure does not indicate the nature of the tax services, those fees will appear in the "other" column.

## Director Profiles

### Nominees

| Name | Company | ISS | Affiliation | Term Ends | Tenure | Age | Audit | Comp | Nom | Outside Boards | Outside CEO |
|------|---------|-----|-------------|-----------|--------|-----|-------|------|-----|----------------|-------------|
| Aulana L. Peters | Independent | Independent Outsider | | 2008 | 17 | 65 | ☑ | | | 3 | |
| Rozanne L. Ridgway | Independent | Independent Outsider | | 2008 | 18 | 71 | ☑ | C | | 5 | |
| W. James Farrell | Independent | Independent Outsider | | 2008 | 1 | 64 | F | | | 3 | |
| Vance D. Coffman | Independent | Independent Outsider | | 2008 | 5 | 62 | | C | ☑ | 2 | |
| Linda G. Alvarado | Independent | Independent Outsider | | 2008 | 7 | 55 | F | | | 4 | |
| Edward M. Liddy | Independent | Independent Outsider | | 2008 | 7 | 61 | C F | | ☑ | 2 | |
| Herbert L. Henkel | Independent | Independent Outsider | | 2008 | NEW | 59 | | | | 2 | ☑ |
| Robert S. Morrison | Independent | Independent Outsider | | 2008 | 5 | 64 | ☑ | ☑ | | 3 | |
| George W. Buckley | Not Independent | Insider | CEO/Chair | 2008 | 2 | 60 | | | | 1 | |
| Michael L. Eskew | Independent | Independent Outsider | | 2008 | 4 | 57 | F | | | 2 | ☑ |

### Summary Information

| | |
|---|---|
| Average age | 62 |
| Average tenure | 7 |
| Average outside boards per director | 2.7 |
| Percent of directors who have attended an ISS Accredited Program | 20% |
| Percent of directors who are outside CEOs | 20% |
| Directors with less than 75% attendance | |
| Directors who do not own company stock | |

### Independence

| | Number of Directors | Number of Insiders | Number of Affiliated | Percent Independent |
|---|---|---|---|---|
| Board | 10 | 1 | 0 | 90% |
| Audit | 4 | 0 | 0 | 100% |
| Compensation | 4 | 0 | 0 | 100% |
| Nominating | 4 | 0 | 0 | 100% |

The company has a plurality vote standard for the election of directors, and has a director resignation policy in its governance guidelines.

## Executive Compensation

In 2006, the SEC updated disclosure requirements on executive and director compensation and called for more information on pension, deferred compensation and severance agreements. The new requirements apply for proxy statements of companies whose fiscal years end on or after December 15, 2006. Companies whose fiscal years end before then (e.g. September fiscal years) but whose annual meetings are in 2007 are not required to include the additional disclosure until their next proxy filing. As such, during the 2007 proxy season, the executive compensation section of ISS' research reports will reflect either the new or old disclosure requirements. When applicable, the new executive compensation section in ISS' research reports will reflect the updated disclosure information. All compensation data, with the exception of stock awards and options valuation, are taken from the company's most recent proxy statement. Stock awards and options are valued under the full grant date fair value rather than the amortized value over the requisite service period. Also, the estimated present value of stock options is determined under full-term assumptions. For a complete listing of frequently asked questions, go to http://www.equilar.com/iss/iss_faq.html

**Total Compensation**



This chart shows a comparison of total compensation for the company's CEO and the median of a peer group for the most recent fiscal year.[1][2] Total compensation is the sum of all pay components as reported in the summary compensation table by the company. The calculated total compensation figure will not match with the company's disclosed total compensation because stock awards and options are valued under the full grant date fair value rather than the amortized value over the requisite service period. Additionally, options are valued under full-term assumptions.

**Salary, Bonus and Non-Equity Incentive Awards**



This chart shows a comparison of salary, bonus and non-equity incentive awards for the company's CEO and the median of a peer group for the most recent fiscal year.[1][2] Bonus may include discretionary or guaranteed amounts. Non-equity incentive awards may include annual performance-based cash bonus, multi-year performance cash award, or awards where performance measures are not stock price driven and are not settled in company's stock.

**Stock Awards and Option Awards**



This chart shows the different types of equity plan awards. Stock awards and options values will not match with the company's disclosure as they are valued under the full grant date fair value rather than the amortized value over the requisite service period. The value of stock awards reflects the full grant date value under FAS 123R and may include awards with performance-based conditions. The estimated present value of options is determined under full-term assumptions.

**Change in Pension Value and Deferred Compensation and All Other Compensation**



This chart shows the aggregate increase in actuarial value of pension plans, above-market earnings on deferred compensation and all other compensation, which include, but are not limited to, the following items: perquisites, tax gross-ups, dividends paid on stock or option awards or life insurance premiums. The median group calculation includes companies that do not provide pension and preferential earnings in deferred compensation.

**Compensation Mix for Most Recent Fiscal Year**





This chart shows the percentage of executive compensation that came from five key areas - Cash compensation, stock awards, options, performance cash compensation and non-performance compensation (which may include perks, tax gross-ups, annual company contributions to vested and unvested defined contribution plans, insurance premiums, dividends paid on stock or options and other compensation not disclosed in other columns).

**CEO Stats**

**General**

| | |
|---|---|
| Age | 60 |
| Tenure | 2 |
| # of Outside Boards | 1 |
| Outside Boards | The Black & Decker Corp. |
| Committees at Outside Boards * | Compensation And Remuneration at The Black & Decker Corp. |

**Retirement Data** — Qualified & Non-Qualified Plan

| | |
|---|---|
| Present Value of accumulated benefit | 9,282,725 |

**Equity Compensation**

| | |
|---|---|
| Did the company grant performance-contingent options last FY? | No |
| Did the company grant premium-priced options last FY? | No |
| Did the company grant discount options last FY? | Yes |
| Did the company grant performance-contingent stock awards last FY? | No |
| What were the specific performance measures? | Not disclosed |

**Other Stats**

| | |
|---|---|
| CEO pay as % of company revenue (CEO total comp/revenue) | 0.08% |
| CEO pay as % of company net income (CEO total comp/net income) | 0.45% |

* As of the most recent annual meeting date of the other companies listed.

**Company Financials**

## Change in Total Direct Compensation vs. Stock and Financial Measures

| % chg in TDC (2006-2005)[3] | | 1-yr TSR % | 3-yr TSR % | Revenue ($MM) | % Chg in Revenue |
|---|---|---|---|---|---|
| BUCKLEY, G | NA | 2.97% | -0.80% | $22,923 | 8.30% |
| Peer Group Avg. | NA | 29.40% | 22.30% | $25,146.42 | 4.09% |

**CFO and Other Named Executive Officers ($ in 000s)**

|  | Subject Company | | |
|---|---|---|---|
|  | Principal Financial Officer | Other Three Named Execs* | Top Five Named Execs |
| Base | $676 | $1,749 | $4,025 |
| Bonus + Non-Equity Incentive | $751 | $2,110 | $10,310 |
| Stock Awards | $0 | $540 | $633 |
| Options | $1,891 | $6,114 | $15,432 |
| Chg in Pension value | $493 | $546 | $1,094 |
| Above Market Earning on Deferred Comp | $0 | $0 | $0 |
| All Other Comp | $95 | $212 | $958 |
| Total | $3,905 | $11,271 | $32,451 |
| As a Multiple of Net Income | 0.10% | 0.29% | 0.84% |
| As a Multiple of Revenue | 0.02% | 0.05% | 0.14% |

* Values equate to aggregate totals of those other named executives. Positions include: Executive Vice President, Consumer and Office Business, Executive Vice President, Research and Development, and Chief Technology Officer, Senior Vice President Legal Affairs and General Counsel

**CEO's Last Fiscal Year Total Direct Compensation ($ in 000s)**



Due to changes in SEC reporting requirements, a direct comparison of total compensation between 2006 and previous years is not possible. This chart is provided for client reference and reflects previous reporting requirements.

## Footnotes

1. The company's peer group will generally contain 12 companies based on the six-digit Global Industry Classification Standard (GICS) and the fiscal year revenue closest to the company. If there are insufficient companies within the six-digit GICS, peer companies would be supplemented from the four-digit GICS. For 2007, companies will be required to provide enhanced disclosure under the updated SEC rules. As companies file their proxy statements at various times during the year, the company's peer group, as determined by ISS, may not contain all 12 companies. A minimum of eight companies will be required for the median figure to be calculated. The peer group does not represent the financial or compensation peer groups that may be disclosed in the company's proxy statement. References made to the peer group of 12 companies are only relevant to this page. GICS represents the global industry classification standard indices developed by Standard & Poor's and Morgan Stanley Capital International.
2. List of peer companies: Carlisle Companies Inc., General Dynamics Corp , General Electric Co., Raytheon Co., Sequa Corp., Teleflex Inc., Textron Inc., Tredegar Corporation, Walter Industries, Inc.
3. Under the new SEC disclosure rules, companies will not be required to restate compensation for the previous two years. The year-over-year comparison does not apply for the first effective year under the revised SEC disclosure requirements on executive compensation

Source: Equilar - Executive Compensation, Standard & Poor's Research Insight - Financial

## Vote Results

### Vote Results for 05/09/2006 Annual meeting

| Proposal | Mgmnt Rec | Vote Requirement | Base | Result | % For |
|---|---|---|---|---|---|
| 1.1. Elect Director Linda G. Alvarado | For | Plurality | F+A | Majority | 96.64 |
| 1.2. Elect Director Edward M. Liddy | For | Plurality | F+A | Majority | 97.73 |
| 1.3. Elect Director Robert S. Morrison | For | Plurality | F+A | Majority | 97.67 |
| 1.4. Elect Director Aulana L. Peters | For | Plurality | F+A | Majority | 97.14 |
| 2. Ratify Auditors | For | 50% | F+A+AB | Pass | 97.68 |
| 3. Declassify the Board of Directors | For | 80% | Outstanding | Pass | 84.31 |
| 4. Performance-Based | Against | 50% | F+A+AB | Fail | 33.24 |
| 5. Adopt Animal Welfare Policy | Against | 50% | F+A+AB | Pending | 0.00 |
| 6. Implement China Principles | Against | 50% | F+A+AB | Fail | 6.35 |

#### Notes

1. Vote results are for the most recent annual meeting.
2. Abbreviations for the "Base" identifier are as follows: F+A - For and Against; F+A+AB - For, Against and Abstain; Outstanding - Outstanding shares.

## Proposals

### Items 1.1-1.10: Elect Directors                                                                  FOR

- A substantial majority of the board members are independent outsiders.

- The key board committees include no insiders or affiliated outsiders.

#### Company Overview

At last year's annual meeting, shareholders approved the election of four nominees to the board, which was still classified at the time of the vote. Additionally, shareholders approved a proposal eliminating the classified structure of the board, replacing it with an annual election beginning with the 2007 annual meeting. ISS notes that the board has been declassified, and all directors are up for annual shareholder election. In addition, shareholders submitted a proposal to establish a pay-for-superior-performance standard in the company's compensation plans for senior executives. ISS supported the amendment, which received 34 percent of the votes. The United Brotherhood of Carpenters Pension Fund has submitted a similar proposal for the 2007 annual meeting. See Item 7 (Pay for Superior Performance) below for further analysis.

In November 2006, the board amended the company's bylaws to eliminate the supermajority vote requirements that were included in its governance guidelines. Accordingly, at the 2007 annual meeting shareholders will vote on a proposal to amend the certificate of incorporation to eliminate the supermajority vote requirements. Similarly, shareholders will also vote on a proposal to amend the certificate of incorporation to eliminate the fair price provision. See Items 3 and 4 below for further analysis on these proposals.

In August 2006, 3M appointed W. James Farrell to serve as a director. Mr. Farrell is a retired chairman of Illinois Tool Works Inc., a Fortune 200 diversified manufacturing company. In January 2007, director Kevin Sharer announced his intention to not stand for re-election at the upcoming annual meeting, citing personal reasons.

In December 2006, the company completed the sale of its branded pharmaceuticals business in the United States, Canada, Latin America and Asia Pacific region, including Australia and South Africa. Later, in January 2007, the company completed the sale of its pharmaceuticals business in Europe.

In 2006, the company completed 19 acquisitions for a total purchase price of $888 million, net of cash acquired. These combinations are reflective of a more aggressive growth strategy compared to the previous year when 3M closed only four company purchases. These acquisitions helped the company to add sales volume, improve the company's technology base, gain production capacity, fill product lines, and increase access to new markets. As a result, 3M increased its sales volume 8.2 percent in 2006, the highest level of sales volume growth in six years. Net sales rose to $22.9 billion, up 8.3 percent from $21.2 billion in 2005, where all six business segments contributed to an average 5.6 percent growth in local-currency sales excluding the impact of businesses acquired during the year. Acquisitions increased sales by 2.1 percent, driven by the August 2005 purchase of CUNO and the August 2006 acquisition of Security Printing and Systems Limited. At the same time, operating income surged 17.3 percent to $5.7 billion in 2006 from $4.8 billion in 2005, which included $1.07 billion of pre-tax gains in the sale of the pharmaceutical business. As a result, 3M obtained a record net income of $3.8 billion in 2006, up 23.8 percent compared with $3.1 billion in 2005, which includes $674 million after-tax gains related to the sale of certain portions of the company's branded pharmaceuticals business.

During the first quarter of 2007, 3M has announced six additional acquisitions involving companies such as PolyMask Corp., Accuspray Application Technologies Inc., Rite-Lok product line from Chemence Inc., E Wood Holdings PLC, Interchemall Sp. z o.o. and Acolyte Biomedica.

Cash flows provided by operating activities decreased $365 million in 2006, primarily driven by an increase of $600 million in tax payments compared with 2005. These tax payments are related to the repatriation of $1.7 billion of foreign earnings during 2006. Total capital expenditures totaled $1.17 billion, up $225 million

compared with 2005, and an additional $1.4 billion are expected for 2007.

Total cash dividends paid to stockholders increased 7 percent to $1.38 billion in 2006 from $1.29 billion in 2005, while cash used in stock repurchases totaled $2.3 billion in 2006. In August 2006, the Board of Directors approved a repurchase of common shares that raised the total authorization to $3.0 billion for the period from February 13, 2006 to February 28, 2007. In February 2007, the Board approved an additional $7.0 billion two-year share repurchase program for the period from February 12, 2007 to February 28, 2009. Also in February, 3M's Board of Directors authorized a dividend increase of 4.3 percent to 48 cents per share, equivalent to an annual dividend of $1.92 per share for 2007.

## CEO Compensation

As ISS reviewed George W. Buckley's compensation, it had particular concern about the value of the supplemental executive retirement plan (SERP) payment that was being carried over from his previous employment with Brunswick Corporation. Mr. Buckley forfeited his SERP benefits, among others, when he resigned from Brunswick in 2005. 3M compensated Mr. Buckley for such benefits. Based on the disclosure that the company had provided in its proxy filing, it was not clear if the SERP benefit was truly make-whole of the forfeited amount or if additional amounts were being provided, and how the terms and conditions compare.

Supplemental executive retirement plans (SERPs) are entitlements and are not performance driven or linked to a company's or individual's performance. Not only do SERPs not receive the favorable tax deductions that qualified plans do, but also the company pays taxes on the income it must generate in order to pay the executive in retirement. SERPs also guarantee fixed payments to the executive for life. Most SERPs formula largely depend on the highest level of compensation received in the years prior to an executive's retirement. Some companies even provide additional years of service not worked for a newly hired executive to account for pension forfeited at the previous company. Such enhancements create substantial lifetime costs to the company and its shareholders.

According to the company's 2007 proxy statement, Mr. Buckley's employment agreement requires the company to provide him supplemental retirement benefits designed to compensate for benefits provided by Brunswick that he forfeited, presently valued at $8,587,354. Pursuant to the agreement, Mr. Buckley will earn a supplemental retirement benefit payable in the form of a lump-sum at the time of his termination of employment. The amount of this benefit will be the actuarially equivalent present value of the amount by which (a) a single life annuity payable for Mr. Buckley's lifetime commencing at age 60 (or, if later, on the date of his termination of employment) equal to 40 percent of his highest average annual cash compensation (base salary plus bonus) during any three consecutive years during his final ten years of employment, exceeds (b) the sum of his actual pension benefits payable at age 60 (or, if later, on the date of his termination of employment) under the plans of the company and his previous employers. The benefit formula for this supplemental retirement benefit increases by 2 percent (from 40 percent) for each full year following Mr. Buckley's 60th birthday that he remains employed by the company, up to a maximum of 50 percent. This supplemental retirement benefit vests in full on December 6, 2010, upon Mr. Buckley's death or termination due to disability, upon a termination of his employment by the company without cause, or upon a termination of his employment by Mr. Buckley for good reason.

## Conclusion

ISS recognizes that attracting executive talent, particularly at the CEO position, can be challenging in today's environment. "Golden hello" payments are increasingly being used by boards to lure executives from outside companies into the CEO suite. While we do not recommend withholding from compensation committee members at this time, ISS will closely monitor the pay practices at 3M. Shareholders would be well served to do the same.

**Vote FOR Items 1.1-1.10.**                                          *US Standard Policy*

**Item 2: Ratify Auditors**                                              **FOR**

The board recommends that PricewaterhouseCoopers be approved as the company's independent accounting firm for the coming year. Note that the auditor's report contained in the annual report is unqualified, meaning that in the opinion of the auditor, the company's financial statements are fairly presented in accordance with generally accepted accounting principles.

**Vote FOR Item 2.**                                        *US Standard Policy*

## Item 3: Reduce Supermajority Vote Requirement                              FOR

This item seeks shareholder approval to amend the company's certificate of incorporation to eliminate the supermajority vote requirements by deleting Article Eleventh. Item 4 below seeks to eliminate the fair price provision upon removal of the required supermajority vote of Article Thirteenth.

The board believes that the supermajority provision is inconsistent with principles of good corporate governance in that they limit shareholders' ability to participate effectively in corporate governance. Essentially, a supermajority vote can provide a veto to a large minority shareholder or group of shareholders, thus limiting the abilities of a majority of shareholders.

Article Eleventh requires that the affirmative vote of at least 80 percent of the outstanding stock voting to amend, alter or repeal the bylaws or certain provisions of the certificate of incorporation. This shareholder proposal would remove the 80 percent supermajority vote requirement relating to the ability (1) to amend, alter or repeal any provision of the bylaws; and (2) to amend, alter or repeal Article Eleventh or Article Thirteenth of the certificate of incorporation. Upon shareholder approval, the principal effect of this proposal will be that those provisions may be amended, altered or repealed upon approval of the board and the vote of the holders of a majority of the company's outstanding stock entitled to vote.

ISS maintains that a simple majority of voting shares should be sufficient to effect changes in a company's corporate governance. Requiring more than a simple majority may permit management to entrench itself by blocking amendments that are in shareholders' best interests.

ISS supports any reduction of a company's voting requirements, even if the change is simply a lower supermajority.

**Vote FOR Item 3.**                                                    *US Standard Policy*

## Item 4: Rescind Fair Price Provision                                    FOR

This item seeks shareholder approval to amend the company's certificate of incorporation to eliminate the fair price provision by deleting Article Thirteenth.

A fair price provision is an anti-takeover measure designed to help companies defend against certain kinds of tender offers, known as coercive, two-tiered tender offers. In this type of takeover, a potential acquirer will offer one price for the shares needed to gain control of a target company and then offer a lower price or other less favorable consideration for the remaining shares, thereby creating pressure for stockholders to tender their shares for the tender offer price, regardless of their value. Standard fair price provisions encourage a potential acquirer to negotiate with a company's board of directors by requiring the potential acquirer to pay a "fair price" for all shares as determined under a specified formulation, unless the acquirer's offer has satisfied specified board or stockholder approval requirements.

Section 203 of the Delaware General Corporation Law contains provisions that provide similar protection to those under Article Thirteenth. When the company adopted Article Thriteenth in 1986, Section 203 of the DGCL had not yet been enacted. The board believes that the protection afforded by Section 203 is sufficient, and that the Article in question is no longer necessary. Further, it is noted that 3M Co. will continue to be subject to Section 203 of the DGCL without regard to whether this amendment is approved.

The repeal of Article Thirteenth will have two principal effects on shareholder voting: (1) those transactions covered by the Article that would otherwise require a shareholder vote under the DGCL would require the vote of the holders of a majority of outstanding stock, rather than the current 80 percent supermajority vote; and (2) the board will be able to effect, without obtaining shareholder approval, those transactions covered by the Article that do not otherwise require shareholder approval under Delaware law.

Given the similar protection provided by Delaware General Corporation Law, we believe that the elimination of the fair price provision does not significantly reduce the company's ability to discourage two-tiered tender offers. Rescinding the fair price provision would provide the company with flexibility in pursuing strategic transactions without compromising the company's ability to protect itself from potential hostile takeovers.

**Vote FOR Item 4.**                                              *US Standard Policy*

## Item 5: Approve Executive Incentive Bonus Plan                      FOR

The company has submitted for shareholder approval the **3M Executive Annual Incentive Plan**, a cash or stock bonus plan, to avoid the tax deduction limitations imposed by Section 162(m) of the Internal Revenue Code.

The deduction limit does not apply to compensation paid under a plan that meets certain requirements for "performance-based compensation." To qualify for this exception: (1) the compensation must be payable as a result of the attainment of one or more preestablished objective performance goals; (2) the performance goals must be established by a compensation committee composed solely of two or more outside directors; (3) the material terms of the compensation and the performance goals must be disclosed to and approved by shareholders before payment; and (4) the compensation committee must certify in writing that the performance goals have been satisfied before payment.

Under OBRA guidelines, companies must disclose either the formula or the maximum dollar amount that can be earned, but not both. In addition, companies do not have to disclose information that may be considered proprietary. The Internal Revenue Code requires resubmission to shareholders for approval within five years of initial approval, or earlier, if a material change has been made to the plan provisions. Material features of the plan are as follows:

| | |
|---|---|
| Eligible Participants: | Named executives and other senior executives whose compensation is approved by the Compensation Committee (not disclosed) |
| Form of Awards: | Cash or shares of common stock, restricted stock, or restricted stock units reserved under the Management Stock Ownership Program |
| Administrator: | Compensation Committee: Vance D. Coffman (IO); Robert S. Morrison (IO); Aulana L. Peter (IO); Rozanne L. Ridgway (IO); Kevin W. Sharer (IO) |
| Performance Criteria: | One or more of the following financial measures: organic growth, operating income and economic profit (See Compensation Discussion & Analysis). |
| Formula: | Determined by achievement of pre-established target levels. |
| Performance Period: | One year |
| Change in Control: | Not disclosed |
| Individual Award Limits: | For named executives, the limit is 0.25 percent of the adjusted net income of the company for the year. For all others, the limit is 0.10 percent. |
| Previous Year Awards: | Not disclosed |
| Projected Awards: | Not disclosed |

ISS recognizes that bonus plans such as this one can be an important part of an executive's overall pay package, along with stock-based plans tied to long-term total shareholder returns. Over the long term, stock prices are an excellent indicator of management performance. However, other factors, such as economic conditions and investor reaction to the stock market in general, and certain industries in particular, can greatly impact the company's stock price. As a result, a bonus plan can effectively reward individual performance and the achievement of business unit objectives that are independent of short-term market share price fluctuations.

ISS has concerns with an individual award limit expressed as a percentage of a financial line item as it can produce astronomical payouts.

Given the tax advantages that the 162(m) plan provides we recommend support for this proposal. However, ISS will monitor the performance bonus payouts provided to named executive officers and may recommend a vote to WITHHOLD from the compensation committee members if the company does reach the individual award limit without providing sufficient and complete disclosure in the proxy statement.

**Vote FOR Item 5.**                                          *US Standard Policy*

## Item 6: Approve Executive Incentive Bonus Plan                    FOR

The company has submitted for shareholder approval the **Performance Unit Plan**, a cash or stock bonus plan, to avoid the tax deduction limitations imposed by Section 162(m) of the Internal Revenue Code. Further, this proposal will amend the available performance criteria.

The deduction limit does not apply to compensation paid under a plan that meets certain requirements for "performance-based compensation." To qualify for this exception: (1) the compensation must be payable as a result of the attainment of one or more preestablished objective performance goals; (2) the performance goals must be established by a compensation committee composed solely of two or more outside directors; (3) the material terms of the compensation and the performance goals must be disclosed to and approved by shareholders before payment; and (4) the compensation committee must certify in writing that the performance goals have been satisfied before payment.

Under OBRA guidelines, companies must disclose either the formula or the maximum dollar amount that can be earned, but not both. In addition, companies do not have to disclose information that may be considered proprietary. The Internal Revenue Code requires resubmission to shareholders for approval within five years of initial approval, or earlier, if a material change has been made to the plan provisions. Material features of the plan are as follows:

| | |
|---|---|
| Eligible Participants: | Senior-level management (approximately five individuals) |
| Form of Awards: | Cash or common stock. As noted in the Compensation Discussion & Analysis, the company has consistently made the payments in the form of cash. |
| Administrator: | Compensation Committee: Vance D. Coffman (IO); Robert S. Morrison (IO); Aulana L. Peter (IO); Rozanne L. Ridgway (IO); Kevin W. Sharer (IO) |
| Performance Criteria: | Upon shareholder approval, one or more of the following financial measures: adjusted net income or improvement in adjusted net income, earnings per share or improvement in earnings per share, net sales, cash flow, gross margin, operating margin, earnings before interest and taxes, EBITDA, economic value added, stock price, return on assets or net assets, and operating income or improvement in operating income. As amended, the performance criteria available to the Compensation Committee under the Plan now include return on capital employed, return on assets or net assets, net sales, sales growth, cash flow, earnings per share or improvement in earnings per share, return on equity, stock price, gross margin, operating margin, total shareholder return, economic value added, economic profit or improvement in economic profit, earnings before interest and taxes, EBITDA, operating income or improvement in operating income, improvements in certain asset or financial measures, reductions in certain asset or cost areas, net income or variations of net income in varying time periods, and comparisons with other peer companies or industry groups or classifications with regard to one or more of these criteria. As amended, the criteria may now apply either to the Company as a whole or to any of its business segments. |
| Formula: | Determined by achievement of a preestablished target level. |
| Performance Period: | Three years |
| Change in Control: | Awards become fully vested |
| Individual Award Limits: | $360 per performance unit |
| Previous Year Awards: | Not disclosed |
| Projected Awards: | $4,280,040 to named executives (based upon target awards disclosed under non-equity incentive in the Grants of Plan-Based Awards table) |

ISS recognizes that cash bonus plans such as this one can be an important part of an executive's overall pay package, along with stock-based plans tied to long-term total shareholder returns. Over the long term, stock prices are an excellent indicator of management performance. However, other factors, such as economic

conditions and investor reaction to the stock market in general, and certain industries in particular, can greatly impact the company's stock price. As a result, a cash bonus plan can effectively reward individual performance and the achievement of business unit objectives that are independent of short-term market share price fluctuations.

The performance measures included under the plan are appropriate for the company given its line of business, long-term strategic objectives, and industry-specific measures for assessing market competitiveness. Additionally, the plan is administered by a committee of independent outsiders who must certify attainment of these objective, measurable performance goals before cash awards are paid to participants. Moreover, preservation of the full deductibility of all compensation paid reduces the company's corporate tax obligation.

**Vote FOR Item 6.**                                      *US Standard Policy*

## Item 7: Pay For Superior Performance    FOR

The United Brotherhood of Carpenters Pension Fund has submitted this proposal requesting that the executive compensation committee establish a pay-for-superior-performance standard in the company's executive compensation plan for senior executives, by incorporating the following principles into the plan:

(1) The annual compensation program should utilize defined financial performance criteria that can be benchmarked against a disclosed peer group of companies. Annual bonuses should be awarded only when the company's performance exceeds its peers' median or mean performance on the selected financial criteria;

(2) The long-term compensation program should utilize defined financial and/or stock price performance criteria that can be benchmarked against a disclosed peer group of companies. Options, restricted shares, or other equity or non-equity compensation should be structured so that compensation is received only when the company's performance exceeds its peers' median or mean performance on the selected financial and stock price performance criteria; and

(3) Disclosure should be sufficient to allow shareholders to determine and monitor the pay and performance correlation established in the programs.

**Proponent's Position**

The proponent feels it is imperative that compensation plans for senior executives be designed and implemented to promote long-term corporate value. A critical design feature of a well-conceived executive compensation program is a close correlation between the level of pay and the level of corporate performance relative to industry peers. The proponent further states that compensation committees typically target senior executive total compensation at the median level of a selected peer group. Then the committees design any annual and long-term incentive plan performance criteria and benchmarks to deliver a significant portion of the total compensation target regardless of the company's performance relative to its peers. The proponent believes that high total compensation targets combined with less than rigorous performance benchmarks yield a pattern of superior-pay-for-average-performance. A senior executive compensation plan based on sound pay-for-superior-performance principles will help moderate excessive executive compensation and create competitive compensation incentives that will focus senior executives on building sustainable long-term corporate value.

**Management's Position**

The board supports a performance-based executive incentive compensation program, and notes a long history of linking compensation to company performance. However, the board believes that adopting the proponent's rigid policy of fixing annual incentive and long-term equity compensation mechanically from a single industry peer group performance measure, would unwisely restrict the compensation committee's discretion. Further, the board believes that the proposal is inflexible, which deprives the ability of the committee to design compensation to balance short-term objectives with action that will increase shareholder value in the long-term. The board believes that the current compensation program is appropriately designed to attract and retain talented executives in today's highly competitive market. Further, the board believes that the compensation committee should retain the flexibility to make compensation awards without the constraint of rigid, pre-determined formulae dictated by a plan that rewards executives on the basis of the performance of the stock market or industry peers.

**ISS' Analysis**

In determining the vote recommendation for this pay-for-superior-performance proposal, ISS conducts an in-depth analysis of the company's annual and long-term incentive compensation programs to assess the extent to which executive pay is linked to performance. Additionally, proxy statement disclosure should be sufficient to allow shareholders to monitor the correlation between pay and performance. Although commendable, ISS does not mandate executive compensation to be tied to performance relative to a peer group, or that compensation is paid only in cases where company performance exceeds mean or median peer performance. Instead, we are looking for compensation programs that are substantially performance based, which ensures

senior executives have "skin in the game." When recommending "for" this non-binding, precatory proposal, ISS is supporting the spirit of the proposal: a greater use of at-risk, performance-based cash and equity compensation for senior executives coupled with increased disclosure and transparency for shareholders. More specifically, ISS will examine the following:

(1) What aspects of the company's short and long-term incentive compensation programs for senior executives are performance-based? If the company's executive incentive programs are not tied to performance relative to a peer group, are the performance measures, hurdle rates and weightings disclosed prospectively or retrospectively and is a substantial portion of equity compensation to named executive officers performance-based according to ISS' policies? (ISS defines a substantial portion of performance-based awards as at least 50 percent of the shares awarded to named executive officers for that fiscal year.)

(2) Can shareholders assess the correlation between pay and performance for senior executives based on the company's disclosure?

(3) What industry and stage of the business cycle is the company in?

### Annual Incentive Compensation

For fiscal 2006, annual cash bonus awards were delivered in the form of quarterly profit sharing plans based on the quarterly economic profit of the company and its business units. Economic profit was defined as quarterly net operating income minus a charge for operating capital used by the business. All executives received at least a portion of their bonus based on the quarterly economic profit of the company as a whole, while some executives also received a portion based on the performance of their respective business units. The target annual bonus for the CEO was $2,600,000, or 162 percent of annual base salary, while the target annual bonus for all other named executives was 87 percent of their respective base salaries. Total economic profit of the company for fiscal 2006 was $1,998 billion, an increase of 2 percent over that for fiscal 2005. This resulted in payments made to those executives who received profit sharing based solely on results of the company as a whole of 102 percent of their annual target.

Effective upon shareholder approval of Item 5 (see above), the compensation committee will replace the current profit sharing plans with the Executive Annual Incentive Plan. The new annual incentive plan will be based on organic growth, operating income and economic profit. Payments will be made in the form of cash or in shares of common stock, restricted stock or restricted stock units delivered pursuant to the Management Stock Ownership Program. For named executives, the maximum incentive payable to any individual will be 0.25 percent of the adjusted net income, while the maximum for all other individual will be 0.1 percent. The change will be effective in 2007 for the company's executives and in 2008 for the remaining employees currently participating in the profit sharing plans.

ISS commends the company for establishing a performance based annual plan, however, ISS notes that the performance metric is not benchmarked against a peer group and that the company has not disclosed the specific hurdle rates for economic profit (minimum, target and maximum levels). It is unclear form the disclosure what type of payouts would be determined if 100 percent or higher of the target performance is achieved, or less than 100 percent of the target is achieved. Without the specific hurdles, shareholders cannot assess the rigor of the bonus plan and whether pay and performance are linked.

### Long-Term Equity Compensation

The company's long-term compensation consists of stock options (100% fair market value), restricted stock, restricted stock units, SARs, reload stock options and performance units.

The Management Stock Ownership Program ("the Program") and the Performance Unit Plan are the primary vehicles for delivery of long-term incentive compensation to executives. The Program recognizes individual performance in determining the size of annual grants, and authorizes the compensation committee to grant stock options, restricted stock, SARs and other stock-based awards. Restricted stock or RSUs granted under the Program are time-based, vesting over periods ranging from one to five years. The Program also allows for progressive stock options or reloads.

The Performance Unit Plan allows for annual awards of performance units contingent upon the attainment of performance criteria as selected each year by the compensation committee over the applicable three-year performance period. The performance units are payable in either cash or shares of common stock, though typically in cash. For fiscal 2006, the performance units were based upon attainment of preapproved levels of economic profit growth and sales growth, with approximately 60 percent of the amount determined by economic profit growth and 40 percent by sales growth. The amount payable ranges from $0 to $360 per unit, depending upon performance of the company during the three-year performance period ending Dec. 31, 2008.

The compensation committee approved the following formula for determining amounts payable for performance units granted in 2006: For economic profit growth, payouts range from $0 per unit for performance below 5 percent to $216 per unit for performance at 20 percent or higher; for sales growth exceeding the Industrial Production Index, payouts range from $0 per unit for performance below the Index to $144 per unit for performance exceeding the Index by 5 percent.

ISS believes that a significant portion - 50 percent or greater (in terms of shares) - of equity compensation for named executives should be performance-based, with clearly disclosed, specific and challenging performance targets or benchmarked against a disclose peer group. Accordingly, traditional stock options and awards of restricted stock that vests over time do not qualify as performance-based equity compensation. For fiscal 2006, named executives received 94.7 percent of total long-term equity compensation in standard stock options/option reloads and time-vested restricted stock, and 5.3 percent in target performance units. ISS recognizes that 7,500 shares of time-vested restricted stock was granted for retention purposes. Even excluding these one-time retention grants, a significant portion of the long-term compensation is not performance-based under ISS guidelines.

ISS believes that a significant portion – 50 percent or greater – of named executives' equity compensation should be performance-based. Further, companies should disclose specific performance measures and hurdles rates for performance-based grants to named executives, so that shareholder can assess the correlation between long-term equity compensation and performance.

### Industry and Business Cycle

The company belongs to the conglomerates sector, was founded in 1902 and has traded publicly on the NYSE since 1946. The company is one of the 30 stocks of the Dow Jones Industrial Average, and is also part of the S&P 500. Given the company's size, age, and industry, ISS believes that the company should place more reliance on performance-based compensation in its annual and long-term compensation programs, regardless of whether performance is measured on an absolute or relative basis (i.e. benchmarked against a peer group or index). Moreover, disclosure of specific performance measures, hurdles rates, and the degree to which past and current performance targets are being met allows shareholders to assess the rigor of the company's compensation programs and evaluate whether pay is tied to performance.

### Conclusion

In this case, ISS notes that the company's annual compensation program for named executives does not provide adequate disclosure concerning the specific target payments for the disclosed financial metric, nor is it clear how payouts are determined with respect to target performance. Further, the long-term compensation program is largely time-based. Accordingly, ISS believes that the company has not sufficiently established a pay-for-superior-performance standard in its executive compensation programs. As such, ISS believes that shareholder support for this proposal is warranted.

**Vote FOR Item 7.**                                           *US Standard Policy*

## Additional Information and Instructions

**3M CO**
**3M CENTER**
**BLDG. 220-11W-02**
**ST PAUL MN 55144-1000**
**6517332204**

**Shareholder Proposal Deadline:** November 27, 2007

**Solicitor:** ADP

**Security ID:**88579Y101 (CUSIP).

This proxy analysis and vote recommendation have not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While ISS exercised due care in compiling this analysis, we make no warranty, express or implied, regarding the accuracy, completeness, or usefulness of this information and assume no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities.

ISS is a wholly-owned subsidiary of RiskMetrics Group, Inc. (RMG), a provider of financial risk management analytics and solutions.

This issuer may be a client of ISS, ICS, or ISS' parent company, RMG, or the parent of, or affiliated with, a client of ISS, ICS, or RMG. ISS may in some circumstances afford issuers, whether or not they are ICS clients, the right to review draft research analyses so that factual inaccuracies may be corrected before the recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with ISS.

One, or more, of the proponents of a shareholder proposal at the upcoming meeting may be a client of ISS, ICS or ISS' parent company, RMG, or the parent of, or affiliated with, a client of ISS, ICS or RMG. None of the sponsors of the shareholder proposal(s) played a role in preparing this report.

Three of RMG's largest stockholders, General Atlantic, Spectrum Equity Investors, and Technology Crossover Ventures, are private equity investors whose business activities include making equity and debt investments in public and privately-held companies. In addition, RMG has other smaller stockholders who may make equity investments in public and privately-held companies. As a result, from time to time one or more of RMG's stockholders or their affiliates (or their representatives who serve on RMG's Board of Directors) may hold securities, serve on the board of directors and/or have the right to nominate representatives to the board of a company which is the subject of one of ISS' proxy analyses and vote recommendations. We have established policies and procedures to restrict the involvement of any of RMG's non-management stockholders, their affiliates and board members in the editorial content of our analyses and vote recommendations.

Institutional Shareholder Services Europe SA ("ISS Europe") is a wholly-owned subsidiary of ISS. Jean-Nicolas Caprasse, the managing director of ISS Europe, is a non-executive partner of Deminor International SCRL ("International"), a company which provides active engagement and other advisory services to shareholders of both listed and non-listed companies. As a result, International may be providing engagement services to shareholders of a company which is the subject of one of our analyses or recommendations or otherwise working on behalf of shareholders with respect to such a company. As a non-executive partner of International, Mr. Caprasse is not involved in the engagement and other services provided to the clients of International. International has no role in the formulation of the research policies, reports and vote recommendations prepared by ISS or ISS Europe. Mr. Caprasse will benefit financially from the success of International's business in proportion to his partnership interest.

Neither RMG's non-management stockholders, their affiliates nor RMG's non-management board members are informed of the contents of any of our analyses or recommendations prior to their publication or dissemination.

3M CO

April 19, 2007

© 2007, Institutional Shareholder Services Inc. All Rights Reserved. The information contained in this ISS Proxy Analysis
may not be republished, broadcast, or redistributed without the prior written consent of Institutional Shareholder Services
Inc.

**US Proxy Advisory Services**

Publication Date : April 19, 2007

## Company Info

| | |
|---|---|
| **Ticker** | MMM .... |
| **Meeting** | Annual May 8, 2007 |
| **Record Date** | March 9, 2007 |
| **Incorporated** | Delaware |

Diversified technology company (GICS:20105010 )

**Shares Held on Record Date**

**Shares Voted**

**Date Voted**

## Shareholder Returns

| | 1 yr% | 3 yr% | 5 yr% |
|---|---|---|---|
| **Company** | 2.97 | -0.80 | 7.87 |
| **S&P 500** | 15.78 | 10.43 | 6 19 |
| **GICS peers** | 17.08 | 16.77 | 11.60 |

Annualized shareholder returns. Peer group is based on companies inside the same "General Industry Classification System" code

## CGQ Rating

| | |
|---|---|
| **Index Score** | 61 |
| **Industry Score** | 92.9 |

MMM outperformed 61% of the companies in the S&P 500 and 92.9% of the companies in the Capital Goods group.

ISS calculate governance rankings for more than 8,000 companies worldwide based on up to 63 corporate governance variables.

# 3M CO

**Recommendations - US Standard Policy**

| Item Code* | Proposal | Mgt. Rec. | ISS Rec. | VOTED |
|---|---|---|---|---|
| 1.1 M0201 | Elect Director Linda G. Alvarado | FOR | FOR | |
| 1.2 M0201 | Elect Director George W. Buckley | FOR | FOR | |
| 1.3 M0201 | Elect Director Vance D. Coffman | FOR | FOR | |
| 1.4 M0201 | Elect Director Michael L. Eskew | FOR | FOR | |
| 1.5 M0201 | Elect Director W. James Farrell | FOR | FOR | |
| 1.6 M0201 | Elect Director Herbert L. Henkel | FOR | FOR | |
| 1.7 M0201 | Elect Director Edward M. Liddy | FOR | FOR | |
| 1.8 M0201 | Elect Director Robert S. Morrison | FOR | FOR | |
| 1.9 M0201 | Elect Director Aulana L. Peters | FOR | FOR | |
| 1.10 M0201 | Elect Director Rozanne L. Ridgway | FOR | FOR | |
| 2 M0101 | Ratify Auditors | FOR | FOR | |
| 3 M0608 | Reduce Supermajority Vote Requirement | FOR | FOR | |
| 4 M0614 | Rescind Fair Price Provision | FOR | FOR | |
| 5 M0535 | Approve Executive Incentive Bonus Plan | FOR | FOR | |
| 6 M0535 | Approve Executive Incentive Bonus Plan | FOR | FOR | |
| 7 S0520 | Pay For Superior Performance | AGAINST | FOR | |

*S indicates shareholder proposal

# EXHIBIT B

# PROXY Governance, INC.

Contact: Alesandra Monaco

## 3M CO (NYSE : MMM)

| Annual Meeting | Record Date: 03/09/2007 | Meeting Date: 05/08/2007 |
|---|---|---|

**Classification:** Fortune 500, Russell 3000, S&P 500
**Fiscal Year End:** 12/31/2006
**Market Capitalization:** $55.6B
**Solicitor:** Georgeson Shareholder Communications
**Shareholder Proposal Deadline:** 11/27/2007

- Investor Relations
- Proxy Statement
- SEC Filing 10k
- Company Description

## Meeting Agenda

| Proposals | | Management | PROXY Governance | |
|---|---|---|---|---|
| MGT 1 | Elect Nominees | FOR | FOR | Analysis |
| | 1.1 LINDA G. ALVARADO | FOR | FOR | |
| | 1.2 GEORGE W. BUCKLEY | FOR | FOR | |
| | 1.3 VANCE D. COFFMAN | FOR | FOR | |
| | 1.4 MICHAEL L. ESKEW | FOR | FOR | |
| | 1.5 W. JAMES FARRELL | FOR | FOR | |
| | 1.6 HERBERT L. HENKEL | FOR | FOR | |
| | 1.7 EDWARD M. LIDDY | FOR | FOR | |
| | 1.8 ROBERT S. MORRISON | FOR | FOR | |
| | 1.9 AULANA L. PETERS | FOR | FOR | |
| | 1.10 ROZANNE L. RIDGWAY | FOR | FOR | |
| MGT 2 | Ratify Appointment of Auditors - PRICEWATERHOUSECOOPERS LLP | FOR | FOR | Analysis |
| MGT 3 | Eliminate Supermajority Vote | FOR | FOR | Analysis |
| MGT 4 | Eliminate Fair Price Provision | FOR | FOR | Analysis |
| MGT 5 | Approve Executive Incentive Plan | FOR | FOR | Analysis |
| MGT 6 | Reapprove Performance Unit Plan Criteria for OBRA | FOR | FOR | Analysis |
| SH 7 | Award Pay for Superior Performance | AGAINST | AGAINST | Analysis |

*MGT = Management, SH=Shareholder, SHB=Shareholder— binding proposal*

## Table of Contents

**Comparative Performance Analysis**
- Peer Companies
- Comparative Return to Shareholders
- Composite Performance Summary
- Performance Summary

**Governance Analysis**
- Executive Compensation
- Board Profile
- Stock Ownership/Voting Structure
- State law/Charter/Bylaw Provisions
- Auditor Profile
- Vote Results

**Proposal Analysis**

## Comparative Performance Analysis

PROXY Governance's Comparative Performance Analysis contains calculations and graphs that reflect a company's historical performance and that of its industry peers (listed below) based on certain key financial metrics generally over a five–year period.

Comparative Performance Analysis

## Peer Companies

For the Comparative Performance Analysis, generally up to 10 peer companies are selected primarily based on industry, but also considering market capitalization.

| Peer Companies | | | |
|---|---|---|---|
| CARLISLE COS INC | MCDERMOTT INTL INC | SEQUA CORP -CL A | SIEMENS AG -ADR |
| TELEFLEX INC | TEXTRON INC | TOMKINS PLC -ADR | TYCO INTERNATIONAL LTD |
| WALTER INDUSTRIES INC | | | |

Comparative Performance Analysis

## Comparative Return to Shareholders



Source: FAME North American Pricing [NAP]

The graphs above depict total shareholder return and compounded annual growth rate at specific points in time over the past five years based on average monthly stock prices. The graphs should be read from left (present time) to right (60 months before present time). The graphs allow the user to determine either the company's total shareholder return or compounded annual growth rate to date based on an investment made at a specific point in time over the last five years. Assumes payment, but not reinvestment, of dividends.

Comparative Performance Analysis

## Composite Performance Summary

Composite Performance:

| | Percentile relative to S&P 1500 | | Percentile Pts. |
|---|---|---|---|
| | Company | Peers | Trend |
| **Composite:** | 61 | 51 | ↓ -7 |
| Quarterly Shareholder Returns: | 37 | 57 | ↓ -7 |
| Cash Flow from Operations/Equity: | 86 | 56 | ↓ -9 |
| Return on Equity: | 94 | 39 | ↑ -11 |
| Revenue/Expenses: | 75 | 32 | ↓ -2 |




*Based on five-year data when available

Comparative Performance Analysis

## Performance Summary






Source: Stock Price — North American Pricing [NAP]







Source: Cash Flow/Equity — Compustat







Source: ROE — Compustat







Source: Revenues/Expenses — Compustat

## Governance Analysis

Governance Analysis

## Executive Compensation

PROXY *Governance* evaluates a company's executive compensation over the last three years, as available, and compares that to the median compensation paid by its peers over the same time frame. For our compensation model, generally 20 peer

companies are selected based on similarity of market capitalization and broad economic sector using the GICS. Only U.S. and certain U.S. reporting companies that are incorporated offshore are included in this peer group.

The graph that follows shows:

- The average three–year CEO compensation paid by the company expressed as a percentage from median peer compensation.
- The average three–year compensation paid to the company's other named executives (excluding the CEO) as a percentage from median peer compensation.

| Domestic Peer Companies | | | |
|---|---|---|---|
| BOEING CO | CATERPILLAR INC | EMERSON ELECTRIC CO | FANNIE MAE |
| FEDEX CORP | HONEYWELL INTERNATIONAL INC | LOCKHEED MARTIN CORP | MEDTRONIC INC |
| TYCO INTERNATIONAL LTD | UNITED PARCEL SERVICE INC | UNITED TECHNOLOGIES CORP | |



| Executive Compensation | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Salary | Bonus | Stock Awards | Option Awards | Cash Incentive | Pension Deferred Compensation | All Other | 1-yr Pay[2] | Avg. Pay[2] |
| George W. Buckley Chairman of the Board, President and Chief Executive Officer | $1,600,000 | $4,117,500 | $5,780,234 | $0 | $3,330,740 | $54,869 | $651,246 | $15,236,084 | $12,702,107 |
| Richard F. Ziegler Senior Vice President, Legal Affairs and General Counsel | $714,595 | $0 | $852,690 | $0 | $778,328 | $904 | $117,853 | $1,824,853 | $2,448,443 |
| Patrick D. Campbell Senior Vice President and Chief Financial Officer | $675,878 | $0 | $1,447,590 | $0 | $751,406 | $492,731 | $94,517 | $2,376,430 | $2,847,678 |
| Moe S. Nozari Executive Vice President, Consumer and Office Business | $616,964 | $0 | $2,905,131 | $0 | $713,626 | $208,751 | $51,741 | $2,317,365 | $2,552,661 |
| Frederick J. Palensky Executive Vice President, Research and | $417,259 | $0 | $1,278,717 | $0 | $618,060 | $336,802 | $42,603 | $1,734,403 | $1,734,403 |

PROXY Governance, Inc.                                                Page 7 of 14

| Development and Chief Technology Officer | | | | | | | | | |

¹Options valued using binomial formula.
²Average pay is based on three-years of pay date, when available.

Source: Salary.com (www.executive.salary.com)
As disclosed for fiscal year end 2006.
* CEO appointed during the last two fiscal years. Full three-year data is not available

Governance Analysis

## Board Profile

| Name | Nominee | Term Ends | Not Ind. | Position | Audit | Comp. | Nom. | Age | Tenure | Other Board Seats | <75% Att. | No stock | Prev. yr. withhold votes | Tot Comper |
|------|---------|-----------|----------|----------|-------|-------|------|-----|--------|-------------------|-----------|----------|--------------------------|------------|
| Linda G. Alvarado | ✪ | 2008 | | | Financial Expert | | | 55 | 7 | 4 | | | 3.4% | $170 |
| George W. Buckley | ✪ | 2008 | ✪ | Chair, CEO, President | | | | 60 | 2 | 1 | | | -- | -- |
| Vance D. Coffman | ✪ | 2008 | | Lead Director | Financial Expert | Chair | ✪ | 62 | 5 | 2 | | | -- | $179 |
| Michael L. Eskew | ✪ | 2008 | | | Financial Expert | | | 57 | 4 | 2 | | | -- | $179 |
| W. James Farrell | ✪ | 2008 | | | ✪ | | | 64 | 1 | 3 | | | -- | $64, |
| Herbert L. Henkel | ✪ | 2008 | | | | | | 59 | 0 | 2 | | ✪ | -- | -- |
| Edward M. Liddy | ✪ | 2008 | | | Chair, Financial Expert | | ✪ | 61 | 7 | 3 | | | 2.3% | $185 |
| Robert S. Morrison | ✪ | 2008 | | | | ✪ | ✪ | 64 | 5 | 3 | | | 2.3% | $170 |
| Aulana L. Peters | ✪ | 2008 | | | Financial Expert | ✪ | | 65 | 17 | 3 | | | 2.9% | $175 |
| Rozanne L. Ridgway | ✪ | 2008 | | | | ✪ | Chair | 71 | 18 | 4 | | | -- | $185 |

| Independence | |
|--------------|--------|
| Board | 90.0% |
| Audit | 100.0% |
| Compensation | 100.0% |
| Nominating/Governance | 100.0% |

PROXY Governance believes that the Self-Regulatory Organizations' (SROs) standards of independence are satisfactory and does not support the use of an additional overlay of independence standards, which may vary among advisory services, institutional investors, and commentators. PROXY Governance believes that if the SROs standards are perceived to be inappropriate, interested parties should reopen the debate with the SROs or the SEC to have those standards adjusted.

Governance Analysis

## Stock Ownership/Voting Structure

| Type of stock | Outstanding shares | Vote(s) per share |
|---------------|--------------------|--------------------|
| Common | 727,566,923 | 1 |

| Director & Officer Ownership | | Significant Shareholders | |
|------------------------------|--------|--------------------------|------|
| | 0.4% | State Street Bank and Trust Company ("State Street") | 7.5% |

Governance Analysis

## State Law/Charter/Bylaw Provisions

| State Law Statutory Provisions | |
|---|---|
| State of incorporation | Delaware |
| Business combination | ⊘ |
| Control share acquisition | |
| Fair price provision | |
| Constituency provision | |
| Poision pill endorsement | |

| Charter/Bylaws Provisions | |
|---|---|
| Classified board | |
| Cumulative voting | |
| Dual class/unequal voting rights | |
| Blank check preferred stock | ⊘ |
| Poison pill | |
| Directors may be removed only for cause | ⊘ |
| Only directors may fill board vacancies | ⊘ |
| Only directors can change board size | |
| Supermajority vote to remove directors | |
| Prohibit shareholders to call special meetings | |
| Prohibit action by written consent | |
| Fair price provision | ⊘ |
| Supermajority vote for mergers/business transactions | ⊘ |
| Supermajority to amend charter/bylaw provisions | ⊘ |
| Constituency provision | |

**Note:**

The company has a director resignation policy that requires a director to tender his resignation if the number of "withhold votes" exceeds the number of "for" votes in an uncontested election. The Nominating and Governance Committee is required to make recommendations to the board with respect to the resignation, and the board must take action with respect to this recommendation and disclose their decision-making process.

The company amended its governance documents to declassify its board effective at the 2007 annual meeting.

Governance Analysis

## Auditor Profile



Peer group includes companies listed under Executive Compensation.

PricewaterhouseCoopers LLP serves as the company's independent auditors. The company did not disclose the year PricewaterhouseCoopers LLP was first engaged as its auditors.

| Audit Fees | | | | | |
|---|---|---|---|---|---|
| | Audit fees | Audit Related fees | Tax fees | Other fees | Total fees paid |
| 3M CO | $10,900,000 | $600,000 | $1,300,000 | $0 | $12,800,000 |

As disclosed for fiscal year end 2006.

Governance Analysis

## Vote Results of Last Annual Meeting

| Proposals | | % FOR Votes[1] | For Votes | Against Votes | Abstentions | Broker Non-Votes |
|---|---|---|---|---|---|---|
| MGT | Elect directors[2] | 96.6% – 97.7% | | | | |
| MGT | Ratify Appointment of Auditors: Pricewaterhouse Coopers LLP | 99.0% | 638,355,869 | 6,473,616 | 8,695,690 | 1,600 |
| MGT | Eliminate Classified Board | 98.7% | 636,186,156 | 8,097,889 | 9,242,530 | 200 |
| SH | Award Performance-Based Compensation | 34.1% | 181,007,185 | 350,501,564 | 13,086,772 | 108,931,254 |
| SH | Review/Report on Animal Welfare | N/A[3] | | | | |
| SH | Adopt China Principles | 7.1% | 34,565,622 | 450,365,187 | 59,665,375 | 108,930,591 |

[1] As a % of votes cast for and against; may not reflect passage of proposal.    [2] Low — High director votes.    [3] Voting Results not disclosed.

**Note:** See the Board Profile for individual director votes.

## Proposal Analysis

Management

### 1 Elect Nominees

**PROXY *Governance* Vote Recommendation: FOR**

**Proposal:**

To elect the following 10 nominees to the board: L. Alvarado, G. Buckley, V. Coffman, M. Eskew, W. Farrell, H. Henkel, E. Liddy, R. Morrison, A. Peters and R. Ridgway.

**Analysis:**

- Board size: 10
- New directors since last year: 2
- Independent directors: 9
- Non-Independent directors: 1

Non-Independent directors: Chairman/CEO/President G. Buckley

Unless there is evidence of a breakdown in board monitoring or effectiveness -- such as poor corporate performance relative to peers, excessive executive compensation, noncompliance with SEC rules or SRO listing standards, a lack of responsiveness to legitimate shareholder concerns, or various other factors -- we presume that the board is properly discharging its oversight role and that it is adequately policing itself in terms of board organization, composition and functioning.

**Performance:** According to PROXY *Governance*'s performance analysis, the company has **outperformed** peers over the past five years; the company ranks at the 61st percentile relative to the S&P 1500 compared to peers at the 51st percentile. but is **declining** relative to peers at a rate of 7 percentile points per year. We note that the company is significantly underperforming peers with regard to quarterly shareholder returns. The board has been actively engaged in an ambitious share repurchase plan over the last several years, approving $7.3 billion in repurchases from Jan. 1, 2005 to Feb. 28, 2007. and another $7 billion over the next two years, representing, in the aggregate, 24% of the company's current market capitalization.

**Compensation:** The average three-year compensation paid to the CEO is 6% below the median paid to CEOs at peer companies and the average three-year compensation paid to the other named executives is 37% below the median paid to executives at peer companies.

The company's executive compensation appears **reasonable** given its financial performance relative to peers.

**Rationale/Conclusion:**

PROXY *Governance* believes that the board is properly discharging its oversight role and adequately policing itself.

[back to top]

Management

### 2| Ratify Appointment of Auditors - PRICEWATERHOUSECOOPERS LLP
**PROXY Governance Vote Recommendation: FOR**

**Proposal:**

The Audit Committee has selected PricewaterhouseCoopers LLP as the company's independent auditors for the next fiscal year.

**Analysis:**

Barring circumstances where there is an audit failure due to the auditor not following its own procedures or where the auditor is otherwise complicit in an accounting treatment that misrepresents the financial condition of the company, PROXY Governance recommends the company's choice of auditor. PROXY Governance believes that concerns about a corporation's choice of auditor and the services performed (e.g., high non-audit fees) should be directed through withhold votes from the members of the audit committee, which is responsible for retaining and compensating the auditor.

**Rationale/Conclusion:**

We believe that, in this circumstance, the board/audit committee should be accorded discretion in its selection of the auditor.

[back to top]

Management

### 3| Eliminate Supermajority Vote
**PROXY Governance Vote Recommendation: FOR**

**Proposal:**

Amend the articles of incorporation to eliminate the supermajority vote requirements. Approval of this proposal requires support from 80% of the outstanding shares.

**Management View:**

The board recognizes that some shareholders view supermajority voting requirements as limiting the ability of stockholders to effect change by essentially providing a veto to a large minority stockholder or group of stockholders. In addition, a lower threshold for stockholder votes can increase stockholders' ability to effectively participate in corporate governance.

**Analysis:**

The company's articles currently require a 80% supermajority vote (1) to amend or repeal any provision in the company's bylaws, or (2) to amend or repeal the fair price provision in the articles of incorporation. The company has separately put forth a proposal to eliminate the fair price provision.

PROXY Governance, Inc. will generally support proposals to remove supermajority voting thresholds in the belief that corporate actions requiring shareholder approval should be subject to simple majority rule. In some cases, supermajority voting provisions can work against boards as well as shareholders because many shareholders (particularly individual shareholders) do not bother to vote.

**Rationale/Conclusion:**

PROXY Governance supports the elimination of the supermajority vote provision given that the board has presumably carefully considered the issue and has concluded that it is in the best interest of shareholders to do so.

[back to top]

Management

### 4| Eliminate Fair Price Provision
**PROXY Governance Vote Recommendation: FOR**

**Proposal:**

Amend the articles of incorporation to eliminate the fair price provision, which requires that certain transactions with a "related person" (i.e., with a beneficial owner of 10% or more of the company's stock) be approved by the holders of at least 80% of the outstanding shares, unless the transaction is approved by a majority of the continuing directors or unless certain minimum price requirements are met.

**Management View:**

The board seeks approval of this proposal as part of its package of changes designed to strengthen its corporate governance. It also believes that certain provisions of Delaware law, which have been added since the time of the company's incorporation, are sufficient to provide the anti-takeover protections afforded by this provision.

**Analysis:**

The company's fair price provision provides that business combinations with a holder of 20% or more of the voting stock must be approved by 80% of the outstanding shares unless the transaction is approved by a majority of disinterested directors or unless certain fair price criteria are met. These conditions are designed to ensure that all shareholders receive equitable pricing and are treated fairly and similarly in these types of transactions.

Elimination of the provision means that the default protections under Section 203 of the Delaware General Corporation Law would effectively replace it. This section provides that a "business combination" with an "interested person" (in this case meaning an owner of at least 15% of the company's shares) cannot be completed within three years after the person became an interested person unless: (1) the interested stockholder's status has been ratified by the board, (2) the interested stockholder already owns at least 85% of the company's shares, or (3) the business combination is approved by the board and two-thirds of outstanding shares not owned by the interested stockholder.

We note that several large U.S. companies have taken steps to eliminate fair price provisions as shareholders continue to encourage simple majority voting on all matters.

**Rationale/Conclusion:**

PROXY *Governance* supports the elimination of the fair price provision given that the board has presumably carefully considered the issue and has concluded that it is in the best interest of shareholders to do so.

[back to top]

**Management**

| 5 | Approve Executive Incentive Plan |
|---|---|

**PROXY *Governance* Vote Recommendation: FOR**

**Proposal:**

Approve the Executive Annual Incentive Plan.

**Management View:**

Approval of the proposal will ensure that bonus awards to executive officers will be considered qualified performance-based compensation and will be fully deductible to the company for federal tax purposes.

**Analysis:**

- Eligibility: 5 named executives
- Annual limit per participant: 0.25% of the adjusted net income of the company for the year
- Previous year's bonuses: $2,654,408 for CEO G. Buckley and undetermined for the other named executives
- Performance goals for previous year's bonuses: economic profit

PROXY *Governance* takes a holistic approach to executive compensation, examining all components of executive pay including salary, bonus plans and equity plans. We then review that data to determine how the executives are paid relative to their peers and relative to the company's financial performance versus its peers.

With regard to approving performance measures to meet the requirements for the tax deductibility under Section 162(m) of the Internal Revenue Code, we look at the overall nature of the proposal, including whether the performance criteria seem appropriate, if the company clearly and concisely discloses how and when the goals are set, and what the maximum levels of compensation, particularly for the principal executive officers, will be. While we recognize that, in a plan which will presumably be in effect for several years, the Compensation Committee must retain the flexibility to adjust the criteria or the weighting of those criteria depending on circumstances and the objectives set for the corporation in any given year, we also

note that shareholders frequently feel that the language of the plans affords so much latitude that it is impossible for them to know or understand what they are approving.

In that sense, whether the compensation awarded under the plan is reasonable and appropriate in light of the company's performance can frequently be evaluated only in retrospect, and will be an important factor in PROXY *Governance*'s evaluation of the effectiveness of the Compensation Committee members. It is our view that, if the company's overall executive compensation is excessive under our pay-for-performance model, ensuring that it is tax deductible becomes a secondary concern.

According to PROXY *Governance*'s analysis, the company's executive compensation appears reasonable compared to peers and given relative financial performance.

**Rationale/Conclusion:**

The company's compensation structure is reasonable and clearly disclosed. In addition, the company utilizes realistic performance goals for executives while preserving a valuable deduction for the company.

[back to top]

---

Management

| 6 | **Reapprove Performance Unit Plan Criteria for OBRA** |

**PROXY *Governance* Vote Recommendation: FOR**

**Proposal:**

To re-approve the material terms of the Performance Unit Plan for purposes of Section 162(m) of the Internal Revenue Code.

**Management View:**

Approval of the proposal will ensure that bonus awards to executive officers will be considered qualified performance-based compensation and will be fully deductible to the company for federal tax purposes.

**Analysis:**

- Eligibility: Number of eligible participants not disclosed
- Annual limit per participant: 0.3% of the consolidated net income of the company for that year
- Previous year's bonuses: Undetermined
- Performance goals for previous year's bonuses: Economic profit growth and sales growth

PROXY *Governance* takes a holistic approach to executive compensation, examining all components of executive pay including salary, bonus plans and equity plans. We then review that data to determine how the executives are paid relative to their peers and relative to the company's financial performance versus its peers.

With regard to approving performance measures to meet the requirements for the tax deductibility under Section 162(m) of the Internal Revenue Code, we look at the overall nature of the proposal, including whether the performance criteria seem appropriate, if the company clearly and concisely discloses how and when the goals are set, and what the maximum levels of compensation, particularly for the principal executive officers, will be. While we recognize that, in a plan which will presumably be in effect for several years, the Compensation Committee must retain the flexibility to adjust the criteria or the weighting of those criteria depending on circumstances and the objectives set for the corporation in any given year, we also note that shareholders frequently feel that the language of the plans affords so much latitude that it is impossible for them to know or understand what they are approving.

In that sense, whether the compensation awarded under the plan is reasonable and appropriate in light of the company's performance can frequently be evaluated only in retrospect, and will be an important factor in PROXY *Governance*'s evaluation of the effectiveness of the Compensation Committee members. It is our view that, if the company's overall executive compensation is excessive under our pay-for-performance model, ensuring that it is tax deductible becomes a secondary concern.

According to PROXY *Governance*'s analysis, the company's executive compensation appears reasonable compared to peers and given relative financial performance.

**Rationale/Conclusion:**

The company's compensation structure is reasonable and clearly disclosed. In addition, the company utilizes realistic performance goals for executives while preserving a valuable deduction for the company.

[back to top]

| Shareholder |
|---|
| **7** | **Award Pay for Superior Performance** |
| **PROXY *Governance* Vote Recommendation: AGAINST** |

**Proposal:**

The proponent requests that the Executive Compensation Committee establish a pay-for-superior-performance standard with the following principles:

- The annual incentive component should utilize financial performance criteria that can be benchmarked against peer group performance, and provide that no annual bonus be awarded unless the company exceeds the median or mean performance of a disclosed group of peer companies on the selected financial criteria;
- The long-term equity compensation component should utilize financial and/or stock price performance criteria that can be benchmarked against peer group performance, and any options, restricted shares, or other equity compensation used should be structured so that compensation is received only when company performance exceeds the median or mean performance of the peer group companies on the selected performance criteria; and
- Plan disclosure should allow shareholders to monitor the correlation between pay and performance.

**Proponent:**

United Brotherhood of Carpenters Pension Fund

**Shareholder View:**

The proponent contends that a critical design feature of a well-conceived executive compensation plan is a close correlation between the level of pay and the level of corporate performance. The proponent believes that the failure to tie executive compensation to superior corporate performance has fueled the escalation of executive compensation and detracted from the goal of enhancing long-term corporate value. In the proponent's view, two common and related executive compensation practices have combined to produce pay-for-average-performance and escalating executive compensation: (1) executive compensation levels targeted at peer group median levels and (2) performance criteria and benchmarks are calibrated to deliver a significant portion of the targeted amount.

The proponent believes that the company's compensation program fails to promote the pay-for-superior-performance principle, and that a new plan to reward only superior corporate performance will help moderate executive compensation and focus senior executives on building sustainable long-term corporate value.

**Management View:**

The board believes that executive compensation at the company is not excessive and is designed to be competitive with the companies with which the company competes for executives. A compensation program that would provide no incentive compensation for performance that was in line with peers would put the company at a disadvantage with regard to attracting and retaining executive talent. The board believes that its Compensation Committee has developed a compensation program that promotes the company's success and should be allowed the flexibility to continue to craft such programs.

**Analysis:**

PROXY Governance takes a holistic approach to executive compensation, examining all components of executive pay including salary, bonus plans and equity plans. We then review that data to determine how the executives are paid relative to their peers and relative to the company's financial performance versus its peers. Where executive pay is out of line with performance, we may be inclined to support shareholder initiatives asking the board to structure its executive compensation program so that it appropriately rewards for superior performance. Accordingly, our focus will be on executive compensation packages as a whole rather than on its components.

We believe that the company's executive compensation practices are reasonable compared to peers and given relative financial performance. Moreover, we do not perceive a pay-for-performance problem at the company. Compensation, in fact, appears to be slightly below that of peers while the company's overall performance has been good overall (although we recognize that the company's stock price has not reflected this performance).

We agree with the proponent in strongly advocating performance metrics based on relative performance. We note that the company bases certain performance goals related to annual incentives on absolute targets, it does not appear to condition any of its compensation on targets which are benchmarked to peers. We believe that some compensation could easily be tied to such benchmarks, such as total shareholder return compared to peers. Still, given the company's performance and current executive compensation levels, we do not believe that the proposal here is necessary.

Lastly, we note that the proposal is limiting in the sense that it advocates no incentive pay if performance does not exceed that of the peer median/average. The company would not be competitive in attracting executives if total pay were

substantially below that of companies with comparable performance.

A similar proposal at the 2006 annual meeting received support of 34.1% of shares voted at the meeting.

**Rationale/Conclusion:**

The proposal appears to be too prescriptive for this company given its solid financial performance and reasonable overall pay levels.

[back to top]

© 2007 by PROXY Governance, Inc.™ All Rights Reserved. The information contained in this proxy analysis is confidential, for internal use only in accordance with the terms of the subscriber's subscription agreement, and may not be reproduced or redistributed in any manner without prior written consent from PROXY Governance, Inc. All information is provided "as is" and without any warranty to accuracy, is not intended to solicit votes, and has not been submitted to the Securities and Exchange Commission for approval. The information should not be relied on for investment or other purposes.
Proponents and issuers written about in PROXY Governance research reports may be subscribers to PROXY Governance's proxy voting and/or research services. Although PROXY Governance often confers with both proponents and issuers to ensure the accuracy of data, and to obtain an in-depth understanding of matters and positions, neither proponents nor issuers are involved in the preparation of the report or voting recommendations and PROXY Governance independently prepares such reports and recommendations.